1

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2
   UNITED STATES OF AMERICA,
3
                        Plaintiff,
4
        vs.                 CRIMINAL ACTION NUMBER:  1:17CR51
5
   JAMES L. LAURITA, JR.
6
                        Defendant.
7
```

### TRIAL – DAY 1

```
8
       Proceedings had in the Trial of the above styled action
9
   on January 29, 2018 before The Honorable Irene M. Keeley,
10
   Senior Judge, at Clarksburg, West Virginia.
11
   APPEARANCES:
12
   FOR THE PLAINTIFF:      JAROD J. DOUGLAS, ESQUIRE
13                          RANDOLPH J. BERNARD, ESQUIRE
                            Assistant United States Attorney
14                          P.O. Box 591
                            Wheeling, West Virginia   26003
15                          304-234-0100

16 FOR THE DEFENDANT:       JOHN A. CARR, ESQUIRE
                            179 Summers Street, Suite 209
17                          Charleston, West Virginia   25301
                            304-344-4822
18
                            MICHAEL B. HISSAM, ESQUIRE
19                          Bailey & Glasser
                            209 Capitol Street
20                          Charleston, West Virginia   25301
                            304-345-6555
21
   The defendant was present in person.
22
   Proceedings recorded by stenomask, transcript produced by
23 official court reporter.

24

25
```

**LINDA L. BACHMAN, CCR, CVR–M, OFFICIAL COURT REPORTER**
**P.O. BOX 969, CLARKSBURG, WEST VIRGINIA   26302–0969**
**304–282–0395**

2

1                          **I N D E X**

2  **WITNESS**              **DIRECT**  **CROSS**  **REDIRECT**  **RECROSS**

3  (For the Government)

4  Karen Hughes              37      75       88        93

5

6  Government Opening Statement – Page 19

7  Defendant Opening Statement – Page 26

8

9  **EXHIBITS**                          **ADMITTED**

10 Government Exhibit 1-3                   42
   Government Exhibit 1-4                   45
11 Government Exhibit 1-23                  47
   Government Exhibit 1-29                  49
12 government Exhibit 1-22                  54
   Government Exhibit 1-69                  57
13 government Exhibit 1-86                  58
   Government Exhibit 1-96                  59
14 Government Exhibit 50                    64
   Government Exhibit 51                    64
15 Government Exhibit 52                    64
   Government Exhibit 53                    69
16 Government Exhibit 66                    70
   Government Exhibit 8                     72
17 Government Exhibit 9                     74
18

19

20

21

22

23

24

25

3

```
 1                      P R O C E E D I N G S
 2              (01-29-2018, 2:00 p.m., defendant present)
 3              THE COURT:  Thank you.  Please be seated.  Are
 4    there any matters to bring up and decide before the jury
 5    comes in?
 6              MR. DOUGLAS:  No, Your Honor.
 7              MR. CARR:  No, Your Honor.
 8              THE COURT:  All right.  No motion was filed
 9    regarding sequestering of witnesses.  Is there anyone who
10    wishes to raise that before we begin?
11              MR. DOUGLAS:  Not by the Government.
12              MR. CARR:  Yes, Your Honor.  We would make a motion
13    to sequester the witnesses.
14              THE COURT:  All right.  Excluding the case agent,
15    any witnesses who plan to testify in this case on behalf of
16    either the Government or the defendant are excluded, the
17    rule having been invoked.  Is there anyone who needs to
18    leave?  All right.  Please look around, Counsel, to make
19    sure.  No potential witnesses in the case?
20              MR. DOUGLAS:  Correct.
21              MR. CARR:  No, Your Honor.
22              THE COURT:  Okay.  Then we can bring the jury in.
23    Thank you.
24         (Jury in 2:05 p.m.)
25              THE COURT:  All right.  If the two--if Alternates
```

4

1     Three and Four will take the bench as they were before

2     lunch.  Thank you.  All right, Ladies and Gentlemen, look

3     around and make sure you're in your proper seat and I would

4     suggest that in the future when you come in it's best to do

5     what you do in grade school, get in line according to your

6     number and then come in that way and the back row first and

7     then the front row and then you won't any mix up.  Please be

8     seated.  Thank you.

9         All right, Ladies and Gentlemen, as I told you before

10    lunch, we will now do the preliminary instructions.  What

11    I'm about to say is somewhat familiar to you but not all of

12    it.

13        Now you have in front of you notebooks and pencils.

14    I'll explain that further to you but those are your

15    notebooks to use during the trial.

16        What I am about to say is intended to serve as an

17    introduction to the trial of this criminal case.  It is not

18    a substitute for the more detailed instructions on the law

19    that I will give to you at the close of the case before you

20    hear the closing arguments of the attorneys and then retire

21    to consider your verdict.

22        These preliminary instructions will help you, I hope,

23    better understand what will be presented to you during the

24    course of the trial and how you should conduct yourselves

25    during the trial.

1    Now we met this morning.  I am Judge Keeley, but you're

2    probably wondering who some of the people in the courtroom

3    besides the attorneys and Mr. Laurita, to whom you were

4    introduced this morning are.

5    Seated below me with the mask and taking down absolutely

6    every word we say in the courtroom is Linda Bachman, the

7    Court Reporter.  Okay.

8    And you have met Debbie next to her.  Debbie is our

9    Courtroom Deputy and she's really the person in charge.  She

10   keeps track of all the evidence.  You'll see the lawyers

11   giving her the evidence after it's been admitted and they

12   have used it with the witness.  She keeps track of all of

13   that and she is also here to assist you with any issues that

14   may arise during the trial.

15   And next to me on my left is Jim McDaniel, whom I always

16   introduce to juries as the brains of the operation.  He is

17   my Law Clerk and he works with me when we're reviewing

18   particularly issues of law that arise in the case so he's

19   here in the courtroom taking notes and then of course we're

20   always conferring.  In the law we have a nickname for the

21   kind of Law Clerk it is.  It's called an Elbow Law Clerk and

22   all that means is he's at the Judge's elbow, okay, but he's

23   a recent graduate of West Virginia University College of

24   Law.

25   Also I have two externs from West Virginia University

1    College of Law sitting in the courtroom and they're over

2    there at the--at the far end.  They're here for the semester

3    simply observing and learning, well we hope they're

4    learning, but they're--they're here for that purpose.

5        And from time to time, coming in and out of the

6    courtroom, as you know, will be Court Security Officers and

7    you've already met some of them as you've been escorted to

8    the jury room and into the courtroom.  They move on a

9    schedule so when they enter or leave the courtroom you

10   should not be concerned or confused.  It is simply their

11   regular schedule.  Okay.

12       Now during the trial, and beginning with these

13   preliminary instructions, you are going to hear some terms

14   that you may not have heard used before, or if you've heard

15   them you may not have heard them in the same context so let

16   me explain briefly just a few of them.

17       Sometimes you will hear me refer to counsel, that's

18   spelled c-o-u=n-s-e-l and that means attorneys.  Another way

19   is to say the lawyers in the case.

20       I will sometimes refer to myself as the Court.

21       The prosecution and the defendant are sometimes called

22   the parties to the case.

23       If you hear me sustain an objection to the admission of

24   evidence, what I am doing is excluding or keeping out that

25   evidence from the trial for a good reason.

7

1      When you hear that I have overruled an objection to some

2   evidence, I am permitting that evidence to be admitted.

3   I'll sometimes say it may come in.

4      When we say admitted to evidence or received into

5   evidence, we mean that this particular statement or a

6   particular exhibit will now become part of the trial and may

7   be considered by you when you deliberate to your decision in

8   the case.

9      The term burden of proof is one you heard me use this

10  morning and there's another term, sustaining its burden of

11  proof, means the obligation of a party of proving its case

12  in this trial.  Here the Government is the one bearing the

13  burden of proof and that obligation is to produce proof

14  beyond a reasonable doubt.

15     This is a criminal case commenced by the United States.

16  During the course of the trial the United States may be, and

17  already has been, sometimes referred to as the Government,

18  sometimes as the prosecution.

19     The case is against the defendant James L. Laurita, Jr.

20  whom you met this morning.  The case is based upon an

21  Indictment.  Now from the jury selection process you are

22  acquainted with the general nature of the charges contained

23  in this Indictment.  You must distinctly understand that an

24  Indictment is simply a charge or charges by the Government

25  to begin a case and it is not in any sense at all evidence

1     of the allegation it contains.  An Indictment is merely a

2     formal method of accusing a person of the commission of an

3     offense or offenses.

4         Mr. Laurita has earlier entered a plea of not guilty to

5     each of the charges contained in the Indictment.  The burden

6     therefore is on the United States to prove each of the

7     essential elements of the charges contained in the

8     Indictment beyond a reasonable doubt.  The purpose of this

9     trial is to determine whether the United States can meet

10    this burden of proof as to Mr. Laurita.  I instruct you that

11    you must presume that Mr. Laurita is innocent of all the

12    charges in the Indictment.

13        Now this trial will proceed through five basic stages.

14    Let me summarize.  First, the parties, through their

15    attorneys, will make an opening statement.  The United

16    States will make its opening statement at the beginning of

17    the case.  That is usually followed by the defendant's

18    opening statement but the defendant may postpone the making

19    of an opening statement until after the Government finishes

20    its case in chief.  Neither party is obligated to make an

21    opening statement but it is traditional to do so.

22        Now what is said in opening statement is not evidence.

23    This deviates from what you say on TV.  Opening statements

24    serve the purpose of introducing you, the jurors, to the

25    evidence that the party making the statement intends to

1    produce during the course of the trial.  That's phase one.

2        Second stage.  After any opening statements the United

3    States will then proceed to introduce evidence that it feels

4    supports the charges contained in the Indictment.

5        In the third stage, after the United States has

6    presented its evidence, the defendant may then proceed to

7    present evidence but he is not obligated to do so.  As I

8    have explained, in a criminal case the burden is always on

9    the Government to prove each and every essential element of

10   the offenses charged beyond a reasonable doubt.  The law

11   never requires a defendant, such as Mr. Laurita, in a

12   criminal case to call any witnesses or to introduce any

13   evidence.  The defendant is presumed to be innocent of all

14   the changes.

15       In the fourth stage after all the evidence has been

16   received, I will then give you orally and in a written copy

17   for each of you the final instructions on the law that you

18   must apply to the evidence received during the trial.  Those

19   instructions will be much more detailed than these.

20       Finally, the fifth stage.  After you have heard my

21   instructions the attorneys for each party will have the

22   opportunity to present oral argument to you in support of

23   their case.  This is called closing argument.  What is said

24   in closing arguments is not evidence, just as what is said

25   in the opening statements is not evidence.  The arguments

1    are designed to present to you the contentions of the

2    parties as to what they believe the evidence has shown and

3    what inferences they believe may fairly be drawn from the

4    evidence.  The Government has the right to open and close

5    the final arguments because it bears the burden in the case.

6         You will then retire to consider your verdict.  That

7    means you go to the jury room.  It doesn't mean you quit

8    your job and stay with the verdict.  Your verdict must be

9    unanimous.  Indeed all twelve of you must agree to it as to

10   each of the charges in the Indictment separately.  You have

11   a separate vote on each charge.

12        Your purpose as jurors in this criminal case is to find

13   and determine the facts.

14        You must keep an open mind to both sides during this

15   trial.

16        Under our system of criminal procedure, you and you

17   alone are the sole judges of the facts.  If at anytime

18   during the course of the trial I should make a comment

19   regarding the facts of the case you may disregard those

20   comments.

21        It is especially important that you perform  your duties

22   of determining the facts in the case diligently and

23   conscientiously for ordinarily there is no means of

24   correcting an erroneous determination of the facts by the

25   jury.

1       On the other hand, and with equal emphasis, the law as I

2   will give it to you in my instructions constitutes the only

3   law for your guidance and it is your duty to accept and

4   follow the law given to you by me in my instructions, even

5   though you may disagree with it or believe that the law

6   should be otherwise.

7       You are to determine the facts in the case solely from

8   the evidence admitted and that will consist of the testimony

9   of the witnesses and the exhibits received.  Questions, here

10  again we differ from TV, questions asked by the lawyers are

11  not evidence for the evidence consists of the witness'

12  answers to the questions, not the questions themselves.

13      As I said earlier, statements and arguments by the

14  attorneys are not evidence.

15      The attorneys, however, may enter into agreements or

16  what we call stipulations of facts which are not in dispute,

17  and when they do so, you may accept those facts as

18  stipulated by the attorneys.

19      I may also tell you that I am taking what's called

20  judicial notice of certain facts.  If I do that you may

21  accept those facts as true as well.  However, it is always

22  up to you to decide what facts are established by the

23  evidence and what inferences are to be drawn from those

24  facts.

25      There are two kinds of evidence, direct and

1    circumstantial.

2        Direct evidence is testimony by a witness about what

3    that witness personally saw or heard or did.

4        Circumstantial evidence is indirect evidence; that is,

5    proof of one or more facts from which another fact can be

6    found.

7        Now in this case you may consider both direct and

8    circumstantial evidence in deciding this case.  The law

9    permits you to give equal weight to both but it is up to you

10   to decide how much weight to give any of the evidence.

11       Some evidence may be admitted for what we call a limited

12   purpose.  When the Court instructs you that an item of

13   evidence has been admitted for a limited purpose, that is

14   the only purpose for which you may consider it.

15       During the course of the trial, the parties may

16   sometimes object to some of the testimony or other evidence.

17   It is the duty of an attorney to object to evidence that he

18   believes may not properly be offered.  You should not be

19   prejudiced in any way against an attorney or that attorney's

20   client when an objection is made to evidence presented by

21   the other party.  An objection is the only proper method of

22   requesting a ruling from the Court concerning evidence.

23       At times I may sustain the objections, directing that

24   you disregard certain testimony or keeping evidence out.

25   Should I do that, you must not consider any evidence to

1   which an objection is sustained or that I have instructed

2   you to disregard.

3       From time to time during the trial it may become

4   necessary for me to talk with the lawyers privately out of

5   your hearing about various evidentiary or procedural issues.

6   You saw how that works this morning, Ladies and Gentlemen.

7   You must understand that while you are waiting, we are

8   working.  We are not trying to hide everything--or anything,

9   I should say, but the purpose of these conferences is not to

10   keep relevant evidence from you but to decide how certain

11   issues are to be treated under the rules of evidence so as

12   to avoid confusion and error.  I will do what I can to keep

13   the number and length of these conferences to a minimum.  I

14   may not always grant a lawyer's request for a conference.

15   Do not consider my decision whether to grant or deny a

16   request for a conference as any indication of my opinion of

17   the case or of what your verdict should be.

18       You are the sole judges of the facts, as I've said, so

19   as the sole judges of the facts, you must determine which of

20   the witnesses you believe, what portion of their testimony

21   that you will accept, and what weight, if any, you will

22   attach to it.

23       The law requires that your verdict be based solely upon

24   what we call competent evidence before you so if I exclude

25   items from your consideration, it will be because in my

1    opinion those--that evidence is not legally admissible.

2        The law does not, however, require you to accept all the

3    evidence that will be admitted, even though it will be

4    competent evidence.

5        In determining what evidence you will accept, you must

6    make your own evaluation of the testimony given by each of

7    the witnesses and determine the degree of weight,

8    credibility and value you choose to give the testimony of

9    each witness.

10        The testimony of a witness may fail to conform to the

11    facts as they occurred for a variety of reasons.  The

12    witness may be intentionally telling a falsehood.  The

13    witness may not adequately have heard or seen the fact about

14    which the witness has testified or it may be that the

15    witness' recollection of the event is faulty or because he

16    or she has not expressed himself clearly in giving

17    testimony.

18        I cannot give you a magic formula by which to evaluate

19    witness testimony, but you bring with you to the courtroom

20    all of the experience and background of your lives.  In your

21    everyday affairs you determine for yourselves the

22    reliability or unreliability of statements made to you by

23    others.  Those same tests that you use in your everyday

24    dealings are the tests to apply here in your deliberations.

25        Let me give you some examples.  The interest of a

1    witness in the outcome of the case, if any; the bias or

2    prejudice of a witness, if any; a witness' age, appearance;

3    the manner in which each witness presents testimony from the

4    witness stand; the opportunity that each witness had to

5    observe the facts about which the witness testifies.

6        The probability or improbability of each witness'

7    testimony, when viewed in light of all the other evidence in

8    the case, are all items to be taken into consideration by

9    you in determining the weight and value, if any, that you

10   will assign a particular witness' testimony.

11       If the kinds of considerations that I've suggested make

12   it appear that there is a discrepancy in the evidence, then

13   you will have to consider whether the apparent discrepancy

14   or differences may be reconciled or resolved by fitting the

15   stories together.  If that is not possible however, you will

16   then have to determine which of the conflicting versions you

17   accept.  Thus, you give the testimony of each witness such

18   weight and value as you believe it deserves.

19       Do not read or review any news accounts about this case

20   in any newspaper or watch such accounts on TV.  Do not

21   listen to any such news accounts on the radio.  In other

22   words, do not consider anything that you have read or heard

23   about the case outside of the courtroom, whether before,

24   during or after the trial--or after your deliberations,

25   excuse me.

1      Do not attempt any independent research or investigation

2  about this matter.  As I suggested earlier, you cannot go on

3  your phone or your tablet or to a computer and look the case

4  up on Google or see what's trending on some account.  It's

5  not allowed.  No independent research or investigation.

6      Until the case is submitted to you, do not discuss it

7  with anyone, not even with your fellow jurors.  Why?

8  Because it's important that you keep an open mind throughout

9  the trial and not decide any issue in the case until all the

10 evidence is in and only after you've heard my instructions

11 and the closing arguments of the attorneys and then only

12 after you've had an opportunity to exchange views among

13 yourselves about the evidence in the case.

14     During the course of the trial, as I said to you before

15 lunch, don't permit any third person to discuss the case

16 with you or in your presence.  Should anyone, and that

17 includes your family, persist in attempting to discuss the

18 case with you in spite of your telling them not to do so,

19 you need to report this fact to me, either directly or

20 through Court Security or Debbie, as soon as possible.

21     I know it's a normal human tendency to converse with

22 people with whom one is thrown in contact but I instruct you

23 not, during the time you serve on this jury, to have any

24 conversation whatsoever either in or outside the courtroom

25 with the parties or their attorneys or any witness in the

1   case.  By this I mean you should have no conversation at

2   all, even to passing the time of day.  The attorneys and the

3   parties will not speak with you because I have already

4   instructed them that they must not.  It simply does not look

5   appropriate for one side or the other in this case to be

6   speaking with any one of you, no matter how innocent or

7   trivial the conversation might in fact be.  So when you come

8   in with WVU regalia on, you can't discuss the Kentucky game.

9   Who wants to talk about that game anyway?

10      The reason for this, Ladies and Gentlemen, it's not a

11  light matter, is that there's no other way that all the

12  parties can be assured of your absolute impartiality.

13      The defendant, the attorneys in the case and the public

14  generally are entitled to expect absolute impartiality from

15  you as jurors.

16      To the notebooks.  If you wish, you may take notes to

17  help you remember what the witnesses said.  That's

18  particularly helpful for those of you who are inclined to do

19  so when the case may involve a number of witnesses.

20      If you do take notes, please keep them to yourself until

21  you and your fellow jurors go to the jury room to decide the

22  case and we'll be picking them up from you during our

23  recesses and when we adjourn at the end of a day.  They'll

24  be kept in our safe.  No one here looks at them.  They're

25  returned to you with your juror number.  You're going to

1   write your number, if you haven't already, on the back of

2   the notebooks.

3        Do not let note taking distract you so that you do not

4   hear other answers by witnesses.  You know how that can be.

5   You start writing and then the case moves on and suddenly

6   you didn't hear the next question.

7        So when you leave the courtroom, I'll be instructing you

8   to leave your notebooks face down on your chairs.

9        Notes, while helpful, are not entitled to any greater

10  weight than the memory or impression of each juror as to

11  what the testimony may have been so whether you take notes

12  or not, each of you must form and express your own opinion

13  as to the facts of the case.

14       If you do not take notes, then you should rely on your

15  own memory of what was said and not be overly influenced by

16  the notes of other jurors.

17       In conclusion, let me remind you of a few key principles

18  that we will adhere to as we begin this trial.

19       Your job is to decide all the factual issues in the

20  case, like who should be believed and who should not be

21  believed.

22       I will decide all the legal questions, like what

23  testimony and exhibits are received into evidence and which

24  ones are not.  Please do not concern yourselves with the

25  legal questions.

1   The defendant, Mr. Laurita, has pled not guilty and he

2   is presumed to be innocent of the crimes charged.  As such,

3   he is not required to produce any evidence whatsoever.

4   By bringing the Indictment, moreover, the Government has

5   accepted the responsibility of proving his guilt to the

6   charges, each one individually, unanimously beyond a

7   reasonable doubt.

8   Please don't discuss this case with anyone and keep an

9   open mind until all the evidence has been received.

10   At the close of the evidence in the case I will be able

11   to give you complete and final instructions on what the law

12   is in the case, much more detailed than what you're

13   presently hearing.

14   Then, and only then, will you be fully prepared to begin

15   your deliberations and reach your verdict.

16   Ladies and Gentlemen, that concludes the preliminary

17   instructions.

18   We'll now hear from the parties in what, as I told you

19   earlier, are called opening statements.  The Government may

20   begin.  Mr. Douglas.

21   MR. DOUGLAS:  Thank you, Your Honor.

22   THE COURT:  You're welcome.

23   GOVERNMENT OPENING STATEMENT

24   MR. DOUGLAS:  This case is about abuse of trust and

25   abuse of authority.  The evidence will show that the

1   defendant abused the public trust when he attempted to

2   influence federal candidates through unlawful campaign

3   contributions.  The evidence will also show that he abused

4   his authority as president and CEO of a company by directing

5   his employees and their spouses to make these contributions

6   on his behalf and by causing his company to fund these

7   contributions without any approval.

8       So what happened?  The evidence will show that between

9   2010 and 2013 the defendant directed his eight executives

10  and their spouses to make contributions to candidates of his

11  choosing and he did so with company money, entirely

12  undetectable to the Federal Government, in this case the

13  Federal Election Commission.

14      You'll hear from all eight of the executives and they

15  will tell you that the defendant controlled every aspect of

16  these contributions.  He told them the candidates, how much,

17  when and sometimes where as well as whether the spouse would

18  be required to contribute.

19      You'll hear that the defendant would bundle the checks

20  together and sometimes personally deliver the checks to the

21  campaigns as if he had lawfully raised the money.

22      But most importantly you will hear again that he caused

23  the company, through what they called bonuses, to fund these

24  contributions.  They were not bonuses and you'll hear that

25  from all eight of the executives.

1    You'll hear that this program only ended in 2013 because

2   the company filed bankruptcy and the bankruptcy attorney

3   started asking questions about these extra bonuses.

4    So, what's the problem?  Well, first, federal law places

5   limits on how much an individual can contribute to a

6   candidate.  For example, it may be twenty-four hundred

7   dollars for this election; twenty-four hundred dollars for

8   this election.

9    Then you might expect as well that federal law prohibits

10   going around this individual limit.  For example, prohibits

11   an individual from using other individuals as puppets to

12   make contributions with money they're giving them to make

13   them when they're really controlling every aspect.  Those

14   are referred to as conduit contributions.  Those individuals

15   are mere conduits of the individual behind them and their

16   money.

17    Another problem with conduit contributions is that

18   campaigns are required by law to report where they're

19   getting their money that is supporting their campaign; the

20   name, the employer of the individual that is contributing.

21    In these cases of conduit contributions, they're getting

22   false information and they're reporting the false

23   information, the campaigns are, to the Federal Election

24   Commission, which is then publishing false information to

25   you and us, the public, and it's going to be very important

1    in this case to prove what the defendant knew about that law

2    in a general sense that I just explained to you.

3         So first of all, what will be the evidence of what the

4    defendant knew on limitations on individuals and how much

5    they can contribute?

6         First, you will see e-mail correspondence which will

7    prove that he was aware of the individual limitation.  You

8    will see e-mails where people are telling him what the

9    specific individual limitation is.  You will see an

10   e-mail--at least one e-mail from him telling someone else

11   what the individual limitation is.  You will see that he

12   received, over this three year time period, numerous

13   fundraiser invitations which specified what the limit was.

14   You will see and hear from his secretary, who drafted

15   invitations for fundraisers he was hosting that has in the

16   language of the invitation what the limitations are.  You

17   will see that he, himself, the defendant, made personal

18   contributions where he was required to fill out contribution

19   forms which told him what the individual limits were.  You

20   will see that he was asking the executives to make

21   contributions at the maximum--at the maximum individual

22   limitation so he could max out all the money he wanted to

23   give to candidates and then just the general sense of him

24   jumping through these hoops and using these people to make

25   contributions shows that he knew an individual like himself

1    was limited to only a certain amount.

2        Next, with regard to the law and how it prohibits what

3    we call the conduit contributions, using other people to

4    make contributions with your money, here's what we'll see.

5        First.  You'll see that some candidates require the

6    contributor to fill out a contribution form and you'll see

7    one particular one that he himself filled out and signed and

8    he signed to confirm that quote:  "No one has advanced you

9    funds for the purpose of making this contribution and that

10   no one will reimburse you for it".  The very thing that he

11   was doing, he signed confirming to that candidate he was not

12   doing in that instance.

13       You will also see through his e-mail--through the

14   e-mails that went through his account, both to and from,

15   other fundraiser invitations and not just--this isn't junk

16   mail.  This isn't it comes through, it's deleted.  He is

17   hosting the fundraiser and those fundraiser invitations will

18   include language such as, contributions must be made from

19   your own funds and funds cannot be provided to you by

20   another person or entity for the purpose of making this

21   contribution.  That is in the--in the invitation for Mark

22   Critz, a Pennsylvania Congressional candidate.  You'll see

23   that at least five times over a three year period and again

24   invitations for his own fundraisers.  He's approving these

25   invitations that his secretary is writing and he is

1   approving them to be sent out to those that are being

2   invited to his fundraiser.

3        But, this isn't a--just a document case.  This is a

4   common sense case as well and you will hear evidence that

5   the defendant purposely sought to contain information about

6   this program to the group.  You will see--you will hear that

7   he did not seek approval from their parent company.  You

8   will also see that he did not inform the capital firm that

9   was providing funds for a two billion dollar project and was

10  requesting financials on a weekly basis, did not inform them

11  what these other bonuses were being used for.

12       He also did not inform an auditor who conducted an audit

13  on an annual basis, including at least two times during this

14  program of what these other bonuses were and they just

15  weren't bonuses.

16       But you're also going to hear first from Karen Hughes.

17  She was the defendant's secretary and treasurer.  She had

18  worked for the defendant for--or with him and known him for

19  forty years.  She played certain roles for him, had certain

20  tasks in this program.

21       Number one, she would communicate to the group what

22  instructions he was giving her; candidate, amount, spouse,

23  when it's needed by and in this regard you will hear from

24  her that he restricted her in two ways.  He gave her two

25  rules.  The first one was to not communicate about this

1     program outside of the group of people that were being asked

2     to make the contributions.  You will hear from her that this

3     caused her to ask the group to delete certain e-mails about

4     the program and the second rule was, when you're

5     communicating these instructions, always ask, don't tell and

6     you'll hear from her that this caused her to use certain

7     soft language like suggested.  It's suggested that you make

8     this contribution to Senator Manchin.  It's requested that

9     it be in this amount.  This was false.  Just by the

10    mechanism of how this program worked, it's false.

11        The bonuses were advancements, a large pool of money, at

12    times almost up to fifteen thousand dollars per individual.

13    Here's fifteen thousand dollars.  I'm going to come around

14    and ask you to make it to McKinley.  You're not going to

15    tell me no.  So the mere fact of asking her to say ask,

16    don't tell, is false and goes towards his intent.

17        And then finally with regard to the false reporting to

18    the Government, to the Federal Election Commission with

19    regard to what his state of mind was.  You will also see

20    e-mail correspondence showing that he was aware that the

21    campaign committees were required to regularly report the

22    contribution.  In fact, there's at least one example where

23    he's providing a name to the campaign directly of what to

24    report.

25        The evidence will also show that he knew that the

1    campaigns were not aware that he was causing his company to

2    fund these contributions that the executives were given.  In

3    fact, you'll see at least one e-mail where they're talking

4    with him about raising the money, as if he's raising it.

5    This is not raising money.  This is funneling money.

6        And then you'll see evidence from some of the FEC

7    reports themselves and of course the campaign committees

8    reported only the information they had, which was that these

9    executives and these spouses of executives were the true

10   sources of these contributions, which is false.

11       Because of this the defendant has been charged with

12   making conduit contributions, with making excessive

13   contributions and with causing false reporting to the FEC.

14       Based upon the evidence we'll return and ask you to find

15   him guilty as charged.  Thank you.

16              END OF GOVERNMENT OPENING STATEMENT

17              THE COURT:  All right.  Mr. Parr (sic).

18              MR. CARR:  Thank you, Your Honor.

19              THE COURT:  You're welcome.  I said Mr. Parr, Mr.

20   Carr.  Excuse me.

21              DEFENDANT OPENING STATEMENT

22              MR. CARR:  Members of the jury, first I want to

23   thank each of you for being here.  I know each of you may

24   have something better to do this week.  I know many of you

25   are traveling a long way and we're supposed to get some

1    weather this week as well, but the duty that--the function

2    that you have this week is critical, is absolutely critical

3    to the foundation of not only our country but certainly our

4    criminal justice system and on behalf of the defense team

5    and I'm sure everybody in the courtroom we very much

6    appreciate your time and attention this week.

7         How much money can an individual give to a campaign?

8    Can a corporation give to a campaign?  What is a PAC?  How

9    much money can you give to a PAC?  Can a corporation give to

10   a PAC?  Can a PAC give to campaigns?  How does that vary if

11   we're talking about the Democratic or Republican National

12   Committees or the Republican or Democratic Governor's

13   Association?  Campaign finance law is complex.  It's

14   difficult and it's not intuitive.

15        We are not talking about a charge--and that's all it is

16   right now.  As the Judge has instructed you, the Indictment

17   is merely an allegation.  As Mr. Laurita sits here today he

18   is presumed innocent and I would suggest that if you were to

19   return to your deliberation room right now, having heard no

20   evidence or testimony, you would have to find him not

21   guilty.  We are not referring to--you're not dealing with an

22   allegation of something that we expect to be intuitive, a

23   crime like you've heard a couple of those answers this

24   morning during voir dire, murder, sexual assault, malicious

25   wounding, the things that we expect people to know exactly

1     what the rules are.  This is not that kind of case.

2         The Judge has given you preliminary instructions.  I

3     want to mention this now because I believe it is critical in

4     every case and especially this case, at the end of all of

5     the evidence, the Judge, the Court is going to provide to

6     you instructions, instructions on the law and instructions

7     to guide you during your deliberations.  It's interesting.

8     It's expected in this case that may be lengthy and we ask

9     you to pay very close attention to those instructions,

10    especially in this case and as close of attention as you do

11    to the witnesses on the stand and the actual physical

12    evidence that may be introduced.

13        The Court has asked you to keep an open mind until all

14    of the evidence comes in and has also told you that the

15    defense has no burden of presenting any evidence whatsoever

16    and would instruct you that if the defendant, James L.

17    Laurita, Jr., he goes by Jim, that's how I'll refer to him,

18    did not take the stand you could not hold that against him.

19    He has an absolute constitutional right not to do that.

20        Oftentimes young lawyers are told you never broadcast.

21    You never tell the jury until the end of the Government's

22    case as to whether the defendant is going to testify.  I

23    will tell you right now you will hear, when the defense gets

24    the chance to present evidence and testimony, you will hear

25    from Jim Laurita.  He will take the witness stand.  He will

1     be placed under oath and he will tell you what happened.

2          Two very important things that I would like to mention

3     right now.  He will tell you that to his knowledge nearly

4     all, if not all, of the money, the compensation that the

5     executives of his company had, came from the company Mepco

6     and consequently he did not, and does not consider that when

7     an executive made a contribution, went to the grocery store,

8     paid their electric bill, paid for their student's college,

9     that Mepco was paying for it.  That was not Mepco's money.

10          And he will also tell you, and it is not expected that

11    there will be any contrary testimony, that he did not and

12    does not believe that what he did was unlawful, that there

13    was anything wrong with what happened.

14          Mr. Laurita will give you a little bit of background as

15    to some of the entities the Government has mentioned in

16    opening statement.  They didn't mention all the names; they

17    don't have to.

18          Mr. Laurita is involved in the coal business.  He has

19    been ever since he was a little kid.  He worked at his

20    father's mine until he grew up.  He worked there in high

21    school, picked shale out of the coal pile back before they

22    had Prep Plants.  He went to WVU.  He got an Engineering

23    Degree and when he was done he went back to the family

24    business.  He rose through the ranks, got more

25    responsibility and at some point he formed, with his brother

1    and sister, a company called Mepco and he, as president,

2    along with his brother and sister, started to run a coal

3    mine and they grew that coal mine.  The coal mine actually

4    is located north of Morgantown.

5        They grew that company and at some point a group of

6    investors approached him because they wanted to build a

7    power plant and the name of that power plant was going to be

8    Longview and the power plant was going to be located, in

9    effect, right next door to the coal mine.  That power plant

10   was going to use the same coal that came out of Jim's mine

11   but the investors, in order to put the expected two billion

12   dollars into that power plant, needed a guarantee that they

13   would get the coal coming out of that coal mine and so Jim

14   made the decision to sell that family business but he was to

15   remain as President of Mepco.

16       That began.  He put his executive team together.  It is

17   expected that you will hear from the entire executive team,

18   how close they were, how often they met, how much concern

19   they had with the company and with the miners that they

20   employed.

21       Jim will also tell you that before 2008--before the

22   Presidential Election in 2008, he really wasn't involved in

23   politics.  He never had been.  He didn't contribute money.

24   He didn't go to fundraisers.  It wasn't something he

25   concerned himself with.  He was running a coal mine.

1      In fact in 2008, as perhaps all of you remember, Barack

2  Obama ran against John McCain.  He contributed to neither

3  candidate.

4      He will tell you that he was a member of the West

5  Virginia Coal Association, as all producers were at the

6  time.  Producers meaning people who mine coal, the company

7  presidents and there was some concern with statements that

8  one of the candidates had made beforehand about bankrupting

9  the coal industry but Jim will tell you that he understood

10 generally within the industry and within the coal

11 association and even within the company, it wasn't believed

12 that that could actually happen, that there would be a

13 significant impact on the coal industry, but after the

14 election something changed.  Permits were yanked.

15 Regulation legislation was introduced, which in effect would

16 mean that as soon as that power plant, Longview, came on

17 line, it would be shut down.

18     Jim will tell you that both within the coal association,

19 as well as the investors in parent companies, it was an

20 effort amongst the leaders in the industry to become more

21 politically active and to fight this war on coal, as many

22 were calling it.

23     Unfortunately at this time, Longview, the power plant,

24 as you might imagine, two billion dollars, a number of

25 permits, a lot of government regulations, a lot of

1    construction, was behind schedule.

2        Mepco was not in terrific financial shape.  Across the

3    company wages and salaries were not commiserate with the

4    industry.  Mepco was actually up for sale.

5        Jim went back, he will tell you, in March of 2010 and

6    met with the executives and asked them--told them what he

7    had been told about the industry becoming more politically

8    active and asked them if they wanted to participate and Jim

9    will tell you and it's not been disputed, they all agreed.

10   They agreed with the need to protect the miners, the company

11   and the industry.

12       Jim knew that their compensation was low.  Jim had two

13   ways of increasing compensation, neither one of which

14   required Board approval at all.  He had the authority to do

15   it himself.  One, he could increase base salaries or, two,

16   he could give them an additional discretionary bonus.

17       Jim will explain to you from the stand that he

18   considered raising salaries but the problem is with the

19   company for sale, with expecting it to be sold within the

20   year, he did not want to permanently increase base salaries

21   for a potential buyer and with respect to once the company

22   was sold, there was going to be a compensation package for

23   the executives negotiated into it and so instead this was

24   supposed to be short-lived, he'll tell you he chose to

25   increase their compensation, the money that went into their

1    accounts, just like every other dollar they got from Mepco,

2    increased through the discretionary bonus.

3        There was no effort to hide anything.  The money was put

4    into--the payments were put into the payroll system like

5    anything else.  It was direct deposited into their normal

6    accounts.  There was no effort to hide anything.  It was

7    never, ever denied we will tell you and it's not expected

8    there will be anything to say it was.

9        Once there was an agreement to do this, Jim in effect

10   did handle--hand off to Karen Hughes, just monitor and take

11   care of this.  You can imagine running a coal company takes

12   a lot of time.  He'll tell you he didn't pay much attention

13   to it.

14       It is the case that at times the execs would ask or

15   suggestions would be made to them about which candidates to

16   support and in what amounts.  In fact you will hear that

17   there was disagreement at times amongst the executives as to

18   which candidate to support.  The program was not mandatory.

19       The Government, in opening statement, characterized it

20   as restraints that were put on--that were put on Karen

21   Hughes.  Jim will tell you he was extremely sincere.  There

22   was to be nothing mandatory about it.  The contributions

23   were completely voluntary and Jim did not track them as to

24   who did and did not give.

25       What you will hear though is that someone was tracking

1   and who was that?  The campaigns.  Jim came to learn that

2   the campaigns knew how much money he had given, whether he

3   had quote "maxed out".  The campaigns knew whether the execs

4   had given and would actually send e-mails to him saying

5   three of your execs can still give us money.  Would it help

6   if we called them?  The fact that it was voluntary doesn't

7   mean that it is expected that you will hear everyone

8   thoroughly enjoyed this.  Jim will tell you that he himself,

9   it wasn't something he necessarily enjoyed.  He didn't like

10  to go to the fundraisers but he understood and understood

11  that all the execs agreed that it was important to the

12  miners, to the company, and to the industry for those

13  elected officials and those running for office to understand

14  the importance of what was going on in government, to not

15  only the industry but to their companies.

16      Jim will explain to you there was not any quid pro quo

17  with the executives.  It was not here's a thousand dollars,

18  give me a thousand dollar check.  That's not what happened.

19  He increased their overall compensation.  Did they get more

20  money than they gave?  Did they spend the money on other

21  things?  Jim doesn't know.  There was never any money passed

22  back and again, there was never an effort to hide it.  No

23  one ever said everything about any concern with anything

24  being unlawful, that there could possibly be anything wrong

25  with Mepco increasing their compensation and that the

1    executives being active politically.

2         Unfortunately the sale of Mepco was delayed.  It went

3    through one potential buyer, then another potential buyer,

4    which lasted much longer than anyone thought it was going

5    to.  The 2010 congressional elections, the state elections

6    were a big deal and it continued but unlike what you heard

7    in the Government's opening statement, and again the Court

8    has instructed you that opening statements are not evidence,

9    this did not end because bankruptcy lawyers discovered

10   something.  It ended because it was clear Mepco was going to

11   go into bankruptcy, it appeared that way, and Jim said we

12   have to stop all discretionary bonuses.  We can not be

13   paying extra money to anyone.  Cuts were actually made

14   across the company because the company is going into

15   bankruptcy receivership.

16        At the end of this case when you have heard all the

17   evidence and all the testimony and you go back to your

18   deliberation, after you have heard all the Government's

19   witnesses and testimony, all the defense presentation, as I

20   mentioned the sworn testimony of Jim Laurita, the Government

21   will have been unable to prove beyond a reasonable doubt

22   that the money given by the executives to the campaigns was

23   Mepco money or that Jim Laurita knew that there was anything

24   unlawful about what they had done.

25        Consequently, at the end of the presentation of the

1   evidence, we will ask you to return a not guilty verdict on

2   all counts.  Thank you.

3                    END OF DEFENSE OPENING STATEMENT

4           THE COURT:  Ladies and Gentlemen, that concludes

5   the opening statements.  The Government may now begin its

6   case in chief.  Mr. Douglas.

7           MR. DOUGLAS:  Yes, Your Honor.  United States calls

8   Karen Hughes.

9           THE COURT:  Karen Hughes.  Is someone going to get

10  her?  Have you made those arrangements for someone to do

11  that?

12          MR. DOUGLAS:  Yes, Your Honor.

13          THE COURT:  Thank you.  Ladies and Gentlemen,

14  anyone who's testifying in the case has not been in the

15  courtroom so somebody has to go over to the conference rooms

16  to let the witness know.

17      All right.  Ms. Hughes--good afternoon, Ms. Hughes.  If

18  you would please approach to the front of the

19  courtroom--it's rather a tight squeeze in here, but if you

20  could come before the lady in the green suit, she'll

21  administer the oath to you before you take the witness

22  stand.

23           KAREN HUGHES, GOVERNMENT'S WITNESS, SWORN

24          THE CLERK:  Thank you.  You may have a seat in the

25  witness stand.  The witness is Karen Hughes, H-u-g-h-e-s.

Hughes – Direct

1          THE COURT:  All right.  Ms. Hughes, the gentleman

2     in the blue blazer will assist you to your chair.  Thank

3     you.  Now that is a movable microphone.  As you can se, it's

4     the same as mine and you can make it as comfortable for you

5     to speak into as possible without leaning or doing something

6     awkward.

7          THE WITNESS:  Okay.  Thank you.

8          THE COURT:  Please speak in a loud, clear voice.

9          THE WITNESS:  Okay.

10          THE COURT:  Thank you

11                    DIRECT EXAMINATION

12     BY MR. DOUGLAS:

13     Q.  Ms. Hughes, could you please introduce yourself to the

14     jury?

15     A.  Hello.  My name is Karen Hughes.

16     Q.  And where do you reside?

17     A.  I reside in Masontown, Pennsylvania.

18     Q.  Are you currently employed?

19     A.  I am not.  I'm retired.

20     Q.  What did you retire from?

21     A.  I retired from Mepco as Mepco's secretary-treasurer.

22     Q.  And how long did you work at Mepco?

23     A.  For the company Mepco itself from about the year 2000

24     until 2015.

25     Q.  Could you explain to the jury what Mepco was at that

Hughes – Direct

1    time?

2    A.   During that period of time Mepco had related companies

3    and they mined coal in West Virginia and Pennsylvania and

4    they sold that coal to neighboring power plants.

5    Q.   And when you were the secretary and treasurer, who was

6    your boss?

7    A.   James Laurita, Jr.

8    Q.   Is he the defendant in the courtroom?

9    A.   Yes he is.

10   Q.   How long have you known the defendant?

11   A.   Since about 1974.

12   Q.   Did he hire you on at Mepco?

13   A.   Not--not directly, no.  When his father retired I

14   became--my employment just transferred from his father's

15   company over to his company.

16   Q.   Prior to being secretary-treasurer, what was your

17   position with Mepco?

18   A.   I guess I would classify my position as office manager.

19   I did various duties.

20   Q.   So was your movement to being the secretary and

21   treasurer a promotion?

22   A.   It was.

23   Q.   And who was in charge of promoting you?

24   A.   Mr. Laurita.

25   Q.   Who was the secretary and treasurer before you?

39

Hughes – Direct

1    A.  Jeanie Dehring, who is Mr. Laurita's sister, was the

2    secretary-treasurer prior to mine.

3    Q.  And what happened with her?  Did she leave the company?

4    A.  She did.  She left the company in 2007.

5    Q.  Did your promotion to secretary-treasurer coincide with

6    some type of organizational structural change at Mepco?

7    A.  Yes it did.  In 2007 there was n ownership and a

8    structural change within the company.

9    Q.  And first of all was Mepco previously a corporation and

10   then became LLC's or how did that work?

11   A.  They were--the entities were all incorporated and with

12   the structural change they became LLC's.

13   Q.  Now what about Laurita family ownership, was there a

14   change at that time as well in that regard?

15   A.  Mr. Laurita, James Junior and his two siblings were

16   owners of the incorporated companies and when the ownership

17   changed and the brother and sister left, Mr. Laurita

18   remained with the company.

19   Q.  And were these changes related in any way to the

20   Longview power plant project?

21   A.  Yes they were.

22   Q.  Do you know what the purpose was for making these

23   changes in coinciding with that project?

24   A.  There was an agreement made with an investment firm

25   where the investment firm would contribute capital, both in

Hughes – Direct

1    cash and through loans, to construct the Longview power

2    plant.  When the power plant would be completed Mepco was

3    good to provide a hundred percent of the coal to operate

4    that plant so in order to affect that the two Laurita

5    siblings who left the company decided that it was best for

6    them to leave.

7    Q.  Did the defendant ever share with you how important he

8    believed it was that Mepco had a hundred percent coal supply

9    agreement with Longview?

10   A.  Yes he did.

11   Q.  What did he tell you?

12   A.  That it was very important for Mepco to supply the coal.

13   It provided longevity for the company's success and you know

14   the employees would have long--long standing, good paying

15   jobs.

16   Q.  Okay.  Was there a time when you worked at Mepco when

17   you began to make political campaign contributions?

18   A.  Yes.

19   Q.  Could you describe for the jury how that started?

20   A.  In 2010 Mr. Laurita called a meeting with all the

21   officers where he proposed a plan whereby we would support

22   candidates that were favorable to the coal industry.

23   Q.  Was there any discussion at that initial meeting about

24   whether spouses would also participate?

25   A.  Yes.

Hughes – Direct

1    Q.  What was that discussion?

2    A.  I don't remember the exact words but Mr. Laurita's

3    presentation was that in some cases if the spouses would

4    contribute as well as the officers.

5    Q.  Was there discussion in that initial meeting about how

6    these contributions would be funded?

7    A.  The--each individual--yes there was a discussion.

8    Q.  And what was that discussion?

9    A.  The individual officers would make the contributions and

10   then would receive reimbursement from the company to cover

11   the cost.

12   Q.  And who was explaining that during the meeting?

13   A.  Mr. Laurita.

14   Q.  Was it explained that this is really compensation, you

15   can use it however you want to?

16   A.  No.

17   Q.  What was your understanding for what this money would be

18   used for based on you being at that meeting?

19   A.  The money was to be used for the political

20   contributions.

21   Q.  At that time in 2010 had you ever made a campaign

22   contribution before?

23   A.  Not that I could ever remember.

24   Q.  At that time had your husband ever made a contribution

25   before?

Hughes – Direct

1    A.  I don't believe he did either.

2            MR. DOUGLAS:  Your Honor, may I approach the

3    witness?

4            THE COURT:  You may.

5    BY MR. DOUGLAS:

6    Q.  Ms. Hughes, I've handed you a number of exhibits.  Right

7    now I just want you to look at the first exhibit which is

8    marked as Exhibit 1-3.

9    A.  Okay.

10   Q.  Do you recognize Exhibit 1-3?

11   A.  I do.

12   Q.  What do you recognize it to be?

13   A.  It's e-mail correspondence between Mr. Laurita and the

14   officers of Mepco.

15   Q.  Is it comprised of an e-mail sent from the defendants to

16   the executives?

17   A.  Yes it is.

18   Q.  So it's the defendant's statements that are in the

19   e-mail?

20   A.  Yes.

21           MR. DOUGLAS:  We would move to admit Exhibit 1-3.

22           THE COURT:  Is there any objection?

23           MR. CARR:  No, Your Honor.

24           THE COURT:  All right.  Exhibit 1-3 is admitted.

25       (Government Exhibit Number 1-3 admitted)

43

Hughes – Direct

1        MR. DOUGLAS:  Permission to publish.

2        THE COURT:  You may.  All right.  Ladies and

3  Gentlemen, I think you're going to see these exhibits coming

4  up on the screen.  As you know there are three or four--four

5  I think screens in your jury box and there's the large

6  screen here in the courtroom.

7  BY MR. DOUGLAS:

8  Q.  And if we could blow up the e-mail please.  Could you

9  read the date of this e-mail?

10  A.  I'd like to have a meeting tomorrow at eleven-thirty

11  in--

12  Q.  Sorry.  Wait.  I asked you for the date.

13  A.  Oh, I'm sorry.  Thursday, March 4, 2010.

14  Q.  And could you read the e-mail for us?

15  A.  I'd like to have a meeting tomorrow at 11:30 AM in the

16  conference room.  It is in regard to the election--

17        THE COURT:  I'd ask you to slow down a bit because

18  the Court Reporter is taking down everything you say.

19        THE WITNESS:  Oh, I'm sorry.

20        THE COURT:  People who read--when they read

21  something have a tendency to move it fast.

22        THE WITNESS:  I'm sorry.

23        THE COURT:  No, that's all right.  Fine.

24  BY MR. DOUGLAS:

25  A.  It is in regard to the elections and our support for

Hughes - Direct

1    particular candidates.  Rick is on vacation so I'll meet up

2    with him when I return, but if you can make it I would

3    appreciate doing so before I leave town.  I only expect the

4    meeting to be approximately one half hour.  If several can't

5    make it, we'll try again late next week or the following

6    week when I return.  Let me know if you can't make it.

7    Lunch will be provided and we will discuss while we're

8    eating.  Jim.

9    Q.  Does this e-mail relate to that initial meeting that

10   was--that the defendant led?

11   A.  Yes.

12   Q.  If you'll take a look at the next exhibit in that stack

13   which should be marked as Exhibit 1-4.  Do you recognize

14   Exhibit 1-4?

15   A.  I do.

16   Q.  And what is it?

17   A.  It's an e-mail exchange from Mr. Laurita to the Mepco

18   officers.

19   Q.  So does it include statements from the defendant?

20   A.  Yes it does.

21          MR. DOUGLAS:  We would move to admit Government

22   Exhibit 1-4.

23          THE COURT:  Any objection?

24          MR. CARR:  No, Your Honor.

25          THE COURT:  Government Exhibit 1-4 is admitted.

Hughes – Direct

1      (Government Exhibit 1-4 admitted.)

2           MR. DOUGLAS:  Permission to publish.

3           THE COURT:  You may.  Once it's admitted, you may

4      publish.

5           MR. DOUGLAS:  Yes, Your Honor.  Thank you.

6      BY MR. DOUGLAS:

7      Q.  If we could zoom in on the top part of this e-mail

8      please.  So what is happening here in this e-mail?

9      A.  Mr. Laurita is sending Kevin and Rick--or notifying

10     Kevin and Rick that he will try to call and discuss the

11     meeting but that they should contact me when they return for

12     preview and he goes on to tell everyone that he wants

13     contributions to be made to the listed candidates.

14     Q.  And if you could read the last sentence right before his

15     name Jim.

16     A.  Please direct all contributions to Karen.

17     Q.  So did you have certain roles within this program of

18     contributions?

19     A.  For the most part I would forward to the officers his

20     requests for contributions and then I would collect those

21     contributions and distribute them however he told me to.

22     Q.  And how did you know that you had that role of

23     communicating to the group?

24     A.  He called me into his office shortly after this initial

25     March 4th meeting, I think, and discussed that with me.

Hughes – Direct

1    Q.  And was that a meeting between just the two of you?

2    A.  Yes.

3    Q.  During that meeting did the defendant tell you how to

4    cause the payments to the group to make the contributions?

5    A.  I don't understand what you mean, to cause them to be

6    made--to communicate them?

7    Q.  No, first of all with regard to the payments, how did

8    the company funds get into the accounts of the participants

9    in the group?

10   A.  I was to direct Rodney Bolyard, who was the person that

11   actually did the Mepco payroll, to direct him to give

12   bonuses to the officers which would cover the cost of the

13   contributions.

14   Q.  And during that separate meeting you had with the

15   defendant, did he talk about how those payments would be

16   made, including the term bonus?

17   A.  We discussed what the options were for the payroll

18   system to accommodate these payments and the bonus category

19   was the only thing that was available in the system that we

20   could use.

21   Q.  Okay.  Now did the defendant at that separate meeting

22   with you give you any further constructions about how to

23   communicate with the group?

24   A.  No.  No he didn't.

25   Q.  Did he discuss with you whether you should just talk to

Hughes – Direct

1    the group and not to others about the program?

2    A.   Mr. Laurita told me two things.  One was that I should

3    ask the officers for their contributions, don't tell them

4    that they had to make them and second, I was not to discuss

5    this program with anybody outside of the group of officers

6    who were actually making the contributions.

7    Q.   Did he explain during that initial meeting with you what

8    the purpose for these two rules were?

9    A.   No.

10   Q.   I would like you to now take a look at Government

11   Exhibit 1-23.  Do you recognize Exhibit 1-23?

12   A.   Yes I do.

13   Q.   What do you recognize it as?

14   A.   It's an e-mail from me to the officers of Mepco.

15   Q.   And is this included as a communication that you're

16   making to the group at the direction of the defendant?

17   A.   Yes.

18            MR. DOUGLAS:  We would move to admit 1-23.

19            THE COURT:  Is there any objection?

20            MR. CARR:  No, Your Honor.

21            THE COURT:  All right.  1-23 is admitted.

22       (Government Exhibit 1-23 admitted.)

23   BY MR. DOUGLAS:

24   Q.   Could you read the subject of that e-mail?

25   A.   Manchin.

Hughes – Direct

1   Q.  And then read the body of it please.

2   A.  You will be receiving a one thousand dollar net bonus by

3   direct deposit in the next few days.  Please delete this

4   e-mail.

5   Q.  Could you explain to the jury why you were telling the

6   officers to please delete this e-mail?

7   A.  One of the directives I had from Mr. Laurita was that

8   this program shouldn't be discussed with anyone outside of

9   the group of officers who were participating so when I sent

10  out the e-mail to the officers, especially two of them

11  worked at mine sites whose offices were very busy.  There

12  were people in there, salesmen, other employees were through

13  their offices all the time, so I never knew when their

14  e-mail would be left open and inadvertently someone else

15  would see it or if they would print something and someone

16  would pick it up out of the printer, so I asked them to

17  delete the e-mails to insure that no one would see them.

18  Q.  I'd like to ask you to take a look at Exhibit 1-29.

19  What is 1-29?

20  A.  It is an e-mail from me to the Mepco officers.

21  Q.  Is this an e-mail you were sending within the scope of

22  your duties as they were given to you by the defendant in

23  this program?

24  A.  Yes.

25          MR. DOUGLAS:  Move to admit 1-29.

49

Hughes – Direct

1          THE COURT:  Is there any objection?

2          MR. CARR:  No, Your Honor.

3          THE COURT:  Court admits 1-29.

4      (Government Exhibit 1-29 admitted.)

5  BY MR. DOUGLAS:

6  Q.  Could you read the subject of this e-mail as well as the

7  body?

8  A.  The subject says delete this e-mail.  The body says,

9  I'll reimburse you in the next couple days.

10 Q.  Why did you ask the officers to delete this e-mail?

11 A.  For the same reason I had said previously.  I didn't

12 anyone else inadvertently reading it.

13 Q.  Other than when you're speaking about the reimbursements

14 for this campaign program, did you ever ask the officers to

15 delete other e-mails?

16 A.  Not that I can ever remember.

17 Q.  Now at the time that this program was being started was

18 there some oversight over the finances of Mepco?

19 A.  Yes, there was.

20 Q.  And who was overseeing the finances of Mepco?

21 A.  The Longview group and the owners--the owners of

22 Longview required us to complete a cash flow statement

23 weekly to report all of our cash outflow.

24 Q.  And to which entities would those cash flow forecasts be

25 submitted?

Hughes – Direct

1   A.   There were probably twenty people on the list that

2   received it but it was officers of Longview as well as

3   members of the First Reserve Group who was the capital

4   contributors to the Longview Power Plant.

5   Q.   So did it include General Power, the parent company?

6   A.   Yes, GenPower officers received it as well.

7   Q.   And then you mentioned First Reserve, a capital firm.

8   Is that a firm that was providing capital for the Longview

9   Power Plant?

10  A.   Yes.

11  Q.   And what type of information would be in these

12  forecasts?

13  A.   It was a very complex report but it detailed the

14  expected incoming cash and outgoing cash for the company for

15  the next thirteen weeks.

16  Q.   Did the outgoing cash category include compensation of

17  employees?

18  A.   It did.

19  Q.   Was that compensation broken down between salary and

20  bonuses?

21  A.   No.

22  Q.   Did you have any knowledge of the defendant seeking any

23  type of approval from General Power to use company money to

24  fund campaign donations?

25  A.   I have--no.  I have no knowledge of that.

Hughes – Direct

1   Q.  Do you have any knowledge of the defendant informing

2   First Reserve about funding the campaign donations?

3   A.  I have no knowledge of that either.

4   Q.  During this time frame was there also an auditing firm

5   that would conduct audits of Mepco's finances?

6   A.  Yes.

7   Q.  What was the name of that firm?

8   A.  Ernst and Young.

9   Q.  And how often would that company conduct audits?

10  A.  Annually.

11  Q.  And what type of information would be provided to them

12  for their audits?

13  A.  They had free reign of every piece of paper in the

14  office so they looked at everything; everything coming in,

15  going out, payroll, taxes, everything.

16  Q.  Have you seen some of the reports they've prepared?

17  A.  I have seen them, but I don't believe I've ever read

18  them.

19  Q.  All right.  Do you know whether Ernst and Young had

20  reviewed compensation of employees as part of their audits?

21  A.  Yes, they would review.

22  Q.  Do you know whether the compensation records they were

23  provided had a breakdown between salary and bonuses?

24  A.  The payroll system would have separated that out so,

25  yes, they would have known that.

Hughes – Direct

1   Q.   Okay.  So this is the time to talk about bonuses.  Would

2   there other types of bonuses that executives received?

3   A.   Yes.

4   Q.   What other type of bonus was there?

5   A.   The executive received a production bonus every month.

6   Q.   What does that mean?

7   A.   Based on the number of tons the company sold in a month,

8   there was a computation applied to that tonnage that would

9   give each officer a bonus.

10  Q.   And do you know what that was--what those production

11  bonuses were entered into the payroll system as?

12  A.   Just bonuses.

13  Q.   And do you know what the payments for the political

14  contributions were entered into the payroll system as?

15  A.   Bonuses.

16  Q.   So was there any distinction in the payroll records

17  between the two types of bonuses?

18  A.   No.

19  Q.   Were you involved at all with the Ernst & Young audits?

20  A.   Yes.

21  Q.   Did Ernst & Young ever ask you about any inflation in

22  bonuses?

23  A.   No.

24  Q.   Did you ever inform Ernst & Young about the additional

25  bonuses now being made?

Hughes – Direct

1    A.  No.

2    Q.  Why not?

3    A.  They didn't ask.  They just reviewed what was there and

4    never asked any questions about it.

5    Q.  Do you have any knowledge of the defendant informing

6    Ernst & Young about the additional bonuses?

7    A.  I have no knowledge of that.

8    Q.  Now you mentioned a minute ago that another rule was to

9    always ask, not tell when you're communicating with the

10   executives.  At any point in the program did any executive

11   refuse to make a contribution that you were asking them on

12   the defendant's behalf to make?

13   A.  Not that I can remember.

14   Q.  I want to show you now or as you now to look at what

15   should be the next exhibit, which is 1-22.  What is Exhibit

16   1-22?

17   A.  It is an e-mail from me to the officers of Mepco.

18   Q.  Were you sending this e-mail within your

19   responsibilities as given to you by the defendant in this

20   contribution program?

21   A.  Yes.

22              MR. DOUGLAS:  We would ask to admit 1-22.

23              THE COURT:  Any objection?

24              MR. CARR:  No, Your Honor.

25              THE COURT:  All right.  1-22 is admitted.

Hughes – Direct

1        (Government Exhibit 1-22 admitted.)

2    BY MR. DOUGLAS:

3    Q.  Could you please note the subject of this e-mail?

4    A.  It says Manchin 001--oh, I'm sorry.  Manchin.

5    Q.  And could you read the second sentence of the body of

6    the e-mail starting with should?

7    A.  Starting at the beginning?

8    Q.  Yes, the sentence starting with should and the second

9    sentence.

10   A.  Oh, I'm sorry.  Should you wish to contribute, and I'm

11   sure all of you do, one thousand dollars is the suggested

12   donation.  There are two methods to contribute.  One, write

13   a check payable to Manchin for West Virginia or two,

14   complete the attached credit card authorization form.  I

15   have already noted the one thousand dollar donation button

16   on the credit card authorization form.  Only one one

17   thousand dollar donation is requested, not from wives, only

18   from you.

19   Q.  That's fine.  Thank you.  I want to ask you specifically

20   about, in that second sentence where you used the term

21   suggested donation.  Why did you use the term suggested

22   donation?

23   A.  It was just my way of asking them to make the donation

24   as opposed to telling them they had to make it.

25   Q.  Where did the one thousand dollars come from, the

55

Hughes – Direct

1    amount?

2    A.  Mr. Laurita directed the one thousand dollar donation.

3    Q.  Did anyone respond to you saying, no, I am not going to

4    make the donation?

5    A.  No.

6    Q.  And if you also look at the sentence that says only one

7    thousand dollar donation is requested.  Why did you use the

8    term requested?

9    A.  Because I was asking them for the donation.

10   Q.  Do you recall anyone responding to you saying I'm not

11   going to make it in this amount?

12   A.  No.

13   Q.  So that meeting is held and then you have that separate

14   meeting with the defendant, how are you feeling about this

15   proposal, this idea?

16           MR. CARR:  Objection.  Relevance.

17           THE COURT:  Sustained.

18   BY MR. DOUGLAS:

19   Q.  Did you find that your contributions were voluntary?

20           MR. CARR:  Objection.  Relevance.

21           THE COURT:  Sustained.

22   BY MR. DOUGLAS:

23   Q.  You mentioned having certain roles within this program

24   and you mentioned communication to the group.  How would you

25   receive the instructions from the defendant?

Hughes – Direct

1    A.  It varied.  Sometimes I would receive an e-mail

2    instructing.  Sometimes he would just tell me.  Sometimes he

3    would leave a note on my desk with instructions.

4    Q.  And what types of things were in the instructions?

5    A.  Just the candidates, the amount and whether or not it

6    was officers only or their wives as well.

7    Q.  Can you recall which candidates or some of the

8    candidates that received the contributions under the

9    program?

10   A.  I can remember some of the federal candidates.  Manchin

11   and Capito and McKinley.  There were some state and locals,

12   but I don't remember a lot of those.

13   Q.  Okay.  So once you received the instructions from the

14   defendant, what did you do next?

15   A.  I would type up a note and pass that along to all of the

16   officers through the inter-company mail.

17   Q.  Were some of the officers in the same building as you?

18   A.  Yes.

19   Q.  Were some offices at mine sites?

20   A.  Yes.

21   Q.  At some point did you start to use e-mail to communicate

22   with the group?

23   A.  At some point I believe that we did.

24   Q.  I want you to look now please at 1-69.  What is 1-69?

25   A.  It is an e-mail from me to Kevin O'Dell.

Hughes – Direct

1   Q.  Were you sending this e-mail within the scope of your
2   responsibilities in this program?
3   A.  Yes.
4           MR. DOUGLAS:  Move to admit 1-69.
5           THE COURT:  Is there any objection?
6           MR. CARR:  No, Your Honor.
7           THE COURT:  US Exhibit 1-69 is admitted.
8       (Government Exhibit 1-69 admitted.)
9   BY MR. DOUGLAS:
10  Q.  To whom were you sending this e-mail?
11  A.  Kevin O'Dell.
12  Q.  Was he one of the other executives?
13  A.  He is.
14  Q.  And that amount that you're discussing there, what was
15  that amount of money for?
16  A.  It was for the political contributions.
17  Q.  Could you read what you said about that amount of money?
18  A.  You have seven thousand fifty-six dollars in your
19  account that is not yours.  Save for future contributions.
20  Q.  Could you please take a look at 1-86?  What is 1-86?
21  A.  It is a series of e-mails between me and Rick Usery and
22  Suzanne Likins.
23  Q.  And were you making these communications pursuant to
24  your responsibilities in the program?
25  A.  Yes.

Hughes – Direct

1          MR. DOUGLAS:  Move to admit 1-86.

2          THE COURT:  Objection?

3          MR. CARR:  No, Your Honor.

4          THE COURT:  Government Exhibit 1-86 is admitted.

5      (Government Exhibit 1-86 admitted.)

6  BY MR. DOUGLAS:

7  Q.  If we could just enlarge the top part.  So to whom are

8  you sending this e-mail at the top?

9  A.  To Rick Usery.

10  Q.  And who's that?

11  A.  He was one of the executives.

12  Q.  And what are you telling him?

13  A.  I am relatively certain about the check but not sure

14  about the attendance.  I'll find out.

15  Q.  And what did you mean you were relatively certain about

16  the check?

17  A.  That I was relatively certainly we were supposed to make

18  a contribution but I didn't know if we were supposed to

19  attend.

20  Q.  And when you say I'll find out, is there a certain

21  person that you were going to find out from?

22  A.  I would be asking Mr. Laurita.

23  Q.  Could you take a look at 1-96 please?  What is 1-96?

24  A.  It is an e-mail from me to Mr. Laurita.

25  Q.  And does it consist of communication between the two of

Hughes – Direct

1    you about the program?

2    A.  Yes.

3              MR. DOUGLAS:  Move to admit 1-96.

4              THE COURT:  Any objection?

5              MR. CARR:  No, Your Honor.

6              THE COURT:  Court admits US Exhibit 1-96.

7         (Government Exhibit 1-96 admitted.)

8    BY MR. DOUGLAS:

9    Q.  Could you read the e-mail from the bottom up?

10   A.  Mr. Laurita is asking me did I say anything to you

11   concerning funding this event and I answered him by saying a

12   thousand dollars per officer.

13   Q.  Now in addition to communicating with the group, did you

14   have any other responsibilities within the program?

15   A.  Not that I can recall.

16   Q.  Let me ask it this way.  When the executives had, let's

17   say, written a check, did they know what to do with it?  How

18   did they know what to do with it?

19             MR. CARR:  Objection.  Calls for speculation.

20             THE COURT:  If it's based on her knowledge, she may

21   answer.  Otherwise sustained.  Rephrase the question.

22             MR. DOUGLAS:  Yes, Your Honor.

23   BY MR. DOUGLAS:

24   Q.  Did you ever tell the executives what they were supposed

25   to do with checks once they had written it?

Hughes – Direct

1    A.  Usually I told them to give the checks back to me.

2    Q.  Okay.  And what did you do with the checks when you

3    collected them from the executives?

4    A.  Once I collected them Mr. Laurita would instruct me what

5    to do with them next.

6    Q.  And what did that include?

7    A.  It varied.  Sometimes he would take them.  Sometimes one

8    of the candidates would come and pick them up or sometimes

9    one or more officers would take the checks to a fundraiser.

10   Q.  Did you ever know what the defendant was doing on those

11   occasions where he would pick them up from you?

12   A.  No.

13   Q.  And when--on those occasions when the defendant would

14   pick them up from you, was it check by check or was it

15   checks that were together?

16   A.  They were together in a bundle.

17   Q.  Okay.  Did you keep any record as it concerned the

18   program?

19   A.  In the beginning I did not, but as time went on I did

20   start to keep records so that I could accurately track the

21   amounts of the donations to determine when the officers need

22   to be paid back and how much.

23   Q.  So how did you obtain the information that you were

24   putting into these records?

25   A.  From my own personal records and I asked for

Hughes – Direct

1   corroboration from the officers so I could double check that

2   the record I had agreed with what they--what they had in

3   their personal files.

4   Q.  Did you ever learn whether the defendant was himself

5   keeping any type of record of the executive contributions?

6   A.  I don't know if he did.

7   Q.  Did the defendant ever tell you anything about campaigns

8   knowing that he had made certain contributions or that

9   certain executives had made certain contributions?

10  A.  I can think of a couple of occasions where he would know

11  that we had made a contribution like for the primary and it

12  was time to make a contribution for the general election but

13  not specific things.

14  Q.  You didn't know where he was getting that information?

15  A.  No, I can't recall where he would have gotten that.

16  Q.  Okay.  Now were these advancements or reimbursement

17  payments, were taxes accounted for?

18  A.  Yes.

19  Q.  How so?

20  A.  Whatever--whatever the reimbursement amount was, was the

21  net of the pay check and so I grossed up--I grossed up from

22  there so that taxes would be taken out and the net of the

23  check would be what the reimbursement equaled.

24  Q.  And when you had calculated the amount that you were

25  seeking, who would you communicate that to?

Hughes – Direct

1   A.   Rodney Bolyard.

2   Q.   And who was that?

3   A.   He was a comptroller and was the person who did the

4   Mepco executives payroll.

5   Q.   Who would actually enter it into the payroll system as a

6   bonus?

7   A.   Rodney.

8   Q.   As a practical manner, how did that show up, let's say,

9   on your bank statement, one of these payments, one of these

10   deposits?

11   A.   It would just show up as another credit on my bank

12   statement.

13   Q.   Was it a check or was it direct deposit?

14   A.   It was direct deposited.

15   Q.   And would it be included with that other type of bonus

16   you were talking about earlier, the performance bonus or

17   would it be separate from it?

18   A.   I believe they were separate.

19   Q.   Okay.  Did the payments take the form of both

20   advancements and back end reimbursements during this

21   program?

22   A.   Yes.

23   Q.   When the payment was an advancement, where would you get

24   the amount that needed to be advanced?

25   A.   Mr. Laurita would tell me.

Hughes – Direct

1   Q.  When the payment was a reimbursement, how did you

2   calculate that amount?

3   A.  I would just accumulate the contributions that had been

4   made and compare that to the advance that had been

5   previously made to see how it netted out and when it ended

6   up that the contributions exceeded what the advance payment

7   was, then I would just initiate a reimbursement.

8   Q.  Now I would like you to take a look at Exhibits 50, 51

9   and 52 please.  What generally are these exhibits?

10  A.  50 and 51 are spread sheets created by me indicating a

11  reimbursement that was made--a calculation for the

12  reimbursements made to officers.

13  Q.  And what is 52?

14  A.  52 is tracking the contributions as well as the

15  reimbursements during a specific period of time.  This must

16  have been 2010 through 12.

17  Q.  And were you keeping these records to fulfill your

18  duties as given to you by the defendant in this program?

19  A.  Yes.

20  Q.  Were you keeping these regularly once you started

21  keeping them?  I know you said you didn't start early on but

22  once you started were you keeping them regularly?

23  A.  Yes, I tried to keep up with them as best that I could.

24          MR. DOUGLAS:  We move to admit 50, 51 and 52?

25          THE COURT:  Is there any objection?

Hughes – Direct

1          MR. CARR:  No, Your Honor.

2          THE COURT:  All right.  50, 51 and 52?

3          MR. DOUGLAS:  Yes, Your Honor.

4          THE COURT:  All right.  All three are admitted.

5     (Government Exhibit 50, 51 and 52 admitted.)

6    BY MR. DOUGLAS:

7    Q.  Let's take a look at 50 please.

8    A.  Okay.

9          THE COURT:  Is this all 2010 through 12?  Is that

10   what the testimony was?

11         MR. DOUGLAS:  Yes, Your Honor, so far I think

12   that's what it's been.

13         THE COURT:  Thank you.

14   BY MR. DOUGLAS:

15   Q.  Now if you look at the far left column, those names,

16   whose names are those in general?

17   A.  The officers of Mepco.

18   Q.  Okay.  And if you look over on the right, you have two

19   columns, one called net goal and net actual.  What does that

20   mean?

21   A.  The net goal was the amount of the contribution

22   reimbursement that I was targeting and the actual is just

23   what the payroll system ended up calculating as the net.

24   Q.  And then on the far left you have a gross column?

25   A.  Yes.

Hughes – Direct

1   Q.   Okay.  Is this how you were accounting for the taxes as

2   you were describing?

3   A.   Yes.

4   Q.   And if we just pop Exhibit 51 up quickly please.  Is

5   this just another example of another date of one of those

6   spread sheets?

7   A.   Yes it is.

8   Q.   And are these the spreadsheets you're actually sending

9   to Rodney Bolyard to cause the deposits?

10  A.   I believe I did send these to Rodney.

11  Q.   Okay.  Now if we can take a look at Exhibit 52 please.

12  And if first we could just enlarge sort of the top half of

13  the page.  Could you explain to the jury what type of

14  information you're keeping in this spreadsheet?

15  A.   On the left is a list of all the candidates that were

16  supported and in the middle are the cumulative totals and

17  behind that are all the individual officers' contributions

18  but this is the total page that were contributed to each of

19  those candidates and whether it was the primary or general

20  election and whether it was employees only.  An SP would

21  designate that the spouse contributed also.

22  Q.   Okay.  And then if we could enlarge the bottom half of

23  that page please.  And here what does the bottom half of

24  this page depict?

25  A.   If you see total from above and total from feeder pages,

Hughes – Direct

1    it equals a total of all the contributions and then below

2    that in the negative--the negative things are the

3    reimbursement totals that were paid to the officers.

4    Q.  And is that just for the year 2010?

5    A.  Yes.

6    Q.  Is that what those dates are there?  What are those

7    dates?

8    A.  The dates on the left would've been the dates of the

9    reimbursements or the advance, whichever the case may be.

10   Q.  And what do you mean there at the very bottom of excess

11   reimbursement?

12   A.  That the net--the nets probably didn't calculate--the

13   net pay didn't calculate specifically to the penny and that

14   was the excess.

15   Q.  Okay.  And is that divided among eight executives?

16   A.  I'd have to look at each one.  It probably varied for

17   each one but, yes, generally.

18   Q.  Let's take a look at the second page of Exhibit 52

19   please.  And if we could just do the top half please.  So

20   here there's the name Karen.  Is that you?

21   A.  Yes.

22   Q.  So is there then a separate sheet for each executive?

23   A.  Yes, there was.

24   Q.  Okay.  And so the same columns that you've already

25   explained?

Hughes – Direct

1    A.  Correct.

2    Q.  And if we could look at the bottom half of that page

3    please.  And so that total there of twenty-four thousand

4    three hundred and fifty dollars, is that just for you?

5    A.  Yes.

6    Q.  Contributions you have made?

7    A.  And my husband, yes.

8    Q.  And your husband.  I'm sorry.  And those are

9    the reimbursements that you received at the bottom?

10   A.  That's correct.

11   Q.  Okay.  We are not going to look at all of them but did

12   you then keep a similar sheet for each of the executives--

13   A.  I did.

14   Q.  --as you were going along?

15   A.  I did.

16   Q.  Okay.  I do want to jump to page twelve please and if we

17   could enlarge the top half please.  What record are you

18   keeping here?

19   A.  This is very similar to the page we just looked at for

20   2010 but it was for 2011 and 12, had each officer on the

21   left and the contributions--contribution totals they had

22   made.

23   Q.  For what time period?

24   A.  2011 and 12.

25   Q.  Okay.  And if we could enlarge the bottom half of page

Hughes – Direct

1    twelve please.  What record are you keeping here?

2    A.   That is also for 2011 and 12 but it's a list of all of

3    the candidates and the amount that each one of them was

4    supported and which election, the far right column, if I

5    knew I put it in there.

6    Q.   And is that for the same time period you've already

7    indicated?

8    A.   Yes.

9    Q.   Okay.  And then if we could finally look at page

10   thirteen please and enlarge the top half.  What record are

11   you keeping on this page?

12   A.   This is a record of the candidates that I

13   supported--there's not a date on here so for whatever period

14   of time that this is covering.

15   Q.   Okay.  And finally, if we look at the bottom half of

16   page thirteen.  It may give you an understanding for the

17   time period.  Do you see the dates on there?

18   A.   Yes.  2011 and 12.  This--these would have been the

19   reimbursements that I received for that period of time.

20   Q.   Did you also keep spreadsheets for the performance

21   bonuses?

22   A.   I did.

23   Q.   Could you look at Exhibit 53 please.  What is Exhibit

24   53?

25   A.   It is an example of a spreadsheet that I kept for the

69

Hughes – Direct

1   performance--the production bonuses.

2   Q.  And is this an example of a record that you were keeping

3   regularly?

4   A.  I did it monthly, yes.

5   Q.  And were you the one that was calculating the

6   information that was put in there?

7   A.  Yes.

8           MR. DOUGLAS:  Okay.  We move to admit Government

9   Exhibit 53.

10          THE COURT:  Any objection?

11          MR. CARR:  No, Your Honor.

12          THE COURT:  Government Exhibit 53 is admitted.

13      (Government Exhibit Number 53 admitted.)

14   BY MR. DOUGLAS:

15   Q.  If we could just enlarge the top part there please.  And

16   we're not trying to get technical here but if you could just

17   generally explain how you're calculating this?

18   A.  On the far left column are the months of the year and

19   the tonnage is calculated for the sales that we had in that

20   particular--the sales tons we had in that particular month

21   and the rate by which the bonus was calculated and then the

22   bonus amount and the date we paid.

23   Q.  So are these bonuses deposited separately from the other

24   bonuses we've been discussing?

25   A.  Yes.

Hughes – Direct

1    Q.  Thank you.  Finally, did you pro--did you prepare any

2    spreadsheets for the defendant during your working for him?

3    A.  Yes.

4    Q.  Could you take a look at Exhibit 1-66 please.  What is

5    Exhibit 1-66?

6    A.  It as an e-mail from me to Mr. Laurita.

7    Q.  Does it include an attachment to the e-mail?

8    A.  It does.

9    Q.  What is the attachment to the e-mail generally?

10   A.  It's a spreadsheet with the officers and their salaries.

11   Q.  Did you create this spreadsheet at the defendant's

12   direction?

13   A.  Yes.

14          MR. DOUGLAS:  We move to admit 1-66.

15          THE COURT:  Any objection?

16          MR. CARR:  No, Your Honor.

17          THE COURT:  Government Exhibit 1-66 is admitted.

18      (Government Exhibit 1-66 admitted.)

19   BY MR. DOUGLAS:

20   Q.  If we could bring up page two, the attachment to the

21   e-mail, please.  Do you see the column in both of those

22   tables called fundraising compensation?

23   A.  Yes.

24   Q.  What is that?

25   A.  It would be the amount of money that was paid to each

Hughes - Direct

1   officer to reimburse them for their campaign contributions

2   in the specific years, 2010 and 11.

3   Q.  Did you find you made money by receiving these deposits,

4   that it was actually compensation?

5   A.  I never considered it as compensation.

6          MR. DOUGLAS:  Objection.  Relevance.

7          THE COURT:  Sustained.

8          MR. DOUGLAS:  Move to strike.

9          THE COURT:  Ladies and Gentlemen, that was

10  non-responsive to the question and the Court strikes the

11  answer.  You should disregard the answer.

12         MR. DOUGLAS:  The Court's indulgence.

13     (Pause)

14  BY MR. DOUGLAS:

15  Q.  Was there ever a time that you received one of these

16  advancements and you spent it on whatever you wanted to and

17  then didn't make the contributions?

18  A.  No.

19  Q.  Why not?

20  A.  I was under the impression that these funds were seg--to

21  be segregated for the campaign contributions.

22  Q.  Where did you get that impression?

23  A.  From Mr. Laurita.

24  Q.  I would like you to take a look at Government's Exhibit

25  8.  Could you tell us what generally Government Exhibit 8

Hughes – Direct

1   is?

2   A.   Contributions made by my husband and I, both by check

3   and by credit card.   These are my credit card statements

4   and--and some checks, yeah.

5           MR. DOUGLAS:   Okay.   We move to admit Government

6   Exhibit 8.

7           THE COURT:   Is there any objection?

8           MR. CARR:   No, Your Honor.

9           THE COURT:   Government Exhibit 8 is admitted.

10      (Government Exhibit Number 8 admitted.)

11   BY MR. DOUGLAS:

12   Q.   What is this on page one?

13   A.   That is a check to McKinley for Congress for a campaign

14   contribution made by my husband.

15   Q.   And was this check written pursuant to the program?

16   A.   Yes.

17   Q.   In fact were all of these contributions in these records

18   made pursuant to the program?

19   A.   Yes.

20   Q.   I would like to take a look at page six please.   If

21   you'll see at the bottom left corner you can tell the pages.

22   All right.   What is on page six?

23   A.   That is a check from me to Capito for Congress for five

24   hundred dollars.

25   Q.   Why did you write this check?

Hughes – Direct

1    A.  It was a campaign contribution which was part of this

2    program.

3    Q.  How did you know you were supposed to write it?

4    A.  Mr. Laurita asked us to write those.

5    Q.  And finally on this exhibit if we could go to page

6    twelve.  If you could scroll that down please and enlarge

7    the bottom half.  If I can draw your attention to the

8    transaction on 4/12.

9    A.  Yes.

10   Q.  What is that transaction for?

11   A.  It's a five thousand dollar contribution to Manchin for

12   West Virginia.

13   Q.  Why did you make that credit card transaction?

14   A.  It was part of the contribution program.

15   Q.  Now if you could take a look at the last exhibit for

16   you, which is Exhibit 9?  What is Exhibit 9?

17   A.  It's a series of my personal bank statements.

18   Q.  And do these bank statements relate to the advancements

19   or reimbursements in the program?

20   A.  I can see on the first page there is an advance.

21        MR. DOUGLAS:  Okay.  We'll move to admit Government

22   Exhibit 9.

23        THE COURT:  Any objection?

24        MR. CARR:  No, Your Honor.

25        THE COURT:  Government Exhibit 9 is admitted.

74

Hughes – Direct

1       (Government Exhibit Number 9 admitted.)

2   BY MR. DOUGLAS:

3   Q.  If you could bring up that first page please and enlarge

4   the bottom half.  Can you identify the advancement, if

5   there's an advancement here?

6   A.  Well based on the day, from those previous e-mails that

7   we looked at, on March 9th the eleven thousand seven hundred

8   and one dollar credit would have been an advance.

9   Q.  Okay.  And just to help us distinguish between other

10  compensation or other payments you're receiving from Mepco,

11  what is that one at the top on March 5th?

12  A.  On March 5th that credit--I'm not sure if that would

13  have been the production bonus or if it's a payroll--just a

14  regular payroll salary.

15  Q.  Okay.  At some point did you stop making campaign

16  contributions?

17  A.  Yes.

18  Q.  Why?

19  A.  Mr. Laurita just stopped asking us to make them.

20  Q.  Since you left Mepco have you made any campaign

21  contributions?

22          MR. CARR:  Objection.  Relevance.

23          THE COURT:  Sustained.

24  BY MR. DOUGLAS:

25  Q.  During the time frame of 2010 to 2013, if your name is

75

Hughes - Cross

1   on an FEC report for campaign contributions, would that have

2   been related to the program?

3          MR. CARR:  Objection.  Foundation.  Calls for

4   speculation.

5          THE COURT:  Sustained.  Inadequate foundation.

6   BY MR. DOUGLAS:

7   Q.  Did you make any other campaign contributions other than

8   pursuant to this program during 2010 to 2013?

9   A.  No.

10  Q.  All right.  In the absence of the defendant asking you

11  to make the contributions, would you have made the

12  contributions?

13  A.  No.

14         MR. DOUGLAS:  Nothing further.

15         THE COURT:  Anything further, Mr. Douglas?

16         MR. DOUGLAS:  No.  Nothing further.

17         THE COURT:  Passing the witness?

18         MR. DOUGLAS:  Yes, Your Honor.

19         THE COURT:  All right.  Cross-examination?

20         MR. CARR:  May I have a moment please?

21         THE COURT:  Yes.

22     (Pause)

23                      CROSS EXAMINATION

24  BY MR. CARR:

25  Q.  Ms. Hughes, I would first like to talk to you about your

Hughes - Cross

1  testimony regarding the two e-mails that you were shown in

2  which you instructed or asked individuals to delete the

3  e-mail.  Are you aware of any other e-mails you sent other

4  than those two in which you directed people to delete the

5  e-mail?

6  A.  I don't remember if I sent more.

7  Q.  Do you recall the exhibit you were shown which dealt

8  with the thousand dollar deposit?

9  A.  A thousand dollar deposit?

10         MR. CARR:  Excuse me just a second.  If I may

11  retrieve Government Exhibit 1-23?

12         THE COURT:  Did you retrieve them from the witness?

13  Okay.  Mr. Douglas, in the future, when you're finished with

14  the exhibits, you need to give them back to the Clerk so

15  that the next person may use them.

16         MR. DOUGLAS:  Yes, Your Honor.

17         THE COURT:  Ms. Hughes, do me a favor and just pull

18  up all those exhibits and hand them to Mr. Carr.  Thank you.

19    Mr. Carr, if you're going to go through a number of

20  those, just hold onto them and give them back to the Clerk

21  at the end of your examination.

22         MR. CARR:  Yes, Your Honor.  May I approach, Your

23  Honor?

24         THE COURT:  You may.

25  BY MR. CARR:

Hughes - Cross

1   Q.  I'm going to give you back Government Exhibit 1-23.

2   A.  Okay.

3   Q.  And the jury doesn't have that up.  It's a--if I can

4   just summarize, is that the very short e-mail that the

5   subject line was Manchin and you say you will be receiving a

6   one thousand net bonus by direct deposit in the next few

7   days?

8   A.  Yes.

9   Q.  Please delete this e-mail is the end of it.  That

10  deposit never happened did it?

11  A.  I don't know.

12  Q.  If that deposit happened, would you agree with me that

13  it should be on Government Exhibit 52, the spreadsheet that

14  you were keeping?

15  A.  It should be accounted for somewhere in the

16  calculations, yes.

17  Q.  And if I can then clarify, for instance on page two--

18          MR. CARR:  May I approach, Your Honor.

19          THE COURT:  You may.  You don't have to ask once

20  you've started.

21          MR. CARR:  Thank you, Your Honor.

22  BY MR. CARR:

23  Q.  On Government Exhibit 52, am I correct that you have for

24  2010, and this is just using you as an example, three

25  deposits in 2010?

Hughes - Cross

1    A.  Okay.

2    Q.  Is that--is that what that represents?

3    A.  That is what that represents.

4    Q.  And you were attempting to put on this sheet any deposit

5    relating to these contributions and keep track of them, is

6    that right?

7    A.  That would have been my intention.

8    Q.  So this should be all of them?

9    A.  I would think so.

10   Q.  And I realize the jury doesn't have this back up but

11   that was in March of 2010, October of 2010 and then December

12   30th, 2010, the end of the year?

13   A.  Okay.

14   Q.  Is that--

15   A.  That's correct.

16          THE COURT:  Mr. Carr, we can put those--you can put

17   those on the ELMO if you want to and use them that way.

18   It's up to you.

19          MR. CARR:  Thank you, Your Honor.  It will be

20   brief.

21          THE COURT:  Okay.

22   BY MR. CARR:

23   Q.  And again, in reference to Government Exhibit 52, this

24   is again for you, is that correct?

25   A.  Yes.

Hughes - Cross

1    Q.  And this is page--there aren't page numbers on this

2    copy.  So for the time period of 11 and 12, it's March 11th,

3    August 12th of '11--I apologize.  March 14th of '11, October

4    12th of '11 and then August 27th of '12.

5    A.  Yes, that's what's on there.

6    Q.  And these would have been the deposition into your

7    account, is that correct?

8    A.  They should be.

9    Q.  And so if that thousand dollar deposit that you

10   referenced is not on the spreadsheet or not in your bank

11   records, that would indicate that it was never made, is that

12   right?

13   A.  I can't answer that specifically without reviewing all

14   the records to see if I accounted for it in another way but

15   generally I would probably agree with you.

16   Q.  But then that thousand dollar deposit, and actually all

17   deposits, especially taking your case for example, were

18   direct deposited into your bank account?

19   A.  They would have been--yes.

20        MR. CARR:  And I retrieved the exhibits from the

21   witness.

22        THE COURT:  You may.  Oh, you did.

23        MR. CARR:  I'm just noting for the record, Your

24   Honor.

25        THE COURT:  Okay.  Thank you.

Hughes – Cross

1    BY MR. CARR:

2    Q.  So you are only aware of the two e-mails that we spoke

3    about in which you asked somebody to delete something, is

4    that right?

5    A.  That I can recall, yes.

6    Q.  And we have the records and so they weren't deleted, is

7    that correct?

8    A.  Apparently not.

9    Q.  And you're not aware of any records within the office

10   regarding this program, as it's been referred to, that were

11   destroyed, either as it was happening or after?

12   A.  No.  I'm not aware of anything that was destroyed.

13   Q.  And no one, certainly to your knowledge, instructed

14   anyone to destroy anything as it relates to this program?

15   A.  No one instructed us to do that.

16   Q.  Is it accurate that executive compensation in general

17   was treated confidentially amongst the executives?

18   A.  Yes.

19   Q.  You did not--is it correct that you did not--the

20   executives did not want their compensation to be known to

21   anyone really outside of that group?

22   A.  That's true.

23   Q.  It was not just limited to the second bonus, as it's

24   been referred to?

25   A.  That's correct.  It was just compensation in general.

Hughes - Cross

1   Q.  And that was even more so the case with the executives

2   that were down at the mine sites because of the number of

3   people that were in and out of those offices?

4   A.  Are you talking about compensation in general?

5   Q.  Yes, compensation in general, that if there were--I

6   wanted to make that I heard you correctly that there was a

7   concern for instance that one of those executives would

8   leave e-mails up or open and other people down at the mine

9   sites could access them?

10  A.  Well, that was my concern, yes.  I didn't want my--it to

11  be my reason that somebody else found something out that we

12  wanted to keep confidential.

13  Q.  I understand.  There was a question asked of you

14  regarding the designation of these payments as bonuses.  Is

15  it not accurate--put that a different way.  Is it accurate

16  that the only way in the payroll system to trigger the

17  payment of the money was to call it a bonus?

18  A.  Under the setup of the system, yes, that was correct.

19  Q.  Am I correct that to your knowledge that is the only

20  reason why it was called a quote "bonus" in the computer

21  system?

22  A.  Yes, because it would have been very involved to create

23  more--more designations and Rodney would've had to be the

24  person to do that.

25  Q.  Mr. Laurita certainly at no time ever instructed you to

Hughes - Cross

1   hide the fact that these were somehow linked to political

2   contributions within the financial system?

3   A.  No.

4   Q.  You mentioned Ernst and Young being in the office?

5   A.  Yes.

6   Q.  They had access to any piece of paper that they wanted

7   in the office, is that correct?

8   A.  That's correct.

9   Q.  Are you aware of them ever asking what the second bonus

10  was for?

11  A.  No.

12  Q.  Are you aware of anyone denying what the second bonus

13  was for?

14  A.  No.

15  Q.  In your bank records payments from Mepco are designated,

16  generally speaking, Mepco payroll, is that correct?

17  A.  That's correct.

18  Q.  And that included three payments that you--three

19  categories of payment that you received during the year,

20  your base salary?

21  A.  Yes.

22  Q.  The tonnage bonus?

23  A.  Yes.

24  Q.  And the second bonus?

25  A.  Correct.

Hughes – Cross

1   Q.  And the designations for those deposits into your

2   account, is it your understanding that that's a matter of

3   how the bank lists those on your account?

4   A.  That's correct.

5   Q.  And all three of those appear identical?

6   A.  That's correct.

7   Q.  As we have just reviewed Government Exhibit 52, would

8   you agree with the characterization that the, in effect

9   since we're referring to it as bonus two, the payments that

10   you received under the second bonus were staggered?  It was

11   not every contribution or a here's a check for a thousand

12   dollars, give me a check for a thousand dollars?

13   A.  They were staggered.

14   Q.  There were, in effect, according to your records, three

15   in 2010, correct?

16   A.  Yes.

17   Q.  Two in 2011?

18   A.  Yes.

19   Q.  And one in 2012?

20   A.  Yes.

21   Q.  Is it correct that Jim Laurita never told you that you

22   had to contribute to anyone?

23   A.  He never said that.  He never told us we had to.

24   Q.  And he also didn't tell you that you couldn't spend the

25   money on anything else?

84

Hughes - Cross

1    A.  Not specifically.

2    Q.  Since you were not previously politically, especially

3    active, for lack of a better term, would it be correct that

4    you do not know whether it is common for companies to bring

5    contributions together or individuals in a neighborhood and

6    present those to the campaign?  Do you know whether that's

7    common or not?

8    A.  I have no idea.

9            MR. CARR:  Retrieving Government Exhibit 52.

10           THE COURT:  All right.

11           MR. CARR:  Your Honor, would it--and I apologize.

12   Would it be possible to have the ELMO turned on?

13           THE COURT:  All right.  Yes, we can turn the ELMO

14   on.  Ladies and Gentlemen, ELMO is our name for what is a

15   modern overhead projector so there will be an exhibit placed

16   on the screen or the pad and it will show up on the screen.

17   BY MR. CARR:

18   Q.  Ms. Hughes, can you see that?

19   A.  Yes.

20   Q.  And I know I have the original but I will represent to

21   you that this is page four of Government Exhibit 52 and

22   these would be the contributions for Chris, is that correct?

23   A.  Yes.

24   Q.  For 2010?

25   A.  Yes.

Hughes – Cross

1    Q.  And according to this document, am I correct—I'm going

2    to point to it, that near the end of the list there are two

3    entries for Oliverio, correct?

4    A.  Yes.

5    Q.  Fourteen hundred dollars and five hundred dollars?

6    A.  Yes.

7    Q.  And this is the next page and this would be for Brian,

8    is that right?

9    A.  Yes.

10   Q.  And who is Brian?

11   A.  Brian Osborn.

12   Q.  And I apologize.  Who is Chris?

13   A.  Chris Stecher.

14   Q.  Brian did not give to Oliverio, is that correct?

15   A.  That's correct.

16   Q.  Would you agree with me then that the jury could compare

17   donations on your spreadsheet to see if different executives

18   did or did not give to a candidate and if the amounts

19   differ?

20   A.  If I recorded everything accurately, yes they could do

21   that.

22   Q.  Do you have any reason to believe this document is

23   inaccurate?

24   A.  No I don't.

25   Q.  Are you aware of other instances in which it appears

Hughes - Cross

1    that execs gave to--some execs gave to one candidate, some

2    didn't and amounts differed or did you pay attention to

3    that?

4    A.  I rarely paid attention.

5    Q.  I take it that given your duties, Ms. Hughes, this was

6    not one of the primary things that you focused on, would

7    that be fair?

8    A.  That's fair.

9    Q.  But the numbers, for instance in the e-mails that you

10   had previously testified about, Jim did make clear to you

11   that those were only suggestions?

12   A.  Yes.

13   Q.  And at times, Ms. Hughes, is it fair to say, for

14   instance of October of 2010, you may have gotten a tad bit

15   behind on keeping up with the spreadsheet?

16   A.  Yes.

17   Q.  And would--do you recall in October of 2010 sending

18   e-mails to a number of the execs with portions of that

19   spreadsheet attached?

20   A.  I do.

21   Q.  And is it accurate that you said to the execs words to

22   the effect of, the yellow highlights are those donations I

23   have not received from you.  If you intend to make those

24   donations, please fill in the amount and return to me?

25   A.  I remember that, yes.

Hughes - Cross

1    Q.  And that's part of the e-mail.  The--if the execs did

2    not make the donations, you'd didn't care did you?

3    A.  No.

4    Q.  You would complete the spreadsheet and make the

5    calculations for the bonus?

6    A.  That's correct.

7           MR. CARR:  Returning Government Exhibit 52 to the

8    Court.

9           THE COURT:  All right.

10   BY MR. CARR:

11   Q.  I'm going to refer you to Government Exhibit 1-69 and,

12   Ms. Hughes, if you would like to see it again please tell me

13   and I'll be happy to bring it up to you.  It's the one line

14   e-mail to Kevin O'Dell that says--from you, that says you

15   have, and it has a certain amount in your account that is

16   not yours.  Do you recall that e-mail?

17   A.  I do.

18   Q.  Jim did not tell you to send that did he?

19   A.  No.

20   Q.  To your knowledge Jim had no idea that you sent that to

21   him?

22   A.  I doubt that he knew.

23   Q.  To your knowledge, Jim never demanded that an exec make

24   a campaign contribution?

25   A.  He did not demand that.

Hughes - Redirect

1              MR. CARR:  May I have just a moment, Your Honor?

2              THE COURT:  Yes.

3         (Pause)

4    BY MR. CARR:

5    Q.  Ms. Hughes, as it relates to Government Exhibit 52, and

6    that's the spreadsheet that we have been discussing and I

7    had just put on the ELMO, am I correct that you have no

8    reason to believe that at the time Mr. Laurita ever saw that

9    spreadsheet?

10   A.  I don't believe he did ever see it.

11   Q.  It was kept on your computer, is that correct?

12   A.  That's correct.

13             MR. CARR:  Nothing further at this time, Your

14   Honor.

15             THE COURT:  All right.  Is there any redirect?

16             MR. DOUGLAS:  Briefly, Your Honor.

17             THE COURT:  All right.

18                      REDIRECT EXAMINATION

19   BY MR. DOUGLAS:

20   Q.  Ms. Hughes, I'd like to take a look again at 1-22

21   please.  If you could enlarge the top please.  I'd like you

22   to pay attention first of all with regard to the date and

23   time of this e-mail.  What is it?

24   A.  August 13th at 8:47 in the morning.

25   Q.  Okay.  And I believe you already testified on direct

Hughes – Redirect

1    that this is regarding Manchin.  What are you requesting in

2    this e-mail?

3    A.  A thousand dollar donation from each of the officers.

4    Q.  Okay.  And so is that a request for a thousand dollar

5    donation to Manchin?

6    A.  Yes.

7    Q.  Okay.  And let's take a look at 1-23 please.  You just

8    testified that that previous e-mail, 1-22, was on August 13

9    at 8:47 a.m.  What time is this e-mail and what date?

10   A.  August 13th 8:49 a.m.

11   Q.  And what are you saying there?

12   A.  You will be receiving a one thousand dollar net bonus by

13   direct deposit in the next few days.

14   Q.  And what's the subject?

15   A.  Manchin.

16   Q.  Are these two e-mails related at all?

17   A.  They appear to be.

18   Q.  Okay.  Then let's take a look at Government Exhibit 52.

19   And how are these two e-mails related by the way?  You're

20   asking for a thousand dollar donation for Manchin and you're

21   telling them they're going to get a thousand dollars

22   deposited.  What's the relation?

23   A.  That once the contributions are made that I would

24   reimburse them the thousand dollars.

25   Q.  Okay.  So let's take a look at page fifty--page two of

Hughes - Redirect

1   Exhibit 52 please.  And if you could enlarge the top half

2   please.  Right there.  Is--you see where it says Karen, is

3   that you?

4   A.  Yes, it is.

5   Q.  Do you see where it says Manchin near the bottom?

6   A.  I do.

7   Q.  Do you see the amount?

8   A.  A thousand dollars.

9   Q.  Okay.  And if you could look at the--blow up the bottom

10  of this page please.  And do you see these reimbursements?

11  A.  Yes.

12  Q.  And do you see that there's a seventy-six dollar

13  difference left over?

14  A.  Yes.

15  Q.  So did you account for the Manchin contribution that was

16  discussed in those e-mails?

17  A.  I did account for the contribution.

18  Q.  Okay.  So just cause it says you will be receiving a

19  thousand dollar bonus by direct deposit in the next few days

20  and it doesn't happen in the next few days, does that mean

21  that that contribution wasn't reimbursed?

22          MR. CARR:  Objection, Your Honor.  Relevance.

23          MR. DOUGLAS:  Withdrawn.

24          THE COURT:  Ladies and Gentlemen, please disregard

25  the question.  Anything further, Mr. Douglas?

Hughes – Redirect

1          MR. DOUGLAS:  Yes, Your Honor.  Not on this

2     exhibit.

3     BY MR. DOUGLAS:

4     Q.  Just a few other questions.  You were asked about

5     deleting e-mails.  Did you ever ask officers to delete any

6     e-mails about tonnage bonuses?

7     A.  No.

8     Q.  You were asked on cross-examination whether the

9     defendant ever told you that you couldn't spend the money

10    you were receiving on anything else and you said not

11    specifically.  Do you remember that?

12    A.  Yes.

13    Q.  Did he indicate it to you in any other way than

14    specifically stating it?

15    A.  The spirit of the idea--

16          MR. CARR:  Objection, Your Honor, calls for

17    speculation and relevance.

18          MR. DOUGLAS:  We're talking about her impression of

19    her communications.

20          THE COURT:  Rephrase the question.

21    BY MR. DOUGLAS:

22    Q.  Did you have the communication with this defendant that

23    indicated to you that he did not want you to spend it on

24    anything else, the money?

25    A.  Not specifically.

Hughes - Redirect

1   Q.  What do you mean by not specifically?

2   A.  Well he never said that you can't spend the money on

3   anything else but the--the understanding was that there

4   was--

5           MR. CARR:  Objection, Your Honor.  Calls for

6   speculation.  Relevance.  It's non-responsive.

7           THE COURT:  The answer appears to go beyond her own

8   personal understanding so I sustain the objection.

9   BY MR. DOUGLAS:

10  A.  There was a direct--

11  Q.  No, you--

12  A.  I'm sorry.

13  Q.  What was your understanding about whether you could

14  spend it on anything else?

15          MR. CARR:  Objection.  Relevance.

16          THE COURT:  I'll allow it.  Overruled.

17  BY MR. DOUGLAS:

18  Q.  You may answer.

19  A.  There was a direct correlation between the amount of the

20  contributions and the amount of the reimbursements so that

21  those two were directly related and that's what the

22  reimbursements were for.

23  Q.  You were asked on cross-examination about Brian Osborn

24  and a couple of Oliverio contributions in your spreadsheet

25  that weren't there.  Do you recall Brian Osborn ever

93

Hughes – Recross

1   refusing to give a contribution to Oliverio?

2   A.  No.

3   Q.  Do you recall any officer ever refusing to give any of

4   the contributions?

5   A.  No.

6           MR. CARR:  Objection.  Foundation.

7           THE COURT:  Sustained.

8   BY MR. DOUGLAS:

9   Q.  If you will look at 1-69 please.  You were asked on

10  cross-examination about this e-mail.  I want do ask you,

11  what did you mean by is not yours, this money is not yours?

12          MR. CARR:  Objection.  Outside the scope of cross.

13  The question was asked as to whether Mr. Laurita had

14  directed it.

15          THE COURT:  Sustained.

16          MR. DOUGLAS:  Nothing further, Your Honor.

17          THE COURT:  All right.  Thank you.  Does the

18  redirect prompt recross within the limited arena of the

19  questions?

20          MR. CARR:  May I have just a moment, Your Honor.

21      (Pause)

22          MR. CARR:  Very briefly, Your Honor.

23                      RECROSS EXAMINATION

24  BY MR. CARR:

25  Q.  Ms. Hughes, and I'm holding up Government Exhibit 52, I

Hughes – Recross

1    know it's getting late in the day so I won't hand it back to

2    you but if you want to see it I'm happy to show it to you.

3    A.   Okay.

4    Q.   Generally speaking--please disregard.  Did you list the

5    names going down each page to the campaigns in chronological

6    order of the donation being made?

7    A.   Probably not.

8    Q.   And you did not put any dates with these entries?

9    A.   That's correct.

10   Q.   And so it would be somewhat impossible after the fact

11   now to go back and determine whether a certain contribution

12   matched--a certain contribution to the campaign matched an

13   entry on your spreadsheet, is that correct?

14   A.   That would be correct.

15   Q.   It appeared perhaps that this spreadsheet continued to

16   get longer and that there were entries added to the bottom.

17   Would one expect that entries earlier in the year would be

18   at the top and entries later in the year would be on the

19   bottom?

20   A.   I don't know necessarily that that's the case.

21          MR. CARR:  I appreciate that and I understand.

22   Thank you, Your Honor.

23          THE COURT:  Is there anything further for the

24   witness?  Mr. Douglas?

25          MR. DOUGLAS:  No, Your Honor.  Thank you.

Hughes – Recross

1          THE COURT:  All right.  Thank you.  Is the witness

2    subject to recall?

3          MR. CARR:  Yes, Your Honor.

4          THE COURT:  All right.  So, Ms. Hughes, you're free

5    to step down and you're excused as a witness at this time

6    but you're subject to recall so you need to leave the

7    courtroom.  Thank you.  And you must not discuss your

8    testimony with anyone while you're subject to recall.

9          THE WITNESS:  Thank you.

10          THE COURT:  Is that clear?

11          THE WITNESS:  Yes.

12          THE COURT:  Thank you.

13      (Witness excused)

14          THE COURT:  All right.  Mr. Douglas, do you have a

15    short witness?

16          MR. BERNARD:  Your Honor, the next witness will be

17    Kevin O'Dell.  I believe he'll probably be about twenty to

18    thirty minutes in direct.

19          THE COURT:  On direct.  Okay.  Rather than break it

20    up, it's four-thirty.  This jury has been here a very long

21    time today.  Unless there's an objection from counsel I

22    think we should conclude for today.  I think also we have a

23    juror who probably needs to let an employer know that she's

24    going to be coming at five-thirty after today.

25          MR. BERNARD:  Your Honor, could I approach for a

1    second.  With regard to this witness we're going to call I

2    believe he has a flight first thing in the morning to

3    Wyoming for business purpose.  Now I don't--

4            MR. DOUGLAS:  That's where he lives.

5            MR. BERNARD:  Yeah.  And so that's the only reason

6    I'd say if we could possibly get him on today even if we

7    need--

8            THE COURT:  We can't finish him today so

9    you--if--if we're going to interrupt him in the middle, I'm

10   going to let you go for fifteen minutes.  I've got to let

11   this juror go so that she can get to her employer.  He's

12   going to be back tomorrow no matter what you do.  He's

13   subject to cross-examination.

14           MR. BERNARD:  Your Honor, we'll just put him on

15   tomorrow.  No use breaking it up then.  If we're going to

16   have to bring him back and not finish him today, let's just

17   make it a continuity with this witness.

18           THE COURT:  Yes.  I don't think that's fair to the

19   juror who told us she has to let her employer know.

20           MR. BERNARD:  I agree.  I agree.  Thank you, Your

21   Honor.

22           MR. CARR:  Agreed, Your Honor.

23           THE COURT:  All right.  Thank you.

24      All right.  Ladies and Gentlemen of the jury, I'm going

25   to excuse you for the evening and is there anyone who can't

1    be here to begin at eight-thirty tomorrow morning?

2        (No Response)

3            THE COURT:  All right.  Thank you.  Now you can

4    bring whatever you want tomorrow by way of your special

5    coffee, snacks in the morning, your lunch.  As I explained

6    to you earlier, that jury room is yours.  We will have

7    coffee for you in the morning.  I think we also have tea for

8    you and you're free to use the refrigerator and leave things

9    in there if you wish to.

10       During the adjournment tonight, before you return

11   tomorrow morning to resume at eight-thirty, do not discuss

12   this case with anyone.  You're going to go home and I know

13   there will be questions but you cannot discuss the substance

14   of the case.  All you can say is you have been selected as a

15   juror in a trial taking place in federal court in Clarksburg

16   and that you've been instructed not to say anything further.

17       Please recall my admonition that you're not to review

18   any independent evidence in the case, whether on your own

19   research or in the newspaper, on the radio or television,

20   however it may be displayed to you and you are limited to

21   what you hear and see in the courtroom and what

22   my--regarding the evidence and what my instructions are.

23       Should a third-party attempt to approach you to discuss

24   the case, you must walk away from them and advise that

25   you've been instructed not to discuss this case with them.

1   If they pursue you and continue to attempt to discuss the

2   case with you, please let them know you're going to be

3   reporting that to me and do so at your earliest opportunity

4   either through Debbie, Court Security or if you--if it's

5   here around the courthouse and you want to approach me

6   directly, you should let Debbie or the Court Security

7   Officer know and I can make a determination at that time how

8   to deal with it.  Okay.

9       Now if--I don't know what the temperature in the

10  courtroom will be tomorrow but we're going to try to keep it

11  as comfortable as we can.  You should be prepared to put on

12  or take off as the case may be as the temperature moves

13  around and I apologize for that.  We have a very old HVAC

14  system.  We've been advised we're going to get a new one.

15  That would be the first one since this building was built in

16  the '30s.  That's pretty good, but it's not going to happen

17  during this trial.  Okay.

18      So thank you very much for your attention and your

19  patience today.  You've been here a long time today and we

20  appreciate the hard work that you've done.

21      At this time, you're excused to be returned--to return

22  for a start at eight-thirty tomorrow morning.  Now I would

23  suggest as you leave that the back row go out first, all of

24  the back row and then the second row go out and then the two

25  alternates proceed out or--you know, because you're going to

1   have to come around the jury box and I think it's the

2   easiest way to go and I'd wait for them to be out so that

3   you're not just standing right here.  Thank you.  Okay.

4       Leave your notebooks face down on your chairs.  They'll

5   be returned to you tomorrow morning.  If they do not have

6   your juror number on them, they will have them on tomorrow

7   morning.  Okay.  Safe travels.

8       (Jury out at 4:32 p.m.)

9       THE COURT:  Thank you.  Any issues to take up

10  tonight before we adjourn?

11      MR. DOUGLAS:  Your Honor, the Court had previously

12  asked us to let you know when we were going to use 404(b)

13  evidence.  There was a little bit of a reference to state

14  candidates.  I don't know if the Court would want to do that

15  tomorrow sometime early.  We can't really pinpoint--I mean

16  some might mention state contributions.  I only know that

17  Suzanne Crane, which is like the fifth witness, we might get

18  into affirmative evidence about a state candidate.

19      THE COURT:  Okay.  All right.  And if you all have

20  agreed on a limiting instruction, otherwise I'll just give a

21  generic limiting instruction to the jury to know how they

22  should deal with that--

23      MR. DOUGLAS:  I proposed--

24      THE COURT:  --that evidence.

25      MR. DOUGLAS:  Sorry.  I proposed one that I filed--

1          THE COURT:  I saw it.

2          MR. DOUGLAS:  --and it wasn't objected to at the

3    pretrial.

4          THE COURT:  If there's no objection--you have a

5    right--they have a right to object to it before I actually

6    use it at trial.

7          MR. CARR:  Your Honor, we'll be prepared to address

8    that in the morning whether we would request the Court--I

9    know that we do not have an issue with a generic

10   instruction, but we will insure that there's--if possible,

11   Your Honor, respectfully we'll bring up first thing in the

12   morning if we have an issue with the proposed instruction.

13         THE COURT:  All right.  All right.  I should be

14   here by eight o'clock--

15         MR. CARR:  Yes, Your Honor.

16         THE COURT:  --ten after, anything that you want to

17   raise before the jury comes in.

18       All right.  Is there any objection from you all to

19   starting at eight-thirty throughout the week?  We have an

20   alternate who's got to be at her second job at now

21   five-thirty, but she needed to be able to make those

22   arrangements today and also I think we're looking at

23   some--some snow tonight so we had, you know, a couple of

24   jurors, one who has to get to Calhoun County; one who has to

25   get over to--where's he from, Pleasants County on the river

1    and I didn't see anybody from Preston County and in that

2    regard we're pretty lucky.  So--but I know we have

3    Monongalia on here as well so we'll--we'll see how the

4    weather goes for the rest of the week but if there's nothing

5    further, Court stands adjourned.  See you at eight-thirty

6    tomorrow morning.

7                   (Court adjourned at 4:35 p.m., 01-29-2018)

8

9    ************************************************************

10                              CERTIFICATE

11       I, Linda L. Bachman, Official Reporter of the United

12   States District Court for the Northern District of West

13   Virginia, do hereby certify that the forgoing is a true and

14   correct transcript of the proceedings had in the above

15   styled action on January 29, 2018, as reported by me by

16   stenomask.

17       I certify that the transcript fees and format comply

18   with those prescribed by the Court and the Judicial

19   Conference of the United States.

20       Given under my hand this 15th day of February, 2018.

21

22                        _____/s/ Linda L. Bachman_____
                          Linda L. Bachman, CCR, CVR-M
23                        Official Reporter, United States
                          District Court for the Northern
24                        District of West Virginia

25