1               IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2

UNITED STATES OF AMERICA,
3
               Plaintiff,
4
   vs.            CRIMINAL ACTION NUMBER:  1:17CR51
5
JAMES L. LAURITA, JR.
6
               Defendant.
7
               **TRIAL – DAY 2**
8
    Proceedings had in the <u>Trial</u> of the above styled action
9
on January 30, 2018 before The Honorable Irene M. Keeley,
10
Senior Judge, at Clarksburg, West Virginia.
11
APPEARANCES:
12
FOR THE PLAINTIFF:      JAROD J. DOUGLAS, ESQUIRE
13                        RANDOLPH J. BERNARD, ESQUIRE
                        Assistant United States Attorney
14                        P.O. Box 591
                        Wheeling, West Virginia   26003
15                        304-234-0100
16
FOR THE DEFENDANT:      JOHN A. CARR, ESQUIRE
                        179 Summers Street, Suite 209
17                        Charleston, West Virginia   25301
                        304-344-4822
18
                        MICHAEL B. HISSAM, ESQUIRE
19                        Bailey & Glasser
                        209 Capitol Street
20                        Charleston, West Virginia   25301
                        304-345-6555
21
The defendant was present in person.
22
Proceedings recorded by stenomask, transcript produced by
23 official court reporter.
24
25

      **LINDA L. BACHMAN, CCR, CVR–M, OFFICIAL COURT REPORTER**
      **P.O. BOX 969, CLARKSBURG, WEST VIRGINIA   26302–0969**
                **304–282–0395**

1                          **I N D E X**

2    **WITNESS**                **DIRECT   CROSS   REDIRECT   RECROSS**

3    (For the Government)

4    Kevin O'Dell              108     133      139       142

5    Brian Osborn              143     168      176

6    Rick Usery                181     194      198

7    Suzanne Crane             201     231

8    Kent Lindsay              241     252

9    Charles Huguenard         257     267

10   Eric Grimm                270     285

11   Christopher Stecher       292     298

12   James Lafferty            303     319

13   Steven Polce              321     337

14   William Raney             345     360

15

16

17

18

19

20

21

22

23

24

25

1                          I N D E X

2     EXHIBITS                              ADMITTED

3     Government  Exhibit  12                 119
      Government  Exhibit  13                 120
4     Government  Exhibit  1-62               129
      Government  Exhibit  2                  155
5     government  Exhibit  3                  156
      Government  Exhibit  14                 188
6     Government  Exhibit  15                 192
      Government  Exhibit  1-65               204
7     Government  Exhibit  1-109              207
      Government  Exhibit  1-110              208
8     Government  Exhibit  1-112              209
      Government  Exhibit  1-115              210
9     Government  Exhibit  1-134              211
      Government  Exhibit  44                 213
10    Government  Exhibit  56                 213
      Government  Exhibit  1-72               216
11    Government  Exhibit  1-73               216
      Government  Exhibit  1-81               218
12    Government  Exhibit  1-82               219
      Government  Exhibit  1-84               220
13    Government  Exhibit  1-89               221
      Government  Exhibit  1-95               222
14    Government  Exhibit  1-111              223
      Government  Exhibit  1-85               224
15    Government  Exhibit  1-99               225
      Government  Exhibit  55                 226
16    Government  Exhibit  1-113              228
      Government  Exhibit  10                 247
17    Government  Exhibit  11                 248
      Government  Exhibit  1-8                263
18    Government  Exhibit  1-14               276
      Government  Exhibit  1-51               277
19    Government  Exhibit  1-91               278
      Government  Exhibit  1-92               279
20    Government  Exhibit  6                  281
      Government  Exhibit  7                  283
21    Government  Exhibit  4                  295
      Government  Exhibit  5                  296
22    Government  Exhibit  1-2                309
      Government  Exhibit  1-5                309
23    Government  Exhibit  1-16               309
      Government  Exhibit  1-17               309
24    Government  Exhibit  1-24               309
      Government  Exhibit  1-38               309
25    Government  Exhibit  1-50               309
      Government  Exhibit  1-52               309

| | **EXHIBITS** | **ADMITTED** |
|---|---|---|
| 1 | | |
| 2 | Government Exhibit 1-53 | 309 |
| | Government Exhibit 1-54 | 309 |
| 3 | Government Exhibit 1-64 | 309 |
| | Government Exhibit 1-68 | 309 |
| 4 | Government Exhibit 1-80 | 309 |
| | Government Exhibit 1-90 | 309 |
| 5 | Government Exhibit 1-107 | 309 |
| | Government Exhibit 1-139 | 309 |
| 6 | Government Exhibit 1-140 | 309 |
| | Government Exhibit 18 | 310 |
| 7 | Government Exhibit 18-8 | 310 |
| | Government Exhibit 41 | 312 |
| 8 | Government Exhibit 43 | 312 |
| | Government Exhibit 20 | 314 |
| 9 | Government Exhibit 22 | 314 |
| | Government Exhibit 24 | 314 |
| 10 | Government Exhibit 26 | 314 |
| | Government Exhibit 28 | 314 |
| 11 | Government Exhibit 30 | 314 |
| | Government Exhibit 32 | 314 |
| 12 | Government Exhibit 34 | 314 |
| | Government Exhibit 36 | 314 |
| 13 | Government Exhibit 38 | 314 |
| | Government Exhibit 16 | 330 |
| 14 | Government Exhibit 17 | 333 |
| | Government Exhibit 1-15 | 351 |
| 15 | Government Exhibit 1-18 | 355 |
| | Government Exhibit 1-19 | 357 |
| 16 | Government Exhibit 1-21 | 358 |
| 17 | Defendant's Exhibit A | 170 |
| | Defendant's Exhibit B | 255 |
| 18 | | |
| 19 | | |
| 20 | | |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |

1                     P R O C E E D I N G S

2          (01-30-2018, 8:35 o'clock a.m. Defendant present)

3          THE COURT:  Good morning, Counsel and Mr. Laurita.

4    All jurors are now present and I--we owe them a note of

5    thanks because they came through some rough weather to get

6    here this morning.  The jurors, I think, are ready to come

7    in.  Are you all ready?  Any preliminary issues?

8          MR. DOUGLAS:  Your Honor, just at the end of the

9    day yesterday we discussed a limiting instruction--

10         THE COURT:  Uh-huh (yes).

11         MR. DOUGLAS:  Counsel have now discussed it this

12   morning and we're proposing that it only be included at the

13   end during the final instructions and that it's not

14   necessary during the case.

15         THE COURT:  That's fine.

16         MR. CARR:  Your Honor, the defense requested that.

17   We do not want a limiting instruction read during the trial

18   testimony and we'll discuss this I'm sure at the charge

19   conference but we believe that the generic instruction is

20   appropriate.

21         THE COURT:  All right.  Thank you very much.  Now

22   if there are any potential witnesses in the courtroom who

23   need to be reminded about the sequestration order, I order

24   them to leave.  Nobody?  All right.  Thank you.

25       We can bring the jury in.  Thank you.  Oh, by the way,

1   because this courtroom is so small and cluttered, I don't

2   ask you to stand.  You can--I know that breaks your heart

3   and violates all the rules but really you can be seated when

4   the jury comes in.  In the future I'm going to ask that you

5   all leave an aisle for the alternates so they don't have to

6   come through the middle there.

7        (Jury in 8:36 a.m.)

8            THE COURT:  All right.  Do we have all the jurors?

9   Please be seated.

10           JUROR:  One's in the bathroom.

11           THE COURT:  Oh, one's in the bathroom.  Okay.  In

12   the future don't come in until everybody is ready.

13       (Pause)

14           THE COURT:  Good morning, Ladies and Gentlemen.

15   Welcome back and we salute you, the few, the hardy, the

16   brave who were out on the highway this morning.  I really

17   appreciate your effort to be here on a timely basis.  If you

18   think eight-thirty is too early because of the tenuous

19   nature of the weather, please let me know but I'll let you

20   know this afternoon what the reports for tomorrow are before

21   you leave so we can decide.  Okay.  All right.  Thank you.

22       We're ready to resume with the second witness for the

23   Government.

24           MR. BERNARD: Thank you, Your Honor.  The United

25   States would call Kevin O'Dell.

108

O'Dell – Direct

1           THE COURT:  All right.  Thank you, Mr. Bernard.

2           MR. BERNARD:  You're welcome.

3       (Pause)

4           THE COURT:  Mr. O'Dell, good morning.  Would you

5   please approach the Clerk standing here in the front of the

6   courtroom.  She will administer the oath to you before you

7   take the stand.  She's in the gray suit.  Thank you.

8           KEVIN O'DELL, GOVERNMENT'S WITNESS, SWORN

9           THE CLERK:  Thank you.  The witness is Kevin

10  O'Dell, O-'-D-e-l-l.

11          THE COURT:  Mr. O'Dell, if you'll please speak in a

12  loud, clear voice into the microphone which you may move

13  down to accommodate where you are.  Thank you.

14          THE WITNESS:  Okay.

15          THE COURT:  You may proceed.

16          MR. BERNARD:  Thank you, Your Honor.

17                  DIRECT EXAMINATION

18  BY MR. BERNARD:

19  Q.  Good morning, sir.

20  A.  Good morning.

21  Q.  Could you please tell us a little bit about yourself,

22  your name, where you live, if you're employed?

23  A.  My name is Kevin O'Dell.  I live in Rock Springs,

24  Wyoming.  I am employed by GenWyoming.

25  Q.  Okay.  In what capacity?

O'Dell – Direct

1    A.  I am the Manager of Human Resources and Safety there.

2    Q.  At some point in the past were you employed at a company

3    in or about the Morgantown area known as Mepco?

4    A.  Yes, sir.

5    Q.  When did you start working for Mepco?

6    A.  I think 2004.

7    Q.  How is it that you came to work for Mepco?  Who

8    recruited you and for what position?

9    A.  Jim Laurita for the Human Resources Director position

10   there.

11   Q.  And moving forward to in or about 2010, what was your

12   position in or about 2010?

13   A.  Vice President of Human Resources and Safety.

14   Q.  Now at some point while you were employed in that

15   capacity at Mepco did you and your wife become involved in

16   making campaign contributions, political contributions?

17   A.  Yes, sir.

18   Q.  How is it that you came to become involved in making

19   contributions?

20   A.  Jim met with us and said that he was going to put

21   together a program where we would receive bonuses and be

22   asked to make contributions to various candidates.

23   Q.  And when you say Jim, you mean the defendant?

24   A.  Yes, sir.

25   Q.  Is in the courtroom today?

O'Dell - Direct

1    A.  Yes, sir.

2    Q.  Okay.  Seated at the table to my right?

3    A.  Yes.

4    Q.  All right.  Now had you at any other time at Mepco been

5    given a bonus or been asked to contribute by Mr. Laurita,

6    the defendant, to political campaigns prior to that date?

7    A.  We received a bonus each month based on productivity,

8    but prior to that I've never been asked to make

9    contributions.

10   Q.  And that bonus, that's the so-called tonnage bonus?

11   A.  Yes, sir.

12   Q.  Did anybody ever direct you or suggest that you use your

13   tonnage bonus for--for anything?

14   A.  No, sir.

15   Q.  The tonnage bonus and let's say your salary--your salary

16   and the tonnage bonuses, would it be fair to say those

17   were--that was compensation that you chose to spend it on

18   whatever you or your wife chose to spend it on?

19   A.  Yes, sir.

20   Q.  What about this new bonus?  Did you--were you free to

21   spend it on whatever you wanted to spend it on?

22          MR. CARR:  Objection, Your Honor, calls for

23   speculation.

24          THE COURT:  If it's rephrased to ask his

25   understanding, I'll allow it.

O'Dell – Direct

1      MR. BERNARD:  Okay.

2   BY MR. BERNARD:

3   Q.  Is it your understanding this new bonus--I'll call it

4   the second bonus because--

5          THE COURT:  Without leading.  You can just ask him

6   what his understanding was.

7          MR. BERNARD:  Okay, Your Honor.

8   BY MR. BERNARD:

9   Q.  What was your understanding as to this second bonus?

10  A.  As I said, Jim, when he presented us with the bonus, he

11  said there would be some contribution suggestions made to us

12  for us to contribute.

13  Q.  And what was your understanding as to those suggestions,

14  whether you could follow them or choose not to follow them?

15  A.  I felt like that I should follow them.

16  Q.  Why is that?

17  A.  I felt like that was the intent of the program.

18  Q.  Did you feel you could not follow them?

19          MR. CARR:  Objection.  Leading.

20          THE COURT:  Sustained.

21  BY MR. BERNARD:

22  Q.  Did you ever not follow them?

23  A.  No, I always followed them.

24  Q.  Why did you always follow them?

25  A.  I felt like it was the right thing to do.

O'Dell – Direct

1   Q.  The right thing, why?

2   A.  For me.  I felt like it was the right thing for me to

3   do.

4   Q.  What would happen if you didn't?

5   A.  I have no idea.

6   Q.  What were you afraid would happen if--

7   A.  I wasn't--

8           MR. CARR:  Objection.  Leading.

9           THE COURT:  Sustained.

10  BY MR. BERNARD:

11  Q.  Did you have any concern about what would happen if you

12  didn't?

13  A.  I wasn't fearful.  I just felt like it was the right

14  thing to do.  Jim asked and I do what he said.

15  Q.  Okay.  Why is it that you would do what the defendant

16  asked you to do?

17  A.  I respected him.

18  Q.  Was there any other reason?

19  A.  I would say that was pretty much the main reason.

20  Q.  Well who hired you at Mepco?

21  A.  Jim.

22  Q.  Who was responsible for promoting you?

23  A.  Jim.

24  Q.  Who determined what your pay was going to be?

25  A.  Jim.

113

O'Dell – Direct

1    Q.  And who had the power to demote or terminate you?

2    A.  Jim.

3    Q.  Okay.  Let's talk about the program a little bit.  who

4    was responsible--to your knowledge who was responsible for

5    communicating the suggestions about the program to you?

6    A.  Karen Hughes.

7    Q.  Okay.  And how did--how did that work?  Specifically

8    during the program of political contributions at Mepco, how

9    did the whole process work?

10   A.  As I remember Jim or Karen would provide a list of

11   candidates and suggested contributions for us to make.

12   Q.  Okay.  And in addition to--how were those usually

13   communicated and in what manner?

14   A.  I don't remember.  I know I sometimes received an e-mail

15   and I think sometimes we would receive like a written

16   statement or a--in an envelope, a statement of some sort.

17   Q.  And did these communications, did they--well let me ask

18   you.  Where did they usually occur, the communications that

19   you had with Ms. Hughes about the suggested contributions?

20   A.  It would either be--as I said a communication, an e-mail

21   which I would see in my office or she may sometimes I think

22   leave an envelope with my name on it or we would maybe

23   discuss it in her office as I remember.

24   Q.  Where were you physically located when these

25   conversations were occurring or communications?

O'Dell – Direct

1    A.   In the office.

2    Q.   Okay.  And where's the office?

3    A.   In Granville.

4    Q.   Okay.  In or about the Morgantown area?

5    A.   Yes, sir.

6    Q.   Do you recall--in addition to the candidates that you

7    were asked to contribute to, what other information was

8    contained upon these requests from Ms. Hughes?

9    A.   It would be the candidates and the amount to each

10   candidate.

11   Q.   Did it--was your spouse also requested to make

12   contributions under this program?

13   A.   Yes, sir.

14   Q.   So would that--would the communications you received

15   delineate between whom or who should be the one?

16   A.   Yes.

17   Q.   Do you recall the--any of the political campaigns to

18   which you contributed under this program?

19   A.   Yes, sir.

20   Q.   Why don't you tell us some of the--the names?

21   A.   Manchin, Capito.  I think Tomblin.

22   Q.   Okay.  I've got some exhibits that may refresh your

23   recollection as to some of those.

24   A.   Okay.

25   Q.   Now once you received that communication, the note on

O'Dell – Direct

1   how you were--or to whom you were supposed to make the

2   contribution and how much that was going to be, how is that

3   you got your contributions to where they had to be?  What

4   were the mechanics with respect to that process?

5   A.  I would typically write a check and my wife would write

6   a check or we would use a credit card voucher type form and

7   most of the time give that to Karen to--I would give it to

8   her and I think she took it the rest of the way.

9   Q.  What was your understanding what would happen to the

10  checks after you provided them to Karen?

11  A.  They were taken to the campaign someway.

12  Q.  Did you ever yourself have to deliver them?

13  A.  I don't remember doing it myself but it could have

14  happened.  I just don't remember doing it though.

15  Q.  Did you ever have any discussions, either early on in

16  the program or at any time while you were at Mepco, as to,

17  you know, why isn't Mepco just making these contributions?

18  A.  I don't remember having that discussion.

19  Q.  Now who was responsible--while this program was going

20  on, who was the one responsible for tracking your

21  contributions and reimbursements to you?

22          MR. CARR:  Objection.  Foundation.  Calls for

23  speculation.

24          THE COURT:  Again, what is his knowledge of.

25          MR. BERNARD:  Yes.

O'Dell – Direct

1      THE COURT:  That would be fine.

2  BY MR. BERNARD:

3  Q.  Do you know who was responsible or do you have an

4  understanding who was responsible for tracking what

5  contributions you made and what reimbursements were made to

6  you?

7  A.  Karen.

8  Q.  How is it that this process would work?  What would you

9  have to do in order to get advancements or reimbursements

10  for the contributions?

11  A.  Karen would--kept track of the--we would receive a bonus

12  and Karen kept track of the requests for contributions and

13  when that number--when the amount was down then we would get

14  an additional contribution.

15  Q.  And these amounts, these deposits you were getting,

16  other than political contributions were you doing any extra

17  work at Mepco for this bonus, the second bonus?

18  A.  No, sir.

19  Q.  At any point did the defendant come to you and say, hey,

20  I want to give you an additional fifty thousand dollars to

21  increase your compensation?

22  A.  I don't remember that conversation.

23  Q.  And the conversation you had with the defendant about

24  this additional money, the second bonus, all related to

25  political contributions?

117

O'Dell - Direct

1    A.  Yes, sir.

2    Q.  Did you yourself--you or your wife at the end of the day

3    make any money off of this so-called second bonus program?

4    A.  No, sir.

5          MR. BERNARD:  Your Honor, may I approach the

6    witness?

7          THE COURT:  You may.

8    BY MR. BERNARD:

9    Q.  Now, sir, I have put three exhibits in front of you so

10   it would save me from going back and forth and risking

11   tripping like I usually do.  I would go over those

12   individually and ask you first of all if you could look at

13   what's been marked as Exhibit 12 and just generally flip

14   through that and let me know what that is, that compilation

15   of documents.

16   A.  These are three--copies of three checks and one credit

17   card statement.

18   Q.  Okay.  And whose checks are they?  Without going into

19   specificity, in general whose--which checking account are

20   they from?

21   A.  Oh, my checking account, yes.

22   Q.  You and your spouse's checking account?

23   A.  Yes.

24   Q.  What about the credit card records, whose are those?

25   A.  It's my credit card.

O'Dell – Direct

1   Q.  And do these records relate at least in part to

2   contributions you made during the Mepco political

3   contribution program?

4   A.  Yes, sir.

5   Q.  These contributions that we are talking about are the

6   same ones that were directed or suggested by the defendant

7   and paid for by the defendant, is that correct?

8           MR. CARR:  Objection.  Leading.

9           THE COURT:  Sustained.

10  BY MR. BERNARD:

11  Q.  Who paid for the checks and the credit card charges that

12  you have in front of you and again without getting into

13  specifics who paid for those?

14  A.  I wrote the checks and it was on my credit card.

15  Q.  And who ultimately paid for them, the contributions

16  contained therein?

17          MR. CARR:  Objection.  Calls for a legal

18  conclusion.

19          THE COURT:  Overruled.

20  BY MR. BERNARD:

21  A.  This--these payments would reconcile to the bonus that

22  we have been discussing.

23  Q.  Okay.  Again, who ultimately made the payments

24  reflected--

25  A.  From Jim or from the company.

O'Dell – Direct

1        MR. BERNARD:  Your Honor, I move to admit Exhibit
2    12.
3        THE COURT:  Any objection to the admission of
4    Government Exhibit 12?
5        MR. CARR:  No, Your Honor.
6        THE COURT:  All right.  United States Exhibit 12 is
7    admitted.
8      (Government Exhibit 12 admitted.)
9    BY MR. BERNARD:
10   Q.  Let's talk about Exhibit 13.  Do you have that in front
11   of you?
12   A.  Yes, sir.
13   Q.  All right.  Again, if you could just flip through there
14   and tell me in general what those are, without getting into
15   the specifics at this point?
16       THE COURT:  Which exhibit is this?
17       MR. BERNARD:  I'm sorry, Your Honor.  Exhibit 13.
18       THE COURT:  Thank you.
19       MR. BERNARD:  You're welcome.
20   BY MR. BERNARD:
21   A.  These are copies of my bank account statement.
22   Q.  Okay.  And do those bank account statements relate in
23   any manner to deposits that you received from Mepco for
24   political contributions?
25   A.  Yes, sir.

O'Dell – Direct

1          MR. BERNARD:  Your Honor, at this time I would move

2     to admit Exhibit 13.

3          THE COURT:  Is there any objection?

4          MR. CARR:  No, Your Honor.

5          THE COURT:  Government Exhibit 13 is admitted.

6     (Government Exhibit 13 admitted.)

7     BY MR. BERNARD:

8     Q.  Let's back up and turn to Exhibit 12 and publishing the

9     first page of that exhibit please.  Page one of Exhibit 12,

10    can you tell me what that item is?

11    A.  That is a check from my account--from our joint account

12    written by my wife to McKinley for Congress.

13    Q.  Okay.  And the date of that check is March 10th, 2010.

14    It appears to be the first check in the series so is--

15         MR. CARR:  Objection.  Counsel is testifying.

16         THE COURT:  Well, yes, that's true, Mr. Bernard, be

17    careful about that.

18         MR. BERNARD:  I will.

19         THE COURT:  I don't think it was for any ulterior

20    motive other than to move the case along but please be

21    careful.

22         MR. BERNARD:  I will, Your Honor, and that's

23    exactly what it was for.

24    BY MR. BERNARD:

25    Q.  But let me ask you, this check that was made out by your

O'Dell – Direct

1    spouse, was that pursuant to this program we've been talking

2    to?

3    A.  Yes, sir.

4    Q.  Did she make that contribution on her own initiative or

5    did she come up with the idea of doing a five hundred dollar

6    contribution to McKinley?

7    A.  No, sir.

8    Q.  Whose idea was that?

9    A.  This was one of the contributions that we were suggested

10   to make.

11   Q.  The defendant was the one that suggested you make it?

12   A.  Yes, sir.

13   Q.  Who paid for it ultimately?

14   A.  The company.

15   Q.  Go to page two please.  Can you tell me what that is on

16   page two of Exhibit 12?

17   A.  A copy of a check to Capito for Congress written by

18   myself.

19   Q.  Okay.  And who suggested or directed that you make this

20   contribution?

21   A.  Jim.

22   Q.  Who paid for it?

23   A.  The company.

24   Q.  Going to page three of the exhibit, why don't you tell

25   me what it is?

O'Dell – Direct

1  A.  This is a copy of a check written by my wife to McKinley
2  for Congress.
3  Q.  Okay.  And who suggested or directed that your wife Dawn
4  make this contribution?
5  A.  Jim.
6  Q.  Who paid for it?
7  A.  The company.
8  Q.  Now going to the last page of that Exhibit 12, can you
9  tell me what this is?  It's a little bit different.
10  A.  A copy of a credit card statement.
11  Q.  Okay.  Stacy, could you please go to the bottom of that.
12  Thank you.  There is an April 12, do you see that charge to
13  Manchin for five thousand dollars?
14  A.  Yes, sir.
15  Q.  And what is that?
16  A.  That's a payment to the campaign.
17  Q.  Okay.  And who suggested or directed that you make that?
18  A.  Jim.
19  Q.  Who paid for that charge ultimately?
20  A.  The company.
21  Q.  And we're talking Mepco?
22  A.  Yes, sir.
23  Q.  When you say the company?
24  A.  Yes, sir.
25          THE COURT:  Mr. Bernard--

O'Dell – Direct

1          MR. BERNARD:  Yes, Your Honor.

2          THE COURT:  Just because of possible confusion for

3   the jury, I assume that that whole credit card statement

4   will be coming in because I don't believe the date tells us

5   the year.

6          MR. BERNARD:  I can--

7          THE COURT:  If you can elicit that information or

8   at least show the jury what--

9          MR. BERNARD:  I sure can, Your Honor.

10          THE COURT:  --what year you're talking about here.

11          MR. BERNARD:  Sure, Your Honor.

12   BY MR. BERNARD:

13   Q.  And if we go to--on that exhibit, if we go to the very

14   top of the exhibit.  Can you tell from looking at that

15   statement what year that was?

16   A.  It says 6/6/12.

17   Q.  That's the--

18   A.  Oh, I'm sorry, that's the due date.  Yes, sir.

19   Q.  And if you look--Stacy, can you blow that up right

20   there, and if you see the opening and closing date in the

21   account summary, can you see that?

22   A.  Yes.

23   Q.  Okay.  And what is the date range for your statement at

24   that time?

25   A.  4/10/12 through 6/9/12.

124

O'Dell – Direct

1   Q.  So the 4/12, what year was the April 12th Manchin

2   donation made according to your statement?

3   A.  2012.

4        MR. BERNARD:  All right.  Thank you.  Thank you,

5   Your Honor.

6   BY MR. BERNARD:

7   Q.  Now let's turn to Exhibit 13 and once again could you

8   briefly explain to the jury in general what these documents

9   are?

10  A.  Copies of my bank account statement.

11  Q.  And looking at page two, particularly on March 9th--let

12  me ask you this first of all.  Looking at--you don't need to

13  bring this up, Stacy, but if you would turn to the--the

14  first page of your statement, can you tell, Exhibit 13, page

15  one and two, what year that statement was from?

16  A.  The statement is dated February 26, 2010.

17  Q.  All right.  So let's turn to page 2 and a March 9th

18  payroll deposit, March 9th, 2010 payroll deposit of eleven

19  thousand four hundred and fifty-six dollars.  Are you with

20  me?

21  A.  Yes, sir.

22  Q.  What does that deposit reflect?

23  A.  That would be one of the bonus payments for the program

24  we're discussing.

25  Q.  The bonus payment that related to and was for political

O'Dell – Direct

1    contributions?

2    A.  Yes, sir.

3    Q.  That money, as far as you know, the eleven thousand odd

4    dollars that was deposited, did you use any of that for

5    personal expenses?

6    A.  No, sir.

7    Q.  Pay any tuition with it?

8    A.  No, sir.

9    Q.  What did you pay with it?

10   A.  I made contributions.

11   Q.  Contributions suggested or directed by whom?

12   A.  Jim.

13   Q.  Let's go to page four of the statement and the previous

14   page, if you look at that and tell me what year this

15   statement is from and if you have the specific date?

16   A.  This statement is for October 27, 2010.

17   Q.  Let's turn over to page four and if you look with me at

18   an October 6 deposit of nine thousand nine hundred and

19   sixty-four dollars--are you with me?

20   A.  Yes, sir.

21   Q.  Could you tell me what that is?

22   A.  This is another bonus payment for the contribution

23   program.

24   Q.  Did you use any of that for personal expenses, tuition

25   or otherwise?

O'Dell – Direct

1   A.  No, sir.

2   Q.  What did you use it for?

3   A.  Political contributions.

4   Q.  And who suggested that you use it for those?

5   A.  Jim.

6   Q.  Let's turn to page six and again if you could look at

7   the page before that and just refresh yourself as to the

8   date of this statement, page five?

9   A.  It says down below I think--I'm sorry, 3/28/11.

10  Q.  Okay.  Now looking at page six, March 17th, there's a

11  deposit of fourteen thousand eight hundred and fifty-six

12  dollars.  What is that?

13  A.  It would be a contri--I mean a deposit for--from the

14  bonus program for the contributions.

15  Q.  Okay.  Did you use that for any personal expenses like

16  tuition or otherwise?

17  A.  No, sir.

18  Q.  What did you use it for?

19  A.  Political contributions.

20  Q.  Political contributions that were suggested by whom?

21  A.  Jim.

22  Q.  And paid for by whom?

23  A.  The company.

24  Q.  Mepco?

25  A.  Yes, sir.

O'Dell - Direct

1    Q.  Turning then to--first of all, if you would look at page

2    seven of that exhibit and tell me the date of that

3    statement?

4    A.  August 29th, 2011.

5    Q.  All right.  If we go to page eight, August 12th there's

6    a deposit of thirteen thousand two hundred dollars.  Can you

7    tell me what that is?

8    A.  It is a bonus payment for the political contribution

9    program.

10   Q.  Okay.  Did you--what did you use that money for?

11   A.  Political contributions.

12   Q.  Did you use it for any personal expenditures?

13   A.  No, sir.

14   Q.  The political contributions for which you used that

15   money, who made the decision on the politicians that were

16   supposed to receive that money?

17   A.  Jim.

18   Q.  Who paid for those contributions?

19   A.  Mepco.

20   Q.  Now if you'd turn with me to the last page and again,

21   before you do that, if you could look at page thirteen of

22   the exhibit just to refresh what the date of the statement

23   is?

24   A.  March 27, 2013.

25   Q.  Looking at March 14th, 2013 on page fourteen, there's a

O'Dell – Direct

1   fourteen thousand one hundred and eighty-seven dollar
2   deposit.  Can you tell me what that is?
3   A.  It is a bonus.  It's a deposit from a bonus for the
4   political program.
5   Q.  And did you use any of that fourteen thousand dollars
6   for personal expenses like tuition or anything?
7   A.  No, sir.
8   Q.  What did you use it for?
9   A.  Political contributions.
10  Q.  Who made the decision as to which politicians would
11  receive that money?
12          MR. CARR:  Objection.  Calls for speculation.
13          THE COURT:  If he knows.
14  MR. BERNARD:
15  Q.  If you know.
16  A.  Yes, sir; Jim Laurita.
17  Q.  Who ultimately paid for those political contributions?
18  A.  Mepco.
19  Q.  Let me ask you, would you or your wife have made any of
20  the political contributions we just talked about had the
21  company or the defendant not reimbursed you or told you were
22  going to be reimbursed for that money?
23  A.  No, sir?
24  Q.  Did--when this whole program was being presented to you,
25  did the defendant ever say to you or anybody on his behalf

O'Dell – Direct

1    say, hey, you know your salary just isn't commensurate with

2    the industry so I'm going to give you an additional fifty

3    thousand dollars to bring you up to speed?

4    A.  I don't remember any conversation like that.

5    Q.  You have in front of you if you could look at

6    Exhibit--what's been marked for identification as 1-62.  Do

7    you have that in front of you?

8    A.  Yes, sir.

9    Q.  Would you tell--tell the jury in general what that is?

10   A.  It is a copy of an e-mail sent from--from Mr. Laurita to

11   myself.

12   Q.  And in part, or in general, did this e-mail relate to

13   contributions you were making pursuant to the defendant's

14   suggestions or directives?

15   A.  Yes,

16          MR. BERNARD:  Your Honor, I would ask that Exhibit

17   1-62 be admitted.

18          THE COURT:  Any objection?

19          MR. CARR:  No, Your Honor.

20          THE COURT:  All right.  Government Exhibit 1-62 is

21   admitted.

22      (Government Exhibit 1-62 admitted.)

23   BY MR. BERNARD:

24   Q.  Would you pull that up please and blow up the bottom

25   section of it?  Thank you.  Now it appears that, and I'll

O'Dell – Direct

1    let you explain it in more detail, but it appears that there

2    is a--two e-mails, one that's being forwarded and one from

3    Mr. Laurita to you.  Is that a fair statement?

4    A.  Yes.

5    Q.  And the lower e-mail mentions your name.  Can you read

6    that, where it mentions your name?

7    A.  Kevin O'Dell was going to send the remaining one

8    thousand via a post dated check from his wife Dawn.

9    Q.  Okay.  And that statement that Kevin O'Dell was going to

10   make the remaining one thousand dollars, was that something

11   you came up with on your own to make a one thousand dollar

12   contribution to apparently the McKinley campaign?

13   A.  No, sir.

14   Q.  Who made the decision that you were going to do that?

15   A.  Jim.

16   Q.  Who was alternately paying for that one thousand

17   dollars?

18   A.  Mepco.

19   Q.  Now the e-mail also says, if you can read right below

20   where it talks about you, what does that next line say?

21   A.  I am following up with each of them as well but hoping

22   you could be helpful push as well--be a helpful push as

23   well.  I'm sorry.

24   Q.  During this program did you occasional get a helpful

25   push from the defendant or others to make sure you get your

O'Dell - Direct

1    contributions in?

2    A.  I don't remember--I didn't remember this until I saw the

3    e-mail but, no, I don't think that happened on a regular

4    basis.

5    Q.  Okay.  Why is that?

6    A.  I tried to do what I was asked.

7    Q.  Tried to get your contributions in on time?

8    A.  Yes, sir.

9    Q.  And if you--in this instance it appears that you got a

10   push?

11   A.  Yes, sir.

12   Q.  Do you know why you hadn't gotten it in on time at that

13   time?

14   A.  I don't remember.

15   Q.  Okay.  And this talks about--this e-mail is dated when?

16   A.  April 4th, 2011.

17   Q.  Okay.  And it is a thousand dollars donation supposedly

18   from your spouse?

19   A.  Yes, sir.

20   Q.  Stacy, could you bring up Exhibit 12 page three?  Blow

21   that up.  This appears to be and I--the e-mail is dated, as

22   you have indicated, April 4th, 2011?

23   A.  Yes, sir.

24   Q.  This check--who wrote this check?

25   A.  My wife.

132

O'Dell - Direct

1   Q.   Okay.  It appears to be post dated to March 31st, 2011,

2   is that a fair statement?

3   A.   The date is March 31st, I can see that for sure.

4   Q.   That's a thousand dollars to McKinley?

5   A.   It is.

6   Q.   Did that relate to this e-mail as far as you know or can

7   tell?

8   A.   As far as I would know, yes, sir.

9   Q.   So the push worked in this instance?

10  A.   Yes, sir.

11  Q.   In fact, let's go back to Exhibit 1-62 because I kind of

12  went over it quickly but at the top of that e-mail is--you

13  reference a message from Mr. Laurita, the defendant?

14  A.   Yes.

15  Q.   That's the message basically what--he's asking--help

16  moving your donation along?

17  A.   Yes, sir.

18           MR. BERNARD:  Excuse me, Your Honor.

19       (Pause)

20  BY MR. BERNARD:

21  Q.   Now at some point while you were at Mepco, did the

22  contribution program and/or the deposits for contributions

23  end?

24  A.   Yes, sir.

25  Q.   Do you know why?

O'Dell – Cross

1   A.  No.

2   Q.  After--while you were at Mepco, after the deposits ended

3   or the reimburses ended, did you make any other

4   contributions?

5   A.  No, sir.

6   Q.  Political contributions, I meant.

7   A.  I understand, yes, sir.

8   Q.  Thank you.

9        MR. BERNARD:  Your Honor, I pass this witness for

10  cross-examination.  I'm happy to retrieve the exhibits

11  unless--

12        THE COURT:  All right.  Thank you.  Do you want the

13  exhibits left up there for his use, Mr. Carr?

14        MR. CARR:  Yes, Your Honor.  Your Honor, may I have

15  a moment please?

16        THE COURT:  Yes.

17     (Pause)

18        MR. CARR:  Thank you, Your Honor.

19        THE COURT:  You're welcome.

20                    CROSS EXAMINATION

21  BY MR. CARR:

22  Q.  Mr. O'Dell, during some of the questions there was a

23  compound verb in there which was and who made--or who made

24  the suggestions or directed.  Is it correct that the

25  campaigns and the amounts were always suggestions?

134

O'Dell - Cross

1    A.  The term suggestion was always used as I remember; yes,
2    sir.
3    Q.  At no time were you ever told from Jim Laurita that it
4    was mandatory?
5    A.  I don't remember being told that it was mandatory.
6    Q.  Did you also receive an anniversary bonus?
7    A.  I may have, I don't remember that.
8    Q.  And a wellness bonus?
9    A.  Yes.  I do remember that; yes, sir.
10   Q.  There's a health bonus which was initiated?
11   A.  Yes.
12   Q.  And are you aware of whether or not those are
13   discretionary bonuses that Jim Laurita is authorized to
14   give?
15   A.  I assume they are.  I don't know.
16   Q.  Did you ever disagree with giving money to a certain
17   campaign?
18   A.  No, sir.
19   Q.  Did you ever disagree with the amount?
20   A.  No, sir.
21   Q.  Are you aware of other executives that did and were you
22   present for any of those discussions?
23   A.  Not that I remember.
24   Q.  At any time did Jim Laurita ever tell you to hide the
25   fact that the additional bonuses had something to do with

O'Dell - Cross

1    political contributions?

2    A.  I don't remember being told that.

3    Q.  You were never told to destroy documents or e-mails?

4    A.  I don't remember being told to do that.

5    Q.  And the payments were made to you through the normal

6    payroll system, just like all other payments from Mepco, is

7    that correct?

8    A.  Yes, sir.

9    Q.  And they showed up on your bank statements in the same

10   way?

11   A.  That's correct.

12   Q.  The payments were also made a few times a year in a lump

13   sum payment?

14   A.  Yes, sir.

15   Q.  At no time was there anything such as, hey, we need a

16   thousand dollar check.  We'd like to have a thousand dollar

17   check.  Here's a thousand dollars, now give me the check?

18   A.  I don't remember it being like that; no, sir.

19   Q.  All the money that you were paid by Mepco went into the

20   same bank account, is that correct?

21   A.  Yes.

22   Q.  If I can draw your attention to Government Exhibit 1-62,

23   the e-mail.

24   A.  Okay.

25   Q.  Were you aware at the time that the campaigns were

O'Dell - Cross

1    tracking your contributions?

2    A.  No.  I was aware that Karen had a, you know, a sheet

3    that was tracking what we were asked to do and what we did

4    but I don't know about the campaigns themselves.

5    Q.  Were you surprised to see this e-mail then when the

6    campaigns were keeping track of your donations?

7    A.  I don't remember--I don't remember the e-mail actually

8    but I don't remember being surprised; no, sir.

9    Q.  And as far as Jim forwarding that e-mail to you, with

10   the statement, which the Government's already gone over in

11   on direct, was there any other follow up from Jim?

12   A.  I don't remember any.

13   Q.  He just simply sent the e-mail and said any help would

14   be appreciated?

15   A.  That's all that I remember.

16   Q.  Is it accurate, Mr. O'Dell, that the vast majority of

17   your household income comes from your--at the time in 2010

18   and 12, '13 came from your employment with Mepco?

19   A.  I don't know what your term vast majority is but, yes,

20   sir, most of my income would be from employment.

21   Q.  Did you have any other source of income?

22   A.  I'm sorry.  I thought you were differentiating between

23   the bonus and the other income.  So, no, you're exactly

24   right.  It was all my income.  I'm sorry.  I misunderstood

25   you.

O'Dell - Cross

1    Q.  No, no, no.  It was a bad question on my part.  All of

2    your income came from Mepco?

3    A.  Yes, sir.  My wife was employed from time to time but

4    for myself it was all my income.

5    Q.  I'm going to ask that page three of Government Exhibit

6    12 be displayed.  I apologize.  Page four.  If we could

7    highlight the bottom portion of that statement.  Mr. O'Dell,

8    this is your Marriott rewards credit card?

9    A.  It is.

10   Q.  And again we are referencing, for the record, page four

11   of Government Exhibit 12.  Mr. O'Dell, because all of your

12   income except for the times when your wife worked, came from

13   Mepco.  Would you agree with me for instance that--well

14   would you agree with me the first entry is McDonalds of

15   Westover for two dollars and seventy-five cents?  Is that

16   correct?

17   A.  Yes.

18   Q.  And you decided to go to McDonald's, correct?

19   A.  Yes, sir.

20   Q.  But ultimately Mepco paid for that?

21   A.  That's fair to say; yes, sir.

22   Q.  And on the next entry is Sheetz of Morgantown, is that

23   correct?

24   A.  It is.

25   Q.  Seven dollars and sixty-two cents if I can read that

O'Dell – Cross

1    correctly?

2    A.  Yes.

3    Q.  And ultimately you used Mepco money to pay for that?

4    A.  Yes, sir.

5    Q.  And 4/9, Bob Evans of Morgantown thirty dollars and

6    sixty-one cents?

7    A.  Yes.

8    Q.  And again, Mepco money paid for that?

9    A.  Correct.

10   Q.  That's true of every entry on this credit card, is it

11   not?

12   A.  Yes, sir.

13   Q.  Under--

14   A.  Yeah, I understand.  Yes, sir.

15   Q.  There wasn't any other source of income you had?

16   A.  Save the little bit--or what my wife may deposit from

17   time to time but, yes, that's all.

18           MR. CARR:  Your Honor may I have just a moment

19   please?

20           THE COURT:  Yes.

21      (Pause)

22   BY MR. CARR:

23   Q.  Mr. O'Dell, Jim Laurita never gave you any indication

24   that there was anything wrong with what has been referred to

25   as the program, is that correct?

139

                          O'Dell - Redirect

1    A.  That is correct.

2    Q.  And you never indicated to him that you believed there

3    was anything wrong with the program?

4    A.  No, sir.

5            MR. CARR:  No further questions at this time, Your

6    Honor.

7            THE COURT:  All right.  Any redirect?

8            MR. BERNARD:  Briefly, Your Honor.

9                        REDIRECT EXAMINATION

10   BY MR. BERNARD:

11   Q.  Would you bring up Exhibit 12 page four again please?

12   Sir, during cross-examination there was a discussion about

13   your statement which is page four of Exhibit 12 and you also

14   talked--a little bit about Ms. Hughes and her spreadsheet

15   concerning donations and tracking the same.  Did Karen

16   Hughes, to your knowledge, track how you spent your salary

17   in a spreadsheet?

18   A.  No, sir.

19   Q.  Did she track how you spent your tonnage bonus?

20   A.  No, sir.

21   Q.  But she did track how you spent this additional bonus?

22   A.  Yes, sir.

23   Q.  Why?

24           MR. CARR:  Objection.  Calls for speculation.

25           MR. BERNARD:  If you know?

O'Dell – Redirect

1          THE COURT:  Thank you.  With the correction I'll
2     allow it.
3     BY MR. BERNARD:
4     A.  I would assume--well I know it was to make sure that
5     when we--there was enough money to cover the contributions
6     that were suggested.
7     Q.  Did she also track the contributions that were made?
8     A.  I assume she did.
9     Q.  Did the defendant ever send you an e-mail saying, hey,
10    you haven't been to McDonald's lately, you should probably
11    go there on this date and spend your salary?
12    A.  No, sir.
13    Q.  But he did send you an e-mail, as we've discussed, when
14    your contribution was a little late, political contribution?
15    A.  Yes.
16    Q.  Now there was a question about legality and whether the
17    defendant--and I don't know the exact language so I'll
18    paraphrase, whether the defendant ever indicated that there
19    was anything unlawful or untoward concerning this program.
20    Do you remember that discussion with Mr. Carr?
21    A.  Yes.
22    Q.  When the defendant was proposing this program to you,
23    did you trust the defendant and whether the program--whether
24    there was any problem with the program?
25    A.  I did.

O'Dell – Redirect

1    Q.  And you trusted him--it was his idea.  He came up with

2    the program and this reimbursement program, for lack of a

3    better term?

4    A.  I--

5           MR. CARR:  Objection.  Calls for speculation.

6           MR. BERNARD:  I'm asking whether he trusted the

7    defendant, Your Honor.

8           THE COURT:  Overruled.

9    BY MR. BERNARD:

10   A.  I trust Jimmy.

11   Q.  Now just so we're clear, everything else aside, to your

12   knowledge the defendant was aware and had even made

13   suggestions to you about donations to political campaigns.

14   Is that a fair statement?

15   A.  So that again please.

16   Q.  The defendant, Mr. Laurita, was aware that you were

17   making campaign contributions?

18          THE COURT:  Are you summing up or are you tracking

19   on redirect what was on the cross examination?

20          MR. BERNARD:  A little bit of both I think.

21          THE COURT:  Limit it to the cross examination.

22   BY MR. BERNARD:

23   Q.  Whether the defendant ever talked to you about the

24   legality of this program or the appropriateness of the

25   program, to your knowledge was he aware of the fact that you

O'Dell - Recross

1   were making the contributions and the company was

2   reimbursing them.

3   A.  He was--

4           MR. CARR:  Objection.  Calls for speculation.

5           MR. BERNARD:  To your knowledge.

6           THE COURT:  It's to his knowledge.  Overruled.

7   BY MR. BERNARD:

8   A.  Yes, he was aware.

9           MR. BERNARD:  Okay.  Thank you.  I have no further

10  questions.

11          THE COURT:  Any further cross-examination?

12          MR. CARR:  Just a brief moment, Your Honor.

13      (Pause)

14          MR. CARR:  Briefly, Your Honor.

15                          RECROSS EXAMINATION

16  BY MR. CARR:

17  Q.  Mr. O'Dell, why did you trust Jim Laurita?

18  A.  I had worked with Jim for several years.  He had proven

19  to be, and I believe is, a very honest and good man.

20          MR. CARR:  Nothing further, Your Honor.

21          THE COURT:  All right.  Is the witness excused?

22          MR. CARR:  The witness is excused on behalf of the

23  United States.  I don't know if he's subject to recall or

24  not.

25          MR. CARR:  Your Honor--no, Your Honor.

Osborn - Direct

1          THE COURT:  All right.  Mr. O'Dell, you are free to

2     go.  You may step down.  You are excused as a witness.

3          (Witness excused)

4          THE COURT:  The Government may call its next

5     witness.

6          MR. BERNARD:  Your Honor, the United States would

7     call Brian Osborn.

8          THE COURT:  Brian Osborn.  Mr. Bernard, do you want

9     to retrieve the exhibits you used with the witness?

10          MR. BERNARD:  Sure.  Yes, Your Honor.

11          THE COURT:  Thank you.

12          MR. BERNARD:  You're welcome.

13          THE COURT:  Mr. Osborn, good morning.  I'm Judge

14     Keeley.  Would you please come forward right through the

15     middle there and approach the Clerk standing in front of me

16     and she will administer the oath to you before you take the

17     witness stand.

18          BRIAN OSBORN, GOVERNMENT'S WITNESS, SWORN

19          THE CLERK:  Thank you.  If you would please have a

20     seat in the witness stand.  The witness is Brian Osborn,

21     O-s-b-o-r-n.

22                    DIRECT EXAMINATION

23     BY MR. BERNARD:

24     Q.  Good morning, sir.  Could you please give us your name,

25     a little bit of your background, where you're employed,

Osborn – Direct

1    where you live?

2    A.  My name is Brian Matthew Osborn.  My background is that

3    I'm from--originally from Bridgeport.  I'm a mining

4    engineer.  I graduated from WVU in 1985 and I currently am

5    employed with Mepco LLC in Morgantown.

6    Q.  And when did you, if you recall, first become employed

7    with Mepco?

8    A.  1997.

9    Q.  And in approximately 2010 what role did you serve at

10   Mepco?

11   A.  I was the Vice President of Engineering.

12   Q.  I don't know if you said, if you did I missed it, but

13   where are you currently employed and what is your title?

14   A.  I am currently employed at Mepco LLC and my current

15   title is Senior Vice President of Operations.

16   Q.  It's fair to say that you know the defendant

17   Mr. Laurita?

18   A.  Yes.

19   Q.  Do you recall in or about 2010 being approached by

20   Mr. Laurita, the defendant, concerning making political

21   contributions?

22   A.  Yes.

23   Q.  How did you--how were you approached?  What happened?

24   A.  He had called a meeting of the officers.

25   Q.  Okay.  What happened at that meeting?

Osborn – Direct

1    A.  Jim mentioned to us that we were needing to have access

2    to certain elected officials and he explained that to do

3    that, political contributions would help us as a company do

4    that.

5    Q.  Did he specifically tell you how political contributions

6    correlated to access the politicians?

7    A.  I don't really recall that part.

8    Q.  Okay.  But his statement was in order to have access we

9    need to make contributions?

10   A.  Correct.

11   Q.  Okay.  What specifically or how did he describe this

12   process?  How was it going to work?

13   A.  The mechanics of it?

14   Q.  Yes.

15   A.  I don't recall him making any statements to that effect

16   at that meeting.

17   Q.  At some point did somebody, either the defendant or

18   somebody on his behalf, tell you how it was going to work?

19   A.  No.  The way it happened was I received money and

20   requests from other folks at the company to make

21   contributions.

22   Q.  Specifically tell me how that happened then.  You

23   received the money how?

24   A.  I received the money through my payroll and it was

25   deposited by direct deposit into my checking account or

Osborn - Direct

1    wherever it was at the time.  I had two bank accounts over

2    the years.

3    Q.  So at this time--let's break your salary or your

4    compensation down a little bit.  You indicated that you had

5    two bank accounts?

6    A.  Yes.

7    Q.  Where was--was your salary deposited into either or of

8    those accounts?

9    A.  It was either one or the other.  I had just changed

10   accounts.

11   Q.  And how was it deposited?

12   A.  It was direct deposit and it was deposited periodically.

13   Well I shouldn't say periodically.  It was deposited--there

14   was no rhyme or reason to it.  It was sometimes before the

15   contribution, sometimes after the contribution was made.

16   Q.  Let me back you up a little bit.  I'm talking in general

17   your salary, how was that--your overall salary?

18   A.  It was paid every two weeks.

19   Q.  Okay.  And did you receive any bonuses--prior to this

20   contribution program were you receiving regular bonuses?

21   A.  Yes.

22   Q.  Were those the so-called tonnage bonuses?

23   A.  Yes.

24   Q.  How often did you receive a tonnage bonus?

25   A.  Monthly.

147

Osborn – Direct

1   Q.  So during a particular month, before this contribution

2   program, how many deposits for salary would you get per

3   month?

4   A.  Two.

5   Q.  Okay.  And how many deposits for bonuses would you get?

6   A.  I would get one for tonnage.

7   Q.  And then once this program began, I think what you just

8   said, is additional deposits would--would show up on a

9   sporadic basis?

10  A.  That's correct.  Yes.

11  Q.  And if I call this the second bonus, do you know what

12  I'm talking about?

13  A.  Yes.

14  Q.  Okay.  The second bonus being the political contribution

15  fund?

16  A.  Yes.

17  Q.  Now once--do you recall initially when the program

18  began, did you start making contributions out of the gate?

19  Did you receive funds out of the gate, if you recall?

20  A.  I do not recall that.

21  Q.  When you were to make a political contribution, what

22  were the mechanics of that?  How is it that you knew to make

23  a political contribution to whomever?

24  A.  I would receive an e-mail or I would receive a written

25  request from other folks.

Osborn - Direct

1   Q.  Is it fair to say--did you ever--let me ask it this way.

2   Did you ever, during this program, just decide, hey, I'm

3   going to write a check to this campaign for twenty-five

4   hundred dollars on your own volition?

5   A.  No.

6   Q.  Whose direction did you wait for before you made a

7   contribution?

8   A.  It was Karen Hughes or Suzanne Crane.

9   Q.  And at whose direction, to your knowledge, were they

10  making those decisions?

11  A.  I think that came directly from Jim.  That is my

12  understanding.

13  Q.  At the meeting or when it was discussed with you, who

14  was the one that was going to be the, I guess the one in

15  charge of this program making those decisions?

16  A.  It was my understanding it was Jim.

17  Q.  It wasn't going to be you?

18  A.  No, sir.

19  Q.  And who was the one, as far as you knew, that was going

20  to pay for those contributions?

21  A.  The company.

22  Q.  Mepco?

23  A.  Yes.

24  Q.  Who was the one that decided that Mepco was going to pay

25  for those?

149

Osborn - Direct

1    A.   Jim.

2    Q.   Did you have any concern about, you know, where is this

3    money going to come from, that if I'm going to be making

4    political contributions where am I going to get the money

5    from?

6    A.   I knew that I would be made whole; that I would be

7    reimbursed for those contributions.

8    Q.   So you weren't worried about losing money?

9    A.   No.

10   Q.   You weren't worried about losing compensation?

11   A.   No.

12   Q.   Had you ever made a political contribution, either you

13   or your wife, prior to the Mepco program?

14   A.   No.

15   Q.   Did you have any--did you voice any concerns or--or you

16   voice any hesitancy about the program when it was first

17   addressed with you?

18   A.   No I didn't.

19   Q.   Why not?

20   A.   I didn't think there was anything wrong with it.

21   Q.   Why not?

22   A.   I trusted Jim, that he would make good decisions like he

23   had my whole career.

24   Q.   You were relying on him?

25   A.   Yes.

Osborn – Direct

1    Q.   Okay.  During this time frame at Mepco, who was

2    responsible for promoting you?

3    A.   Jim.

4    Q.   Who determined what your pay was going to be?

5    A.   Jim.

6    Q.   And who had the power to demote or terminate you?

7    A.   Jim.

8    Q.   Let's talk a little bit about the communication during

9    this program.  How is it that you learned or were going to

10   learn which candidates and how much you were supposed to

11   donate?  How was that going to work or how did it work?

12   A.   It worked by--through e-mails from Karen or Suzanne or I

13   would receive a slip of paper with the contribution form

14   attached.

15   Q.   What were--what information was contained in these

16   e-mails or forms or whatever communication you received?

17   A.   It would say something like suggested contribution to

18   such and such elected official or one running for office.

19   Q.   Did it--did it delineate in those communications who

20   should be making the contribution, whether it is you or your

21   spouse?

22   A.   Yes, it would.

23   Q.   Do you recall, during the program, some of the campaigns

24   to which you contributed through the Mepco program?

25   A.   Yes.

Osborn - Direct

1    Q.  Would you tell us some of those if you recall?

2    A.  Yes, I remember Senator Manchin, Representative

3    McKinley, Mr. Altmire, Mr. Critz, Ms. Capito.  Those are the

4    ones that come to mind.

5    Q.  Okay.  Now I think you indicated a few minutes ago that

6    among the ways the wishes or desires of the defendant

7    concerning political contributions--among the ways those

8    were communicated to you included e-mails, are you with me?

9    A.  Yes.

10   Q.  And I believe--who sent those e-mails to you?

11   A.  Karen Hughes or Suzanne Crane.

12   Q.  Do you recall among those e-mails ever being asked to

13   delete them after you read them or were received them?

14   A.  I do recall one, yes.

15   Q.  Okay.  And had you ever received a request by Karen or

16   anybody at Mepco to delete an e-mail that had been sent to

17   you--to specifically delete an e-mail?

18   A.  Yes.

19   Q.  And what was that?

20   A.  That was from Karen Hughes.  I don't recall exactly what

21   the e-mail said but I do recall the e-mail.

22   Q.  Did it relate to this campaign contribution program?

23   A.  Yes.

24   Q.  Okay.  Other than that e-mail that you recall--had you

25   ever in your entire time at Mepco been asked to delete an

Osborn – Direct

1   e-mail specifically in the body of an e-mail?

2   A.  No.

3   Q.  What was your reaction being asked to delete the e-mail?

4        MR. CARR:  Objection.  Relevance.

5        THE COURT:  Sustained.

6   BY MR. BERNARD:

7   Q.  Who--when you got the contribution together, whether it

8   be a check or credit card charge, how was it then delivered

9   to the campaigns or how did the process next work?

10  A.  I would--whether it was check or credit card application

11  I would turn those into the person who requested them.

12  Q.  So--well let me ask you.  Who were the individuals

13  typically under this program that collected your

14  contributions?

15  A.  Karen Hughes or Suzanne Crane.

16  Q.  Okay.  Do you know what happened to them after you

17  delivered them to either Ms. Hughes or Ms. Crane?

18  A.  No.

19  Q.  Did you have--was there ever indication that the checks

20  that you made, the credit card contributions that you made

21  never reached the campaigns or went somewhere else other

22  than to the campaigns?

23  A.  Could you repeat that please?

24  Q.  Yes.  To your knowledge, the money that you wrote, the

25  checks that you wrote, the credit card payments that you

Osborn – Direct

1    made to political campaigns, do you have any knowledge that

2    they never made it to the campaigns?

3    A.   No.

4    Q.   As far as you know they did?

5    A.   Yes.

6    Q.   Who--how did you keep records of contributions you made

7    and how much you were owed or how much you had pulled off an

8    advance?  Did you keep records?

9    A.   I did.

10   Q.   So you would then do what with your records?

11   A.   I just would mention to Karen if I thought I was short

12   or, you know, ahead too far.

13   Q.   Did she also keep records, to your knowledge?

14   A.   I believe she did but I don't have any evidence of that.

15   Q.   Did you ever receive any spreadsheets or anything along

16   those lines from Ms. Hughes concerning the campaign

17   contribution program?

18   A.   I don't recall specifically if it was a spreadsheet but

19   I do recall receiving some information to that effect, yes.

20   Q.   Did you--other than your bank statements, did you keep

21   any specific records concerning your tonnage bonuses?

22   A.   No I did not.

23   Q.   Now, did you, as part of this program, attend any

24   fundraisers?

25   A.   I did.

Osborn - Direct

1    Q.  And were other Mepco executives there at some of these

2    fundraisers?

3    A.  Yes.

4    Q.  Was the defendant at those fundraisers?

5    A.  Yes.

6    Q.  During the fundraisers who was the voice of the company,

7    for lack of a better term?

8    A.  It was Jim.

9    Q.  Did you run any of the fundraisers or who was in charge?

10   A.  I did not run fundraisers and Jim was in charge.

11        MR. BERNARD:  Your Honor, may I approach the

12   witness?

13        THE COURT:  You may.

14        MR. BERNARD:  Thank you.

15   BY MR. BERNARD:

16   Q.  I have set in front of you two exhibits and I will ask

17   about them individually.  Turning first to what's been

18   marked as Exhibit 2, could you tell me what that compilation

19   exhibit represents in general, without getting into

20   specifics right now?

21   A.  These are records of contributions to political

22   candidates.

23   Q.  Okay.  And I guess a little more specifically would they

24   include checks as well as credit card payments?

25   A.  Yes.

155

Osborn – Direct

1   Q.  And those were payments made pursuant to this program

2   we've been talking about, the Mepco program?

3   A.  Yes.

4          MR. BERNARD:  Your Honor, at this time I would ask

5   that Exhibit 2 be admitted.

6          THE COURT:  Any objection?

7          MR. CARR:  No, Your Honor.

8          THE COURT:  Government Exhibit 2 is admitted.

9      (Government Exhibit Number 2 admitted.)

10         MR. BERNARD:  Thank you, Your Honor.

11  BY MR. BERNARD:

12  Q.  The--we'll get into this more specifically, but these

13  contributions, the checks and the credit card charges made

14  to political campaigns, at whose direction did you make

15  these?

16  A.  As I said before it was at Karen Hughes or Suzanne

17  Crane's direction.

18  Q.  Okay.  And, again, where were they receiving their

19  instructions, to your knowledge?

20  A.  Yes, from Jim.

21  Q.  And all of these contributions, who ultimately paid for

22  them?

23  A.  The company.

24  Q.  Let me ask you to look at Exhibit 3 please and in

25  general again, just identify what that includes?

Osborn - Direct

1   A.  These are my bank records.

2   Q.  And do those bank records reflect payments made by Mepco

3   as reimbursements or advancements for the political

4   contributions we have talked about?

5   A.  Yes, sir.

6   Q.  Let me ask you to keep Exhibit 3 in front of you and

7   look at page one.  First of all, can you tell me, from

8   looking at page one, what is this and what time frame does

9   it concern?

10  A.  This is a bank record from my United Bank checking

11  account.  It is from February 2010 through March of 2010.

12  Q.  Looking specifically at a deposit March 9th, 2010 of

13  eleven thousand dollars two hundred and twenty-six dollars.

14        MR. BERNARD:  Oh, I'm sorry.  Your Honor, I'd ask

15  that this Exhibit 3 be admitted.

16        THE COURT:  Is there any objection?

17        MR. CARR:  No, Your Honor.

18        MR. BERNARD:  I got ahead of myself.

19        THE COURT:  Government Exhibit 3 is admitted.

20     (Government Exhibit Number 3 admitted.)

21        MR. BERNARD:  I apologize.

22  BY MR. BERNARD:

23  Q.  Do you see that eleven thousand two hundred and

24  twenty-six dollar deposit?

25  A.  Yes, sir.

Osborn – Direct

1    Q.   What is that?

2    A.   That would've been a--either a pre-payment or a post

3    payment for a political contribution or contributions.

4    Q.   Did you use any of that money, that eleven thousand two

5    hundred and twenty-six dollars for any personal expenditures

6    like tuition or anything else?

7             MR. CARR:   Objection.   Leading.

8             THE COURT:   Sustained.

9    BY MR. BERNARD:

10   Q.   Did you use any of that money for personal expenditures?

11            MR. CARR:   Renew my objection.

12            THE COURT:   You're suggesting the area.   You should

13   ask a general question.   Sustained again.

14   BY MR. BERNARD:

15   Q.   Did you use any of that money for anything other than

16   political contributions?

17            THE COURT:   How about what was the money used for?

18            MR. BERNARD:   All right.

19   BY MR. BERNARD:

20   Q.   What was the money used for?

21   A.   It was used for political contributions.

22   Q.   Anything other than that?

23   A.   No.

24   Q.   Thank you.   Looking at page two, there is a--and again

25   could you tell us what the date of that statement is, the

Osborn – Direct

1    date range?

2    A.   This is a bank statement from October 1st through the

3    29th of 2010.

4    Q.   Okay.  There is a deposit October 6th of nine thousand

5    nine hundred and thirty-four dollars.  Could you tell us

6    what that is?

7    A.   That appears to be reimbursement for a political

8    contribution.

9    Q.   What did you use that for?

10   A.   For political contributions.

11   Q.   Did use it for anything other than that?

12   A.   No.

13   Q.   Turning next to page three I believe, could you tell me

14   what the date of that statement is or at least that portion

15   of the statement?

16   A.   That was March 1st through the 31st of 2011.

17   Q.   Looking at March 17th there's a deposit of fourteen

18   thousand eight hundred and fifty-six dollars.  Could you

19   tell us what that is?

20   A.   That is a reimbursement for political contribution.

21   Q.   What did you use that for?

22   A.   Political contributions.

23   Q.   Anything other than political contributions?

24   A.   No.

25   Q.   Turning then to page four please, and again if you could

Osborn - Direct

1  look and tell us what the date range is of this statement or

2  portion of the statement?

3  A.   That is a bank record of mine from July 30th of 2011 to

4  August 31st of 2011.

5  Q.   Looking at August 12th there is a deposit of thirteen

6  thousand two hundred dollars.  What is that?

7  A.   That would have been a reimbursement for a political

8  contribution.

9  Q.   What did you spend it on?

10  A.   Political contributions.

11  Q.   Anything other than political contributions?

12  A.   No.

13  Q.   Then finally if you will flip to page seven of that

14  exhibit and first of all could you tell me what the date

15  range is with regard to this statement?

16  A.   March 1st through the 29th of 2013.

17  Q.   Looking at March 14th there's a fourteen thousand five

18  hundred and eighty-seven dollar fifty cent deposit.  Can you

19  tell me what that is?

20  A.   That was a reimbursement for a political contribution.

21  Q.   What did you use those funds for?

22  A.   Political contributions.

23  Q.   Anything else?

24  A.   No.

25  Q.   And all the contributions you made pursuant to these

Osborn – Direct

1    deposits we just talked about, at whose direction did you

2    make those contributions?

3    A.   From Karen Hughes and Suzanne Crane.

4    Q.   And who did they receive their direction from to your

5    knowledge?

6    A.   Jim.

7    Q.   And who--obviously the money came from your bank account

8    and your checking account--excuse me, your credit cards.

9    Who ultimately paid for all of those payments reflected by

10   your contributions?

11   A.   The company.

12   Q.   Let's look at Exhibit 2 which I believe has been

13   admitted.  We will go through these rather quickly.  Page

14   one is what?

15   A.   That is a check for political contribution.

16   Q.   Okay.  And that is made apparently by your spouse?

17   A.   Yes.

18   Q.   At whose direction did she make that contribution?

19   A.   At my direction.

20   Q.   And from whom did you receive your direction?

21   A.   From Karen Hughes I believe at that time.

22   Q.   And ultimately who directed her to do that?

23   A.   Jim.

24   Q.   Who paid for this contribution?

25   A.   The company, Mepco.

Osborn - Direct

1    Q.   Turning to page two there are a total of four checks but

2    I'm interested in looking at the three checks on the bottom.

3    Can you read those?

4    A.   Yes.

5    Q.   What are those three checks?

6    A.   Those are three checks to political candidates.

7    Q.   Okay.  And what candidates are contained or being--are

8    receiving these contributions?

9    A.   Two were to David McKinley and the third was to

10   Oliverio.

11   Q.   Same question as before, ultimately who directed that

12   these contributions be made?

13   A.   Jim.

14   Q.   And ultimately who paid for them?

15   A.   Mepco.

16   Q.   Let's turn over to page three--and actually page four

17   more specifically.  What does this represent, this page

18   first of all?

19   A.   This is a credit card statement.

20   Q.   Are you able to tell approximately what year this

21   is--this is for?

22   A.   This is for 2010.

23   Q.   And more specifically with regard to this exhibit, I

24   believe it's August 19th, there is a charge Manchin for West

25   Virginia.  Do you see that?

162

Osborn - Direct

1    A.   Yes.

2    Q.   And it appears to be a thousand dollar charge?

3    A.   Yes.

4    Q.   What is that?

5    A.   That's a political contribution to Senator Manchin.

6    Q.   Ultimately who directed that that be made?

7    A.   Jim did.

8    Q.   And ultimately who paid for it?

9    A.   Mepco.

10   Q.   Turn to page five please, page five of Exhibit 2, I'm

11   sorry.  What is that way?

12   A.   That's a political contribution to Senator Capito.

13   Q.   Okay.  And, again, who ultimately directed this be made?

14   A.   Jim.

15   Q.   Who ultimately paid for it?

16   A.   Mepco.

17   Q.   Let's go to page six.  What is this?

18   A.   This is a political contribution to David McKinley.

19   Q.   Okay.  And, again, who directed ultimately that that be

20   made?

21   A.   Jim.

22   Q.   And who ultimately paid for it?

23   A.   Mepco.

24   Q.   Let's go to page seven.  Can you tell me what that is?

25   A.   This is a political contribution to David McKinley.

Osborn - Direct

1    Q.  Okay.  And it's interesting on the memo line it says for

2    Lory Osborn.  Do you know what that means?

3    A.  That is not my handwriting so someone must have put that

4    on the check on her behalf.

5    Q.  Do you know why it was put there on her behalf?

6    A.  Probably so--

7           MR. CARR:  Objection.  Calls for speculation.

8    Foundation.

9           MR. BERNARD:  If you know?

10          THE COURT:  Sustained.

11   BY MR. BERNARD:

12   Q.  Do you know?  If you don't--

13   A.  I don't.

14   Q.  Okay.  Ultimately who directed that this check be

15   written and the contribution made--be made?

16   A.  Jim.

17   Q.  Ultimately who paid for this contribution?

18   A.  Mepco.

19   Q.  Let's go to page eight of the same exhibit.  Could you

20   tell me what that is?

21   A.  This is a political contribution to David McKinley.

22   Q.  Okay.  This is made from what I can see, and correct me

23   if I'm wrong, on the same date as the prior check for

24   twenty-five hundred dollars?

25   A.  That's correct.

Osborn – Direct

1   Q.  Do you know why there were two checks written on that

2   date?

3   A.  One was for--on my behalf and one was for my wife's.

4   Q.  Looking at the check on page eight, check number eleven

5   seventy-two, who ultimately directed that you make that

6   contribution?

7   A.  Jim did.

8   Q.  Who ultimately paid for that?

9   A.  The company.

10  Q.  Let's look at page nine.  Can you tell me what that is?

11  A.  This is a credit card statement.

12  Q.  Okay.  Do you know what year--month or year that it

13  relates to?

14  A.  I'm sorry, I don't see the date on the sheet there.

15  Q.  If you look up at the top below the days in the billing

16  cycle, purchases this year, there's a statement date.  I'll

17  try to help you out a little bit.  Do you see that?

18  A.  Oh, yes I do.

19  Q.  Okay.

20  A.  It's from March the 10th of 2012.

21  Q.  All right.

22  A.  I'm sorry.  May 10th of 2012.

23  Q.  Okay.  Thank you.  There is a charge, if you look down

24  at the purchases, April 12 for Manchin for West Virginia

25  five thousand dollars.  What is that?

Osborn – Direct

1    A.   That is a political contribution to Senator Manchin.

2    Q.   And at whose ultimate direction was that made?

3    A.   From Jim.

4    Q.   Who ultimately paid for that?

5    A.   Mepco.

6    Q.   Turning to page eleven, can you tell me what that is?

7    A.   That's a credit card statement.

8    Q.   I'm sorry.  I'm sorry.  Page ten.  Could you tell me

9    once again what date this statement relates to?

10   A.   This is from October the 10th of 2012.

11   Q.   Looking down at September 14th and  15th, there's a

12   couple charges to Tomblin for Governor.  What are those?

13   A.   Those are political contributions to Governor Tomblin.

14   Q.   Okay.  And who ultimately directed that these be made?

15   A.   Jim did.

16   Q.   And who alternately paid for those?

17   A.   Mepco.

18   Q.   Now we're at page eleven.  Could you tell me what that

19   is?

20   A.   This is a political contribution to Mr. Snuffer.

21   Q.   Okay.  And is it a political contribution, did you say?

22   A.   Yes.

23   Q.   Okay.  At whose ultimate direction was this contribution

24   made?

25   A.   Jim.

Osborn - Direct

1    Q.  And who ultimately paid for that political contribution?

2    A.  Mepco.

3    Q.  Finally the last--well actually it's the next to the

4    last page.  We've got two more.  If you look at page twelve

5    and first of all tell me, if you can, what month and year

6    this statement related to?

7    A.  This was from April of 2013.

8    Q.  And then looking down at the actual details, a few

9    PayPal transactions and it appears to be Morrisey on--can

10   you tell me what those four charges were for?

11   A.  Yes.  These were political contributions to Morrisey.  I

12   am not sure what the election was though.

13   Q.  It says AG, would that be Attorney General?

14   A.  That's fair.

15   Q.  At whose ultimate direction were these made?

16   A.  Jim's.

17   Q.  And who ultimately paid for those?

18   A.  Mepco.

19   Q.  Now we're on the last page.  What is the date of that

20   statement?

21   A.  This is from April of 2005.  I'm sorry I think---I can't

22   see that very clear.  It may be April of 2009.

23   Q.  Actually if you look at--there's total fees charged in

24   2013, if that helps you.

25   A.  I'm sorry.  Yes, I see it now.  2013.

Osborn - Direct

1   Q.  April of 2013?

2   A.  Yes, sir.

3   Q.  Okay.  And if you look at April 1st there's a couple

4   charges for twenty-six hundred dollars, two separate

5   charges.  What are those?

6   A.  Those are political contributions to Dave McKinley for

7   Congress.

8   Q.  At whose ultimate direction were these made?

9   A.  Jim's.

10  Q.  And who ultimately paid for those?

11  A.  Mepco did.

12  Q.  Let me ask you.  All these contributions that we have

13  just discussed and gone over, would you or your wife have

14  made any of those contributions but for the direction of the

15  defendant and more importantly the reimbursement by the

16  defendant from Mepco?

17          MR. CARR:  Objection.  Leading.

18          THE COURT:  Overruled.

19  BY MR. BERNARD:

20  A.  No we would not have.

21  Q.  Do you recall whether the program, while you've been at

22  Mepco, at some point did the program end?

23  A.  Yes, it did.

24  Q.  Do you know why?

25  A.  No I don't.

Osborn - Cross

1    Q.  Did you ask, hey, what happened to my second bonus?

2    A.  No I didn't.

3    Q.  Because that would've been a cut in pay, right?

4    A.  No, it wouldn't.

5    Q.  Why not?

6    A.  Because it wasn't my money.

7            MR. BERNARD:  Thank you.  I have no further

8    questions at this time.

9            THE COURT:  All right.  Cross examination?

10           MR. BERNARD:  First of all, do I need to retrieve

11   the exhibits or are you going to use those.

12           MR. CARR:  You can retrieve them.

13                      CROSS EXAMINATION

14   BY MR. CARR:

15   Q.  Mr. Osborn, it is correct, is it not, that Jim

16   Laurita--neither Jim Laurita nor Karen Hughes nor Suzanne

17   Crane said that the donations were mandatory?

18   A.  No, sir.  No, they did not.

19   Q.  They did not.  There was always suggestions?

20   A.  That's correct.

21   Q.  Did you ever have a disagreement with the suggestion?

22   A.  No, sir.

23   Q.  You mentioned I believe on direct examination two

24   e-mails that you recall in which either Karen Hughes or

25   Suzanne Crane mentioned something about deleting the

Osborn – Cross

1    e-mails?

2    A.  I only recall one.

3    Q.  One.

4    A.  From Karen Hughes.

5    Q.  That was the one from Karen Hughes?

6    A.  Yes.

7    Q.  And Jim Laurita never told you to delete anything

8    concerning this program, did he?

9    A.  No, sir.

10   Q.  Jim Laurita never told you to deny, if someone asked

11   you, what the second bonus was in relation to?

12   A.  No.

13        MR. CARR:  May I approach, Your Honor?

14        THE COURT:  You may.

15   BY MR. CARR:

16   Q.  I am handing the witness what has been marked as

17   Defendant's Exhibit A and it's been shown to the Government.

18   Do you recognize that document?

19   A.  Yes, I do.

20   Q.  What is it?

21   A.  This is a request from Karen Hughes for me to make a

22   donation.

23   Q.  And what is the date on it?

24   A.  October 4th, 2010.

25   Q.  And it's a two-page document?

Osborn – Cross

1    A.  Yes.

2             MR. CARR:  Your Honor, I move for the admission

3    Of Defendant's Exhibit A.

4             THE COURT:  Is there any objection to the admission

5    of Defendant's Exhibit A?

6             MR. BERNARD:  No objection.

7             THE COURT:  Defendant's Exhibit A is admitted.

8        (Defendant Exhibit A admitted.)

9             MR. CARR:  Your Honor, if I may have the ELMO

10   turned on.

11            THE COURT:  Yes.  It may take just--okay.  There it

12   comes up.  Sometimes it takes a minute to warm up.

13   BY MR. CARR:

14   Q.  Mr. Osborn this is an e-mail from Karen Hughes to you,

15   is that correct?

16   A.  Yes it is.

17   Q.  And is this one of the e-mail that--an example of an

18   e-mail that you referred to earlier where Karen Hughes was

19   talking to you about contributions?

20   A.  Yes.

21   Q.  And she indicates that there is a second page, is that

22   correct or an attachment?

23   A.  Yes.

24   Q.  And I'm going to take the first page, the printed off,

25   off.  That is the attachment to the e-mail?

Osborn – Cross

1  A.  Yes.

2  Q.  And she says the yellow highlights are the donations I

3  have not yet received from you.  If you intend to make those

4  donations, please fill in the amount and return to me.  Is

5  that the typical type of language that Karen Hughes used

6  when she talked to you about donations?

7  A.  Yes, it is.

8  Q.  She is in no way saying this is a mandatory donation,

9  where is your check, correct?

10  A.  That's correct.

11  Q.  She's asking if you made the decision to make the

12  donation, correct?

13  A.  Correct.

14  Q.  And then asks, are you and Lory--and again, Lory is your

15  wife?

16  A.  Yes.

17  Q.  Both making a fourteen hundred dollar donation to

18  McKinley, is that correct?

19  A.  Yes.

20  Q.  And, again, she is asking whether you and your wife have

21  decided about making a fourteen hundred dollar donation?

22  A.  Yes.

23       MR. CARR:  If I could retrieve Government Exhibit

24  52?

25       THE COURT:  You may.

172

Osborn - Cross

BY MR. CARR:

Q.   And again she says if you're not going to--if you and
your wife are not going to make the fourteen hundred dollar
donation to McKinley, make the adjustment on the attachment,
correct?

A.   Yes.

Q.   Do you recall, was the suggestion from Mr. Laurita that
both of you make a fourteen hundred dollar donation?

A.   No, it was from Karen.

Q.   I apologize.  I thought in direct you had indicated
anything Karen told you regarding donations you believed
ultimately came from Jim, is that correct?

A.   That's correct; yes.

Q.   So the suggestion was two donations of fourteen hundred
dollars, correct?

A.   Yes.  Uh-huh (yes).

Q.   And that's what was annotated on this attached
spreadsheet?

A.   Yes.

Q.   Have you ever seen the spreadsheet that Karen Hughes was
keeping?

A.   Other than the one we're looking at, no.

Q.   You didn't see the one that she was ultimately keeping
in her office?

A.   Not that I'm aware of, no.  I don't recall that.

Osborn - Cross

1   Q.  And so are you aware that it was from the spreadsheet
2   that she was keeping that your bonus was calculated?
3   A.  I wasn't aware of anything besides what we're looking at
4   right here.
5   Q.  Do you recall whether you and your wife both made
6   fourteen hundred dollar contributions to McKinley?
7   A.  Don't recall.
8   Q.  Consequently, if Karen Hughes' spreadsheet reflected
9   that your wife did not make a donation, you would have no
10  reason to disagree with that?
11  A.  That's correct.
12  Q.  If I could please have Government Exhibit 2, page twelve
13  brought up.
14          MR. CARR:  I'm going to return Government Exhibit
15  52 to the Court.
16          THE COURT:  Thank you.
17          MR. CARR:  And returning Defendant's A to the
18  Court.
19  BY MR. CARR:
20  Q.  As it relates, Mr. Osborn, to those four payments for
21  Morrisey  and I believe you said it seems likely that's
22  Morrisey for Attorney General?
23  A.  Yes.
24  Q.  If in--do you know whether Karen Hughes factored these
25  four contributions in to any payment to you?

Osborn – Cross

1    A.  I assume she did.

2    Q.  If the spreadsheet that she used to calculate the second

3    bonus did not include any annotation for you for Morrisey

4    you would have no reason to disagree with that would you?

5    A.  I would not.

6    Q.  If I could please have the entire bottom of the

7    statement highlighted or brought up?  Mr. Osborn, the bank

8    statements that you testified about and that were introduced

9    appear to indicate that all of your income came from Mepco,

10   is that correct?

11   A.  Nearly all, yes.

12   Q.  More than ninety-eight percent?

13   A.  I would say that's correct, yes.

14   Q.  There appear to be a few small deposits?

15   A.  Yes.

16   Q.  This is your Cabela's credit card statement?

17   A.  Yes.

18   Q.  Given that ninety-eight percent of your money came from

19   Mepco, it is true then, is it not, that for instance the

20   bottom right-hand charge for Lowe's of Morgantown?

21   A.  Yes, sir.

22   Q.  That was ultimately--you used Mepco money for that,

23   correct?

24   A.  I considered it my own money.

25   Q.  I understand but that money came from Mepco?

Osborn – Cross

1    A.  Yes.

2    Q.  The next entry for Walmart?

3    A.  Same thing.

4    Q.  But the money ultimately came from Mepco?

5    A.  Yes it did.

6    Q.  And all of the money you received from Mepco, to include

7    the second bonus, was direct deposited into one account?

8    A.  That's correct.

9    Q.  And at some point you mentioned you got rid of that

10   account and got a new one?

11   A.  That's correct.

12   Q.  Did you also receive a wellness or a health bonus and an

13   anniversary bonus?

14   A.  I don't recall the wellness bonus, but I did receive a

15   retention bonus.  It was an annual retention bonus.

16   Q.  And those were discretionary bonuses authorized by

17   Mr. Laurita?

18   A.  Yes.

19   Q.  You were aware that the bonuses were actually paid to

20   you in a few lump sum payments throughout the year?

21   A.  Which ones are you referring to?

22   Q.  Thank you.  The second bonus.

23   A.  Yes.  It was not on a certain frequency.  It was just

24   however it worked out for contributions.

25   Q.  During the time period in which the second bonus program

Osborn - Redirect

1   as it's been referred to, was in existence, Jim Laurita

2   never indicated to you in any way, shape or form that there

3   could be anything wrong or unlawful with the program, is

4   that correct?

5   A.   That's correct.

6   Q.   And you certainly didn't indicate to him that there

7   could be anything wrong or unlawful with the program?

8   A.   No, sir.

9           MR. CARR:  May I have just one moment, Your Honor?

10          THE COURT:  Yes.

11      (Pause)

12          MR. CARR:  Nothing further Your Honor.

13          THE COURT:  Is there redirect?

14          MR. BERNARD:  Briefly, Your Honor.

15                      REDIRECT EXAMINATION

16   BY MR. BERNARD:

17   Q.   Mr. Osborn, had you ever received any e-mails from

18   either the defendant or Ms. Hughes or anybody at Mepco

19   concerning how you spent money other than political

20   contributions?

21   A.   No, sir.

22   Q.   And I think you indicated that--Counsel showed you an

23   exhibit where Ms. Hughes was asking whether you intended to

24   make a contribution.  Do you recall that?

25   A.   Yes.

177

Osborn - Redirect

1    Q.  Was there ever a time when you were instructed or

2    directed to make a contribution that you didn't, to your

3    knowledge?

4    A.  No.

5    Q.  And had you not done that--let's say you decided I am

6    not going to contribute to McKinley and there was fifteen

7    hundred dollars in your account, what would happen to that

8    money?

9    A.  I felt like I would need to--

10         MR. CARR:  Objection.  Calls for speculation and

11   relevance.

12         THE COURT:  Sustained.

13   BY MR. BERNARD:

14   Q.  You indicated in cross that you believed your salary

15   payment was your money.  Do you recall that?

16   A.  Yes.

17   Q.  What did you mean by that?

18   A.  When I received my salary or a tonnage bonus, I felt

19   like that was my money.  If it was not one of those things

20   or the retention bonus, as Mr. Carr suggested, I felt like

21   that was not my money.

22   Q.  Okay.  Did you feel there were strings attached to the

23   bonus, the second bonus?

24   A.  Yes.

25         MR. CARR:  Objection.  Relevance.

Osborn – Redirect

1          MR. BERNARD:  Your Honor, he's opened up with--

2          THE COURT:  Overruled.

3          MR. BERNARD:  --voluntariness.  He's opened up this

4     door throughout the trial.

5          THE COURT:  Yeah.  Overruled.

6     BY MR. BERNARD:

7     Q.  What was your answer?

8     A.  Yes.

9          MR. BERNARD:  Okay.  Thank you.  I have no further

10    questions.

11         THE COURT:  Any recross?

12         MR. CARR:  No, Your Honor.

13         THE COURT:  Is the witness excused?

14         MR. BERNARD:  He is excused, Your Honor, and I'll

15    defer to counsel whether he is subject to recall.

16         THE COURT:  Okay.  Is the witness subject to recall

17    by the defendant?

18         MR. CARR:  No, Your Honor.

19         THE COURT:  Thank you.  Mr. Osborn, you're excused

20    as a witness and free to go.  You may step down.

21       (Witness excused)

22         THE COURT:  Ladies and Gentlemen, as soon as the

23    witness leaves the courtroom we'll take our mid-morning

24    recess.  During the recess I would request that you not

25    discuss the case among yourselves.  The case hasn't been

1   given to you for deliberation so you can talk about anything

2   else but not the case.  Please leave your notebooks face

3   down on your chairs.  We thank you for your attention and

4   patience and let's resume at ten-thirty.  Please be prepared

5   to return to the courtroom to be in your chairs at

6   ten-thirty.  Thank you.  Court Security please leave them

7   out.

8       Now may I ask Government's table to move so that the

9   jurors can come through there.  Thank you.  Actually, why

10  don't the alternates just come through the door and go into

11  the jury box and come through.  I think that's probably the

12  best way and why don't you return that way as well.  Thank

13  you.

14      (Jury out at 10:15 a.m.)

15          THE COURT:  Are there any matters to address before

16  we recess?

17          MR. DOUGLAS:  No, Your Honor.

18          MR. CARR:  No, Your Honor.

19          THE COURT:  Thank you.  Court stands in recess

20  until ten-thirty.

21          (Recess from 10:15 a.m., until 10:30 a.m.)

22          THE COURT:  Thank you.  Please be seated.  We can

23  bring the jury in please.  May the witness--or next witness,

24  I'm sorry.  We finished with him, didn't we.  Okay.  Who's

25  the next witness?

1          MR. DOUGLAS:  Rick Usery.

2          THE COURT:  Are you bringing the jury in or is

3     somebody--

4          COURT SECURITY OFFICER:  He's bringing them in,

5     ma'am.

6          THE COURT:  All right.  Mr. Usery, just wait back

7     there for a moment please until the jury comes in.  Thank

8     you.

9       (Jury in 10:31 a.m.)

10          THE COURT:  You can be seated, Ladies and

11    Gentlemen.  Ladies and Gentlemen, I should tell you, all the

12    lawyers and the parties wanted to stand for you each time

13    you leave and you come back in.  That's a very good protocol

14    but in our courtroom, because we're so small, we're smaller

15    than the ordinary District Courtroom and we're so cluttered

16    with everything for this case, I've asked them not to do

17    that so you must know that that's not their--if you've been

18    in juries before where you're expecting the lawyers to

19    stand, it's at my directive that they're not standing,

20    afraid they're going to knock things over or something's

21    going to happen so please understand that.  All right.

22    Thank you.

23       The Government may resume with its next witness.

24          MR. DOUGLAS:  United States calls Rick Usery.

25          THE COURT:  Mr. Usery, if you'll approach the Clerk

181

Usery – Direct

1    standing in front of me in the front of the courtroom,

2    she'll administer the oath to you before you take the

3    witness stand.

4            RICK USERY, GOVERNMENT'S WITNESS, SWORN

5            THE CLERK:  Thank you.  You may have a seat in the

6    witness stand.  The witness is Richard Usery, U-s-e-r-y.

7            THE COURT:  Mr. Usery, if you'll speak in a loud,

8    clear voice into the microphone which you can move closer to

9    you and down as well to adjust to where you are in the seat.

10   Thank you.

11                     DIRECT EXAMINATION

12   BY MR. DOUGLAS:

13   Q.  Sir, please introduce yourself to the jury, including a

14   little bit about your background, education and work

15   experience.

16   A.  Hi.  My name is Richard Usery.  I go by Rick.  I am a

17   Mining Engineer.  I was born in Colorado and have lived in

18   Morgantown for the past twelve years.

19   Q.  How are you currently employed?

20   A.  I am the Vice President of Surface Operation and Coal

21   Sales for Mepco LLC.

22   Q.  Around when did you join Mepco?

23   A.  It was November 2005.

24   Q.  And in what position did you join Mepco?

25   A.  I was the Technical Assistant to the President.

182

Usery – Direct

1    Q.  Who was the President?

2    A.  Mr. Laurita.

3    Q.  Is he sitting in the courtroom here at the defense table

4    on my right?

5    A.  Yes, sir.

6    Q.  Who hired you into that position?

7    A.  Mr. Laurita did.

8    Q.  Now around the time of 2010 were you promoted to another

9    position?

10   A.  Yes, sir.

11   Q.  What position was that?

12   A.  My current position as Vice President of Surface

13   Operations and Coal Sales.

14   Q.  Who promoted you?

15   A.  Mr. Laurita.

16   Q.  Throughout your time at Mepco where has your office been

17   physically located?

18   A.  In--in--in Morgantown at the office on Dents Run Road.

19   Q.  Now at some point while you were working for the

20   defendant at Mepco, did you start making campaign

21   contributions?

22   A.  Yes, sir.

23   Q.  And how did that begin?

24   A.  It began as part of--I first found out about it via an

25   e-mail that Mr. Laurita sent out.

Usery - Direct

1   Q.  Was there a meeting that was being held by Mr. Laurita?

2   A.  Yes there was but I was--I was not present at that

3   meeting as I was out of town.

4   Q.  Okay.  Did you ultimately meet with someone to learn

5   what you had missed?

6   A.  Yes.  I met with Karen Hughes after I returned back to

7   work.

8   Q.  Did you learn just the general substance of what the

9   meeting was about?

10  A.  Yes, the general--yes.

11  Q.  What was your understanding?

12  A.  My understanding was that we were going to provide

13  campaign contributions to different candidates and we would

14  be reimbursed for those contributions.

15  Q.  Did you then have a separate meeting with the defendant?

16  A.  Yes, I did.

17  Q.  Why did you have a separate meeting with him?

18  A.  I wanted to understand more fully what the process was

19  and I also wanted to express my--the fact that I was

20  uncomfortable doing that.

21  Q.  What did you express to him with regard to your being

22  uncomfortable?

23  A.  I--I told Mr. Laurita that I didn't like doing it

24  because in general I don't like giving money to politicians.

25  Q.  At that time had you ever done it before?

Usery – Direct

1    A.  No, sir.

2    Q.  Had your spouse ever made a contribution before that

3    time?

4    A.  No, sir.

5    Q.  And you said that you wanted to get a better

6    understanding of why he wanted to do it.  Did he give you a

7    better understanding of why he wanted to do it?

8    A.  Yes, sir.  He told me that it was all about access and

9    that when--we needed--when the company needed assistance for

10   permits or some other issue that may arise that we

11   could--whenever he went in to talk to one of the

12   Congressional representatives, that the first thing they did

13   was look at their roles to see who had contributed to

14   the--to the campaign.

15   Q.  During that meeting with the defendant, did the

16   defendant tell you how you would know to which candidates to

17   contribute?

18   A.  I don't recall that.  I think in the initial meeting

19   with Mrs. Hughes, that's when she--she told me that--that we

20   would receive instructions to that.

21   Q.  In that meeting you had with the defendant did he tell

22   you how the contributions would be funded?

23   A.  That we would be reimbursed by the company.

24   Q.  I want to talk a little bit about that conversation

25   specifically with regard to what you just said about the

Usery - Direct

1    reimbursements.  During that meeting did the defendant tell
2    you how that reimbursement would be made?
3    A.  No, sir.
4    Q.  All right.  Let's talk about the mechanics of how this
5    program worked.  Was there someone who would communicate the
6    instructions to you about campaign contributions?
7    A.  Yes.  In most cases that was Mrs. Hughes.
8    Q.  Okay.  And what generally would those instructions
9    include?
10   A.  They would include the amount to be submitted, to which
11   campaign and how to make the check out to.
12   Q.  And was there a time that your spouse also made campaign
13   contributions?
14   A.  Yes, sir.
15   Q.  So how did you know whether your spouse is--
16   A.  That would be--that would be included in the
17   instructions.
18   Q.  Do you recall some of the candidates to whom you made
19   contributions under this program?
20   A.  Ah, yes.  Manchin, McKinley, Capito and other state and
21   federal candidates.
22   Q.  How did you typically make these contributions you were
23   requested to make?
24   A.  Via personal check.
25   Q.  Okay.  And what would you do with the check once it was

Usery - Direct

1    written?

2    A.  Generally speaking I would give it to Mrs. Hughes.

3    Q.  Do you recall learning whether anyone was keeping record

4    of the contributions versus how much the reimbursements

5    were?

6    A.  Yes.

7    Q.  What do you recall about that?

8    A.  I recall that Mrs. Hughes kept those records.

9    Q.  Do you recall whether Ms. Hughes ever sent you any of

10   those records?

11   A.  I believe she did.

12   Q.  Generally what was the gist of those types of records?

13   A.  The gist was the amount and to who the--it was basically

14   a spreadsheet with the amount and who the--who the

15   contribution was to and what the reimbursement was.

16   Q.  Let's talk a little bit about your pay.  Generally, if

17   we were to look at your bank statement, what kind of

18   deposits would there be from Mepco?  And we will look at

19   that in a minute.

20   A.  Generally speaking there would be--we are paid every two

21   weeks and there would be two--normally two direct deposits

22   for base pay and then a monthly deposit for a production

23   bonus.

24   Q.  And did that production bonus predate or preexist this

25   political contribution program?

Usery – Direct

1    A.  Yes, sir.

2    Q.  Okay.  Did the defendant ever tell you or suggest what

3    to do with your salary?

4    A.  No, sir.

5    Q.  Did the defendant ever suggest what you should do with

6    your performance bonus?

7    A.  No, sir.

8    Q.  What other types of payments were there in addition to

9    salary payments and the tonnage bonus?

10   A.  The only other type of payment would have been the

11   campaign reimbursement payment.

12   Q.  And if I say the second bonus, do you understand what I

13   mean?  Have you heard it called the second bonus?

14   A.  I have heard it called that, yes, sir.

15   Q.  Okay.  Did the defendant suggest what you should do with

16   that second bonus?

17   A.  That was the bonus that was to be used for the campaign

18   contributions.

19   Q.  Did you attend any fundraisers during this program?

20   A.  Yes, sir.

21   Q.  Why?

22   A.  Because that was part of the instructions that we

23   received.

24          MR. DOUGLAS:  May I approach the witness, Your

25   Honor?

Usery – Direct

1          THE COURT:  You may.

2   BY MR. DOUGLAS:

3   Q.  I'm handing you what's been marked as Exhibit 14 and 15

4   for the Government.  Could you take a look first at Exhibit

5   14 and just tell me what it is generally?

6       (No answer – witness looking at document)

7   BY MR. DOUGLAS:

8   Q.  Mr. Usery, are these checks from your bank account,

9   written on your bank account?

10  A.  Yes, sir, they are.  They are checks written by me and

11  my wife.

12  Q.  Okay.  And do these checks relate to the contribution

13  program in that they are the contributions?

14  A.  Yes, sir.

15          MR. DOUGLAS:  Okay.  We move to admit

16  Exhibit--Government Exhibit 14.

17          THE COURT:  Is there any objection?

18          MR. CARR:  No, Your Honor.

19          THE COURT:  Government Exhibit 14 is admitted.

20      (Government Exhibit Number 14 admitted.)

21  BY MR. DOUGLAS:

22  Q.  If we could bring up page one please.  What are we

23  looking at on page one?

24  A.  This is a check written to the McKinley campaign by my

25  wife.

Usery - Direct

1    Q.  Why did your wife--did you direct your wife to write
2    this check?
3    A.  Yes, I did.
4    Q.  Why?
5    A.  Because we followed the instructions as provided by
6    Mrs. Hughes.
7    Q.  And ultimately did you have an understanding of where
8    Karen Hughes was getting her instruction, if you know?
9    A.  My understanding is she was receiving her instruction
10   from Mr. Laurita.
11   Q.  And how ultimately was this check funded?
12   A.  By the second bonus or the campaign contribution bonus.
13   Q.  If we take a look at the second page please.  What are
14   we looking at on the second page?
15   A.  This is a check written by myself to the McKinley
16   campaign.
17   Q.  Why did you write that check?
18   A.  For the same reason, as instructed, to provide to the
19   campaign.
20   Q.  How was that check ultimately funded?
21   A.  It was funded through the campaign reimbursement.
22   Q.  And what I'm going to do is we're going to flip through
23   and show you each one of them and then I'm going to ask you
24   a general question about them so that we don't go through
25   each one.  Is that okay?

Usery – Direct

1    A.  Yes.

2    Q.  All right.  So let's bring up page three, take a quick

3    look at that.  Okay.  Just identify generally what it is.

4    A.  A check to the McKinley campaign written--signed by my

5    wife.

6    Q.  Okay.  And let's look at the next one.  Page four

7    please.  What is this?

8    A.  It's a check to the Capito campaign signed by myself.

9    Q.  Page five please.  What is this?

10   A.  This is a check, another separate check to the McKinley

11   campaign signed by my wife.

12   Q.  Page six.  What is this?

13   A.  This is a check to the McKinley campaign signed by

14   myself.

15   Q.  Page seven please.  What is page seven?

16   A.  This is a check to the Manchin campaign signed by

17   myself.

18   Q.  Page eight please.  At the bottom.  What is that?

19   A.  This is a check to the Tomblin campaign signed by my

20   wife.

21   Q.  Page nine.  What is that?

22   A.  This is a check to the Tomblin campaign signed by

23   myself.

24   Q.  Page ten.  What is on page ten?

25   A.  Page ten is a check to the Snuffer campaign signed by

Usery – Direct

1    myself.

2    Q.  Page eleven?

3    A.  This is a check to the McKinley campaign signed by

4    myself.

5    Q.  What is page twelve?

6    A.  This is a check to the McKinley campaign signed by my

7    wife.

8    Q.  What is page thirteen?

9    A.  This is a check to the Capito campaign signed by myself.

10   Q.  And finally page fourteen?

11   A.  This is a check to the Capito campaign signed by my

12   wife.

13   Q.  Now I'm going to ask you a couple questions with regard

14   to all of those checks.  Why did you write or ask your wife

15   to write all of those checks we just looked at?

16   A.  Upon receiving instructions provided by Mrs. Hughes.

17   Q.  And what was your ultimate understanding of where those

18   instructions came from?

19   A.  Those instructions came from--my understanding is they

20   came from Mr. Laurita.

21   Q.  And what was the ultimate source of the funding for

22   those checks to your understanding?

23   A.  It was company funds.  Mepco funds.

24   Q.  Thank you.  Now I would like to ask you to look at

25   Government Exhibit 15 and just again tell us generally what

Usery - Direct

1    Exhibit 15 is?

2    A.  It's copies of my bank records.

3    Q.  And are these bank statements in specific?

4    A.  Yes, sir, they are.

5    Q.  And do they relate to that second bonus that you were

6    receiving?

7    A.  Yes, sir.

8         MR. DOUGLAS:  Okay.  Move to admit Government

9    Exhibit 15.

10        THE COURT:  Any objection?

11        MR. CARR:  No, Your Honor.

12        THE COURT:  Government Exhibit 15 is admitted.

13    (Government Exhibit Number 15 admitted.)

14   BY MR. DOUGLAS:

15   Q.  If we could bring up page one please and first bring up

16   the top left corner.  What is the date of the statement

17   depicted on page one?

18   A.  March 10th, 2010.

19   Q.  And then if we could bring up page three of the exhibit

20   and the deposits and if I could draw your attention to March

21   9.  What is this March 9 deposit?

22   A.  March 9 would be a deposit that was likely the initial

23   deposit for the campaign contribution program.

24   Q.  Okay.  Now we're going to jump to page nineteen please

25   and bring up the top left corner please.  What is the date

Usery - Direct

1   of this statement?

2   A.  April 10th, 2013.

3   Q.  And then we're going to go to page three of that

4   statement which is page twenty-one of the exhibit and bring

5   up the deposits and if I could draw your attention to the

6   March 14th deposit of fourteen thousand five hundred and

7   eighty-seven dollars and fifty cents.  What is that deposit?

8   A.  That would also be a deposit for the campaign

9   contribution program.

10  Q.  And without going through all the other deposits, if you

11  received a deposit that wasn't salary and wasn't a tonnage

12  bonus, what generally was it from Mepco?

13  A.  It was a reimbursement--campaign reimbursement deposit.

14  Q.  Did you make any contributions or have your wife make

15  any contributions during this entire time period we've just

16  been looking at that wasn't part of the program?

17  A.  No, sir.

18  Q.  At some point did you stop making political

19  contributions?

20  A.  Yes, sir.

21  Q.  Why?

22  A.  Because the instructions were never provided and nor

23  were the funds.

24  Q.  So without the instructions you didn't continue to make

25  political contributions?

Usery - Cross

1    A.  That's correct.

2    Q.  Would you have made any of these contributions if you

3    didn't believe the defendant was asking you to do so?

4    A.  No I would not have.

5    Q.  You already mentioned that the defendant hired you and

6    promoted you.  Did you believe he had the right to demote

7    you or fire you, or the power?

8    A.  Yes, sir.

9    Q.  Since the program ended have you made any other

10   contributions?

11   A.  No, sir.

12        MR. DOUGLAS:  One moment, Your Honor.

13      (Pause)

14        MR. DOUGLAS:  Nothing further.  Should I retrieve

15   the exhibits?

16        THE COURT:  You should.

17        MR. DOUGLAS:  Thank you.

18        THE COURT:  Thank you.  Cross-examination?

19        MR. CARR:  Yes, Your Honor.

20                    CROSS EXAMINATION

21   BY MR. CARR:

22   Q.  Sir, I apologize.  Could you tell me again how to

23   pronounce your last name because I think I've been

24   mispronouncing it.

25   A.  Usery.

Usery - Cross

1    Q.  Usery.

2    A.  Yes.

3    Q.  Mr. Usery, you mentioned that during the initial few

4    weeks or the initial period of time that you expressed to

5    Jim that you were uncomfortable giving to politicians, is

6    that correct?

7    A.  Yes, sir.

8    Q.  But when you say that it was just that you generally

9    don't like giving money to politicians period, correct?

10   A.  That's correct.

11   Q.  It wasn't that you were--that you were concerned in any

12   way, shape or form with the unlawfulness of the program?

13   A.  No, sir, I wasn't.

14   Q.  And at no time during the time--we keep calling it the

15   program so I will continue, that the program existed, you

16   never communicated to Jim any concern about the lawfulness

17   of the program?

18   A.  That's correct.  No, sir, I didn't.

19   Q.  And Jim never indicated to you any concerns about the

20   lawfulness of the program?

21   A.  That's correct.

22   Q.  Sir, do you also receive an anniversary and health or

23   wellness bonus every year?

24   A.  That program has since ceased but I--at one time it did.

25   Q.  It's no longer in existence but during the years 2010 to

Usery – Cross

1    2013?

2    A.  That's possible.  I don't remember the exact timing of

3    that.

4    Q.  Sir, would it be correct from a review of your bank

5    records that your primary and almost exclusive source of

6    income was payments or compensation from Mepco?

7    A.  That's correct.

8    Q.  And the--all payments from Mepco, whether it be salary,

9    tonnage bonus, what we keep referring to as bonus two,

10   wellness bonus, anniversary bonus, if those occurred during

11   those years, all of those payments were treated the same way

12   financially in that they were direct deposited into your

13   designated account?

14   A.  They were direct deposited into that account; yes, sir.

15   Q.  At no time did you receive an envelope for the bonus two

16   program of cash or a separate check.  It was always direct

17   deposited into your account?

18   A.  Yes, sir.

19   Q.  And actually that amount was grossed up or plussed up

20   just as your salary was, meaning that it--it included such

21   things as withholding tax, security security, et cetera, is

22   that correct?

23   A.  That's correct.

24   Q.  Is it also correct that when you--when there was a

25   suggestion made to you to make a donation, it wasn't

Usery – Cross

1    specified as to what account or even money to give.  It was
2    just to please provide, if you want, the campaign donation?
3    A.  I am not sure I understand the question regarding
4    account.
5    Q.  I understand.  You were just asked to provide a check,
6    is that correct?
7    A.  That's correct.
8    Q.  A donation?
9    A.  That's correct.
10   Q.  At no time did Mr. Laurita or Karen Hughes or anyone
11   else in the company state that it was mandatory or required
12   that you give a donation.  Is that correct?
13   A.  That's correct.  No one stated that.
14   Q.  Are you aware that records reflect that there were times
15   when you did not give donations that other members of the
16   executive team gave?
17   A.  No I am not.
18   Q.  If that happened, no one came to you and demanded that
19   you write a check?
20   A.  That's correct.
21   Q.  And no one ever told you that if asked deny why you are
22   getting a second bonus or what it is in relation to?
23   A.  No one ever--no one ever stated that.
24   Q.  And is that correct that no one ever did ask you why you
25   were getting the second bonus?

Usery - Redirect

1    A.  I'm sorry.  No one meaning?

2    Q.  Anyone outside of the executive team?

3    A.  No.  No one asked me that.

4    Q.  Or an independent accounting firm who might've been in

5    the office, simply no one asked you?

6    A.  That's correct.

7            MR. CARR:  May I have just a moment, Your Honor?

8            THE COURT:  You may.

9        (Pause)

10           MR. CARR:  Nothing further at this time, Your

11   Honor.

12           THE COURT:  Is there any redirect?

13           MR. DOUGLAS:  Briefly, Your Honor.

14                     REDIRECT EXAMINATION

15   BY MR. DOUGLAS:

16   Q.  Mr. Usery, did you trust the defendant that the program

17   was lawful?

18   A.  Yes, sir.

19   Q.  Did you ever overcome your discomfort with making

20   campaign contributions?

21   A.  No, sir.

22   Q.  So why did you do it?

23   A.  That's what was expected.

24   Q.  What was your understanding of who expected you to do

25   it?

Usery – Redirect

1    A.   Mr. Laurita did.

2    Q.   Was he your boss?

3    A.   Yes, sir.

4    Q.   Do you know what the other executives were specifically

5    being asked to give to specific candidates?

6    A.   At times I did because the e-mail instructions were

7    copied to those individuals.

8    Q.   Did you always know?

9    A.   Generally, whenever the--yes on the e-mail instructions.

10   Q.   Is it--okay.  Did General Power have access to your

11   personal bank account to see a second bonus?

12   A.   I'm sorry?

13   Q.   Did General Power have access to your bank statements to

14   see a second bonus deposit?

15   A.   I'm not familiar with General Power.

16   Q.   The parent company of Mepco?

17   A.   Oh, I do not know that.

18   Q.   All right.  Do you happen to know that Mepco was audited

19   by an outside firm?

20   A.   Yes.  Yes, sir.

21   Q.   Okay.  Did that outside firm have access to your bank

22   accounts to see a second bonus?

23        MR. CARR:  Objection.

24        THE COURT:  I think the objection is this goes way

25   beyond the scope of the cross-examination and I sustain that

Usery – Redirect

1    objection and, Ladies and Gentlemen, any of those questions

2    about General Power are way beyond the scope of what can be

3    done on redirect and therefore I strike it.

4              MR. DOUGLAS:  Nothing further, Your Honor.

5              MR. CARR:  Thank you.

6              THE COURT:  You're welcome.  Is there anything

7    further?

8              MR. CARR:  No, Your Honor.

9              THE COURT:  All right.  Then is the witness subject

10   to being called again by the Government?

11             MR. DOUGLAS:  Not by the Government, Your Honor.

12             THE COURT:  By the defendant?

13             MR. CARR:  No, Your Honor.

14             THE COURT:  All right.  Then the witness may step

15   down.  Mr. Usery, you're excused as a witness and free to

16   go.  Thank you.

17             THE WITNESS:  Thank you.

18        (Witness excused)

19             THE COURT:  The Government may cause it's next

20   witness.

21             MR. DOUGLAS:  The United States calls Suzanne

22   Crane.

23             THE COURT:  All right.  Suzanne Crane.

24        (Pause)

25             THE COURT:  Ms. Crane, good morning.  I am Judge

Crane – Direct

1    Keeley directing you to the front of the courtroom where the

2    Clerk is standing in the gray suit.  She will administer the

3    oath to you before you take the witness stand.  Please raise

4    your right hand.

5            SUZANNE CRANE, GOVERNMENT'S WITNESS, SWORN

6            THE CLERK:  Thank you.  Please have a seat in the

7    witness stand.  The witness is Suzanne Crane, C-r-a-n-e.

8                      DIRECT EXAMINATION

9    BY MR. DOUGLAS:

10   Q.  Ms. Crane, could you please introduce yourself to the

11   jury?

12   A.  I am Suzanne Crane.

13   Q.  Could you tell them a little bit about your background,

14   where you live and what your current employment is?

15   A.  I currently live in Bruceton Mills, West Virginia and I

16   am currently employed with AECOM and I work in safety and

17   permitting.

18   Q.  What is AECOM?

19   A.  It is a government contractor.

20   Q.  Where were you employed prior to that company?

21   A.  Mid-Atlantic Energy Services.

22   Q.  And what was your position there?

23   A.  Administrative Assistant.

24   Q.  Who were you the Administrative Assistant for?

25   A.  James Laurita, III, George McLaughlin, James Laurita,

Crane – Direct

1   II, Jim Laurita, Jr.

2   Q.   Okay.  Is Jim Laurita, Jr. sitting in the courtroom at

3   the defense table on my right?

4   A.   Yes.

5   Q.   Okay.  When did you work for him at Mid-Atlantic?

6   A.   It would be 2014 to 2016.

7   Q.   Had you worked for him previously at Mepco?

8   A.   Yes.

9   Q.   Around what time frame was that?

10  A.   2011 to 2014.

11  Q.   And what was your position there?

12  A.   Executive Assistant.

13  Q.   When you were hired on at Mepco where had you just been

14  working?

15  A.   Human Resources at WVU Hospitals.

16  Q.   Okay.  And did you interview then for the Executive

17  Assistant position with the defendant?

18  A.   Yes.

19  Q.   Who was at the interview?

20  A.   Kevin O'Dell and Mark Bunker.

21  Q.   And the defendant?

22  A.   Yes.

23  Q.   Okay.  And was there discussion at that interview about

24  your job responsibilities and what would be expected of you?

25  A.   Yes.

203

Crane - Direct

1   Q.  And what generally were those responsibilities?

2   A.  Travel arrangements, managing the calendar, just

3   handling anything Mr. Laurita needed.

4   Q.  And once you started the position did you learn that

5   there were additional expectations of you in your job

6   responsibilities?

7   A.  Yes.

8   Q.  How quickly?

9   A.  Within a couple weeks.

10  Q.  Okay.  And what were those additional responsibilities?

11  A.  Some political fundraising.

12  Q.  Okay.

13          MR. DOUGLAS:  May I approach the witness, Your

14  Honor?

15          THE COURT:  You may.

16  BY MR. DOUGLAS:

17  Q.  I'm handing you a stack of exhibits we hopefully will be

18  going through in order and we're starting with Exhibit 1-65.

19  Could you take a look at 1-65 and tell us generally what it

20  is?

21  A.  It is an e-mail from Mr. Laurita to myself.

22  Q.  In general could you describe, if there's an attachment

23  and what it is?

24  A.  It is an invitation.

25  Q.  Okay.  Is it in regards to a political fundraiser?

Crane - Direct

1    A.  Yes.

2    Q.  All right.  And does this relate to those additional

3    responsibilities we were just discussing about political

4    fundraisers?

5    A.  Yes.

6            MR. DOUGLAS:  Okay.  We move to admit 1-65.

7            THE COURT:  Is there any objection?

8            MR. CARR:  No, Your Honor.

9            THE COURT:  Government Exhibit 1-65 is admitted.

10       (Government Exhibit 1-65 admitted.)

11   BY MR. DOUGLAS:

12   Q.  If we could first just bring up the first page and zoom

13   in please on just the top.  Could you tell us what the date

14   is of this e-mail from the defendant to you?

15   A.  August 15th, 2011.

16   Q.  Around when had you started at Mepco?

17   A.  Sometime in August before this.

18   Q.  In that same month?

19   A.  Yes.

20   Q.  Okay.  And if we could jump to the second page.  Now you

21   can tell us what this fundraiser was for.

22   A.  It was for United States Congressman Jason Altmire.

23   Q.  Did you have any responsibilities with regard to this

24   fundraiser?

25   A.  I believe I was just asked to create the invitation,

Crane - Direct

1    possibly set up a tent, call.

2    Q.  And where was this fundraiser--where did the fundraiser

3    take place?

4    A.  At his residence.

5    Q.  Okay.  Was this part of your introduction to this

6    political involvement and these political responsibilities

7    you would have?

8    A.  Yes.

9    Q.  Okay.  Now at some point did these political

10   responsibilities include the executives making campaign

11   contributions?

12   A.  Yes.

13   Q.  What generally was--were your responsibilities in that

14   regard?

15   A.  I would send the invitation to the executive team and

16   say this is the amount of money you need to contribute and

17   collect the checks.

18   Q.  And where would you be getting your instruction about,

19   you know, which candidates and what amount?

20   A.  Mr. Laurita.

21   Q.  As part of that program were the spouses of the

22   executives also requested to contribute?

23   A.  Yes.

24   Q.  And is that something that you would communicate on to

25   the group?

Crane - Direct

1    A.  Yes.

2    Q.  Where would you get that instruction that spouses should

3    also contribute?

4    A.  Mr. Laurita.

5    Q.  Did you have any knowledge as to how these contributions

6    were being funded, the executive contributions?

7    A.  No.

8    Q.  So you didn't know whether they were paying for it or

9    the company was paying for it?

10        MR. CARR:  Objection.  Asked and answered.  Calls

11   for speculation.  Witness has said she doesn't know.

12        THE COURT:  I'm not sure I heard the question

13   specifically directed to her that way.  If you rephrase, I

14   will allow it.

15        MR. DOUGLAS:  I'll just move on, Your Honor.

16        THE COURT:  Okay.

17   BY MR. DOUGLAS:

18   Q.  Do you recall some of the candidates that were part of

19   the program being asked to contribute to--the executives

20   contributing to them?

21   A.  Yes.

22   Q.  And could you name some of them please?

23   A.  Capito.  Altmire.

24   Q.  Okay.  That's okay.  That's okay.  Let's take a look

25   then at some other exhibits.  You had already indicated

Crane - Direct

1    that--actually let's just look at the exhibit, 1-109 please.

2    What is 1-109?

3    A.  It is an e-mail from Mr. Laurita to myself.

4    Q.  Okay.  And is this an example of an e-mail where he's

5    telling you the instructions to pass along to the group?

6    A.  Yes.

7            MR. DOUGLAS:  Okay.  We would move to admit 1-109.

8            THE COURT:  Is there any objection?

9            MR. CARR:  No, Your Honor.

10           THE COURT:  1-109 is admitted.

11       (Government Exhibit 1-109 admitted.)

12   BY MR. DOUGLAS:

13   Q.  If we could bring up the first page please and zoom in

14   on the bottom half.  If you could direct your attention to

15   the bottom e-mail, the one that's dated March 6th, 2013 at

16   8:33 a.m.  If you could read the second and the third

17   sentence, the one starting with also.

18   A.  Also, we're going to talk about officer contributions.

19   What contribution amount were you thinking?

20   Q.  And is this you asking the defendant that question?

21   A.  Yes.

22   Q.  Okay.  And then if you could look at the response e-mail

23   of the same date and read the sentence that starts with ask.

24   A.  I'm sorry, repeat that.

25   Q.  The e-mail right above that in the chain.

Crane - Direct

1    A.  Oh.

2    Q.  Yeah, if you start looking at the screen please.

3    A.  Ask the officers to contribute twenty-five hundred by

4    here two--by two here too.

5    Q.  Okay.  Let's take a look at 1-110 please.  What is

6    1-110?

7    A.  It is an e-mail from Mr. Laurita to myself.

8    Q.  Is it again with regard to the contribution program?

9    A.  Yes.

10           MR. DOUGLAS:  We move to admit 1-110.

11           THE COURT:  Is there any objection?

12           MR. CARR:  No, Your Honor.

13           THE COURT:  Government Exhibit 1-110 is admitted.

14       (Government Exhibit 1-110 admitted.)

15   BY MR. DOUGLAS:

16   Q.  And then if we could bring up page--on your computer

17   monitor up there and bring up the top half, enlarge the top

18   half please.  And could you read your e-mail dated March 6,

19   2013 to him, the defendant?

20   A.  The Capito fundraiser to be held April 8th, you had

21   mentioned you would like the officers to make a

22   contribution.  Let me know what amount.

23   Q.  And then at the top of that exhibit, could you read the

24   defendant's response e-mail to you?

25   A.  The maximum allowable is twenty-five hundred per person.

Crane - Direct

1    I'd like for them and their spouses each to contribute

2    twenty-five hundred.

3    Q.  Let's take a look at 1-112 please.  What is 1-112?

4    A.  It is an e-mail from Mr. Laurita to myself.

5    Q.  Does it concern the political contribution program?

6    A.  Yes.

7         MR. DOUGLAS:  We move to admit 1-112.

8         THE COURT:  Any objection?

9         MR. CARR:  No, Your Honor.

10        THE COURT:  1-112 is admitted.

11    (Government Exhibit 1-112 admitted.)

12   BY MR. DOUGLAS:

13   Q.  If we could bring up just the top e-mail please.  Could

14   you read that e-mail from the defendant to you?

15   A.  We will need to have the officers and spouses give

16   twenty-six hundred each rather than twenty-five hundred and

17   I think the invitations are fine as they are.  If someone

18   wants to give less, they are not going to turn them away.

19   Q.  And I want to first of all ask you, did you have any

20   understanding of why there was an increase from twenty-five

21   hundred to twenty-six hundred?

22   A.  No.

23   Q.  Okay.  Do you have any understanding of the individual

24   contribution limits?

25   A.  No.

210

Crane - Direct

1   Q.  Okay.  And then with regard to this comment about

2   they're not going to turn them away, let's look at the other

3   part of this e-mail please.  And do you see how you're

4   referencing a McKinley contribution and a McKinley

5   non-contribution?

6   A.  Yes.

7   Q.  Is that what you were referring to when you said--

8          MR. CARR:  Objection.  Leading.

9          THE COURT:  Sustained.

10  BY MR. DOUGLAS:

11  Q.  Okay.  Let's bring up 1-115 please.  I'm sorry.  If you

12  could take a look at it first.  What is 1-115?

13  A.  It is an e-mail from myself to Mr. Laurita.

14  Q.  Is it in regard to the campaign program?

15  A.  Yes.

16         MR. DOUGLAS:  Move to admit 1-115.

17         THE COURT:  I'm sorry.  Admitted.

18      (Government Exhibit 1-115 admitted.)

19  BY MR. DOUGLAS:

20  Q.  If we could bring up 1-115 please?  And could you read

21  your e-mail to the defendant?

22  A.  Jim, I will cut out the contribution section and send

23  them another invitation for the few that are

24  non-contributors.  I will change the officer request to

25  twenty-six hundred.

211

Crane – Direct

1   Q.  Was there ever a time that you changed the amount on

2   your own accord?

3   A.  No.

4   Q.  If you changed an amount, why were you changing an

5   amount?

6   A.  I would only change it if he told me to change it.

7   Q.  Okay.  Please take a look at 1-134.  What is 1-134?

8   A.  It is an e-mail from myself to Mr. Laurita.

9   Q.  Is this in regard to political fundraising at Mepco?

10  A.  Yes.

11          MR. DOUGLAS:  We move to admit 1-134.

12          THE COURT:  Any objection?

13          MR. CARR:  No, Your Honor.

14          THE COURT:  1-134 is admitted.

15      (Government Exhibit 1-134 admitted.)

16  BY MR. DOUGLAS:

17  Q.  If we could bring up 1-134 and start with the bottom

18  e-mail.  Could you read the defendant's e-mail to you with

19  the subject Capito?

20  A.  Suzanne, I will be bringing in two twenty-six hundred

21  dollar checks from Becky and I tomorrow morning.  How about

22  apologizing me to the Congresswoman and finding out what we

23  raised in total for the event.

24  Q.  Okay.  And if we can take a look at your response?  If

25  you could read your response please?

212

Crane – Direct

1   A.  It will end up around a hundred and ten thousand from

2   the Capito event.

3   Q.  Do you recall whether this was an event that the

4   defendant was hosting?

5   A.  I do not.

6   Q.  Okay.  Do you call him ever hosting a Capito event?

7   A.  Yes.

8   Q.  Now in addition to this sort of communication role

9   between you and the group and you and some campaigns, were

10   you also collecting the contributions from the executives?

11   A.  Sometimes.

12   Q.  And how would that generally work?

13   A.  Generally I would send them an e-mail or give them a

14   form to fill out requesting contribution for the event and

15   have them drop it off to me or I would pick it up.

16   Q.  Once you received either a check or a credit card form,

17   what would you do with it?

18   A.  I would track it on a spreadsheet.

19   Q.  What would you do with the actual contribution, the

20   check or the credit card form?

21   A.  I would just keep it till I needed to meet with the

22   financial coordinator for the event and hand it off to them.

23   Q.  Okay.  So you started to mention that you would also

24   keep a record.  What type of record would you keep?

25   A.  Just an Excel spreadsheet.

Crane – Direct

1    Q.  Okay.  Could you please take a look at Government

2    Exhibits 44 and 56?  What are those two exhibits?

3    A.  Capito and McKinley contribution spreadsheet.

4    Q.  Is that what you were just referring to, examples of

5    what you were referring to?

6    A.  Yes.

7    Q.  Okay.  And during the program were you regularly keeping

8    certain records like this?

9    A.  Yes.

10          MR. DOUGLAS:  Okay.  Move to admit Government's

11   Exhibit 44 and 56.

12          THE COURT:  Is there any objection to the admission

13   of these two exhibits?

14          MR. CARR:  Your Honor, may I have a moment?

15          THE COURT:  Yes.

16      (Pause)

17          MR. CARR:  No objection, Your Honor.

18          THE COURT:  All right.  Government Exhibits

19   144--1-44 and 1-56 are admitted.

20          MR. DOUGLAS:  Your Honor, these are actually just

21   44 and 56.

22          THE COURT:  Oh, I'm sorry.  Government Exhibits 44

23   and 56 are admitted.

24      (Government Exhibit Number 44 and 56 admitted.)

25   BY MR. DOUGLAS:

Crane - Direct

1   Q.  All right.  If we could bring up Government Exhibit 44

2   please and zoom in on that spreadsheet?  Actually if you

3   could just zoom in on the first two columns on the left.  So

4   what type of information were you keeping here in these two

5   columns of this spreadsheet?

6   A.  The contributor and the amount they contributed.

7   Q.  Okay.  And if we could look at--zoom in on the title of

8   the spreadsheet please.  And who was this for, which

9   candidate?

10  A.  Shelley Capito.

11  Q.  Okay.  Why were you keeping this spreadsheet?

12  A.  So we would know who all has contributed.

13  Q.  Would you share it with someone?

14  A.  Yes.

15  Q.  Who would you share it with?

16  A.  Mr. Laurita.

17  Q.  Did you just make it up on your own or did he ask you to

18  make the spreadsheets?

19  A.  He asked me.

20  Q.  Okay.  Let's look at Government Exhibit 56.  If we could

21  just start with the title this time.  Who is this

22  spreadsheet for, which candidate?

23  A.  McKinley.

24  Q.  Does it generally include the same information,

25  executives and amounts and method of payment?

Crane - Direct

1  A.  Yes.

2  Q.  Why were you keeping this spreadsheet?

3  A.  So we could keep track of contributions.

4  Q.  And at whose direction again were you keeping this

5  spreadsheet?

6  A.  Mr. Laurita.

7  Q.  Moving on from records, did you also have any

8  responsibilities with regard to drafting of fundraiser

9  invitations or contribution forms?

10  A.  Yes.

11  Q.  What generally were your responsibilities in that

12  regard?

13  A.  The invitation.

14  Q.  Okay.  And at whose direction were you drafting these

15  documents?

16  A.  Mr. Laurita.

17  Q.  Would the defendant ever make any suggestions regarding

18  an invitation and what it should say?

19  A.  Sometimes.

20  Q.  Okay.  If we could take a look at Exhibits--or if you

21  could take a look at Exhibits 1-72 and 1-73 please.  What

22  are those two exhibits generally?

23  A.  Example of an invitation.

24  Q.  Are these e-mails?

25  A.  Yes.

216

Crane - Direct

1    Q.  Okay.  Are they e-mails from the defendant to you?

2    A.  Yes.

3    Q.  With regard to drafting invitations?

4    A.  Yes.

5         MR. DOUGLAS:  Okay.  We move to admit Exhibits 1-72

6    and 1-73.

7         THE COURT:  Any objection?

8         MR. CARR:  May I have just a moment, Your Honor?

9         THE COURT:  Yes.

10   (Pause)

11        MR. CARR:  No, Your Honor.

12        THE COURT:  All right.  Government Exhibits 1-72

13   and 1-73 are admitted.

14   (Government Exhibits 1-72 and 1-73 admitted.)

15   BY MR. DOUGLAS:

16   Q.  Let's bring up 1-72 please and if we could just bring up

17   the top e-mail.  Could you read the first sentence of that

18   e-mail please?

19   A.  Here is an example e-mail format for a fundraiser we may

20   use in the future.  I like how they use an example they are

21   facing as a means to attract interest and potential

22   contributors.

23   Q.  Okay.  If we could back out of that please and if we

24   could go to the second page of that exhibit.  Is this the

25   candidate and the invitation he was referring to?

Crane – Direct

1    A.  Yes.

2    Q.  Let's bring up 1-73 please.  If we could just bring up

3    the top part of the e-mail.  Can you read the second

4    sentence for us that starts with I would also like?

5    A.  I would also like to include the following message

6    included for invites sent via e-mail.  Please feel free to

7    polish it up where you think best.

8    Q.  So these are his suggestions with regard to an

9    invitation?

10   A.  Yes.

11   Q.  And is this for Senator Manchin?

12   A.  Yes.

13   Q.  Okay.  Please take a look at the paper copy of 1-81 and

14   you can take that down.  What is 1-81?

15   A.  A sample invitation.

16   Q.  First off is it an e-mail?

17   A.  Yes.

18   Q.  And is it sending you a sample invitation, particularly

19   the defendant is sending you a sample invitation?

20   A.  Yes.

21        MR. DOUGLAS:  We move to admit 1-81.

22        THE COURT:  Is there any objection?

23        MR. CARR:  I apologize, Your Honor, if I may have

24   just a moment.

25        (Pause)

218

Crane – Direct

1        MR. CARR:  No objection, Your Honor.

2        THE COURT:  All right.  Government Exhibit 1-81 is

3   admitted.

4        (Government Exhibit 1-81 admitted.)

5   BY MR. DOUGLAS:

6   Q.  Please bring up 1-81 and just zoom in on the top e-mail

7   alone.  Is this an e-mail from the defendant to you?

8   A.  Yes.

9   Q.  Could you read what he said to you?

10  A.  Attached is a sample invitation that Stephanie may be

11  using that can be modified for our use.

12  Q.  Is this in regard to Governor Tomblin?

13  A.  Yes.

14  Q.  Could we bring up the invitation that's attached, which

15  is page three of the exhibit?  Is this that example

16  invitation?

17  A.  Yes.

18  Q.  And did that happen sometimes that a campaign would send

19  along invitations if there was going to be a fundraiser that

20  would be sponsored by the defendant?

21  A.  Yes.

22  Q.  If we could zoom in on the bottom language here right

23  below the address that's listed.  Could you read that

24  sentence that starts with under West Virginia state law?

25  A.  Under West Virginia state law, no person may make any

1  contribution except from his, her, or its own funds, unless

2  such person discloses in writing to the person required to

3  report the name, residence, mailing address, major business

4  affiliation, and occupation of the person which furnished

5  the funds to the contributor.

6  Q.  Take that down please.  I promise not to ask you to read

7  that again but I am going to ask you about that sentence

8  again.  Let's bring up 1-82 please and if you could look at

9  1-82, the witness.  What is 1-82?

10  A.  An e-mail from myself to Mr. Laurita.

11  Q.  Is this in regard to further drafts of that Tomblin

12  invitation or your first draft?

13  A.  Yes.

14       MR. DOUGLAS:  We move to admit 1-82.

15       THE COURT:  Any objection?

16       MR. CARR:  No, Your Honor.

17       THE COURT:  Government Exhibit 1-82 is admitted.

18    (Government Exhibit 1-82 admitted.)

19  BY MR. DOUGLAS:

20  Q.  If we can bring up 1-82 and if we could zoom in on just

21  the top e-mail and if you could read just the first sentence

22  of the second paragraph I drafted?

23  A.  I drafted an invitation and donation form, attached.

24  Q.  Okay.  Now let's look at what you drafted.  First of all

25  this is page two.  Is this the invitation?

220

Crane – Direct

1    A.  Yes.

2    Q.  And then page three.  Is this the contribution form for

3    those that would be contributing?

4    A.  Yes.

5    Q.  If you could bring up the language at the bottom of

6    that.  Do you see how the under West Virginia state law

7    sentence is still there?

8    A.  Yes.

9    Q.  Okay.  If you could take a look at the paper copy of

10   1-84.  What is 1-84?

11   A.  An e-mail from myself to Mr. Laurita.

12   Q.  Is it further in regard to this Tomblin invitation

13   you're working on?

14   A.  Yes.

15          MR. DOUGLAS:  We move to admit 1-84.

16          THE COURT:  Any objection?

17          MR. CARR:  No, Your Honor.

18          THE COURT:  Government Exhibit 1-84 is admitted.

19      (Government Exhibit 1-84 admitted.)

20   BY MR. DOUGLAS:

21   Q.  Let's just go straight to the invitation.  Did you

22   e-mail this invitation to the defendant?

23   A.  Yes.

24   Q.  Okay.  And if we could bring up the bottom language.  Do

25   you see how the under West Virginia state law sentence is no

Crane - Direct

1    longer there?

2    A.  Yes.

3    Q.  Do you know why it's no longer there?

4    A.  I do not.

5    Q.  Did the defendant ever ask you about why it wasn't there

6    any more?

7    A.  No.

8    Q.  Take a look at the paper copy of 1-89, the last one with

9    regard to this Tomblin invitation.  Is 1-89 another e-mail

10   from you to the defendant including a version of the Tomblin

11   invitation?

12   A.  Yes.

13   Q.  If you could look at what is page four of that exhibit.

14          MR. DOUGLAS:  If we could move to admit 1-89.

15          THE COURT:  Is there any objection to the admission

16   of 1-89?

17          MR. CARR:  No, Your Honor.

18          THE COURT:  The Court admits 1-89.

19       (Government Exhibit 1-89 admitted.)

20   BY MR. DOUGLAS:

21   Q.  Now if we can bring up and go straight to page four

22   please and bring up the language at the bottom.  This

23   invitation doesn't include the under state law language

24   either?

25   A.  No.

Crane - Direct

1    Q.  Okay.  And if you go back to the e-mail, page one please

2    and bring up just the top half.  Is this an e-mail from you

3    to the defendant?

4    A.  Yes.

5    Q.  Do you see where you say I will get this out today?

6    A.  Yes.

7    Q.  Does that mean this was the final invitation, to the

8    best of your knowledge?

9    A.  Yes.

10   Q.  Did your drafting of invitations also include drafting

11   of federal invitations?

12   A.  I do not recall.

13   Q.  Okay.  Let's take a look at 1-95.  Do you recognize 1-95

14   as an e-mail with another invitation from you to the

15   defendant?

16   A.  Yes.

17          MR. DOUGLAS:  We move to admit 1-95.

18          THE COURT:  Any objection?

19          MR. CARR:  No, Your Honor.

20          THE COURT:  Court admits Government Exhibit 1-95.

21      (Government Exhibit 1-95 admitted.)

22   BY MR. DOUGLAS:

23   Q.  Let's look at the e-mail, just the top half please.  If

24   you could read the first two sentences of your e-mail to the

25   defendant?

Crane - Direct

1    A.  I made a new invitation that will work better for us.

2    Please review the e-mail message and the attached

3    invitation.

4    Q.  Let's look at the invitation.  Let's bring up 1-111.

5    Or take a look at 1-111.  What is 1-111?

6    A.  An e-mail from myself to Mr. Laurita.

7    Q.  Is it--including the attachments, is it invitations?

8    A.  Yes.

9            MR. DOUGLAS:  We move to admit 1-111.

10           THE COURT:  Any objection?

11           MR. CARR:  No, Your Honor.

12           THE COURT:  Court admits 1-111.

13       (Government Exhibit 1-111 admitted.)

14    BY MR. DOUGLAS:

15    Q.  Could we take a look at the invitation please?  Which

16    candidate was this invitation for?

17    A.  McKinley.

18    Q.  And was the defendant one of the hosts?

19    A.  Yes.

20    Q.  And if we bring up the bottom language of that

21    invitation?  Right there.  That's fine.  Do you see the

22    sentence that starts with the maximum allowable?

23    A.  Yes.

24    Q.  Could you read it please?

25    A.  The maximum allowable contribution for the primary

224

Crane – Direct

1    election is twenty-six hundred per person.

2    Q.  And the last invitation we'll look at, if you could look

3    at 1-85.  What is 1-85?

4    A.  An e-mail from Mr. Laurita to myself.

5    Q.  Does it include as an attachment a fundraiser

6    invitation?

7    A.  Yes.

8            MR. DOUGLAS:  We move to admit 1-85.

9            THE COURT:  Any objection?

10           MR. CARR:  No, Your Honor.

11           THE COURT:  The Court admits Government Exhibit

12   1-85.

13       (Government Exhibit 1-85 admitted.)

14   BY MR. DOUGLAS:

15   Q.  If we could bring up the bottom e-mail, part of what was

16   forwarded to you.  Right there.  Did you know Jaime Earl who

17   sent that one?

18   A.  No.

19   Q.  This is being forwarded to you ultimately by the

20   defendant?

21   A.  Yes.

22   Q.  And could you read what the defendant says to you in the

23   e-mail?

24   A.  We need to mail this invitation out as well.  Can you

25   look for the last Critz invitation list and send it to me or

Crane - Direct

1    we can possibly use the Tomblin list.

2    Q.  Okay.  Now in addition to fundraiser invitations and the

3    other responsibilities you've talked about, did you have any

4    responsibilities with regard to the defendant making his own

5    personal political contributions?

6    A.  Sometimes.

7    Q.  What would that involvement have been?

8    A.  Mailing out a contribution.

9    Q.  Okay.  Let's take a look at 1-99.  Tell us what 1-99 is

10   please.

11   A.  An e-mail from Mr. Laurita to myself.

12   Q.  Okay.  And is this in regard to one of his personal

13   contributions he's asking you to send out?

14   A.  Yes.

15         MR. DOUGLAS:  We move to admit 1-99.

16         THE COURT:  Any objection?

17         MR. CARR:  No, your Honor.

18         THE COURT:  Court admits Government Exhibit 1-99.

19      (Government Exhibit 1-99 admitted.)

20   BY MR. DOUGLAS:

21   Q.  If you could bring up just the top e-mail please.  Could

22   you read the defendant's e-mail to you?

23   A.  I will leave a check on your desk for McConnell.  Please

24   send it to the designated address on the attached

25   invitation.  Also can you send me the latest donation

226

Crane - Direct

1    summary after you have recorded this check.

2    Q.  Okay.  Did you keep some type of donation summary of his

3    donations?

4    A.  Yes.

5    Q.  Please look at the paper copy of 55--Exhibit 55.  What

6    is Exhibit 55?

7    A.  It's an Excel spreadsheet of contributions made by

8    Mr. Laurita.

9    Q.  Is this that donation summary he was referencing in the

10   last e-mail?

11   A.  Yes.

12          MR. DOUGLAS:  We move to admit Government Exhibit

13   55.

14          THE COURT:  Any objection?

15          MR. CARR:  No, Your Honor.

16          THE COURT:  Court admits Government Exhibit 55.

17     (Government Exhibit 55 admitted.)

18   BY MR. DOUGLAS:

19   Q.  If we bring up page one and just enlarge the top half.

20   Do you see how this starts with the date--a date in 2009?

21   A.  Yes.

22   Q.  But you didn't start at Mepco until 2011 I think you

23   testified.  How did you get that information from the

24   earlier years?

25   A.  He gave it to me.

227

Crane - Direct

1  Q.  How did you get any of this information even for
2  contributions that were made while you were employed by him?
3  A.  He provided me the information.
4  Q.  What about like when you sent out that Mitch McConnell
5  donation for him, would you add that to this spreadsheet?
6  A.  Yes.
7  Q.  Did you have any idea--did he ever tell--did the
8  defendant ever tell you why he wanted you to keep this
9  spreadsheet?
10 A.  No.
11 Q.  Did you have any understanding of why he wanted you to
12 keep this spreadsheet?
13 A.  No.
14 Q.  Okay.  Were there any special times of years that he was
15 asking for the spreadsheet?
16 A.  No.
17 Q.  And would he sometimes make additions to the spreadsheet
18 himself or make suggestions?
19 A.  Yes.
20 Q.  If you could look at 1-113 and tell us what 1-113 is?
21 A.  It is an e-mail from Mr. Laurita to myself.
22 Q.  And does it attach a version of the spreadsheet we just
23 looked at with some additions from the defendant?
24 A.  Yes.
25           MR. DOUGLAS:  We move to admit 1-113.

228

Crane - Direct

1          THE COURT:  Any objection?

2          MR. CARR:  No, your Honor.

3          THE COURT:  Government Exhibit 1-113 is admitted.

4     (Government Exhibit 1-113 admitted.)

5   BY MR. DOUGLAS:

6   Q.  If we could bring up just the top e-mail please.  Could

7   you read the defendant's e-mail to you?

8   A.  I inserted some subtotals in my page that I want you to

9   continue to carry.  In other words, insert lines for each

10  donation and it should continue to carry the total.

11  Q.  Okay.  If we could bring up page six please.  Had you

12  been adding the contributions made in 2013 that are listed

13  at the bottom of that spreadsheet?

14  A.  Yes.

15  Q.  Does that include to McKinley for Congress in March of

16  13?

17  A.  Yes.

18  Q.  So was the defendant often himself also making personal

19  contributions to the same campaigns that the executives were

20  making into?

21          MR. CARR:  Objection.

22  BY MR. DOUGLAS:

23  Q.  To your knowledge?

24          THE COURT:  Yes, I'll sustain the objection unless

25  it's rephrased.

Crane - Direct

1    BY MR. DOUGLAS:

2    Q.  Did--do you have knowledge as to whether the defendant

3    made contributions to the same campaigns as the executives?

4    A.  Sometimes.

5    Q.  Okay.  Finally I would like you to take a look at what's

6    been marked as Government Exhibit 18-8 and first I want to

7    ask you, during your time that you worked for the defendant

8    did you have the opportunity to see his signature from time

9    to time?

10   A.  Yes.

11   Q.  How regularly would you have seen his signature?  Would

12   you see his signature on a weekly basis?

13   A.  Yes.

14   Q.  Okay.  And did you obtain some type of familiarity with

15   what his signature looks like?

16   A.  Yes.

17   Q.  Okay.  Can you look at the signature on that document of

18   18-8 and tell us whose signature you believe that is?

19          MR. CARR:  Objection, Your Honor.  The witness is

20   not a handwriting expert.

21          THE COURT:  That's true.  Sustain the objection.

22          MR. DOUGLAS:  Okay.

23          THE COURT:  If you can lay a better foundation.

24          MR. DOUGLAS:  All right.

25   BY MR. DOUGLAS:

230

Crane – Direct

1   Q.  Did you work for the defendant for at least three years

2   at Mepco?

3   A.  Yes.

4   Q.  And then did you work for him an additional two years

5   when you went to Mid-Atlantic?

6   A.  Yes.

7           MR. CARR:  Your Honor, may I have a moment please?

8           THE COURT:  Yes.

9      (Pause)

10          MR. CARR:  Thank you, Your Honor.

11          THE COURT:  All right.

12          MR. DOUGLAS:  There's no need to pursue it any

13   further, Your Honor.

14          THE COURT:  Okay.

15          MR. DOUGLAS:  One moment, Your Honor.

16     (Pause)

17          MR. DOUGLAS:  Nothing further.  May I retrieve--

18          THE COURT:  Are you admitting 18-8 or is that--

19          MR. DOUGLAS:  No, Your Honor.

20          THE COURT:  Okay.  Thank you.

21          MR. DOUGLAS:  I'll retrieve the exhibits, Your

22   Honor.

23          THE COURT:  Thank you.  Cross-examination?

24          MR. CARR:  Thank you, Your Honor.

25                    CROSS EXAMINATION

231

Crane – Cross

1    BY MR. CARR:

2    Q.  Ms. Crane, as Jim's Executive Assistant, was that the

3    correct term?

4    A.  Yes.

5    Q.  You were, I know this is a vague term, but fairly close

6    to him?

7    A.  Yes.

8    Q.  And you got to be exposed to certain personal

9    information that the other executives or the standard person

10   within the company didn't know, didn't have access to?

11   A.  Yes.

12   Q.  Is that correct?

13   A.  Yes.

14          THE COURT:  All right.  You need to speak into the

15   microphone, Ms. Crane, so that the jury can hear your

16   answers.  Thank you.

17   BY MR. CARR:

18   Q.  Is it accurate though that you did not know the salaries

19   of the executives?

20   A.  I did not.

21   Q.  And so when you were asked that you did not know about

22   the--what's been referred to in the courtroom as the bonus

23   two program, you didn't know anything about the compensation

24   for the executives?

25   A.  No.

232

Crane – Cross

1   Q.  And you didn't know anything about Jim's compensation?

2   A.  No.

3   Q.  If you recall there was an e-mail that you reviewed in

4   which Jim said we need to change the maximum from

5   twenty-five hundred to twenty-six hundred on the flier.  Do

6   you remember that e-mail?

7   A.  Yes.

8   Q.  Jim told you to do that because on the first flier the

9   maximum personal contribution was incorrect, is that right?

10  A.  Correct.

11  Q.  There was also discussion of the Capito fundraiser and

12  total, which I think was a hundred and ten thousand dollars,

13  if I'm not mistaken, from the fundraiser.  Do you recall the

14  discussion?

15  A.  I do not.

16  Q.  It was Government Exhibit 115.

17          MR. CARR:  Retrieving Government Exhibit 134.  May

18  I approach, Your Honor?

19          THE COURT:  Yes.  134?

20          MR. CARR:  134, Your Honor.

21          THE COURT:  Okay.

22  BY MR. CARR:

23  Q.  That is the e-mail in which you tell Jim that they will

24  end up around a hundred and ten thousand dollars from the

25  Capito event?

Crane – Cross

1    A.  Yes.

2           MR. CARR:  Retrieving Government Exhibit 134.

3    BY MR. CARR:

4    Q.  That was a very large Capito fundraiser, is that

5    correct?

6    A.  Yes.

7    Q.  And you were aware of the invitation list to it?

8    A.  Somewhat.

9    Q.  I'm not going to ask you who all was on it but it was--a

10   lot of different companies came and participated; it was not

11   solely Mepco or Mepco employees, correct?

12   A.  I cannot remember.

13   Q.  You mentioned that there were times when you actually

14   gave the checks to the people from the campaign; they'd stop

15   by the office and you'd have an envelope and give them the

16   checks?

17   A.  Yes.

18   Q.  You somewhat frequently interacted with the individuals

19   from the campaigns, did you not?

20   A.  Yes.

21   Q.  The people in charge of fundraising?

22   A.  Yes.

23   Q.  And is it not accurate that they'd talk--I shouldn't use

24   double negatives like that.  I apologize.  It's accurate, is

25   it not, that the campaigns talk in terms of we will get ten

Crane - Cross

1  thousand dollars from Mepco?  We will get--you know, we will

2  stop by and pick up the twelve thousand dollars from Arch

3  Coal.  They talk like that, don't they?

4  A.  Yes.

5  Q.  And they'd prefer, your perception is, to stop by the

6  office and pick that up all at once?

7  A.  Yes.

8  Q.  Were you aware during this time period that the

9  campaigns were tracking whether individuals within

10  companies, one had donated, and two, to what amounts?

11  A.  I was not.

12  Q.  There were times when you were preparing fliers,

13  campaign invitations, is that correct?

14  A.  Yes.

15  Q.  And when you were drafting those invitations, first off

16  was one of the primary concerns you had was the format and

17  how it looked?

18  A.  Yes.

19  Q.  Whether people would actually read it up on a bulletin

20  board or open it up and be able to see what it is?

21  A.  Yes.

22  Q.  Are you aware of whether there are any legal

23  requirements whatsoever for what goes on an invitation?

24  A.  No.

25  Q.  Did Jim ever indicate to you that there were any legal

Crane – Cross

1   requirements for what went on an invitation?

2   A.  Not that I recall.

3   Q.  And I take it then Jim never indicated to you that he

4   was aware of any legal requirements for what goes on an

5   invitation?

6   A.  No.

7   Q.  Is it accurate that the samples that you used to draft

8   invitations, as well as contribution forms, came from the

9   campaigns themselves?

10  A.  Sometimes.

11  Q.  And often times you would use an invitation or a

12  contribution form from a previous event or that a campaign

13  had previously sent to you?

14  A.  Sometimes.

15  Q.  As it relates to the series of invitations that the

16  Government went over with you on direct examination, there

17  were four or five iterations of it, do you recall that

18  discussion?

19  A.  Sometimes.

20  Q.  Do you recall the discussion--the testimony that you

21  gave on direct examination regarding the variations of that

22  invitation?

23  A.  Yes.

24  Q.  And I will refer to the invitation--if I may have just a

25  moment.

Crane – Cross

1       (Pause)

2   BY MR. CARR:

3   Q.   The Government mentioned that there was--I believe it

4   was Governor Tomblin's invitation, there was State Code

5   language which had been removed.  Do you remember that?

6   A.   Yes.

7   Q.   Jim didn't tell you to remove that, did he?

8   A.   I don't recall.

9   Q.   That final iteration of it you were sending to him,

10  correct?

11  A.   Correct.

12  Q.   And you mentioned in the e-mail that you thought that it

13  looked better?

14  A.   Yes.

15  Q.   The primary concern is formatting and making sure that

16  there's space so that people can read them?

17  A.   For the most part, yes.

18          MR. CARR:  May I have just a moment, Your Honor?

19          THE COURT:  Yes.

20      (Pause)

21          MR. CARR:  Nothing further.

22          THE COURT:  All right.  Thank you.  Redirect?

23          MR. DOUGLAS:  No, Your Honor.

24          THE COURT:  Is the witness excused?

25          MR. DOUGLAS:  By the Government, Your Honor.

Crane – Cross

1          THE COURT:  By the defendant?

2          MR. CARR:  Yes, Your Honor.

3          THE COURT:  All right.  Thank you, Ms. Crane.  You

4    may step down.  Your excused as a witness and free to go.

5       (Witness excused)

6          THE COURT:  Ladies and Gentlemen, we will recess

7    for lunch in just a moment.  All right, Ladies and Gentlemen

8    we will take the noon hour recess.  I would ask that you be

9    prepared to return to the courtroom at one o'clock and

10   during the recess please follow my instructions that you are

11   not to discuss the case among yourselves or with anyone with

12   whom you have contact.

13      If a third party attempts to approach you to discuss the

14   case, please walk away from them, instruct them you've been

15   directed not to discuss the case with them and if they

16   persist in trying to talk to you, please let me know through

17   Court Security or Debbie at your earliest opportunity.

18      Please don't review any media coverage of the case,

19   should there be any, whether on the telephone--telephone,

20   excuse me, the radio, the TV or in the newspaper and don't

21   consult Google or any other--Safari or anything else on your

22   telephone or your tablet in order to do independent

23   research.  Please don't do any independent research at the

24   library either.

25      Do you have any questions or concerns at this time?  Is

1    an hour sufficient for your lunch?  Okay.  Very good.

2        Then we'll see you back here ready to come in at one

3    o'clock.  Please leave your notebooks face down on your

4    chairs and thank you for your attention and patience.

5        The alternates will just come back into the jury box as

6    you did before.  Thank you.

7        (Jury out at 11:55 a.m.)

8            THE COURT:  All right.  I just want to advise that

9    while I don't think anybody actually went to sleep we had a

10   couple of jurors who were nodding off.  In my lack of

11   attention, I apologize, I was reading over the final

12   instructions so I apologize for that.

13       Do you know how long the Government's case in chief will

14   take from this point on?

15           MR. DOUGLAS:  We anticipate that it will last into

16   tomorrow but not past the lunch hour.

17           THE COURT:  So through the rest of today and

18   tomorrow morning.  How many more witnesses?

19           MR. DOUGLAS:  Seven.

20           THE COURT:  Okay.  All on the same subject matter

21   and in the same manner?

22           MR. DOUGLAS:  There are a couple that are not

23   related to Mepco but there's--there's Bill Raney who is the

24   West Virginia Coal Association President and there's Charles

25   Huguenard who worked for Longview so there's a little bit

1    different angles coming in through them.

2            THE COURT:  Okay.  All right.  I just think it's

3    worth noting that the jurors--a couple of the jurors are

4    nodding.  I'm going to have to interject a comment to them

5    if that continues or you can modify how you approach things

6    to see if we can keep their interest.

7            MR. DOUGLAS:  Just for the Court's information--

8            THE COURT:  And I do appreciate the way you

9    compressed some of those exhibits' admission this morning.

10           MR. DOUGLAS:  For your information, most of the

11   remaining witnesses will be very few exhibits, not like

12   Hughes or Crane.

13           THE COURT:  Okay.  Thank you.  And when the

14   defendant's case begins, I know it's a rough estimate, what

15   do you estimate your time frame to be, a day, longer?

16           MR. CARR:  Your Honor, I would estimate a half a

17   day.

18           THE COURT:  A half a day.  All right.  As I said,

19   I've been going over the charge and I think what we'll try

20   to do is have something to you no later than noon tomorrow

21   and that would include a draft of the verdict form with the

22   special interrogatories.  Of course at this point there are

23   a lot of guesstimates by me as to what is actually going to

24   happen but we do know you told the jury that Mr. Laurita's

25   going to testify, so I'm going to prepare the charge that

1    way.

2         MR. CARR:  Absolutely, Your Honor.

3         THE COURT:  Okay.  Thank you.  Is there anything

4    else before we recess?

5         MR. DOUGLAS:  No, Your Honor.

6         MR. CARR:  No, Your Honor.

7         THE COURT:  Court stands in recess until one

8    o'clock.  Thank you.

9         (Recess from 11:58 a.m., until 1:00 p.m.)

10        THE COURT:  Thank you.  Please be seated.  All the

11   jurors are back.  We can bring the jury in.  Is your next

12   witness ready?

13        MR. DOUGLAS:  Yes, Your Honor.

14        THE COURT:  Okay.

15      (Jury in 1:03 p.m.)

16        THE COURT:  You can be seated.  Welcome back,

17   Ladies and Gentlemen.  I hope the temperature here in the

18   courtroom will be warm enough for you.  We've been working

19   on it during the noon recess.  I can guarantee you it's

20   warmer than it is outside.  All right.  We're ready to

21   resume with the Government's next witness.

22        MR. BERNARD:  Thank you, Your Honor.  The United

23   States would call Kent Lindsay.

24        THE COURT:  All right.  What's the first name, Mr.

25   Bernard?

241

Lindsay – Direct

1          MR. BERNARD:  Kent.

2          THE COURT:  Kent Lindsay, Ladies and Gentlemen.

3      (Pause)

4          THE COURT:  Mr. Lindsay, good afternoon.  Would you

5     approach the Clerk standing here in the front of the

6     courtroom in the gray suit.  She'll administer the oath to

7     you before you take the witness stand.

8          KENT LINDSAY, GOVERNMENT'S WITNESS, SWORN

9          THE CLERK:  Thank you.  You can have a seat in the

10    witness stand.  The witness is Kent Lindsay, L-i-n-d-s-a-y.

11         THE COURT:  All right.  Mr. Lindsay, if you'll

12    speak in a loud, clear voice into the microphone and you may

13    adjust it to fit your needs.

14     You may proceed.

15         MR. BERNARD:  Thank you, Your Honor.

16                   DIRECT EXAMINATION

17    BY MR. BERNARD:

18    Q.  Mr. Lindsay, could you give us a little bit of your

19    background, where you live, where you're from and some

20    employment and educational background please?

21    A.  Yes.  I live in Pittsburgh, Pennsylvania.  I have

22    education in finance and economics.  I have been a financial

23    analyst and manager of financial departments in the energy

24    industry since I graduated from college, up to the time of

25    employment with Mepco where I was Chief Financial Officer

242

Lindsay - Direct

1    and have continued.  I am Chief Financial Officer of
2    Pittsburgh Water and Sewer today.
3    Q.  Okay.  And I think you said this, but when did you first
4    become employed at Mepco?
5    A.  It was the summer of 2009.
6    Q.  2009.  All right.  And you were the Chief Financial
7    Officer?
8    A.  That's correct.
9    Q.  Who hired you at Mepco?
10   A.  Jim Laurita hired me.
11   Q.  And at some point during your employment with Mepco, did
12   you get involved in a program concerning political campaign
13   contributions?
14   A.  Yes, I did.
15   Q.  How did that begin or commence?
16   A.  There was a meeting called where Jim called the
17   executive team into a meeting and said that we needed to
18   support some candidates that had positive views on coal and
19   he asked us to help him in contributing to some political
20   candidates that shared those views and would reimburse us
21   for any contributions that we made.
22   Q.  Okay.  So let me break that down.  The--you said Jim,
23   that would be the defendant here in court?
24   A.  Yes.
25   Q.  He indicated that he was interested in having you make

243

Lindsay – Direct

1   political contributions?

2   A.  Yes.

3   Q.  Did he tell you who was going to decide which candidates

4   who were going to receive those contributions?

5   A.  He indicated that he would.

6   Q.  And I think you just indicated, who was ultimately going

7   to pay for those contributions?

8   A.  Mepco would.

9   Q.  At that first meeting did you discuss the mechanics of

10  how this was going to work, how your contributions were

11  going to be made and any--any of the details at that first

12  meeting?

13  A.  I don't recall any specific details; no.

14  Q.  Could you tell us what were the details?  How did it

15  work?  How is it that you began to make contributions?

16  A.  Either Jim or more typically Karen Hughes would

17  distribute either a piece of paper or tell us orally or send

18  an e-mail indicating which candidates we were to make

19  contributions to and how much.

20  Q.  And did the program--was it also suggested that your

21  spouses would be involved in the program?

22  A.  Yes.

23  Q.  Prior to this--this time when that first meeting

24  occurred when you first started making contributions, had

25  either you or your spouse contributed to political campaigns

Lindsay - Direct

1    in the past?

2    A.  No, we had not.

3    Q.  And at that time what was being explained to you, that

4    the company was going to reimburse you for these

5    contributions, did that make a difference to you?

6    A.  No it didn't.

7    Q.  Would you, if the company would have said, hey, I want

8    you to contribute to these political candidates but I'm not

9    going to reimburse you, would you've done that?

10   A.  No, I would not.

11   Q.  Let's talk about once you received the instructions for

12   those political contributions that you just indicated the

13   information you received from Karen Hughes?

14   A.  Yes.

15   Q.  What next would happen?

16   A.  We would cut a check or occasionally go out to the

17   website, click the donate button, make a donation.  We would

18   hand the check or donation receipt to Karen and she would

19   track all of that and made sure we--we get paid.

20   Q.  That was going to be my question, whether somebody kept

21   track of that and I think you just indicated Karen?

22   A.  That's correct.

23   Q.  Did you receive, during the time that she was tracking

24   or recording the donations--obviously--did she record

25   records regarding the donations you made?

245

Lindsay - Direct

1  A.  I don't know exactly what she recorded but she did keep
2  track.
3  Q.  What was the purpose of her keeping track of that
4  information?
5  A.  To insure that we got reimbursed for those
6  contributions.
7  Q.  During this time frame did you receive any spreadsheets
8  or any reports from her concerning your contributions?
9  A.  Yes I did.
10 Q.  And what was reflected on those spreadsheets, if I can
11 use that term?
12 A.  The contributions we made, the amounts, the dates and
13 then how much we had been reimbursed.
14 Q.  Did you yourself ever go around collecting checks or
15 delivering checks to campaigns?
16 A.  No I did not.
17 Q.  Did you attend fundraisers?
18 A.  I attended one fundraiser; yes.
19 Q.  Now it's my understanding that you were, without leading
20 you, is it fair to say you were a salaried employee?
21 A.  Yes I was.
22 Q.  How is it that the payroll deposits would appear in your
23 account--bank account?
24 A.  They would get direct deposited like any other employee
25 compensation.

Lindsay – Direct

1   Q.  How many times a month were your salary payments?

2   A.  Twice a month?

3   Q.  And did you also receive--prior to this political

4   campaign contribution program, were you already receiving a

5   so called tonnage bonus?

6   A.  Yes.

7   Q.  How often would you receive that in your account?

8   A.  That would occur once a month.

9   Q.  And any other--at least during the time of the campaign

10  contribution program, any other deposits that appeared in

11  your account as payroll, would that--would it be fair to say

12  that was the campaign contribution deposits?

13  A.  Most of them would be.  There would be an occasional

14  expense reimbursement.

15  Q.  Okay.  We'll talk about some of those.

16          MR. BERNARD:  Your Honor, may I approach the

17  witness?

18          THE COURT:  You may.

19          MR. BERNARD:  Thank you.

20  BY MR. BERNARD:

21  Q.  I'm going to set in front of you two exhibits marked 10

22  and 11 and ask you if you could look through those and then

23  I have a few questions.  Specifically if you could look at

24  Exhibit 10 first and really my question is what is that

25  compilation of documents?

247

Lindsay – Direct

1    A.   This appears to be checks, credit card statements and

2    the like reflecting contributions to candidates.

3    Q.   They reflect contributions to candidates pursuant to the

4    Mepco program that we've been talking about?

5    A.   Yes.

6         MR. BERNARD:  Your Honor, I would ask that Exhibit

7    10 be admitted.

8         THE COURT:  Is there any objection to the admission

9    of Government Exhibit 10?

10        MR. CARR:  No, Your Honor.

11        THE COURT:  All right.  Government Exhibit 10 is

12   admitted.

13        (Government Exhibit 10 admitted.)

14   BY MR. BERNARD:

15   Q.   Now could you please turn to Exhibit 11 and again, the

16   same question, can you identify what that compilation of

17   documents is?

18   A.   These are the--our checking account documents that

19   reflect payments by Mepco to my wife and I.

20   Q.   All right.  Thank you.  Your Honor, I'd ask that

21   the--let me ask you I guess first of all when you say

22   payments, do those records reflect payments that were made

23   to you, or advances made to you, pursuant to the Mepco

24   political campaign contribution program we've been talking

25   about?

248

Lindsay – Direct

1   A.   Among other deposits, yes.

2          MR. BERNARD:   Your Honor, I would ask for admission

3   of Exhibit 11.

4          THE COURT:   Is there any objection?

5          MR. CARR:   No, Your Honor.

6          THE COURT:   The Court admits Government Exhibit 11.

7          MR. BERNARD:   Thank you, Your Honor.

8      (Government Exhibit 11 admitted.)

9   BY MR. BERNARD:

10  Q.   Let's look at page three of Exhibit 11 please.   Looking

11  at page three, do you see a deposit on March 9th, 2010?

12  A.   Yes.

13  Q.   And I know it doesn't say 2010 but can you tell that

14  statement is from 2010?

15  A.   Yes.

16  Q.   Okay.   March 9th, 2010 there is an eleven thousand three

17  hundred and ninety-six deposit into your account.   What was

18  that deposit for?

19  A.   Reimbursement for political contributions.

20  Q.   Would you please turn to page six?   Looking at page six

21  of Exhibit 10 do you see a ten thousand dollar one hundred

22  and eight and eighty cent deposit?

23  A.   Yes.

24  Q.   Okay.   What is that for?

25  A.   That's compensation under the program.

Lindsay - Direct

1   Q.  When you say compensation, that was money you received

2   to make--

3   A.  Political contributions.  I'm sorry.

4   Q.  That's all right.  Let's go to page nine please.  Okay

5   on page nine do you see a deposit, this is March 17th and

6   again I'll represent to you that it's March 17th, 2011, is

7   that accurate?

8   A.  Yes.

9   Q.  And do you see a fourteen thousand eight hundred and

10  twenty dollar deposit?

11  A.  Yes.

12  Q.  Was that deposit made by Mepco for political campaign

13  contributions?

14  A.  Yes, it was.

15  Q.  Turning then to page twelve of Exhibit 11, and if you

16  look at August 12th and again I'll represent to you, and you

17  correct me if I'm wrong, August 12th of 2011, is that a fair

18  statement?

19  A.  Yes.

20  Q.  Do you see the deposit for twelve thousand six hundred

21  ninety-six dollars?

22  A.  Yes.

23  Q.  Is that also a deposit made for political contributions

24  by Mepco?

25  A.  Yes, it is.

Lindsay - Direct

1    Q.  And with respect to all these deposits made into your

2    account, is it your understanding that all funds that you

3    received for political contributions went to political

4    contributions?

5    A.  Yes.

6    Q.  Let's go to Exhibit 10 please.  I am just going to ask

7    you quickly to identify each one of these pages and then

8    I'll have a few questions at the end of that little

9    exercise, all right?

10   A.  Okay.

11   Q.  Okay.  Let's look at Exhibit--first page of Exhibit 10.

12   What is that?

13   A.  That is a payment to McKinley by my wife.

14   Q.  Okay.  What about page two?

15   A.  That is a payment to McKinley by me.

16   Q.  Page three?

17   A.  That's a payment to McKinley by my wife.

18   Q.  And I didn't ask on the other ones, but this payment

19   June 24th, 2010?

20   A.  Yes.

21   Q.  This check.  All right.  Let's turn to page five and if

22   you would zero in on transaction seventy please.  Do you see

23   transaction seventy?

24   A.  Yes.

25   Q.  Okay.  What is that?

251

Lindsay - Direct

1   A.  A payment to Manchin for a thousand dollars.

2   Q.  Let's go to the next item, next--page six.  Can you tell

3   me what that is?

4   A.  Payment to Capito for five hundred dollars.

5   Q.  All right.  And the date of that is September 9th, 2010?

6   A.  Yes.

7   Q.  Okay.  Next page, if you would look at transaction

8   thirteen and what are these records of?  I don't know if you

9   told me that, but if you did I missed it.

10  A.  They're checks cut from my personal checking account or

11  payments on my credit card.

12  Q.  And page seven, would that be a payment from your credit

13  card?

14  A.  Yes it would be.

15  Q.  And let's look at transaction thirteen, what is that?

16  A.  It's a payment to McKinley for twenty-five hundred

17  dollars.

18  Q.  Page eight, what is that item?

19  A.  That is a check paid to McKinley for twenty-five hundred

20  dollars.

21  Q.  Okay.  Dated March 31st, 2011?

22  A.  Yes.

23  Q.  Let's go to page eleven and using transaction

24  fifty-three.  Do you see transaction fifty-three?

25  A.  Yes.

Lindsay – Cross

1   Q.  What is that?

2   A.  It's a payment to Manchin for five thousand dollars.

3   Q.  And then finally the last page, page twelve, if you'd

4   look at transaction number six please.  Can you tell me what

5   transaction number six is?

6   A.  It's a payment to Snuffer for a thousand dollars.

7   Q.  Okay.  Now with regard to all of the contributions that

8   are set forth in Exhibit 10, were those all contributions

9   that you made at the direction of the defendant?

10  A.  Yes.

11  Q.  And who ultimately reimbursed you for all those

12  contributions?

13  A.  Mepco did.

14  Q.  Did anybody ever tell you at Mepco that the--the

15  additional bonus we've been talking about, this--this

16  deposit for political contributions was for anything or

17  related to anything other than political contributions?

18  A.  No.

19          MR. BERNARD:  Thank you, Your Honor.  No further

20  questions at this time.  I'll retrieve the exhibits.

21          THE COURT:  Thank you.  Cross-examination?

22                    CROSS EXAMINATION

23  BY MR. CARR:

24  Q.  Mr. Lindsay, the candidates as well as the amounts that

25  you gave during the time period of what has been referred to

Lindsay – Cross

1    as the program, those were always suggestions, is that
2    correct?  No one ever told you that you had to?
3    A.   Correct.
4    Q.   And you never had any disagreement with the candidate
5    that was suggested?
6    A.   No.
7    Q.   Were you familiar before you started at Mepco with the
8    coal industry?
9    A.   Yes.
10   Q.   Do you generally understand which candidates were
11   supporting the industry and which ones weren't?
12   A.   Not really.
13   Q.   Consequently those suggestions gave you that
14   information, is that correct?
15   A.   Yes.
16   Q.   No one at any time told you to deny what your additional
17   bonus was for, is that correct?
18   A.   Correct.
19   Q.   And did you also, by the way, receive an anniversary and
20   a wellness or health bonus?
21   A.   No, not that I'm aware of.
22   Q.   Some witnesses have testified that every year there was
23   a bonus given to everyone just for being an employee of the
24   company.  You don't recall getting that?
25   A.   There was a gift around Christmas time.

Lindsay – Cross

1   Q.  And all the deposits from Mepco were treated within the

2   payroll system in an identical fashion, whether it be

3   salary, tonnage bonus, bonus two as it's been referred to or

4   any other money that Mepco gave to you ever during your

5   employment, it came through the payroll system and was

6   direct deposited?

7   A.  That's correct.

8   Q.  Were you aware that the contribution amounts and the

9   campaigns varied amongst the executives?

10  A.  No.

11  Q.  Were you aware that at times there was a disagreement

12  amongst the executives as to which candidate to support?

13  A.  No.

14  Q.  You weren't part of those discussions?

15  A.  I was not.

16          MR. CARR:  Your Honor, may I approach?

17          THE COURT:  You may.

18  BY MR. CARR:

19  Q.  Mr. Lindsay, I'm handing you what's been marked as

20  Defendant's Exhibit B.  I'll give you a moment to review it.

21  Do you recognize that document?

22  A.  I don't recall it specifically but it appears to be an

23  e-mail from Karen to me.

24  Q.  You don't recall it specifically?

25  A.  No.

Lindsay - Cross

1   Q.  Do you doubt that it is accurate?

2   A.  No I don't.

3        MR. CARR:  Your Honor, at this time I move for the

4   admission of Defendant's Exhibit B.

5        THE COURT:  Any objection?

6        MR. BERNARD:  No, Your Honor.

7        THE COURT:  All right.  Defendant's Exhibit B is

8   admitted.

9     (Defendant Exhibit B admitted.)

10  MR. CARR:

11  Q.  Mr. Lindsay, Defendant's Exhibit B is an e-mail from

12  Karen Hughes to you, is that correct?

13  A.  Yes.

14  Q.  Dated October 4th of 2010?

15  A.  Yes.

16  Q.  And the second page, and it was the attachment to the

17  e-mail, is that the spreadsheet that you mentioned on direct

18  examination that you occasionally got from Karen?

19  A.  Yes.

20  Q.  And in the e-mail she is asking--she's missing some

21  donations and is asking you if you intend to make those

22  donations, is that correct?

23  A.  Yes.

24  Q.  She's certainly not telling you that you have to you

25  better get them to her?

Lindsay – Cross

1    A.  Correct.

2    Q.  And nobody did that?

3    A.  Not to my recollection.

4    Q.  In looking at your bank records it appears that nearly

5    all, if not all of your income, during the 2010-2013 time

6    period came from Mepco.  Is that accurate?

7    A.  Yes.

8    Q.  And all of those Mepco payments went to a single bank

9    account?

10   A.  Yes.

11   Q.  During the time period when the program was in

12   existence, Jim Laurita never indicated to you in any way,

13   shape or form that there was anything unlawful with the

14   program.  Is that correct?

15   A.  That's correct.

16   Q.  And you never indicated to him that you had any concerns

17   that the program may be unlawful?

18   A.  That's correct.

19        MR. CARR:  Just a moment, Your Honor.

20     (Pause)

21        MR. CARR:  Nothing further, Your Honor.  I'll

22   return Defendant's Exhibit B to the Court.

23        THE COURT:  Thank you.  Is there any redirect?

24        MR. BERNARD:  No, Your Honor.  Thank you.

25        THE COURT:  All right.  Thank you.  Is the witness

257

Huguenard – Direct

1    excused and free to go, Government?

2            MR. DOUGLAS:  Yes, Your Honor.

3            THE COURT:  Mr. Parr--Carr, I do that every now and

4    then.

5            MR. CARR:  Yes, Your Honor.

6            THE COURT:  Then the witness is free to step down.

7    Mr. Lindsay, you're excused as a witness.

8            THE WITNESS:  Thank you, Your Honor.

9            THE COURT:  Okay.

10       (Witness excused)

11           THE COURT:  Government's next witness?

12           MR. BERNARD:  Your Honor, the United States would

13   call Charles Huguenard.

14           THE COURT:  Charles Huguenard.

15       (Pause)

16           THE COURT:  Mr. Huguenard, would you please

17   approach the Clerk standing here in the front of the

18   courtroom?  She will administer the oath to you before you

19   take the witness stand.

20        CHARLES HUGUENARD, GOVERNMENT'S WITNESS, SWORN

21           THE CLERK:  Thank you.  Please have a seat in the

22   witness stand.  The witness is Charles Huguenard,

23   H-u-g-u-e-n-a-r-d.

24           THE COURT:  Mr. Bernard, you may proceed.

25           MR. BERNARD:  Thank you, Your Honor.

Huguenard - Direct

1      DIRECT EXAMINATION

2    BY MR. BERNARD:

3    Q.  Mr. Huguenard, could you give us a little bit of

4    background, your education and employment history please?

5    A.  I have a Bachelors in Mechanical Engineering.  My

6    background I worked in mostly coal-fired power plants as an

7    engineer and in various stages of supervision and

8    management.

9    Q.  At some time did you become employed or affiliated with

10   Longview Power LLC?

11   A.  Yes, November 2007.

12   Q.  And what was Longview Power LLC?

13   A.  They were a company that was building a coal-fired power

14   plant near Morgantown, West Virginia.

15   Q.  Okay.  And with regard to Longview, did you at some

16   point become acquainted with the defendant Mr. Laurita?

17   A.  Yes.

18   Q.  And what was--what were your interactions?

19   A.  Jim was president of Mepco, which is the coal supply--we

20   had a coal supply agreement with Mepco, Longview had the

21   supply agreement.

22   Q.  And Mepco--that supply agreement, what specifically was

23   that agreement between Mepco and Longview?

24   A.  To provide a certain amount of tonnage and a certain

25   quality of coal once Longview became operational.

259

Huguenard - Direct

1   Q.  Now with respect to Longview, what were your specific
2   duties when you came on board?
3   A.  My role was to transition the facility from construction
4   into operation, hire the staff, make sure they get the
5   training, make sure they have procedures in place in order
6   to commission the facility once the construction was
7   finished.
8   Q.  And without getting into too much detail, just trying to
9   get a little bit of background, is it fair to say Mepco,
10  there's going to be a conveyor belt and direct access to a
11  Mepco mine and the power plant?
12  A.  Yes.
13  Q.  Did you--did the plant have any problems?  Were there
14  any problems with it becoming operational?
15  A.  Yes.  There were--the contractors had some issues.
16  Q.  And, again, without getting into too many details, what
17  were those issues in general?
18  A.  They got behind schedule for various reasons.  They had
19  to repair some construction defects.
20  Q.  Did any of the problems with Longview becoming
21  operational have anything to do with Mepco or Mepco's
22  inability to provide coal?
23  A.  No.
24  Q.  Did you--once you became acquainted with the defendant,
25  did you become involved politically with him, and I say that

Huguenard – Direct

1    in a general sense?

2    A.  Yes.  I would attend some fundraisers.

3    Q.  Did you do more than attend, did you co-host

4    fundraisers?

5    A.  Yes, a few of them.

6    Q.  Co-hosted them with the defendant?

7    A.  Yes.

8    Q.  Did you have discussions with the defendant about

9    candidates that should be supported?

10    A.  Yes.

11    Q.  Did you seek any advice from the defendant as far as

12    politics or political candidates?

13    A.  Yes.

14    Q.  Did you ever seek advice from the defendant concerning

15    contributions and certain rules related to contributions?

16    A.  At times.

17    Q.  Okay.  Was he able to provide you answers?

18    A.  Sometimes.

19    Q.  What happened in those times when he wasn't able to

20    provide an answer?

21    A.  I would--he would either get information from somewhere

22    else or I would find someone else that could answer the

23    question.

24    Q.  All right.  And did any of those discussions you had

25    with the defendant--and let's put a time frame, would this

Huguenard - Direct

1    have been approximately 2009 through what?

2    A.  2012, 2013 possibly.

3    Q.  Okay.  And during those times when you had discussions

4    about campaign issues did the questions of individual limits

5    ever come up?

6    A.  At times.

7    Q.  What are individual limits?  I used that term.  How do

8    you understand--when I use the term individual limit, what

9    is that?

10   A.  The different states had different limits that you could

11   provide a candidate running for--even the different seats

12   they were seeking, how much you could provide during the

13   campaign.

14   Q.  When you say you, what do you mean you?

15   A.  An individual.

16   Q.  Okay.  Like you?

17   A.  Like myself.

18   Q.  Okay.  And if you were going to give to a certain

19   candidate, there are certain limits?

20   A.  Yes.

21   Q.  That you could not exceed yourself?

22   A.  Yes.

23   Q.  Were there any discussions or did you have any

24   experience with direct or indirect payments if you know what

25   I'm saying?

262

Huguenard – Direct

1    A.  Ahh--

2    Q.  When you say--let me back up.  When you say you, the

3    limits are for you individually?

4    A.  Yes.

5    Q.  And once you hit your limit--are you with me?

6    A.  Yes.

7    Q.  Are you able then to make any further contributions in

8    any manner indirectly or directly to your knowledge?

9    A.  No.

10   Q.  Okay.  And do you know what I mean by indirectly?

11   A.  I believe so.

12   Q.  Okay.  Tell me what I mean.

13   A.  I think--I guess indirectly is providing money to

14   someone else to provide that candidate.

15   Q.  Did you ever do that?

16   A.  No.

17   Q.  Did you ever have any discussions with anybody at

18   Longview, employees of yours, to make such contributions?

19   A.  No.

20          MR. CARR:  Objection.  Relevance.

21          THE COURT:  Sustained.

22          MR. BERNARD:  Your Honor, may I approach the

23   witness?

24          THE COURT:  You may.

25          MR. BERNARD:  Thank you.

Huguenard – Direct

1    BY MR. BERNARD:

2    Q.  I'm handing you Exhibit 1-8.  If you could look at that

3    and then in a general sense identify what Exhibit 1-8 is.

4    A.  This an e-mail from myself to Jim Laurita.

5    Q.  Okay.  And what was it in reference to generally?

6    A.  To an article that I had sent him.

7    Q.  Okay.  Let me ask you this.  Did it relate in general to

8    the coal industry and the issues that you were all facing at

9    or about the time of this e-mail.

10   A.  The discussion did, yes.

11   Q.  And were those some of the topics that you discussed

12   with regard to political campaigns and who to support, some

13   of these issues that you're talking about in--in this

14   e-mail?

15   A.  In general.

16           MR. BERNARD:  Your Honor, I'd ask that Exhibit

17   1-8--I'd move for its admission.

18           THE COURT:  Is there any objection?

19           MR. CARR:  No, Your Honor.

20           THE COURT:  Thank you.  Then the Court admits

21   Government Exhibit 1-8.

22       (Government Exhibit 1-8 admitted.)

23   BY MR. BERNARD:

24   Q.  If you could pull up the first section of that--the top

25   section.  Without reading the entire e-mail, do you see

Huguenard - Direct

1   where--let me ask you this, who--this portion of it, is it

2   fair to say this is an e-mail from the defendant to you?

3   A.  Yes.

4   Q.  Okay.  And in there he said I've historically not gotten

5   this much politically involved in the past.  Were you aware

6   of his political activity in the past versus at the time of

7   this e-mail?

8   A.  No.

9   Q.  So you can't comment as to what he meant by that?

10  A.  No.

11  Q.  Okay.  Let me ask you however, he does go on to say that

12  we have too much at stake financially.  What was your

13  understanding of what the defendant was referring to when he

14  said we have two much at stake financially?

15  A.  My understanding was that the capital investment in the

16  Mepco mines, particularly Four West mine was over a hundred

17  million dollars, was required to double the capacity, the

18  output of the mine to supply Longview.

19  Q.  Okay.  And is it fair to say that at that time, to your

20  knowledge, Mr. Laurita had a great concern about that

21  financial investment in the Mepco mine?

22          MR. CARR:  Objection.  Foundation.

23          MR. BERNARD:  I asked to his understanding and

24  based on his discussions.

25          THE COURT:  Based on his understanding I'll allow

Huguenard – Direct

1    it.  Overruled.

2    BY MR. BERNARD:

3    Q.  Do you remember my question?

4    A.  Could you repeat it?

5    Q.  I can.  Based on your understanding, your interactions

6    with the defendant, discussions, did he profess a concern

7    about the financial stake or the investment in Mepco that

8    you just mentioned?

9    A.  In general he was concerned because of the things that

10   were going on at the time.

11   Q.  In other words, he and/or Mepco stood to lose--they

12   stood to lose a lot of money?

13   A.  Mepco did, yes.

14   Q.  If Mepco lost money, would the defendant lose money?

15          MR. CARR:  Objection.  Foundation.  Relevance.

16          THE COURT:  Sustained.

17   BY MR. BERNARD:

18   Q.  Let me switch to campaign contributions by Mepco

19   employees.  During the time when you were interacting with

20   the defendant and let's say this same time frame, 2009

21   through 13, were you able to observe whether Mepco

22   executives were involved in fundraisers or contributing to

23   political campaigns?

24   A.  They would attend some of the fundraisers, yes.

25   Q.  Okay.  Do you, yourself, have any knowledge specifically

Huguenard - Direct

1    about the origin of their donations or any directions by the

2    defendant concerning those donations?

3    A.   No.

4    Q.   At some point did you become aware that there was a

5    concern about improper campaign contributions being made by

6    Mepco executives?

7    A.   After the bankruptcy filing in August 2013 there was

8    another filing made that included some verbiage about the

9    potential of inappropriate contributions.

10   Q.   Other than that, did you delve any further into what

11   happened or whether--you know, and able to form an opinion

12   as to what happened?

13   A.   I asked--

14            MR. CARR:  Objection, Your Honor, relevance as to

15   the witness' opinion.

16            THE COURT:  He hasn't asked what that opinion is.

17   I wouldn't allow it but--

18            MR. BERNARD:  I'll rephrase, Your Honor.

19   BY MR. BERNARD:

20   Q.   Did you have any knowledge factually of what occurred

21   pursuant to those concerns at Mepco with regard to political

22   campaign contributions?

23   A.   In the Fall of 2013 when that notice came out and Jim

24   Laurita resigned, I asked--

25            MR. CARR:  Objection, Your Honor.  Relevance.

Huguenard - Cross

1          MR. BERNARD:  I guess what I'm asking is--

2          THE COURT:  Overruled.  It's appropriate background

3     information.  Answer the question.

4     BY MR. BERNARD:

5     Q.  My question simply is, did you have any independent

6     facts yourself?

7     A.  Prior to 2013.  No.

8     Q.  And even 2013, the facts you learned were based upon

9     reports of others?

10    A.  Yes.  Third or fourth hand.

11         MR. BERNARD:  I have no further questions at this

12    time, Your Honor.  Thank you.

13         THE COURT:  Thank you.  Cross-examination?

14                    CROSS EXAMINATION

15    BY MR. CARR:

16    Q.  Mr. Huguenard--am I pronouncing that correctly?

17    A.  Yes.

18    Q.  During that time period of 2010 to 2013, was it--did you

19    receive a significant amount of requests--requests for

20    involvement or donations from elected officials as well as

21    those seeking office?

22    A.  Yes.

23    Q.  Is it fair to say that there was a tremendous amount of

24    money pouring in on both sides on what was called at the

25    time the war on coal?

Huguenard - Cross

1   A.   I don't know.

2   Q.   There certainly was a lot of activity though, is that

3   correct?

4   A.   Yes.

5   Q.   And you mentioned the importance to Mepco.  That also

6   threatened Longview, did it not?

7   A.   Yes, we had the coal supply agreement with Mepco.

8   Q.   And legislation that was pending was also--the

9   regulations restricting air quality out of the plant could

10  have significant impact on Longview's operation, is that

11  accurate?

12  A.   It could have.

13  Q.   You mentioned you sought advice--advice at times on

14  candidates and political issues from Jim.  Is that correct?

15  A.   At times.

16  Q.   And you knew that he was an officer of the West Virginia

17  Coal Association, is that correct?

18  A.   Yes.

19  Q.   And so you expected him to have that knowledge about the

20  candidates?

21  A.   Yes.

22  Q.   You were asked about generally seeking advice from Jim

23  on campaign contribution topics.  Do you recall specifically

24  what topics you talked to Jim about?

25  A.   Primarily we discussed the various candidates that were

Huguenard - Cross

1    running for the various seats.

2    Q.  You did not ask him questions as far as details of

3    campaign finance law?

4    A.  No.

5    Q.  And in addition to the financial issues that were at

6    stake, both for Mepco and Longview, both organizations

7    employed a significant number of employees, is that correct?

8    A.  Yes.

9         MR. CARR:  May I have just a moment, Your Honor.

10        THE COURT:  You may.

11    (Pause)

12        MR. CARR:  Nothing further, Your Honor.

13        THE COURT:  Any redirect?

14        MR. BERNARD:  No redirect, Your Honor.  Thank you.

15        THE COURT:  All right.  Is the witness excused?

16        MR. BERNARD:  By the United States he is.  Thank

17    you.

18        THE COURT:  Is the witness excused by the

19    defendant?

20        MR. CARR:  Yes, Your Honor.

21        THE COURT:  All right.  Thank you.  Sir, you may

22    step down.  You're excused as a witness and free to go.

23    (Witness excused)

24        THE COURT:  Next witness.

25        MR. DOUGLAS:  United States calls Eric Grimm.

Grimm - Direct

1          THE COURT:  Eric Grimm.

2          MR. DOUGLAS:  Yes, Your Honor.

3      (Pause)

4          THE COURT:  Good afternoon, Mr. Grimm.  Please step

5    forward to the front of the courtroom, I don't think you're

6    going to make that.  I think you're going to have to come

7    down the middle and the Clerk standing here in the gray suit

8    will administer the oath to you before you take the witness

9    stand.  Please raise your hand, your right hand.

10          ERIC GRIMM, GOVERNMENT'S WITNESS, SWORN

11          THE CLERK:  Thank you.  Please have a seat in the

12    witness stand.  The witness is Eric Grimm, G-r-i-m-m.

13          THE COURT:  You may proceed.  Mr. Grimm, if you'll

14    speak in a loud, clear voice into the microphone.  You may

15    adjust the microphone to your needs.  Thank you.

16                       DIRECT EXAMINATION

17    BY MR. DOUGLAS:

18    Q.  Sir, please introduce yourself to the jury, including a

19    little background, work experience and education.

20    A.  My name is Eric Grimm.  I'm a degreed Mining Engineer

21    from the University of Missouri - Rolla.  I have

22    thirty-three years in the mining industry, ten years in

23    operations and twenty-three years--I'm sorry, ten years in

24    engineering and twenty-three years in operation experience.

25    Q.  How are you currently employed?

271

Grimm – Direct

1   A.  Yes, I am.

2   Q.  How are you currently employed, by whom?

3   A.  I am employed by Murray Energy Corporation.

4   Q.  Was there a time when you were employed by Mepco?

5   A.  Yes there was.

6   Q.  And what was the time frame of that employment?

7   A.  2000--end of 2005 to about the end of 2013.

8   Q.  And who hired you in 2005?

9   A.  Mr. James Laurita.

10  Q.  Into what position did he hire you?

11  A.  I was the Superintendent of the Four West Mine.

12  Q.  Is that one of the mines operated by Mepco?

13  A.  Yes it was.

14  Q.  What are the names of the other ones?

15  A.  There was Titus, Prime and Four West were the

16  underground mines and we had a contract operation called Red

17  Bum.

18  Q.  And was it Four West Mine that was going to supply the

19  Longview Power Plant?

20  A.  Yes.

21  Q.  At some point did the defendant promote you to a vice

22  president position?

23  A.  Yes.

24  Q.  When was that?

25  A.  Ah, 2012 or 13 time frame.

272

Grimm - Direct

1    Q.   During your employment with Mepco, where was your office

2    located?

3    A.   My office was in Pennsylvania at the mine site.

4    Q.   Was there a time when you were working for the defendant

5    at Mepco that you began to make political contributions?

6    A.   Yes.

7    Q.   Could you tell the jury how that began?

8    A.   We had a staff meeting somewhere 2010 and we--it was

9    brought up that we would make political contributions to

10   candidates that were--supported the industry.

11   Q.   Who brought that up?

12   A.   Mr. Laurita.

13   Q.   And what was your understanding from that meeting as to

14   what your involvement would be?

15   A.   We would be told who to write checks to and what amount

16   and then we would be reimbursed.

17   Q.   You would be told by whom?

18   A.   By Mr. Laurita.

19   Q.   You would be reimbursed by what?

20   A.   By Mepco.

21   Q.   Prior to the contributions you made while working at

22   Mepco, had you made political contributions before?

23   A.   Yes I had.

24   Q.   And where were you employed when you were making

25   contributions before this time frame?

273

Grimm - Direct

1    A.   At Murray Energy.

2    Q.   What were the general amounts of the contributions that

3    you would make when you worked at Murray Energy?

4    A.   One, two, three hundred dollars.

5    Q.   And did any boss of yours or somebody above you ask you

6    to make those contributions?

7    A.   No.

8            MR. CARR:  Objection.  Relevance.

9            THE COURT:  Sustained.

10   BY MR. DOUGLAS:

11   Q.   Let's talk a little bit about the mechanics of this

12   contribution program at Mepco.  Was there a certain

13   individual that would communicate the instructions to you

14   about the candidate, the amount, whether a spouse would also

15   participate?

16   A.   Yes.

17   Q.   And who was that?

18   A.   Normally Karen Hughes.

19   Q.   And how would she typically communicate that to you

20   being at the Four West Mine?

21   A.   By e-mail.

22   Q.   Okay.  Can you recall some of the candidates to which

23   you and your wife contributed during this time frame at

24   Mepco?

25   A.   Manchin, Capito, McKinley, Critz, ah--I can't remember

Grimm - Direct

1    the others.

2    Q.  That's fine.  By what method did you or your wife

3    typically make your contributions?

4    A.  By check.

5    Q.  And what did you do with the check once you or your wife

6    had written it?

7    A.  I'd have it delivered to the main office.

8    Q.  Did you deliver to any one in particular?

9    A.  I'd usually give it to either Jim or his assistant.

10   Q.  On those occasions where you would give the checks to

11   the defendant, did he indicate what he was doing with those

12   checks?

13   A.  Using--giving them to somebody in the campaign.

14   Q.  Okay.  Did the defendant ever ask you to deliver not

15   only your checks but additional checks to a campaign?

16   A.  Yes.

17   Q.  How many times would you say?

18   A.  Couple times.

19   Q.  And on those two occasions or those couple of occasions,

20   were you delivering other executive's checks as well?

21   A.  Yes.

22   Q.  Did you have any knowledge of anyone keeping record of

23   the contributions you were making, specifically someone at

24   Mepco?

25   A.  I believe Karen kept track of them.

Grimm - Direct

1   Q.  Do you recall receiving any record that she kept, her

2   sharing it with you?

3   A.  She would tell us what we had contributed and if we're

4   maxed out or in that manner.

5   Q.  Did you have any understanding of why she was keeping

6   the record, if you know?

7   A.  I think because we--maybe certain limits.

8   Q.  Now just to talk generally about your payroll deposits

9   while you were at Mepco.  First of all, did you have a

10  salary?

11  A.  Yes.

12  Q.  And how would that come into your bank account?

13  A.  Direct deposit.

14  Q.  And how many times in a month?

15  A.  I think we got paid every two weeks.

16  Q.  Okay.  And prior to this campaign contribution program,

17  were you already receiving a bonus for performance or for

18  tonnage?

19  A.  Yes.  There was a tonnage bonus monthly.

20  Q.  Now an occasion did you communicate directly with the

21  defendant regarding politics at all?

22  A.  Sometimes.

23  Q.  Okay.

24         MR. DOUGLAS:  May I approach the witness, Your

25  Honor?

276

Grimm - Direct

1          THE COURT:  You may.

2     BY MR. DOUGLAS:

3     Q.  I'm handing you a small stack of exhibits I want to go

4     over one by one.  If you could just review that first on,

5     which is marked Government's Exhibit 1-14.  What is Exhibit

6     1-14 generally?

7     A.  It's an e-mail exchange between myself and James

8     Laurita.

9     Q.  And are you discussing the political campaign

10    contribution program?

11    A.  Yes.

12         MR. DOUGLAS:  We move to admit 1-14.

13         THE COURT:  Any objection?

14         MR. CARR:  No, Your Honor.

15         THE COURT:  Government Exhibit 1-14 is admitted.

16    (Government Exhibit 1-14 admitted.)

17    BY MR. DOUGLAS:

18    Q.  We're going to bring that up now on your computer screen

19    up there and we're going to enlarge the content of the

20    e-mail and I would like you to read your e-mail to the

21    defendant on July 17, 2010 please?

22    A.  Jim, I owe you four checks.  Are they to be out to

23    Oliverio for Congress and McKinley for Congress?  I will

24    send them to the office Monday with Jessica.  Eric.

25    Q.  What do you mean I owe you four checks?

Grimm – Direct

1   A.  There were four checks requested that I make out and
2   send to--to those campaigns.
3   Q.  And so you're asking him in addition to whom to make out
4   the checks.  Does that mean you did not know to whom to make
5   out the checks?
6   A.  I wanted to make sure that I had the names right.
7   Q.  Okay.  Thank you.  We can bring that one down and I'd
8   like you to now look at the next exhibit in your stack up
9   there which is marked 1-51.  What is 1-51 generally?
10  A.  It is a e-mail exchange between myself and Jim Laurita.
11  Q.  And are you forwarding him a campaign invitation--
12  A.  Yes--
13  Q.  --fundraiser--I'm sorry.  A fundraiser invitation?
14  A.  Yes.
15          MR. DOUGLAS:  We move to admit Exhibit 1-51.
16          THE COURT:  Any objection to the admission of 1-51?
17          MR. CARR:  No, Your Honor.
18          THE COURT:  The Court admits the exhibit.
19      (Government Exhibit 1-51 admitted.)
20  BY MR. DOUGLAS:
21  Q.  If we could bring up 1-51 and if we could just go to
22  the--to the invitation.  Why were you forwarding this Mark
23  Critz invitation to the defendant?
24  A.  According to my e-mail--according to the e-mail that I
25  received from James Critz, he called me about the event and

278

Grimm - Direct

1   so I forwarded it on to Jim to make sure that he had seen

2   it.

3   Q.  Why did you want to make sure he had seen it?

4   A.  Because he--he would decide whether not we would

5   participate in that.

6   Q.  Were you seeking his input before you would contribute

7   yourself to Mark Critz?

8   A.  Yes.

9   Q.  Why are you seeking the defendant's input before you

10  would make a contribution?

11  A.  Because he's the one--Mr. Laurita decided who we would

12  contribute to and who we wouldn't.

13  Q.  Okay.  Thank you.  Now if you would take a look at the

14  next exhibit in your stack which is Exhibit 1-91.  Could you

15  tell me generally what that is, identify that please?

16  A.  It's an e-mail to me from James Laurita.

17  Q.  Is it in regard to a Critz fundraiser?

18  A.  Yes it is.

19          MR. DOUGLAS:  We move to admit Government's Exhibit

20  1-91.

21          THE COURT:  Is there any objection?

22          MR. CARR:  No, Your Honor.

23          THE COURT:  The Court admits Government Exhibit

24  1-91.

25      (Government Exhibit 1-91 admitted.)

Grimm - Direct

1   BY MR. DOUGLAS:

2   Q.  If we could bring up the e-mail itself please and we're

3   going to enlarge the top part of the chain.  Could you

4   please read the e-mail from Mr. Laurita to you on August

5   22nd, 2012?

6   A.  It says, Eric, I will be unable to attend this event as

7   it looks like I need the entire afternoon with BB&T Bank.

8   Are you willing to go?  Would Cheryl want to go with you?

9   Q.  And that's at 4:45 a.m., that e-mail?

10  A.  Yes.

11  Q.  Okay.  I want to look at--could you look at, in your

12  stack 1-92.  Does that appear to be an e-mail about the same

13  event on the same day just some minutes later, 1-92?

14  A.  Yes.

15          MR. DOUGLAS:  We move to admit 1-92.

16          THE COURT:  Any objection?

17          MR. CARR:  No, Your Honor.

18          THE COURT:  Court admits Government Exhibit 1-92.

19      (Government Exhibit 1-92 admitted.)

20  BY MR. DOUGLAS:

21  Q.  Please bring up the e-mail and we're going to enlarge

22  for you the top part of the chain.  Could you please read

23  that e-mail?

24  A.  Eric, attached is the up-to-date Critz fundraising we

25  have done for Critz, with my edits to the general.  In

Grimm - Direct

1    essence I was only going to have Becky and I, and your and
2    Cheryl give to Critz.  See attached.  If you agree with
3    that, Karen will take care of adjusting your account.  If we
4    need a different strategy, please advise.
5    Q.  Thank you.  If we could look at page two of that exhibit
6    and if we could enlarge that spreadsheet please.  Did you
7    have any understanding why the defendant was forwarding to
8    you this spreadsheet of Critz contributions?
9    A.  I don't recall.
10   Q.  Did you agree to go to the Critz fundraiser that is
11   discussed here?  Did you go, if you recall?
12   A.  Yes I did.
13   Q.  And is it fair to say he's sending you this spreadsheet
14   prior to going?
15   A.  Yes.
16   Q.  Does it indicate to you he wants you to take it with him
17   or to be with you or to be knowledgeable of it?
18   A.  Yes.
19   Q.  Okay.  Now I want you to please look at Exhibit 6, which
20   I think 7 is next on your stack but if you could go to 6.
21   What generally is Government's Exhibit 6?
22   A.  It is a check that I wrote to the McKinley for
23   Congress--
24   Q.  Just, could you leaf through Exhibit 6 and tell us
25   generally what Exhibit 6 is?

Grimm − Direct

1    A.   They are different checks I wrote to different
2    campaigns.
3    Q.   Okay.  And were these written pursuant to this program
4    we've been discussing?
5    A.   Yes they were.
6             MR. DOUGLAS:  We move to admit Government Exhibit
7    6.
8             THE COURT:  Any objection?
9             MR. CARR:  No, Your Honor.
10            THE COURT:  Court admits Government Exhibit 6.
11       (Government Exhibit 6 admitted.)
12   BY MR. DOUGLAS:
13   Q.   All right.  And I just want to look at the first two.
14   First of all, on page one, let's enlarge that check for you.
15   Now can you please tell us what is on page one of Exhibit 6?
16   A.   There's a check for McKinley for Congress for
17   twenty-five hundred dollars signed by myself.
18   Q.   And why did you write that check?
19   A.   To--as part of the program to donate to McKinley
20   campaign.
21   Q.   And if we look at page two please and enlarge it.  What
22   is depicted on page two?
23   A.   It's McKinley for Congress for twenty-five hundred
24   dollars that I wrote and my wife signed.
25   Q.   And could you note for us what the date is on this

282

Grimm - Direct

1   check?

2   A.   March 18th, 2011.

3   Q.   And did you notice what the date was on the first check

4   we were looking at?  If not I'll bring it back up.

5   A.   It was also March 18th, 2011.

6   Q.   And both to McKinley?

7   A.   Yes.

8   Q.   Okay.  Now is it fair to say that in general the rest of

9   these contributions were made pursuant to the program, that

10  we don't need to go over each one of them?

11  A.   Yes they were.

12  Q.   Okay.  Now the last exhibit I want you to look at up

13  there please is Government Exhibit 7 and if you just leaf

14  through it and tell us generally what Exhibit 7 is?

15  A.   Exhibit 7 is a copy of my bank records.

16  Q.   Are they monthly statements of your checking account?

17  A.   Yes they are.

18  Q.   Is it of the account into which your Mepco payroll

19  deposits were made?

20  A.   Yes it is.

21  Q.   Including the additional deposits made for the program?

22  A.   Yes.

23        MR. DOUGLAS:  We move to admit Exhibit 7.

24        THE COURT:  Any objection?

25        MR. CARR:  No, Your Honor.

Grimm – Direct

1          THE COURT:  Government Exhibit 7 is admitted.

2       (Government Exhibit 7 admitted.)

3    BY MR. DOUGLAS:

4    Q.  And if we could please go ahead and cut to page two of

5    Exhibit 7 and first just enlarge--actually if you just

6    enlarge the top quarter there, the top--right there.

7    First, can you tell us the time period--where it says for

8    the period, what those dates are?

9    A.  March 8th, 2011 to April 7th, 2011.

10   Q.  And then if you look down into the deposits section, the

11   very first deposit, do you see the fifteen thousand

12   dollar--five hundred and some dollar deposit?

13   A.  Yes.

14   Q.  What was that for?

15   A.  It was made on 3/17 and that would have been a--a bonus

16   for the--for the campaign contributions.

17   Q.  Is it fair to say that's the day before the checks are

18   dated that we just looked at to the McKinley campaign?

19   A.  Yes.

20   Q.  Now at some point did you stop making contributions

21   while at Mepco?

22   A.  Yes.

23   Q.  Why did you stop?

24   A.  It was--after the bankruptcy was filed we were informed

25   by the bankruptcy attorneys that--

Grimm – Direct

1          MR. CARR:  Objection, Your Honor.  Relevance.

2          MR. DOUGLAS:  That's fine.  Don't--

3          THE COURT:  Sustained.

4          THE WITNESS:  Okay.

5     By MR. DOUGLAS:

6     Q.  Did you make any contributions, political contributions

7     during the program that weren't at the direction of the

8     defendant?

9     A.  No I did not.

10    Q.  In the absence of the directive coming from the

11    defendant, would you have made any of these contributions?

12    A.  I would've probably made some.

13    Q.  Would you have made them in the amounts of twenty-five

14    hundred dollars and twenty-six hundreds?

15    A.  No.

16    Q.  Okay.  Since the program has ended have you made any

17    contributions to, for example McKinley?

18         MR. CARR:  Objection.  Relevance.

19         THE COURT:  Sustained.

20         MR. DOUGLAS:  Nothing further, Your Honor.

21         THE COURT:  All right.  Thank you.

22    Cross-examination?

23         MR. DOUGLAS:  Should I retrieve the exhibits?

24         THE COURT:  Yes, please.

25         THE COURT:  You may proceed.

285

Grimm - Cross

1          MR. CARR:  Thank you, Your Honor.

2                    CROSS EXAMINATION

3     BY MR. CARR:

4     Q.  Mr. Grimm, can you tell me again how long you have been

5     involved in the coal industry?

6     A.  About thirty-three years.

7     Q.  And do you actually--during the time period that you

8     were at Mepco, 2010 to 2013, which office did you work in?

9     A.  I worked out of the office at the mine site.

10    Q.  Did you go underground?

11    A.  Yes.

12    Q.  And again your position title while you were at that

13    mine?

14    A.  I started out as a superintendent and then I became vice

15    president for Pennsylvania Operations.

16    Q.  As superintendent would it be correct for the jury to

17    understand, you oversee the entire mine operation?

18    A.  Yes I did.

19    Q.  Is it fair to say that you are very knowledgeable about

20    issues involving coal mining and the coal industry?

21    A.  Yes.

22    Q.  You were actually part of the Pennsylvania Coal

23    Association, is that correct?

24    A.  Yes.

25    Q.  And, again, I'm talking here about in the time period

Grimm - Cross

1    2010 to 2013 although you certainly still may be, but you

2    were a member of the Pennsylvania Coal Association, correct?

3    A.  Yes.  I was the company representative.

4    Q.  And you knew that Jim was involved with the West

5    Virginia Coal Association?

6    A.  Yes.

7    Q.  Did you actually live up in Pennsylvania?

8    A.  Yes.

9    Q.  And I think you mentioned that part of the mine was in

10   Pennsylvania?

11   A.  All of it was in Pennsylvania.

12   Q.  The entire mine?

13   A.  The entire mine.

14   Q.  A lot of the employees and miners then also lived in

15   those congressional districts?

16   A.  Our employees were from Pennsylvania and West Virginia.

17   Q.  At least some of the miners lived in the various

18   congressional districts in Pennsylvania?

19   A.  Yes.

20   Q.  You were never--the requests for donations for certain

21   candidates and the amounts, those were never told to you

22   that they were mandatory, is that correct?

23   A.  No.

24   Q.  There were always suggestions made?

25   A.  Yes.

Grimm – Cross

1   Q.  And no one ever told you to hide the fact of what
2   this--what's been referred to as the second bonus, as to
3   what that was or what it was for?
4   A.  No.
5   Q.  And it was deposited--it being the second bonus, was
6   deposited into your account just like every other deposit
7   from Mepco?
8   A.  Yes.
9   Q.  And during that time period of 2010 to 2013 did you--was
10  all of your income coming from Mepco?
11  A.  Yes.
12  Q.  If I might ask that 1-51 be pulled up.  I'm going to
13  retrieve--
14          THE COURT:  You may.  Did you find it?
15          MR. CARR:  I apologize, Your Honor.
16          THE COURT:  That's all right.  I doubt anything up
17  there is chronological at this point--numerical, I should
18  say.
19      (Pause)
20  BY MR. CARR:
21  Q.  This is the invite from Congressman Critz, is that
22  correct?  If you can blow that up please.  And you forwarded
23  that to Jim?
24  A.  Yes.
25  Q.  And Congressman Critz is from Pennsylvania, is that

Grimm - Cross

1   correct?

2   A.  He was.

3   A.  And he was running--he actually served one of the

4   congressional districts?

5   A.  Yes.

6   Q.  Is it accurate that you and Jim discussed which

7   candidates to support in Pennsylvania because you had more

8   familiarity with the elected officials than he did since you

9   were actually up living in and operating the mine in

10  Pennsylvania?

11  A.  No.

12  Q.  Why would that not be true?

13  A.  Because I spent most of my time at the coal mine.

14  Q.  Was it--let me separate the first part out then.  Do you

15  recall having discussions with Jim in which he would talk to

16  you about your thoughts about which Pennsylvania officials

17  to be supported?

18  A.  We would talk about different candidates, but as far as

19  support, we would talk about them and he would make the

20  final decision whether or not we would support them.

21  Q.  I understand.

22  A.  Okay.

23  Q.  I very much understand the answer, Mr. Grimm, but he

24  would in fact ask for your input concerning candidates or

25  elected officials in Pennsylvania?

Grimm – Cross

1    A.  I don't recall having that much really call input.  If

2    the mine—-I think the mine site was in Critz' district.

3    Q.  If I could get 1-14 pulled up please.  1-14.  Mr. Grimm,

4    do you actually remember this e-mail?

5    A.  I've seen it but I don't remember exactly all the

6    particulars about it.

7    Q.  And when you said you've seen it, have you seen it in

8    preparation for your testimony today?

9    A.  Yes.

10   Q.  Without having recently seeing the e-mail, do you have

11   an independent recollection of this e-mail?

12   A.  No.

13   Q.  Is it your understanding that you, based upon this

14   e-mail, that you believe that you delivered two checks for

15   Oliverio for Congress and two checks for McKinley for

16   Congress around July 17th of 2010?

17   A.  It says I wrote—-I had four checks written.  I was going

18   to write four checks.

19   Q.  Did you write those checks?

20   A.  I'm sure I did.

21   Q.  Would it surprise you to learn that Karen Hughes'

22   records for 2010 indicate that you did not give Oliverio any

23   money?

24   A.  Yes.

25   Q.  Do you have an independent recollection of giving

290

Grimm – Cross

1    Oliverio money?

2    A.  I thought we did.

3    Q.  Do you recall having discussions with Jim that you

4    wanted to support McKinley and not Oliverio?

5    A.  When we had a--a meeting with the--those candidates came

6    in and they basically said what they stood for and several

7    of us afterwards talked about it and--and we didn't--we

8    didn't believe Oliverio would benefit our industry.  I

9    mentioned that to Jim, as did some others.

10   Q.  Are you aware that some executives then gave to Oliverio

11   and some didn't?

12   A.  No.

13   Q.  But you would be surprised if the records indicate you

14   did not give any money to Oliverio?

15   A.  Yes, I would be.

16   Q.  And again this was during the--just for the record, the

17   2010 time period.  Mr. Grimm, Jim never indicated to you at

18   any time between 2010 and 2013 that there was anything

19   unlawful with the second bonus program, is that correct?

20   A.  That is correct.

21   Q.  And you never indicated to him that you had any reason

22   to believe that the second bonus program was unlawful?

23   A.  I did not.

24        MR. CARR:  A moment, Your Honor.

25      (Pause)

Grimm - Cross

1          MR. CARR:  Nothing further at this time, Your

2    Honor.  Returning Government Exhibit 52.

3          THE COURT:  All right.  Thank you.  Is there any

4    redirect of the witness?

5          MR. DOUGLAS:  No, Your Honor.

6          THE COURT:  Thank you.  Then Mr. Grimm, you're

7    excused as a witness and free to go unless either of the

8    parties wishes to hold him.

9          MR. DOUGLAS:  Not the Government, Your Honor.

10         MR. CARR:  No, Your Honor.

11         THE COURT:  You're free to go.

12    (Witness excused)

13         THE COURT:  And the Government may call its next

14    witness.

15         MR. DOUGLAS:  The Government calls Christopher

16    Stecher.

17         THE COURT:  Christopher Stecher?

18         MR. DOUGLAS:  Yes, Your Honor.

19         THE COURT:  Okay.  Ladies and Gentlemen, we'll be

20    taking a midafternoon recess after this witness.  If any of

21    you need a seventh inning stretch right now, please feel

22    free to stand up and stretch while we're waiting for the

23    witness.  It's gotten a bit warm in here, hasn't it?  Yes.

24    We'll try to do--I told you.  We'll try to do something

25    about that.

Stecher – Direct

1        (Pause)

2            THE COURT:  Mr. Stecher, good afternoon.  Please

3     approach the Clerk, the standing in front of me with the

4     gray suit on.  She will administer the oath to you before

5     you take the witness stand.

6            CHRISTOPHER STECHER, GOVERNMENT'S WITNESS, SWORN

7            THE CLERK:  Thank you.  Have a seat in the witness

8     stand.  The witness is Christopher Stecher, S-t-e-c-h-e-r.

9            THE COURT:  All right, Mr. Stecher, if you'll

10    answer in a loud, clear voice and you may certainly move

11    that microphone around to meet your needs in speaking into

12    it clearly.  Thank you.

13           THE WITNESS:  Thank you.

14                         DIRECT EXAMINATION

15    BY MR. DOUGLAS:

16    Q.  Sir, please state your name?

17    A.  Christopher Stecher.

18    Q.  At some point did you work for Mepco and the defendant

19    Jimmy Laurita?

20    A.  Yes I did.

21    Q.  During what time frame did you work for Mepco?

22    A.  From 2006 through 2012.

23    Q.  And during your time at Mepco was there a time when you

24    began to make political campaign contributions?

25    A.  Yes there was.

293

Stecher – Direct

1    Q.  How did that start?

2    A.  Through several conversations we were told that we would

3    start getting bonuses in order to make campaign

4    contributions.

5    Q.  And when you say we were told, who was telling?

6    A.  It was basically Jimmy.

7    Q.  The defendant?

8    A.  Yes.  James Laurita.

9    Q.  Okay.  And at that time had you made a political

10   contribution before?

11   A.  Never.

12   Q.  And was it your understanding that spouses were going to

13   be asked to contribute as well?

14   A.  Yes.

15   Q.  Had your wife ever made a contribution before at that

16   time?

17   A.  No.

18   Q.  So generally how would you know to which candidate and

19   how much and if your wife would be asked to contribute?

20   A.  Sometimes we would have a meeting where of--we would

21   have a meeting where we would discuss it or sometimes I

22   would receive an e-mail that had the names and the amount of

23   money.

24   Q.  And if you received an e-mail that had the information,

25   from whom would you be receiving that e-mail?

Stecher - Direct

1   A.  Generally Karen Hughes.

2   Q.  Okay.  And once you either wrote a check or your wife

3   wrote the check or you filled out a credit card form, what

4   would you do with that contribution?

5   A.  Most of the time give it to Karen Hughes.  Occasionally

6   we would have a slip where we had our credit card

7   information on it, we would mail it to the candidate's

8   office.

9   Q.  And did you have any understanding as to whether Karen

10  Hughes was also keeping track in some way of the

11  contributions?

12  A.  Yes she was.

13          MR. DOUGLAS:  May I approach the witness, Your

14  Honor?

15          THE COURT:  Yes.

16  BY MR. DOUGLAS:

17  Q.  I'm handing you two exhibits, Government Exhibit 4 and

18  Government Exhibit 5.  Okay.  Would you please start taking

19  a look at Government Exhibit 4?  Could you generally

20  identify what Government Exhibit 4 is made up of?

21  A.  The first page is a wife--is a check written by my wife

22  for the McKinley campaign.

23  Q.  You don't need to identify anything specific about it.

24  A.  Oh, okay.  It's a check to the McKinley campaign and the

25  remaining items are copies of credit card billing slips.

Stecher – Direct

1   Q.   Okay.  And do they relate to this contribution program
2   we've been discussing?
3   A.   Yes they do.
4            MR. DOUGLAS:  All right.  We move to admit
5   Government Exhibit 4.
6            THE COURT:  Any objection?
7            MR. CARR:  No, Your Honor.
8            THE COURT:  The Court admits Government Exhibit 4.
9        (Government Exhibit 4 admitted.)
10  BY MR. DOUGLAS:
11  Q.   We're going to bring up on your computer screen there
12  Government Exhibit 4, the first page and we're going to
13  enlarge that for you.  What does page one of Exhibit 4
14  depict?
15  A.   This is a check written by my wife, Patricia
16  Rodrequez-Sanabia on March 10, 2010 to McKinley for Congress
17  for five hundred dollars, a political contribution.
18  Q.   Did you ask your wife to write that check?
19  A.   Yes I did.
20  Q.   Did someone ask you to ask your wife to write that
21  check?
22  A.   Yes.  It was part--part of us making the contributions,
23  she and I.
24  Q.   Okay.  Now--and I don't want to go through each of these
25  credit card statements, okay, but I'm just going to ask you

296

Stecher - Direct

1    generally if there are transactions in there noting

2    particular campaign committees, would that be part of the

3    program we've been discussing?

4    A.  Yes it would.

5    Q.  Okay.  Now I would like you to look at Government

6    Exhibit 5 please and just leaf through it and tell us

7    generally what Government Exhibit 5 consists of.  Are these

8    monthly statements from your checking account?

9    A.  Up to now, yes, they all are.  I've got three more pages

10   to look at.  Four more.  Yes.  These are personal credit

11   card statements on my bank account with BB&T.

12   Q.  Okay.  You said credit card statements but this is a

13   checking account, isn't it?

14   A.  Oh, I'm sorry.  I misspoke.  I misspoke.  I apologize.

15   These are bank statements with BB&T.

16        MR. DOUGLAS:  All right.  We move to admit

17   Government Exhibit 5.

18        THE COURT:  Is there any objection to the admission

19   of Government Exhibit 5?

20        MR. CARR:  No, Your Honor.

21        THE COURT:  The Court admits the exhibit.  Thank

22   you.

23      (Government Exhibit 5 admitted.)

24   BY MR. DOUGLAS:

25   Q.  Now we're going to bring up page one on your screen

Stecher – Direct

1   there and I'm going to ask that the top left corner be

2   enlarged.  Can you tell us the date of this statement

3   please?

4   A.  Yes, March 24th, 2010.

5   Q.  And now I'm going to have page two of this exhibit,

6   Exhibit 5 brought up and the top enlarged--I mean, no, I'm

7   sorry.  You were enlarging the correct--and I want you to

8   look--draw your attention to March 9 payroll deposit eleven

9   thousand four hundred and seventy-three dollars.  What does

10  that deposit represent?

11  A.  That represents a bonus paid to me for the contribution

12  program.

13  Q.  Now in general with regard to your pay that comes in

14  from payroll at Mepco, does it typically consist of two

15  salary payments, a tonnage bonus, right?

16  A.  That's correct.

17  Q.  Okay.  And now if there is another deposit, especially

18  in large amounts, do those relate to the contribution

19  program we've been discussing?

20  A.  Yes they would be larger than what my pay and my--my

21  paycheck was and also my bonus check, core bonus.

22  Q.  All the contributions that were made during this program

23  by either you or your wife, were they made at the direction

24  of the defendant?

25  A.  Yes.

298

Stecher – Cross

1    Q.  And if you weren't receiving the direction from the
2    defendant would you have made any of these contributions,
3    both in the exhibits and the ones that are outside the
4    exhibits?
5    A.  No.
6            MR. DOUGLAS:  One moment, Your Honor?
7            THE COURT:  Yes.
8        (Pause)
9            MR. DOUGLAS:  Nothing further, Your Honor.
10           THE COURT:  All right.  Cross-examination?
11           MR. CARR:  Thank you, Your Honor.
12                       CROSS EXAMINATION
13   BY MR. CARR:
14   Q.  Sir, would I be correct that all of your income, or the
15   vast majority of it, came from Mepco?
16   A.  No, you would not.
17   Q.  There were some other deposits.  You had another source
18   of income?
19   A.  Yes, I did.
20   Q.  A significant portion of it though was paychecks from
21   Mepco?
22   A.  Would you please define significant?
23   Q.  How about just some of it?
24   A.  That would work.  Yes.
25   Q.  The--and all that money that came from Mepco was

Stecher – Cross

1    deposited into that checking account which you have just

2    reviewed the records?

3    A.  Yes.  Self-deposits.  I mean automatic deposits.

4    Q.  All in exactly the same way?

5    A.  Yes.

6    Q.  No one ever--Jim Laurita never told you, nor Karen, nor

7    Suzanne Crane, that the donations were mandatory.  They were

8    always suggested, is that correct?

9    A.  That's correct.

10   Q.  And you never disagreed with making any of the

11   contributions?

12   A.  No I did not.

13   Q.  Jim Laurita never gave you any indication from 2010 to

14   2013 that there was anything unlawful with the program?

15   A.  No he did not.

16   Q.  Never told you to deny it, hide it, nothing?

17   A.  No he did not.

18   Q.  And you did not give Jim Laurita any indication that you

19   thought there was anything wrong with it?

20   A.  No I did not.

21   Q.  And I just want to clarify because we looked at bank

22   statements which appeared to have deposits and we only

23   looked at those in which there appeared to be one for the

24   second bonus.  Would it be accurate that you received three

25   of those in 2010, two in 2011 and one in 2012?  Does that

Stecher - Cross

1    sound about right?

2    A.  I can't say for certain.  I think it does but not

3    absolute.

4    Q.  Well--go ahead.  I didn't mean to interrupt you.

5    A.  I'm just not--I can't be absolutely certain.

6    Q.  You certainly didn't receive one every month?

7    A.  No.

8              MR. CARR:  Nothing further, Your Honor.

9              THE COURT:  Redirect?

10             MR. DOUGLAS:  No, Your Honor.

11             THE COURT:  All right.  Is the witness subject to

12   recall?

13             MR. DOUGLAS:  Not by the Government, Your Honor.

14             MR. CARR:  No, Your Honor.

15             THE COURT:  Okay.  Thank you, sir, you may step

16   down.  You're excused as a witness and free to go.

17       (Witness excused)

18             THE COURT:  All right, Ladies and Gentlemen, I

19   promised you an afternoon recess so as soon as the witness

20   is able to leave the courtroom we'll excuse.

21        Mr. Stecher, I'd advise coming through the middle here

22   to get out and you can leave the exhibits right there and

23   Mr. Douglas will take care of that.  Thank you.

24        All right.  Ladies and Gentlemen, let's take

25   approximately a fifteen minute recess during which you are

1   not to discuss the case among yourselves or with anyone with

2   whom you have contact.  We'll see if we can't get the

3   temperature adjusted in here and maybe you all can get some

4   caffeine.  And we'll at a quarter till three, 2:45.  Okay.

5       Remember don't discuss the case among yourselves.

6   Please leave your notebooks face down on your chairs and I

7   do thank you for your patience and attention.

8       (Jury out 2:29 p.m.)

9           THE COURT:  Mr. Douglas, old habits die hard.  All

10  right.  I want you to pay attention to Alternate Number One

11  because she's really struggling to stay awake.  She's trying

12  mightily.  She's the lady who works at night and I don't

13  know.  I'm going to see what we can do about the temperature

14  but you know you might try to redirect some of the questions

15  in a way that brings her back.  I haven't seen her just go

16  out completely but I've seen her struggle all afternoon.

17          MR. CARR:  Respectfully, Your Honor, I believe

18  there's two others that fall in that category.

19          THE COURT:  Well I thought--I thought Juror Number

20  Five resurrected and came back to--pretty alert.  Is there

21  another one I missed?

22          MR. CARR:  There appeared to also be another one in

23  the front row, Your Honor.  I certainly understand the

24  struggle but I just wanted to respectfully inform the Court.

25          THE COURT:  Okay.  So we've got two in the back row

1    and Juror Number Eleven in the front row.  Well, I'll make

2    them take a seventh inning stretch if I see it happening

3    again.  Right now Juror Number Five I think was off very

4    briefly but came right back and I didn't see him fall asleep

5    after that, did you?

6            MR. CARR:  Not after that, Your Honor.

7            THE COURT:  Okay.  And then as I said Alternate

8    Number One is awake but she's really moving around trying to

9    stay awake.

10           MR. CARR:  Your Honor, if I could just ask.  I know

11   this doesn't come up very often, but what is the proper way

12   if counsel were to notice that, not wanting to draw

13   attention to it, but--

14           THE COURT:  You have to let me know.

15           MR. CARR:  How--

16           THE COURT:  My staff is watching.  They're sending

17   me notes but they--I'm not going to notice it every time and

18   you need to make sure that if you think this is impairing

19   the trial in any way that you let me know.  Where we can't

20   keep someone awake, I've had to excuse them.

21           MR. CARR:  Yes, Your Honor.

22           THE COURT:  We have four alternates and--but I

23   really think it's in major part this afternoon due to the

24   temperature here in the courtroom which has grown quite

25   warm.

Lafferty - Direct

1           MR. CARR:  Yes, Your Honor.

2           THE COURT:  Okay.  Thank you.  Court stands in

3    recess until two forty-five.

4             (Recess from 2:30 p.m., until 2:45 p.m.)

5           THE COURT:  Thank you.  Please be seated.  We can

6    bring the jury in.  By the way, we think Juror Number Five

7    is taking notes.  Depending on his perspective, he's--he's

8    awake.  He's attentive.

9         (Jury in 2:47 p.m.)

10          THE COURT:  You can be seated.  Welcome back,

11   Ladies and Gentlemen.  We are ready to resume with the

12   Government's next witness.  Is that Mr. Douglas?  Okay.

13          MR. DOUGLAS:  United States calls James Lafferty.

14          THE COURT:  James Lafferty.

15       JAMES LAFFERTY, GOVERNMENT'S WITNESS, SWORN

16          THE CLERK:  Thank you.  Please have a seat in the

17   witness stand.  The witness is James Lafferty,

18   L-a-f-f-e-r-t-y.

19          THE COURT:  I don't think I have to tell you what

20   to do, Mr. Lafferty.  You've heard it for two days.  So

21   there you go.  Okay.  You may proceed, Mr. Douglas.

22                    DIRECT EXAMINATION

23   BY MR. DOUGLAS:

24   Q.  Agent Lafferty, please introduce yourself to the jury.

25   A.  My name is Jim Lafferty.  I'm a Special Agent with the

Lafferty – Direct

1    FBI.

2    Q.  How long have you been a Special Agent with the FBI?

3    A.  A little over fifteen years.

4    Q.  And what type of training do you have to complete before

5    you become a Special Agent with the FBI?

6    A.  At the time it was four months of training in Quantico,

7    Virginia and I did that back in 2002.

8    Q.  Prior to joining the FBI, what were you doing?

9    A.  I worked for an accounting firm in Charleston, West

10    Virginia.  I was a CPA.

11    Q.  Okay.  What's a CPA?

12    A.  Certified Public Accountant.

13    Q.  And then finally what is your education?

14    A.  I graduated with a Bachelor's in Business Administration

15    with an emphasis in Accounting from West Virginia

16    University.

17    Q.  Does the FBI investigate campaign finance offenses and

18    false statement offenses?

19    A.  Yes.

20    Q.  Now while you were in the FBI Academy training, did you

21    receive training on white collar crime investigations?

22    A.  Yes I did.

23    Q.  What type of training did that include?

24    A.  It includes training on the familiarity of the law, as

25    well as different techniques we can use to investigate white

Lafferty – Direct

1    collar crime cases.

2    Q.  Okay.  And then once you finished the Academy, have you

3    continued any education with regard to your Certified Public

4    Accountant license?

5    A.  Yes.

6    Q.  What kind of training does that include?

7    A.  Every year annually the FBI puts on training for its CPA

8    agents--individuals who have their CPA license who are also

9    agents so every year I receive training from the Bureau

10   related to white collar crimes and other matters that we

11   might investigate.

12   Q.  Did that CPA training include any training regarding

13   campaign finance?

14   A.  Yes.

15   Q.  What kind of training did that include?

16   A.  Throughout the years, not every year, but throughout the

17   years we would get information on updates on the law as well

18   as case specific information where other agents would come

19   in and discuss with us how they investigated their cases and

20   things they did right and things they did wrong in there

21   investigations.

22          MR. CARR:  Your Honor, may I have a moment please?

23          THE COURT:  Yes.

24      (Pause)

25          MR. CARR:  Thank you, Your Honor.

Lafferty – Direct

1          THE COURT:  All right.

2    BY MR. DOUGLAS:

3    Q.  And while at the FBI have you focused on a particular

4    type or set of cases?

5    A.  Yes.

6    Q.  What has that focus been?

7    A.  Primarily white collar crime the first five years--the

8    first five years of my career I focused more on financial

9    crimes, primarily Ponzi schemes but in the last ten years

10   more public corruption and other white collar crime matters

11   as opposed to financial matters.

12   Q.  And was it doing this last ten years that you had some

13   experience with campaign finance investigations?

14   A.  Yes.

15   Q.  Now in your capacity as an FBI agent have you been part

16   of an investigation involving campaign donations at Mepco?

17   A.  Yes.

18   Q.  How did you receive this investigation?

19          MR. CARR:  Objection, Your Honor.  Relevance.

20          THE COURT:  I'm not sure I see it.  Why is that

21   relevant, other than that it's background?

22          MR. DOUGLAS:  Just a little bit of background we're

23   trying to give--

24          THE COURT:  I think we can move on.

25          MR. DOUGLAS:  Okay.

Lafferty – Direct

1    BY MR. DOUGLAS:

2    Q.  Keeping it general, what type of investigative

3    techniques did you perform in this case?

4            MR. CARR:  Objection, Your Honor.  Again,

5    respectfully, at this point in the trial I question the

6    relevancy of this testimony.  I certainly understand--if I

7    can just briefly continue, Your Honor.  I don't like talking

8    objections.  I know the Court doesn't.  I certainly

9    understand that the Government intends to bring in some

10   documents through Agent Lafferty.  We have no issue with

11   that but I'm not quite sure where counsel is going with how

12   the investigation was conducted.

13           MR. DOUGLAS:  Just a very brief explanation of

14   where the documents came from.

15           THE COURT:  Well I think if we can limit it to

16   that, that's fine.

17           MR. DOUGLAS:  Yes, Your Honor.

18           THE COURT:  All right.

19           MR. DOUGLAS:  I'll just go ahead--may I approach

20   the--

21           THE COURT:  And actually, in order to remain

22   focused, you could lead briefly through that so it doesn't

23   get far afield.

24           MR. DOUGLAS:  Okay.

25           THE COURT:  I assume there's no objection to that,

Lafferty – Direct

1    Mr. Carr.

2           MR. CARR:  Absolutely not, Your Honor.

3           THE COURT:  All right.  Thank you.

4    BY MR. DOUGLAS:

5    Q.  Has your gathering of evidence included e-mail

6    correspondence?

7    A.  Yes.

8    Q.  Including to and from the defendant?

9    A.  Yes.  We obtained e-mails from Mepco.

10   Q.  Has your gathering of evidence included records of the

11   personal contributions of the defendant?

12   A.  Yes.

13   Q.  Has the gathering of evidence included certain corporate

14   records regarding Mepco?

15   A.  Yes.

16   Q.  And then has your evidence gathering included these FEC

17   reports, reports filed with FEC from certain campaigns?

18   A.  Yes, that's correct.

19          MR. DOUGLAS:  Okay.  Your Honor, may I approach the

20   witness?

21          THE COURT:  You may.

22   BY MR. DOUGLAS:

23   Q.  I'm handing you a stack of exhibits and part of that

24   stack is clipped together, if we could start with it and

25   that's going to be--that is 1-2, 1-5, 1-16, 1-17, 1-24,

309

Lafferty - Direct

1  1-38, 1-50, 1-52, 1-53, 1-54, 1-64, 1-68, 1-80, 1-90, 1-107,
2  1-139 and finally 1-140.  Is that correct?
3  A.  Yes.
4  Q.  Generally are those e-mails to and from the defendant on
5  his Mepco account?
6  A.  That's correct.
7       MR. DOUGLAS:  We move to admit those exhibits.
8       THE COURT:  Is there any objection to the exhibits
9  that the witness has just reviewed?
10      MR. CARR:  No, Your Honor.
11      THE COURT:  All right.  Then the Court admits the
12 following exhibits, Ladies and Gentlemen.  United States
13 Exhibit 1-2, 1-5, 1-16, 1-17, 1-24 1-38, 1-50, 1-52, 1-53,
14 1-54, 1-64, 1-68, 1-80, 1-90, 1-107, 1-139 and 1-140.
15      MR. DOUGLAS:  Thank you, Your Honor.
16    (Government Exhibits 1-2, 1-5, 1-16, 1-17, 1-24, 1-38,
17 1-50, 1-52, 1-53, 1-54, 1-64, 1-68, 1-80, 1-90, 1-107,
18 1-139, 1-140 admitted.)
19 BY MR. DOUGLAS:
20 Q.  Now I want to ask you to look at 18 and 18-1 please,
21 should be the next two exhibits.
22 A.  Okay.
23 Q.  And first of all, what is Government's Exhibit 18
24 generally?
25 A.  These are checks written by Mr. Laurita to different

Lafferty - Direct

1   campaigns.

2   Q.   And does it also include in some instances contribution

3   forms completed with those contributions?

4   A.   Yes.

5   Q.   And is 18-1 just a separate contribution form from 18,

6   just made a separate exhibit, 18-8?

7   A.   I'm sorry.  Are you asking about 18-8?

8   Q.   Yes, sir.

9   A.   That's correct.

10          MR. DOUGLAS:  We move to admit Government's Exhibit

11   18 and 18-8.

12          THE COURT:  Is there any objection?

13          MR. CARR:  No, Your Honor.

14          THE COURT:  The Court admits Government Exhibit 18

15   and Government Exhibit 18-8.

16      (Government Exhibit 18 and 18-8 admitted.)

17   BY MR. DOUGLAS:

18   Q.   I'd like to bring up 18-8 and enlarge the payment

19   information section.  I'm just going to ask the jury to read

20   that, starting with please check here.

21   A.   Are you asking me to read it?

22   Q.   No, I'm asking the jury just to take a moment to read

23   after please check here to themselves.  And I'm going to ask

24   you, Agent Lafferty, is 18-8 something you obtained--a

25   record you obtained from this Tom Smith campaign?

311

Lafferty – Direct

1    A.  It is.

2    Q.  Okay.  Could we bring that down?  Now I would like you

3    to please take a look at Exhibit 41 and Exhibit 43 please.

4    A.  Okay.

5    Q.  Are these organizational records with regard to Mepco

6    and its affiliates?

7    A.  They are.

8    Q.  Is Exhibit 41 an organizational chart from the

9    bankruptcy petition of August 30, 2013?

10   A.  Yes.

11   Q.  And is Exhibit 43 records obtained from the West

12   Virginia Secretary of State with regard to Mepco LLC's

13   organization?

14   A.  Yes.

15           MR. DOUGLAS:  We move to admit Government's Exhibit

16   41 and 43.

17           THE COURT:  Is there any objection?

18           MR. CARR:  No, Your Honor.

19           THE COURT:  All right.  Government Exhibit 41 is

20   admitted and Government Exhibit 43 is admitted.  As to 41,

21   that is the organizational chart?

22           MR. DOUGLAS:  Yes, Your Honor.

23           THE COURT:  Okay.  You added something about the

24   bankruptcy records.  Is that--you're just saying that's

25   where you obtained that?

312

Lafferty – Direct

1      MR. DOUGLAS:  That's where the agent obtained it,

2   yes, Your Honor.

3      THE COURT:  But that's not the bankruptcy file or

4   anything like that?

5      MR. DOUGLAS:  It is only a single page exhibit of

6   the chart from the petition.

7      THE COURT:  Okay.

8      (Government Exhibit 41 and 43 admitted.)

9   BY MR. DOUGLAS:

10  Q.  Now throughout your training and experience have you

11  learned about the Federal Election Commission?

12  A.  Yes.

13  Q.  What is the Federal Election Commission?

14  A.  It was established to primarily regulate federal

15  election campaign.  There was a Federal Election Campaign

16  Act of 1971 that was passed.  This FEC was established to

17  help regulate that Act.

18  Q.  Is the Federal Election Commission an agency or

19  department of the United States government?

20  A.  Yes.

21  Q.  Do you have awareness as to the FEC's responsibilities

22  as an agency through your training and experience?

23  A.  Yes.

24  Q.  And what are those responsibilities?

25  A.  Well, they compile the data from the different federal

313

Lafferty - Direct

1    campaigns, the contributions that are being made to those

2    campaigns, the expenses those campaigns are making.  They

3    compile that data that they get from the different campaigns

4    and they publish that information publicly to anyone who

5    wants to view it.

6    Q.  Now I would like you to please take a look at the

7    remaining exhibits which are Government Exhibits 20, 22, 24,

8    26, 28, 30, 32, 34, 36 and 38 and if you could generally

9    identify what those exhibits are please.

10   A.  These are the different FEC forms filed by the

11   candidates that are in question here in this case.

12   Q.  And are these every FEC form--

13           THE COURT:  Wait a minute.  I'm sorry.  Okay.  The

14   Court Reporter's computer just locked up so let's take just

15   a couple of minutes to let her fix it.

16                      (OFF THE RECORD)

17                      (ON THE RECORD)

18           THE COURT:  All right.  We're back on the record.

19   You may proceed.

20   BY MR. DOUGLAS:

21   Q.  Your Honor, I was just asking the Agent to identify what

22   22, 24, 26, 28, 30, 32, 34, 36 and 38 are.

23   A.  These are forms submitted by the different campaigns to

24   the Federal Election Commission.

25   Q.  And is this exhaustive as to the program or is this just

Lafferty – Direct

1   some of them?

2   A.  Just some of them.

3   Q.  And are these the full reports as in everyone who gave

4   or are these abbreviated to include only the pages that

5   include contributions in the names of the executives?

6   A.  They are abbreviated.

7           MR. DOUGLAS:  We move to admit those Government's

8   exhibits.

9           THE COURT:  Is there any objection?

10          MR. CARR:  No, Your Honor.

11          THE COURT:  All right.  Then the Court

12  admits Government's Exhibits 20, 22, 24, 26, 28, 30, 32, 34,

13  36 and 38.

14      (Government's Exhibits 20, 22, 24, 26, 28, 30, 32, 34,

15  36 and 38 admitted.)

16  BY MR. DOUGLAS:

17  Q.  Do you have an understanding of the term designated

18  campaign committee?

19  A.  Yes.

20  Q.  And all of those exhibits we just discussed and were

21  admitted, are those the designated campaign committees for

22  those various federal candidates?

23  A.  Correct.  You would not write a check to Senator Joe

24  Manchin.  You would write a check to the campaign

25  organization formed to take contributions on his behalf.

Lafferty – Direct

1   Q.  Okay.  If we could bring up please Government's Exhibit

2   38 and I'm just going to have you describe very generally

3   what we're looking at and the different components of an FEC

4   report.  If we could enlarge the top half of 38.  So do you

5   see where it says FEC form 3?

6   A.  Yes.

7   Q.  Does that mean it's a federal government form?

8   A.  Yes.

9   Q.  They're not various types of this out there?  There's a

10  Government issued form?

11  A.  That's correct.

12  Q.  Okay.  And then there's a section for the name of

13  committee here and this one lists Capito for West Virginia?

14  A.  Correct.

15  Q.  Okay.  And then do you see a section called type of

16  report?  What type of report is the one that we are looking

17  at?  I'm sorry, we're going to need to enlarge another

18  section, if we could take that down and enlarge the middle

19  part.  Now I'm sorry.  We're looking at number four, type of

20  report.  What type of report is the one that we are looking

21  at?

22  A.  It's the July 15th quarterly report, the second quarter

23  of the year.

24  Q.  Okay.  So is it your understanding that campaign

25  committees are to--are required to submit these reports for

Lafferty - Direct

1    these quarters?

2    A.   Correct.

3    Q.   Okay.  And are all the exhibits that we had admitted as

4    FEC reports, quarterly reports?

5    A.   Yes.

6    Q.   Okay.  And if we could take that down please and bring

7    up the rest of the page one of Exhibit 38.  And you see

8    number five here, covering period, what does that mean?

9    A.   That means that the information contained in this

10   particular report will cover that time period for the--for

11   the campaign.

12   Q.   Does that mean that this report consists of information

13   regarding contributions made during that time frame?

14   A.   Correct.

15   Q.   Okay.  And then you see here a typed name and a

16   signature of a Reed Spangler.  What position did Reed

17   Spangler have with the Capito for West Virginia committee?

18   A.   He was the treasurer.

19   Q.   And is that common--do you see how it says signature of

20   treasurer that it's the treasurer who was submitting these

21   FEC form 3's?

22   A.   It's common in the documents that I reviewed in this

23   case.

24   Q.   Okay.  And could you read the part that says I certify

25   above his name?

317

Lafferty - Direct

1    A.  I certify that I have examined this report and to the

2    best of my knowledge and belief it is true, correct and

3    complete.

4    Q.  And do you see that type of language in false statement

5    cases that you investigate?

6    A.  Yes.

7    Q.  Certification that something is true?

8    A.  That's correct.

9    Q.  Okay.  And you see down here at the bottom it further

10   says the submission of false information could lead to

11   penalties?

12   A.  Yes.

13   Q.  Okay.  Now let's just take a look at example of the

14   content of these reports.  Let's look at page four please.

15   If we can bring up the second and third contribution

16   information sections, there down.  So is this an example of

17   a contribution made in the names of Karen and Mark Hughes

18   and how it appears in this report?

19   A.  Yes.

20   Q.  And what type of information is included in these

21   reports for each contribution?

22   A.  The name of the person making the contribution, the

23   address of the person, where the person's employed, as well

24   as there's a different section for the occupation and then

25   the amount they provided and the date they made that

318

Lafferty – Direct

1   contribution.

2   Q.  Okay.  So then let's look at page six of Exhibit 38

3   please, and enlarge just the top contribution please.  So

4   then this is for Dawn O'Dell.  Who's Dawn O'Dell?

5   A.  That's Mr. O'Dell's wife.

6   Q.  And you see the information listed for her name of

7   employer and occupation.  What does it say?

8   A.  Mon County is the name of the employer.  Occupation

9   fitness instructor.

10  Q.  Okay.  Then are you saying--from earlier you said in

11  general the FEC is going to take this information and

12  publish it to the public.  Is this information we were

13  talking about, they would take Dawn O'Dell and publish this

14  to the public as if she made this contribution for

15  twenty-six hundred dollars?

16  A.  That's correct.

17          MR. DOUGLAS:  One moment, Your Honor, please.

18          THE COURT:  Yes.

19      (Pause)

20          MR. DOUGLAS:  Nothing further, Your Honor.

21          THE COURT:  All right.  Thank you.

22  Cross-examination?

23      (Pause)

24          MR. CARR:  Thank you, Your Honor.  I apologize.

25                          CROSS EXAMINATION

Lafferty – Cross

1   BY MR. CARR:

2   Q.   If we could pull up Government Exhibit 41 and

3   specifically put a square around the name James Lafferty.   A

4   little bit higher please.   Perfect.   Agent Lafferty,

5   Government Exhibit 41 was the organizational chart, is that

6   correct?

7   A.   Correct.

8   Q.   And it's my understanding--you've been at counsel table

9   all week so I feel like I can ask you this--the Government's

10  counsel table, the purpose of putting this organizational

11  chart in is to show the organizational relationship between

12  Mepco and the other entities that have been testified to, is

13  that correct?

14  A.   Correct.

15  Q.   There are certain percentages and things like Class A

16  and there's also some Class B interests that are on this

17  document.   Is that correct?

18  A.   Correct.

19  Q.   You see those?

20  A.   Yes.

21  Q.   You did not independently investigate or confirm and do

22  not attest to the accuracy of those numbers, is that

23  correct?

24  A.   Other than the--to answer your question fully, other

25  than the organization of Mepco, no.

Lafferty – Cross

1    Q.  Could you repeat your answer for me please?

2    A.  Sure.  Other than investigation I did of Mepco and it's

3    incorporation, no.

4    Q.  But as far as percentage ownership interests of various

5    entities for other various entities you did not do any

6    investigation of that?

7    A.  No.

8    Q.  And you could not attest to the accuracy of that?

9    A.  Correct.

10   Q.  Or if there might have been previous percentages for any

11   entity as far as ownership of another or if amended

12   bankruptcy filing was filed which changed those numbers?

13   A.  Correct.

14   Q.  Agent Lafferty, as part of your investigation, did you

15   attempt to interview James Laurita?

16   A.  No.

17         MR. CARR:  No further questions, Your Honor.

18         THE COURT:  Any redirect?

19         MR. DOUGLAS:  No, Your Honor.

20         THE COURT:  All right.  Agent Lafferty, you may

21   step down and return to your seat.

22      (Witness excused from stand)

23         THE COURT:  And the Government may call its next

24   witness.

25         MR. DOUGLAS:  United States calls William Raney.

Polce - Direct

1          THE COURT:  All right.  Mr. Raney.

2      (Pause)

3          MR. DOUGLAS:  I'm sorry, Your Honor.  Mr. Raney is

4      not here but another witness is.

5          THE COURT:  Oh, I see, all right.

6          MR. BERNARD:  It looks like we're calling Steven

7      Polce, Your Honor.

8          THE COURT:  Steven Polce.  All right.

9          MR. DOUGLAS:  May I retrieve the exhibits, Your

10     Honor?  I'm sorry.

11         THE COURT:  Please do.  Thank you.

12     (Pause)

13         THE COURT:  Sir, if you'll please approach the

14     Clerk here in the front of the courtroom and I would suggest

15     you weave your way through the middle here.  They you go and

16     then here to the Clerk.  She will ask you to raise your

17     right hand and she'll administer the oath to you once you

18     do.  Thank you.

19          STEVEN POLCE, GOVERNMENT'S WITNESS, SWORN

20         THE CLERK:  Thank you.  You may have a seat in the

21     witness stand.  The witness is Steven Polce, P-o-l-c-e.

22         THE COURT:  You may proceed, Mr. Bernard.

23         MR. BERNARD:  Thank you, Your Honor.

24                    DIRECT EXAMINATION

25     BY MR. BERNARD:

Polce - Direct

1    Q.  Good afternoon, sir.  Could you briefly describe to the

2    jury your background, employment, where you live, what

3    you're doing right now, just a little bit about yourself?

4    A.  Right now I'm unemployed.  I'm retired.  I worked

5    forty-two years in the coal industry, various places.  I

6    started at Consol, went to Matika, Preston Energy, Mepco and

7    finished up--well it would be Mepco with Longview.

8    Q.  Okay.  Let's talk about Mepco specifically.  When did

9    you begin your employment with Mepco?

10   A.  I think 2004.

11   Q.  Okay.  And what was--what was your position?

12   A.  I was hired as a mine superintendent.

13   Q.  Who hired you?

14   A.  Mr. Laurita.

15   Q.  Okay.  Which Mr. Laurita?

16   A.  Jim Junior.

17   Q.  The defendant in this case?

18   A.  Yes.

19   Q.  And again, you said you were a mine superintendent, was

20   that at Prime?

21   A.  Yes, sir.

22   Q.  Did you--did your position change throughout the years

23   at Mepco?

24   A.  Yes, I was promoted to vice president.

25   Q.  Vice president of what?

Polce – Direct

1    A.   Mepco, Dana Mining--Dana Mining of West Virginia.

2    Q.   What were your duties when you were vice president?

3    A.   Basically the same.  We run the Prime Mine and also was

4    putting in a new mine in Harrison County called Arco.   We

5    was putting a new mine in there.

6    Q.   So you were one of the VPs at the mines, running the

7    mine operations?

8    A.   Yes.

9    Q.   Is there a time while at Mepco that you were approached

10   about engaging in political contributions?

11   A.   Yes.

12   Q.   How did that come up?

13   A.   I just really don't recall at all but I know that we had

14   a meeting that we were asked to donate money to politicians.

15   Q.   Okay.  Let's break that down.  You said you had a

16   meeting?

17   A.   Yes.

18   Q.   With whom?

19   A.   Jim Junior.

20   Q.   Who called the meeting?

21   A.   I believe Jim Junior did.

22   Q.   And who was at that meeting?

23   A.   I know I was and some of the other VPs of the operation,

24   managers of the--I don't know if they was all there or not

25   but I know there was a few of us there.

Polce - Direct

1   Q.   Okay.  And specifically what did the defendant tell you

2   about this--this plan for political contributions?

3   A.   We wanted to help the coal industry the best we could

4   and that we would donate money to them but we would be

5   reimbursed for the money we paid.

6   Q.   Okay.  Was that important to you?

7   A.   Very.

8   Q.   Why?

9   A.   Because I wouldn't donate it if I wasn't getting

10  reimbursed.

11  Q.   Okay.  Had you ever made a political contribution before

12  the Mepco--

13  A.   Not that I can recall, no.

14  Q.   What about your wife, had she had ever made a political

15  contribution prior to the Mepco program so to speak?

16  A.   Not that I'm aware of.

17  Q.   During the meeting did you receive any instructions

18  from--from the defendant as to whom you should discuss this

19  program with or whether you should keep it amongst

20  yourselves?

21  A.   Basically everything we had in there we kept everything

22  to ourselves.  I know I did personally.

23  Q.   Now after that meeting how did you get involved with the

24  actual contributions?  What happened?

25  A.   We would be instructed who to donate to.

Polce - Direct

1    Q.  Who would instruct you?

2    A.  I would either get it via e-mail or a letter or

3    whatever.

4    Q.  Okay.  I guess when I say who, what individuals would

5    tell you or give you the information?

6    A.  Mrs. Hughes would give me information.  Latter part of

7    the time would be Suzanne Crane, I believe her last name is

8    Crane and I would have--Mr. Clark would drop stuff off at my

9    office.

10   Q.  Do you know or do you have an understanding who

11   ultimately was providing the direction to those individuals?

12   A.  I assume Jim Junior.

13   Q.  Why do you assume?

14   A.  Because it was his program the way I looked at it.

15   Q.  You weren't independently deciding who to contribute to?

16   A.  No, sir.

17   Q.  Did you--you indicated that you would not have made

18   contributions but for the reimbursements?

19   A.  No, sir, I wouldn't have.

20   Q.  Did you raise an objection or say, hey, I don't want to

21   do this?

22   A.  No, sir.

23   Q.  Why not?

24   A.  I really don't know that answer.  I would--I always had

25   faith in Jim Junior.  I worked for him.  He's never steered

Polce – Direct

1    me wrong and I went with what the man had to say.

2    Q.  You trusted him?

3    A.  Yes, sir.

4    Q.  And he hired you?

5    A.  Yes, sir.

6    Q.  He's the one that promoted you?

7    A.  Yes, sir.

8    Q.  He could also demote you?

9    A.  Yes, sir.

10   Q.  He could also fire you?

11   A.  Yes, sir.

12   Q.  Now when you received instructions from Ms. Hughes and

13   the others, what--what specific information did you receive

14   from them, and I'm talking about political contributions?

15   A.  That maybe we're going to donate to such and such a

16   candidate on this day; we need the money by Friday or

17   Thursday or whatever.

18   Q.  And let me back up just briefly.  With respect to this

19   program was it apparent to you that Mr. Laurita, the

20   defendant, was aware that you were being reimbursed?

21            MR. CARR:  Objection, Your Honor.  Relevance.

22            MR. BERNARD:  It's a conduit contribution case,

23   Your Honor.

24            THE COURT:  Yeah.  I'll allow it.  Overruled.

25   BY MR. BERNARD:

Polce - Direct

1    Q.  What was your answer?

2    A.  And the question again, sir?

3    Q.  Based on your understanding, did you know whether

4    Mr. Laurita was aware that you were being reimbursed for the

5    contributions?

6    A.  Yes.

7    Q.  Do you remember some of the--some of the candidates to

8    whom you donated?

9    A.  Tomblin, Manchin, Capito.  In going through my records I

10   found one for Snuffer.  I don't know who that was.  Snyder.

11   One was some Snyder.  Do I recall them all?  No.

12   Q.  Okay.  With respect to the--once you were asked for your

13   contribution, whether it be yours or a contribution by your

14   spouse, what happened--well let me ask you first of all.

15   What forms did you make those contributions in?

16   A.  Check.

17   Q.  Once you made out the check or your wife signed a check,

18   what did you do with them next?

19   A.  I would either give them to Mr. Clark to take to the

20   office if he was coming by that way of if we had meetings I

21   would give them to Karen Hughes.

22   Q.  And to your knowledge do you have any reason to doubt

23   that any of the checks that you wrote did not--were not

24   given to the campaigns?

25   A.  No.

328

Polce – Direct

1  Q.  And with respect to the reimbursements, how were

2  reimbursements made to you or your wife for that matter?

3  A.   Through payroll checks.

4  Q.   Payroll checks or deposits?

5  A.   Deposits.

6  Q.   When you say payroll checks, did you receive your

7  payroll through direct deposit?

8  A.   Yes, sir.

9  Q.   Okay.  Now let me talk about your compensation a little

10  bit.  You were a salaried employee?

11  A.   Yes.

12  Q.  How many times were you paid per month in direct deposit

13  for salary?

14  A.   Bimonthly.

15  Q.   Okay.  Did you have a so called tonnage bonus and other

16  bonuses that were performance related?

17  A.   Yes, sir.

18  Q.   And then during the time frame of the campaign

19  contribution program, did you also receive other deposits

20  through direct deposit to your bank account?

21  A.   Yes.

22  Q.   If we look at your bank statements would you be able to

23  tell at least in part some of the advances or reimbursements

24  that were made to your account for political contributions?

25  A.   I would say because two times a month I was being paid

Polce – Direct

1     my salary.  One time a month I was being paid a production

2     bonus and then if there was anything else in there that has

3     to be the reimbursement.

4     Q.  And--and we'll look at those in a minute but the

5     political contribution reimbursements, in many instances

6     were they, for lack of a better term, more sizable than your

7     other bonus or payroll?

8     A.  Some of them were, yes, sir.

9     Q.  Okay.  We'll get back to that in a minute.  Let me--

10           MR. BERNARD:  May I approach the witness, Your

11    Honor?

12           THE COURT:  You may.

13           MR. BERNARD:  Thank you.

14    BY MR. BERNARD:

15    Q.  I'm going to sit in front of you what's been marked as

16    Exhibit 16 and 17 and I'll ask you to look at Exhibit 16

17    first and just tell me generally what Exhibit 16 represents?

18    A.  Okay.

19    Q.  And I mean generally.  You don't need to get into

20    specifics.  What is Exhibit 16?

21    A.  It has checks on here from my ex-wife donating money to

22    McKinley for Congress.

23    Q.  Okay.  Without getting into the specifics yet, what

24    generally does that exhibit include?  You said checks.  Is

25    it fair to say that there are checks from bank accounts that

Polce – Direct

1    you and your spouse held?

2    A.  Yes, sir.

3    Q.  And is it also fair to say that the records, at least

4    those checks that are in there, reflect contributions you

5    made pursuant to the Mepco program?

6    A.  Yes, sir.

7         MR. BERNARD:  I'd ask that Exhibit 16 be admitted,

8    Your Honor.

9         THE COURT:  Is there any objection?

10        MR. CARR:  No, Your Honor.

11        THE COURT:  Government 16 is admitted.

12        MR. BERNARD:  Thank you, Your Honor.

13        (Government Exhibit 16 admitted.)

14   BY MR. BERNARD:

15   A.  Could I say something?

16   Q.  Yes.

17   A.  Also there's other stuff on here--these are other checks

18   on here too that does not pertain to all that.

19   Q.  Okay.  And my question should have said, in part do they

20   reflect contributions?

21   A.  Yes, sir.

22   Q.  Thank you.  Thank you for that clarification.  Looking

23   at page one, for instance, if you could pull up the first

24   check.  I believe it's been admitted.  Did I not ask for it

25   to be admitted?

Polce - Direct

```
 1              THE COURT:  16 is in.
 2              MR. BERNARD:  Yes.  Thank you.
 3    BY MR. BERNARD:
 4    Q.  The top check please.  Can you tell me what that is?
 5    A.  Yes.  It's a check my wife wrote to McKinley for
 6    Congress for five hundred dollars.
 7    Q.  Okay.  And that check that she wrote, was that at the
 8    direction of the defendant that that check be made out to
 9    McKinley for five hundred dollars?
10    A.  That would have been a redirect through me that she
11    wrote that check.
12    Q.  Who directed you to make the check?
13    A.  Mr. Laurita, Jim.
14    Q.  Okay.  And was that check--who ultimately paid for that
15    donation?
16    A.  Out of our checking account.
17    Q.  Okay.  And who ultimately put money in your checking
18    account to pay for that check?
19    A.  Jim Junior.
20    Q.  Looking at page two and there are a series of four
21    checks and I'll see if I can streamline this.  Two to
22    Oliverio for Congress.  Looks like you signed one and your
23    wife signed one and then two checks for McKinley for
24    Congress and they are all dated June 25th, 2010 and again
25    the McKinley for Congress appear to be a check signed by you
```

Polce – Direct

1    and Victoria.  Were those checks made pursuant to the Mepco

2    political campaign contribution program?

3    A.  Yes, sir.

4    Q.  Were those ultimately paid for by the defendant?

5    A.  Yes, sir.

6    Q.   Let's go to page three.  The check on the bottom is an

7    August 16th, 2010 check to Manchin for West Virginia for a

8    thousand dollars.  Do you see that?

9    A.  Yes, sir.

10   Q.  Is that a check that you were directed to make by the

11   defendant?

12   A.  Yes, sir.

13   Q.  And is that a check that was ultimately paid for by the

14   defendant?

15   A.  Yes, sir.

16   Q.  And without going through each and every check on this

17   exhibit, would it be fair to say with respect to any check

18   in Exhibit 16 made out to a political campaign like

19   McKinley, like Manchin, like Tomblin, Snuffer and McKinley

20   as well, that all those checks contained in Exhibit 16

21   would've all been pursuant to the direction of the

22   defendant?

23   A.  Yes, sir.

24   Q.  And would have been paid for by the defendant?

25   A.  Yes, sir.

Polce - Direct

1    Q.  Could you look at Exhibit 17 please.  And again in

2    general just tell me what is contained in Exhibit 17.  Take

3    a few seconds to leaf through it please.

4    A.  My bank statements.  Mine and my ex-wife's bank

5    statements.

6    Q.  Okay.  And at least in part would those bank statements

7    contain deposits into your account for political

8    contributions, deposits by the defendant or Mepco?

9    A.  Can you please repeat that?

10   Q.  Yes.  Does Exhibit 16, 17 I'm sorry, 17 contain bank

11   statements which would reflect in part deposits being made

12   pursuant to the political contribution reimbursement program

13   we've been talking about?

14   A.  Yes, sir.

15          MR. BERNARD:  I would ask that Exhibit 17 be

16   admitted, Your Honor.

17          THE COURT:  Is there any objection?

18          MR. CARR:  No, Your Honor.

19          THE COURT:  Government Exhibit 17 is admitted.

20      (Government Exhibit 17 admitted.)

21   BY MR. BERNARD:

22   Q.  Let's pull up page one please, a March 9th deposit.

23   Thank you.  You see on March 9th and I believe at the top of

24   the statement in indicates this is 2010.  Do you see a

25   fourteen thousand four hundred and fourteen dollar and three

Polce - Direct

1    cent deposit?

2    A.  You mean eleven thousand four hundred and sixty-three?

3    Q.  You're right.  I don't know what I'm looking at right at

4    the moment.  I think I flipped, looking on the screen up

5    there and not the exhibit.  Yeah.  Eleven thousand four

6    hundred and sixty-three dollars.  Do you see that?

7    A.  Yes, sir.

8    Q.  Was that a deposit that Mepco made for political

9    contributions to your knowledge?

10   A.  To my knowledge that would either be a contribution or

11   that would have been a bonus check for the production of

12   that and the start up of the Arco Mines.  I'm not exactly

13   sure.

14   Q.  Okay.  But you're sure at least as you sit here today

15   that Mepco did make deposits into your account for political

16   contributions?

17   A.  Yes, sir.

18   Q.  But if I went through each page, would your answer be

19   the same?  I'm not really sure.  It could be or it could be

20   another bonus?  Do you know what I'm saying?

21   A.  But what I'm saying is I was reimbursed for all my money

22   that I put in through a political campaign; yes, sir.

23   Q.  Right.  But to go through this statement and have you

24   identify specific deposits, would you know which ones are

25   political campaign contribution deposits versus other

Polce - Direct

1    bonuses?

2    A.  No, not unless I really broke it down and had to look

3    when my two paychecks would fall and all that stuff, sir.

4    Q.  I don't think we need to do that.  What you said is

5    everything that you made a donation for was reimbursed by

6    the defendant in this program?

7    A.  Yes, sir.

8    Q.  Okay.  And it was reimbursed by deposits to your

9    account?

10   A.  Yes, sir.

11   Q.  Did you ever raise an objection during this program to

12   any particular candidates or say I really don't want to give

13   to that guy or person?

14   A.  I would talk that I never really cared for Joe Manchin,

15   to contribute money to Joe Manchin.  Did I personally say to

16   Jim Junior that I don't want to donate to him?  No, sir, not

17   that I can recall.

18   Q.  Well if you didn't want to do it, why did you do it?

19   A.  That's what our program was for, to do it.

20   Q.  But if you didn't want to do it, why did you feel the

21   need to do it?

22   A.  As I said, that's our program to do.  We did it because

23   I worked for Mr. Laurita.  I trusted Jim Junior and I did

24   what the man asked me to do.

25   Q.  Even though you personally didn't want to do it, didn't

336

Polce - Direct

1    want to give to this candidate, you did so because--

2              MR. CARR:  Objection.  Leading.

3              THE COURT:  Sustained.

4              MR. BERNARD:  I'll withdraw.

5              THE COURT:  Okay.

6    BY MR. BERNARD:

7    Q.  Did anybody at Mepco advise you or tell you that you

8    could use any of the monies given to you for political

9    contributions, either advance or reimbursements, so-called

10   reimbursements--did anybody at Mepco ever tell you you could

11   use that for anything other than political contributions?

12   A.  No.  The way it worked is I always wrote the checks

13   first before I was reimbursed the way I recall so it was my

14   money that was going out to be paid to them but it was being

15   put back into my account so it's money then when it comes

16   back.

17   Q.  So it was dollar for dollar, you weren't out any money?

18   A.  Not that I'm aware of because I didn't keep track of it

19   personally myself.  Mrs. Hughes kept track of everything and

20   if she said I was square, I was square.

21   Q.  Did you make any money, to your knowledge, on this

22   program--under this program?

23   A.  Not that I recall.

24             MR. BERNARD:  That's all the questions I have.

25   Thank you, sir.

Polce – Cross

1          THE WITNESS:  Thank you.

2          THE COURT:  All right.  Cross-examination?

3          MR. CARR:  Thank you, Your Honor.

4                    CROSS EXAMINATION

5  BY MR. DOUGLAS:

6  Q.  Is it Polce, am I pronouncing that right?

7  A.  That's fine.  Polce, whatever.  Yeah, anything works.

8  Q.  If I heard you correctly you--your memory is that you

9  wrote the check first out of your funds and then a lump sum

10 payment would be made occasionally in approximately the

11 amount of what you reported you contributed.  Is that right?

12 A.  Yeah.

13 Q.  It wasn't that initially you got a deposit into your

14 account and then you kind of kept writing checks out of that

15 bank account?

16 A.  Not always.  I don't know when I was square and I don't

17 know when I was behind because I didn't keep track of all

18 that.

19 Q.  The majority of your income, perhaps the vast majority,

20 came from your employment at Mepco?

21 A.  The years we're talking about from--

22 Q.  2010 to 2013?

23 A.  Yes.  Yes.

24 Q.  And did you get some type of a three thousand dollar

25 consulting bonus too, Arco consulting fees?

Polce – Cross

1    A.  Yeah.  I mentioned that a while ago that Arco--I had a

2    three thousand dollar a month bonus for starting up the Arco

3    Mines, yes, sir.

4    Q.  And that was a discretionary bonus awarded by Jim to

5    you?

6    A.  Yes, sir.

7    Q.  And all that money that was paid to you went into the

8    same account, in the same way all during this time period?

9    it just got direct deposited into your account?

10   A.  It got direct deposited but it was different.  Some of

11   it was Dana Mining.  Some of it was Mepco.

12   Q.  There was payments and the jury will see that on the

13   bank statements for Dana Mining?

14   A.  Yes, sir.

15   Q.  But the salary, tonnage bonus and what's been referred

16   to as bonus two were--are labeled Mepco, is that right?

17   A.  Yeah.  I don't know what you mean by bonus two.  What do

18   you mean?

19   Q.  They're talking--it's been referred to as a bonus for

20   the political contributions?

21   A.  Okay.  Yeah, they was all direct deposited into my

22   account.

23   Q.  Under the name Mepco?

24   A.  Yes.

25   Q.  Other than you mentioned Joe Manchin, you didn't have

Polce – Cross

1    any disagreements with any of the candidates or the amounts

2    that were suggested to you, is that right?

3    A.   Any disagreement or any what now with what?

4    Q.   Any disagreement with any of the candidates or the

5    amounts to contribute that were suggested to you?

6    A.   I can answer that a couple ways.  I wouldn't have

7    contributed to them if I wasn't being reimbursed for them if

8    that's what you're asking me.

9    Q.   But when you were asked to contribute to them, you

10   voiced concern, at least among some of the execs about

11   contributing to Manchin, is that correct?

12   A.   Yes.

13   Q.   You didn't do that any other time?

14   A.   Not that I recall.

15   Q.   And nobody told you that it was mandatory that you did

16   that.  There were suggestions as far as which candidate and

17   how much to contribute?

18   A.   Well we had a meeting that says we want to donate money

19   to these guys to help them, these ladies to help them, and

20   that's what we did.

21   Q.   You agreed to it?

22   A.   Yeah, when I was getting reimbursed I agreed to it.

23   Q.   You never got any indication from Jim Laurita in any

24   way, shape or form that there was anything unlawful about

25   the program, did you?

Polce – Cross

1    A.  No.

2    Q.  And you didn't indicate to him any concern about the

3    program being unlawful?

4    A.  I didn't know it was unlawful.

5    Q.  That's what the jury is here to decide.  You, though,

6    during the time period 2010 to 2013 did not communicate any

7    concern to Jim?

8    A.  No.

9         MR. CARR:  I apologize for the comment just a

10   moment ago, Your Honor.  May I have a moment?

11        THE COURT:  Yes.

12      (Pause)

13        MR. CARR:  Nothing further, Your Honor.

14        THE COURT:  Is there any redirect?

15        MR. BERNARD:  There's not, Your Honor, and the

16   witness may be excused from the United States' stand point.

17        MR. CARR:  Yes, Your Honor.

18        THE COURT:  All right.  Mr. Polce, you can step

19   down.  You're excused as a witness and free to go.

20        THE WITNESS:  Thank you.

21        THE COURT:  I'd make my way out through the middle

22   of the courtroom rather than try to do the side.

23      (Witness excused)

24        THE COURT:  Government's next witness?

25        MR. DOUGLAS:  The United States calls again William

341

1    Raney.  Hopefully I'm not oh for two.

2              THE COURT:  Okay.  Is someone checking to see if

3    he's there?

4              MR. DOUGLAS:  Yes, Your Honor.

5              THE COURT:  All right.  Any exhibits?  Thank you.

6              MR. BERNARD:  You're welcome.

7         (Pause)

8              MR. DOUGLAS:  Apparently I am oh for two, Your

9    Honor.  Could we have a brief recess just to check and see

10   the status of where this witness is?  He was on his way and

11   was expected to be here ten minutes ago.  He is the last

12   witness.

13             THE COURT:  All right.  You might want to check to

14   see if he went to the state courthouse.  That often happens

15   with people who aren't familiar with where our federal

16   courthouse is.

17        All right, Ladies and Gentlemen, we'll take a brief

18   recess.  Let me say this to you about our schedule.  We're

19   moving very quickly and obviously the Government would like

20   to get Mr. Raney in today and then you have?

21             MR. DOUGLAS:  Then that is actually it, Your Honor.

22             THE COURT:  You might rest after that?

23             MR. DOUGLAS:  Yes.

24             THE COURT:  Okay.  And then the defendant would be

25   ready to begin tomorrow?

1          MR. CARR:  Of course, Your Honor.

2          THE COURT:  Okay.  So we'll talk--I'll talk to the

3    lawyers further about the schedule but if Mr. Raney does

4    make an appearance, I think it's worth making sure that you

5    stay for that so that--you'll be out in time to go to your

6    job tonight.  I can guarantee you that, but let's take a

7    brief recess.  Let's see if we can find out if Mr. Raney

8    cruising around wonderful downtown Clarksburg looking for

9    the federal courthouse and I'll bring you back in as soon as

10   we know something.  All right.  Thank you.  I think the case

11   is--keep your notebooks face down on your chairs.  The case

12   is moving faster than the parties had expected and I think

13   that we will find that tomorrow may be the end of the

14   evidence.  Okay.  Thank you.

15      (Jury out 3:42 p.m.)

16          THE COURT:  All right.  If you can try to find out

17   where Mr. Raney is.

18          MR. DOUGLAS:  Immediately, Your Honor.

19          THE COURT:  Thank you.

20          MR. CARR:  Your Honor, if I may ask--

21          THE COURT:  Court stands in--oh, I'm sorry.

22          MR. CARR:  Do you believe that we would be--that it

23   would be at least ten minutes before we come back in.

24          THE COURT:  Yes.

25          MR. CARR:  So we could step out.  Thank you.

 1              THE COURT:  Oh, yes, definitely.

 2               (Recess from 3:45 p.m., until 3:55 p.m.)

 3              THE COURT:  All right.  Thank you.  I understand

 4     that Mr. Raney is on crutches--

 5              MR. DOUGLAS:  Yes, Your Honor.

 6              THE COURT:  --and needs to come in and take the

 7     stand before--he can take the oath from here.  It's not a

 8     problem.

 9              MR. DOUGLAS:  Yes, Your Honor.  United States calls

10     William Raney.

11              THE COURT:  All right.  And when the jury comes in

12     I'll explain it to them.

13              MR. DOUGLAS:  Thank you, Your Honor.

14              THE COURT:  All right.  Good afternoon, Mr. Raney.

15     Would you please come forward and I think--

16              MR. Raney:  Oh, through the middle here.

17              THE COURT:  Yeah, you're going to have to thread

18     the needle on that and is it comfortable for you to stand

19     there in front of the Clerk to take the oath?  Can you raise

20     your right hand or would you rather be in the chair?

21              THE WITNESS:  I'm fine.

22              THE COURT:  Okay.  Thank you.  Raise your right

23     hand please.

24              WILLIAM RANEY, GOVERNMENT'S WITNESS, SWORN

25              THE CLERK:  Thank you.  Have a seat in the witness

1    stand.

2            THE COURT:  All right.  Now can I ask Court

3    Security to assist Mr. Raney to get up those steps?

4        Okay.  Now you can adjust that microphone so that it

5    will work just fine for you.  With that, we can bring the

6    jury in.

7            (Jury in 3:58 p.m.)

8            THE COURT:  All right, Ladies and Gentlemen,

9    welcome back and when you come in just be seated.  All

10   right.  Ladies and Gentlemen, before you came in, Mr. Raney,

11   who is on crutches, came into the courtroom and he actually

12   took the oath which I think I should ask him to take again

13   in front of you but we escorted him to the chair so that

14   with all the confusion here in the courtroom it was a trap

15   for the unwary and I was fearful.

16       So, Mr. Raney, I know you've already been sworn once but

17   I'm going to ask the Clerk to do it again in front of the

18   jury.  Thank you.

19           MR. Raney:  Yes, ma'am.

20           WILLIAM Raney, GOVERNMENT'S WITNESS, SWORN

21           THE CLERK:  Thank you.  You may be seated.  The

22   witness is William Raney, R-a-n-e-y.

23           THE COURT:  All right.  Okay.  You may proceed,

24   Mr. Douglas.

25           MR. DOUGLAS:  Thank you, Your Honor.

Raney – Direct

DIRECT EXAMINATION

BY MR. DOUGLAS:

Q.   Sir, could you please introduce yourself to the jury?

A.   Yes, sir, I'm Bill Raney.

Q.   And how are you employed, sir?

A.   I am employed by the West Virginia Coal Association.

Q.   What is the West Virginia Coal Association?

Q.   We represent the coal industry here in West Virginia as
well as the companies that support the coal industry, the
mining of coal, the processing of coal, transportation and
use of coal here.

Q.   Is the Association also involved in politics, including
having a Political Action Committee?

A.   We do have a Political Action Committee, yes, sir.

Q.   And you said you're the President of the Coal
Association?

A.   I am, sir.

Q.   How long have you been the president?

A.   Oh, Lord, I think since 1982, would that be right.  92.
Let's do 92, how's that.  I think that's what it is.

Q.   Okay.  Do you know Jim Laurita, Jr. the defendant
sitting here at this table next to me on the right?

A.   I do, yes, sir.

Q.   How long have you known the defendant?

A.   Well I've known the defendant probably most of his life

Raney - Direct

1    and I've known his father.  I don't think I knew him before

2    Jim was born but I've known both of them.

3    Q.  How do you know the Laurita family?

4    A.  Through the coal industry.  It's--you know, I worked up

5    in the Morgantown and Fairmont area as an inspector for the

6    Department of Natural Resources back in the early 70s and

7    Mr. Laurita was mining coal at that point and I inspected

8    his jobs.  I got to know him through--through that

9    relationship and then of course as Jim came along and I was

10   with--first with the Mining Reclamation Association and now

11   with the Coal Association and that's just kind of a natural

12   progression.

13   Q.  Thank you.  At some point was the defendant a member of

14   the West Virginia Coal Association Board?

15   A.  He was, sir, yes.

16   Q.  What time frame was he on the Board?

17   A.  Well I'm going to say it was between 2000--probably from

18   2005, in the early 2000's up through, you know,

19   last--probably four years ago.

20   Q.  Okay.  And was there a certain time frame where he was

21   Chairman of the West Virginia Coal Association Board?

22   A.  Yes, sir.

23   Q.  What time frame was that?

24   A.  I want to say that was 2012 to 14.

25   Q.  Generally have you known the defendant to be involved in

Raney - Direct

1    politics in any time that you've known him?

2    A.   Only--I mean only in the sense of being an interested

3    citizen and you know no more so than anyone else that's a

4    member of the Association.

5    Q.   Okay.   Has that involvement by the defendant in politics

6    included permitting his Mepco offices to be used for any

7    political events as far as you know?

8    A.   Well the one event that I recall was when he was--and,

9    again you're dealing with a memory here, it's liable to be a

10   little sketchy so that--but he was the Chairman of the

11   Government Affairs Committee and I think at the time there

12   was a race going on for the First Congressional District and

13   as I recall, I think it was open at that point, but I think

14   Mike Oliverio and I think Dave McKinley was running, Sarah

15   Minear was running, Mac Warner, and because it was in

16   Morgantown, because it was convenient to all the candidates

17   he invited whoever the members of the Association wanted to

18   participate in an interview process--it wasn't his idea.   It

19   was a collective idea of the Association to bring in the

20   candidates and talk with them as it regards their view of

21   the coal industry.

22   Q.   All right.   And so would that have been in 2010 if

23   you're talking about Oliverio and McKinley?

24   A.   Yes, sir, it sounds like you know what year it was.

25   Q.   I'm asking you.

Raney - Direct

1    A.  Well as best I recall, that was when it was.

2    Q.  All right.  Have you known the defendant to attend any

3    campaign fundraisers, yes or no?

4    A.  Yes, I know he attended some.  I can't tell you when or

5    where but most of the other members have as well.

6    Q.  Have you known the defendant to host or sponsor any

7    campaign fundraisers?

8    A.  Yes, sir.

9    Q.  Okay.

10   A.  And, again, you'll ask me if you want the dates and I'm

11   not sure I can give them to you.

12   Q.  Have you ever witnessed any campaign representative

13   asking the defendant to follow up with any of his employees

14   about donations?

15          MR. CARR:  Objection, Your Honor.  Respectfully

16   with the relevance of this witness' knowledge of

17   Mr. Laurita's political activity.

18          THE COURT:  There's no foundation for the question.

19   I'll sustain it.

20          MR. DOUGLAS:  Okay.

21   BY MR. DOUGLAS:

22   Q.  Have you been copied on any e-mails from campaigns to

23   the defendant regarding fundraisers?

24   A.  That's the ones, as I recall, ones I got copies of, yes.

25   Q.  And in those e-mails that you're saying you recall, did

349

Raney - Direct

1   any of those include the campaign asking the defendant to

2   follow up with any employees of his about donations?

3   A.  You know, I don't recall exactly the wording of the

4   thing.  I think it was a call from--it was McKinley's

5   daughter I think that was running the campaign for him and

6   saying, you know, we'd like to follow up with everybody that

7   had talked about perhaps giving a contribution.

8   Q.  Okay.  Does the Coal Association Board hold meetings?

9   A.  We do, yes, sir.

10  Q.  And do board members ever discuss politics at those

11  meetings?

12  A.  Usually we adjourn when we do that but there's always an

13  interest of course.

14  Q.  Okay.  Have you ever heard the defendant discuss

15  politics at or after adjournment of those meetings?

16  A.  Only in the sense of participating in what I'd call a

17  general conversation among the folks that are in the room.

18  Q.  Okay.  Have you ever discussed campaign limitations with

19  the defendant?

20  A.  Haven't discussed them but I mean we've exchanged

21  e-mails, as I recall there was some e-mails.

22          MR. DOUGLAS:  All right.  May I approach the

23  witness, Your Honor, please?

24          THE COURT:  You may.

25  BY MR. DOUGLAS:

Raney - Direct

1    Q.  I'm handing you a number of exhibits here.

2    A.  Okay.

3    Q.  If you could just briefly take a look at those and we'll

4    start with the first one on top which is marked as

5    Government Exhibit 1-15.  Generally do you recognize this

6    e-mail or do you recognize this exhibit?

7    A.  I do; yes, sir.

8    Q.  What is it in general?

9    A.  It looks like an e-mail chain that talked about an event

10   that was held during our annual meeting which we always have

11   an annual meeting in August.

12   Q.  And is it addressing campaign limitations, donation

13   limitations between you and including the defendant?

14   A.  It's including several people.  It came from Sandi

15   Davison.

16   Q.  Okay.  Do you see that, for example, at the top you're

17   sending an e-mail to the defendant, do you see that?

18   A.  Oh, okay.  Yes, sir.

19   Q.  And do you see how you're talking about number--dollar

20   amounts for limitations?

21   A.  Yes, sir.

22          MR. DOUGLAS:  We move to admit Government Exhibit

23   1-15.

24          THE COURT:  Is there any objection?

25          MR. CARR:  No, Your Honor.

Raney – Direct

1        THE COURT:  Government Exhibit 1-15 is admitted.

2        (Government Exhibit 1-15 admitted.)

3   BY MR. DOUGLAS:

4   Q.  If we could please bring it up.  It's going to be on

5   your computer screen up there and we are going to enlarge

6   the bottom half, just the bottom e-mail first.  Further

7   down.  The entire bar.  Completely down.  Yes.  Do you see

8   this e-mail here at the bottom from Sandi Davison?

9   A.  Yes.  You're asking me I presume, right?

10  Q.  Yes.

11  A.  Yes, sir, I do see it.

12  Q.  And who is Sandi Davison?

13  A.  Sandi was--she was the assistant we had at the

14  Association.  She was there for like forty-two years.

15  Q.  And do you see, if you focus on the third to last

16  sentence, the sentence starting with since this is a federal

17  election?

18  A.  Yes, sir.

19  Q.  Could you read that sentence for us please?

20  A.  Yes, sir.  It says, since this is a federal election

21  individuals can give a maximum of forty-eight hundred

22  dollars which is twenty-four hundred dollars for each the

23  primary and the general elections.  Political Action

24  Committees can give a maximum of ten thousand dollars, being

25  five thousand each for the primary and the general.  An

Raney - Direct

1    invitation is attached.

2    Q.  So is this an example of Sandi Davison sending out

3    information about federal campaign limitations?

4    A.  No.  It's--it's--it's more--it's more an invitation to

5    an event that is being held.  As I said as part of our--it

6    wasn't part of our annual meeting but it was during our

7    annual meeting and Sandi had been asked probably, this had

8    been provided to her I would suspect and she sent it out

9    to--I don't know who all it went to.  It doesn't indicate

10   that.

11   Q.  Okay.  Well let's then focus on another part.  We're

12   going to look at the top part of this e-mail please.  Do you

13   see the e-mail from the defendant to you on July 29th, 2010

14   at 10:10 a.m?

15   A.  Yes, sir.

16   Q.  Could you read that please?

17   A.  So I should conclude that we can only give a maximum of

18   twenty-four hundred dollars for the primary next Thursday

19   and it's premature to give forty-eight hundred dollars.

20   Q.  Okay.  Did you then answer his question in the next

21   e-mail or attempt to?

22   A.  I attempted to.

23   Q.  All right.  What does it say?

24   A.  It says you can give both for a total of forty-eight

25   hundred dollars.  It is reported in the appropriate cycle

353

Raney – Direct

1    for the individual elections.

2    Q.  What did you mean by it was reported in the appropriate

3    cycle for the individual elections?

4    A.  No it is reported.  If you do in fact give forty-eight

5    hundred dollars then you would report it in the--whether

6    it's a primary or general election cycle.

7    Q.  Where did you learn this information?

8            MR. CARR:  Objection.  Relevance.

9            THE COURT:  Overruled.

10   BY MR. DOUGLAS:

11   A.  The--I think it's just a matter of just through the

12   course of experience I think and any time I get a question

13   like that if I don't really know the answer then I will ask

14   either lawyers or practitioners that know something more

15   about it than I do.

16   Q.  Okay.  We'll get to that in a second actually.  Did the

17   defendant ever tell you that he was using company money to

18   fund campaign contributions made in the names of his

19   employees?

20   A.  No, sir.

21   Q.  Did the defendant ever ask you whether it was legal,

22   lawful, right, permitted to do that?

23   A.  No, sir.  I've never been asked that question.

24   Q.  All right.  Now you started to talk about how you would

25   find out information.  I think you mentioned lawyers.  Does

354

Raney - Direct

1   the Coal Association have attorneys available?

2   A.  We do.  I mean they're available to everyone but we

3   happen to use--attorneys at Jackson Kelly are usually our

4   counsel for Association business.

5   Q.  Okay.  So is there a counsel to the Board, a specific

6   counsel to the Board?

7   A.  Louis Southworth typically has served over the years as

8   a counsel to the Board of Directors.

9   Q.  Do you have experience with Louis Southworth as an

10  attorney?

11  A.  I do, yes, sir.

12  Q.  What quality of an attorney is he?

13  A.  I think he's pretty good.  I keep using him.

14  Q.  Have you asked him questions about campaign laws before?

15  A.  Yes, sir.

16  Q.  Did he seem pretty knowledgeable to you on campaign

17  finance laws?

18  A.  Yes, sir.  Again, I think, you know, if he's not

19  familiar then, you know, we gather up the people that we

20  feel like that are familiar and try to get the correct

21  answer.

22  Q.  Okay.  Has the defendant ever requested that you ask

23  Louis Southworth a legal question about campaign donations?

24  A.  Well as I recall and looking through I think these

25  e-mails, I'm not--I'm not exactly sure the genesis of the

355

Raney – Direct

1    question, where it came from.

2    Q.  Then let's take a look at Government Exhibit 1-18

3    please.  What generally is Government's Exhibit 1-18?  Is

4    this an e-mail from the defendant to you?

5    A.  Yes.

6    Q.  Is he asking you to ask a question of Louis Southworth?

7    A.  Yes, it's regarding--

8    Q.  Don't read it.  I'm just asking you.

9    A.  Yes, it is.

10   Q.  And is that question pertaining to campaign laws?

11   A.  Yes, sir.

12          MR. DOUGLAS:  Okay.  We move to admit Government

13   Exhibit 1-18.

14          THE COURT:  Is there any objection?

15          MR. CARR:  No, Your Honor.

16          THE COURT:  Government Exhibit 1-18 is admitted.

17      (Government Exhibit 1-18 admitted.)

18   BY MR. DOUGLAS:

19   Q.  Please bring up page one of 1-18 and please enlarge the

20   top e-mail.  Is this an e-mail from the defendant to you on

21   August 10, 2010 at 5:44 a.m.?

22   A.  Yes, sir.

23   Q.  Okay.  Could you please read it?

24   A.  It says, Bill, I wanted to clear something up, and

25   thought you might possibly have answer for me.  I've seen on

Raney – Direct

1    a few invitations of late that donations to political

2    campaigns from LLC's are permissible.  I do not have Louis'

3    e-mail address but felt maybe you could ask him for me.

4    Thanks, Jim Laurita.

5    Q.  Did that indicate to you that the defendant was reading

6    invitations?

7                MR. CARR:  Objection, Your Honor.  Relevance.

8                THE COURT:  Sustained.

9    BY MR. DOUGLAS:

10   Q.  What did you understand the defendant was wanting you to

11   do in this e-mail--because of this e-mail?

12   A.  Best I can tell is he wanted to know if campaign

13   contributions from LLC's are permissible.

14   Q.  And how was he suggesting in the e-mail that you find

15   out for him?

16   A.  He suggested I ask Louis.

17   Q.  Is that Louis Southworth?

18   A.  Yes, sir.

19   Q.  Is that the counsel to the Board?

20   A.  Yes sir.

21   Q.  Is that an attorney at Jackson Kelly?

22   A.  Yes, sir.

23   Q.  Did the defendant ever explain to you why he was asking

24   you to ask this question?

25   A.  No, sir.

357

Raney - Direct

1    Q.  Did you have any knowledge as to whether Mepco was an
2    LLC?
3    A.  No, sir, I had no idea.
4    Q.  Okay.  Let's take a look please in the paper stack there
5    at Government's Exhibit 1-19.  Does Government's Exhibit
6    1-19 include responses from you and then also response in
7    there from Louis Southworth?
8    A.  Yes, sir, appears to be.
9    Q.  As part of a chain in the e-mail that we were just
10   reviewing?
11   A.  Yes, sir.
12          MR. DOUGLAS:  We moved to admit 1-19.
13          THE COURT:  Is there any objection?
14          MR. CARR:  No, Your Honor.
15          THE COURT:  The Court admits Exhibit 1-19.
16      (Government Exhibit 1-19 admitted.)
17   BY MR. DOUGLAS:
18   Q.  If we could just enlarge the top half of the first page
19   of Exhibit 1-19.  Could you please read your response to the
20   defendant?
21   A.  That would be the second--
22   Q.  Starting with Louis indicated--
23   A.  Louis indicated if the LLC is a partnership it is
24   permissible, but if it is a corporation, it is not.
25   Q.  And then could you please read what Louis Southworth

Raney - Direct

1    added to that response?

2    A.   Yeah.  If LLC is treated as a partnership for tax

3    purposes, a contribution is allocated among the partners

4    according to their ownership.

5    Q.   And is the defendant copied on Louis Southworth's e-mail

6    as well there at the top?

7    A.   Yes, sir.  It appears so.

8    Q.   Okay.  Did the defendant ever discuss with you

9    Mr. Southworth's answer?

10   A.   No, I recall no discussion about that.

11   Q.   Did you have any knowledge as to whether Mepco was

12   treated as a partnership or a corporation?

13   A.   No, sir.

14   Q.   Then lastly I'll ask you to look at Exhibit 1-21.  Is

15   this a further e-mail chain from the same e-mail?

16   A.   It appears to be, yes sir.

17            MR. DOUGLAS:  We move to admit 1-21.

18            THE COURT:  Any objection?

19            MR. CARR:  No, Your Honor.

20            THE COURT:  Government Exhibit 121--1-21, excuse

21   me, is admitted.

22            MR. DOUGLAS:  Thank you.

23       (Government Exhibit 1-21 admitted.)

24   BY MR. DOUGLAS:

25   Q.   If we could bring up page one of 1-21 and just enlarge

Raney – Direct

1    the top two e-mails.  If you could start with the bottom

2    e-mail, is that an e-mail from Louis Southworth to both you

3    and the defendant?

4    A.  Where it reads also the partners?

5    Q.  Yes, sir?

6    A.  Yes, it appears to be.

7    Q.  And could you read what it says please?

8    A.  Also the partners must be individuals.

9    Q.  Okay.  And then do you see at the top where the

10   defendant is then chiming in at the top of this chain,

11   thanks, Louis?

12   A.  Yes, sir.

13   Q.  Okay.  Thank you.  Has the defendant ever requested that

14   you ask Louis Southworth whether it was legal to use company

15   money to fund campaign contributions made in the names of

16   his employees?

17   A.  No, sir.

18   Q.  Are you aware of whether the defendant ever asked Louis

19   Southworth this question on his own?

20   A.  No.  No, sir.

21   Q.  Has the defendant ever asked you to ask anyone this

22   question?

23   A.  No, sir.

24   Q.  Are you aware of the defendant ever asking anyone to ask

25   anyone else this question?

360

Raney - Cross

1   A.  No, sir.

2          MR. DOUGLAS:  Thank you.  Nothing further, Your

3   Honor.

4          THE COURT:  All right.  Cross-examination?

5          MR. CARR:  May I have a moment, Your Honor?

6      (Pause)

7          MR. CARR:  Briefly, Your Honor.

8          THE COURT:  Okay.

9                      CROSS EXAMINATION

10  BY MR. CARR:

11  Q.  Mr. Raney, would you agree with me that at times when

12  Jim Laurita had a--had a question--had any question about

13  legality of something, he would ask you or e-mail you and

14  Louis and ask the question?

15  A.  Yes.  I mean I presume based on these e-mail chains.  I

16  don't know that it's every time, sir, but, you know,

17  certainly there were these times.

18  Q.  During the 2010 time period, did the industry and the

19  Coal Association perceive that there was a war on coal?

20  A.  Yes sir.

21  Q.  And did the political activism, for lack of a better

22  term, increase across the industry?

23  A.  It did.  The interest rose certainly.  I mean it--it

24  was--yeah we had a tough eight years from 2008 to 2016.

25  Q.  How did that compare to the efforts as it relates to

Raney – Cross

1    elected officials and individuals running for political

2    campaigns as to the previous years?

3    A.  You know, there was perhaps an increased interest but I

4    don't know that it was appreciably increased.  There's

5    always been an interest among the industry, among the people

6    that are in the industry, as it regards those that are

7    leading the state either in the legislature or in Congress.

8    Q.  Certainly here in West Virginia?

9    A.  Clearly, yes, sir.

10   Q.  What was--when you said you had a--it was a hard eight

11   years, what did you mean by that?

12   A.  It was very difficult.  I don't know whether you're

13   supposed to get political from the witness stand or not but

14   we had a pretty tough time with the fellow that was running

15   the country didn't care much about the coal industry and

16   that philosophy seemed to be reflected in the agencies that

17   were controlling whether you get permits and whether you

18   continue operations, whether you keep power plants open

19   and-and so forth so markets were dissipating and it was

20   becoming more difficult to mine coal and continue to mine

21   coal so we had a--we had a difficult eight years.

22   Q.  Did it threaten the industry?

23   A.  It did.  Yes, sir, it sure did.  It's--in 2016, for

24   instance, we had the lowest production in this state that we

25   had had in forty years and that was--you know that's

Raney - Cross

1    concerning when you have that.

2          MR. CARR:  Your Honor, may I have just one more

3    moment please?

4          THE COURT:  Yes.

5       (Pause)

6          MR. CARR:  Nothing further.

7          THE COURT:  All right.  Thank you.  Any redirect?

8          MR. DOUGLAS:  No, Your Honor.

9          THE COURT:  All right.  Can we provide Mr. Raney

10   some assistance to get down from the steps there?  Thank

11   you.  You're excused as a witness, Mr. Raney and Mr. Douglas

12   will retrieve that exhibit.  Please leave it up there.

13   Thank you.

14      (Witness excused)

15          THE COURT:  All right.  Government may call its

16   next witness.

17          MR. DOUGLAS:  There are no further witnesses.  The

18   Government rests.

19          THE COURT:  All right.  Ladies and Gentlemen, the

20   Government has rested.  Now that doesn't mean they're going

21   to take a nap.  It means that they have finished the

22   evidence in their case--in its case in chief.  All right.

23   So it also means that you're going to get to go home a

24   little early this afternoon.  The--I did not have a chance

25   to discuss with counsel in detail what the schedule tomorrow

1    may hold but, counsel, my expectation would be that we might

2    finish all the evidence tomorrow.  Does the Government

3    agree?

4            MR. DOUGLAS:  Yes, Your Honor.

5            THE COURT:  Does the defendant agree?

6            MR. CARR:  Yes, Your Honor.

7            THE COURT:  Okay.  So if that is likely for

8    tomorrow and given what the weather was like this morning,

9    counsel, would that change if I brought the jury in at nine

10   o'clock instead of eight-thirty?

11           MR. DOUGLAS:  No, Your Honor.

12           MR. CARR:  Not at all, Your Honor.

13           THE COURT:  Okay.  Thank you.  Ladies and

14   Gentlemen, why don't we adjourn until nine o'clock tomorrow

15   morning and at which time we'll resume the evidence in the

16   case.  The defendant will have an opportunity to put on his

17   evidence in his case in chief but please recall he's under

18   no obligation to put on any evidence whatsoever.  Under the

19   law, our Constitution, he's presumed to be innocent of all

20   the charges and so he's therefore under no obligation to put

21   on any evidence at all.  That was part of my preliminary

22   instructions to you, but assuming that he will put on some

23   evidence then we will begin at nine o'clock and you should

24   be prepared to come into the courtroom to hear that.

25       Now tonight, as you leave, recall my instructions from

1    yesterday which I'm about to give you again, that it that

2    you are not to discuss the case among yourselves or with any

3    third party with whom you may have contact between now and

4    nine o'clock tomorrow morning.  That includes your family.

5    How many of you had to tell your family--you don't have to

6    raise your hands, put just the family I cannot discuss what

7    I'm doing other than to tell you I'm a juror in a case in

8    Clarksburg. So if that were to arise again tonight, you must

9    give that same response.

10        In addition you are not to review any media coverage of

11   the case, whether on the TV, radio or in the newspaper and

12   you are not to undertake any independent examination or

13   investigation of any issues that have arisen in the case,

14   whether by means of your phone or on a tablet or by going to

15   the library.

16        And in addition if a third person approaches you and

17   attempts to initiate a discussion about the case, you need

18   to tell them you're not allowed to talk to them about the

19   case.  If they persist you need to walk away and bring that

20   to my attention through Court Security or Debbie at your

21   earliest opportunity.

22        I cannot tell you at this time whether you will get the

23   case tomorrow or not.  I think it depends on how much

24   evidence there is and we don't know that at this point.  So

25   I can only tell you that I'm sure the evidence will finish

1    tomorrow.  Okay.  So that's as much as I can tell you right

2    now.

3        With that I wish you a safe journey home.  I hope--I

4    haven't been out so I don't know if it warmed up at all but

5    we'll see you at nine o'clock tomorrow morning.  Please

6    leave your notebooks face down on your chairs.  Thank you

7    for your attention.

8        (Jury out 4:25 p.m.)

9            THE COURT:  We are attempting to get a draft charge

10   out to you.  I don't think we're going to have a hard copy

11   to hand to you but we should be able to PDF or Word--a

12   document by Word or PDF to you this evening, but with the

13   caveat that it's an early draft and the--there are some

14   issues that we'll need to take up.  My suspicion will be

15   that when you conclude your evidence maybe we should let the

16   jury go, have the charge conference, let you all prepare for

17   closing argument and then begin fresh on Thursday morning.

18   Does that make sense?

19           MR. DOUGLAS:  Yes, Your Honor.

20           MR. CARR:  Yes, Your Honor, especially given the

21   amount of evidence and documents that came in today.  Thank

22   you.

23           THE COURT:  All right.  I don't have a problem with

24   that and I really don't think the jury will have a problem

25   with that.  Do you have a rough estimate of how long--you

1    said you thought a half a day but I don't want to hold you

2    to that obviously.

3              MR. CARR:  Your Honor, if I can respectfully ask,

4    is the Court concerned that it would be more or less than

5    that?

6              THE COURT:  No.  I do think--I hate to send the

7    jury home if we're only going to be here for a half an hour.

8    You know what I'm saying.

9              MR. CARR:  I apologize, Your Honor.  I understand.

10             THE COURT:  Yes.  Have an obligation not to impose

11   on them.

12             MR. CARR:  Absolutely, Your Honor.  I fully

13   understand now the Court's question.  It will be at least a

14   half a day and I could see it going into the afternoon.

15             THE COURT:  Okay.  Fine.  Thank you.  That--that

16   makes we worry less about the fact that the jury would no

17   more show up than they'd have to leave.  I have had that

18   happen before and I always said I'd never let it happen

19   again.

20        So with the understanding that--do you all have access

21   to a printer to print out something tonight if we send it to

22   you?

23             MR. DOUGLAS:  Yes, Your Honor.

24             MR. CARR:  Yes, Your Honor.

25             THE COURT:  Okay.  Good.  Then I think we'll have

1      something out to you and then we will conduct--I will

2      conduct a charge conference at the conclusion of the

3      evidence in the case entirely tomorrow.  All right.  You

4      should be prepared to stay for that and then finally, if you

5      have any additions that you want--added instructions that

6      you want in the charge and you've got a version you can

7      e-mail tonight, we'd love to have it.  Okay.  I think--and

8      with regard to the 404(b) that will not be the heading on

9      it, but with regard to that evidence I am assuming you want

10     that in before we get to the substantive charge on the

11     counts.  In other words, as part of the boilerplate as

12     opposed to afterwards at the very end.

13            MR. DOUGLAS:  Yes, Your Honor, and actually counsel

14     have discussed this issue and defense counsel requested that

15     it be generic as opposed to the more tailored--

16            THE COURT:  Right.

17            MR. DOUGLAS:  And we have no objection to it being

18     generic.

19            THE COURT:  All right.  So it would then be in what

20     I tend to call the boilerplate but which can change with

21     every case, those generic instructions before we get to the

22     substantive counts.

23            MR. DOUGLAS:  Yes, Your Honor.

24            MR. CARR:  Yes, Your Honor.

25            THE COURT:  Okay.  Now there is a question--you can

1    be seated for this.  There is a question.  I believe--was it

2    the Government who submitted the consciousness of guilt

3    instruction?  I'm not certain--on consciousness of guilt,

4    I'm not certain that I think that it's warranted based on

5    the evidence I have.  I'm sure the Government will make an

6    argument why it is.  We're going to include it but that

7    doesn't mean I've decided.  Okay.  It's just for purposes of

8    discussion on that question.  I don't know what else may be

9    an instruction that--a particular instruction in the charge

10   that you want to argue but if you want to let us know,

11   Judge, this instruction is problematic from the defense

12   perspective.  Judge this is problematic from the

13   plaintiff's--from the Government's perspective,

14   that's--that's fine.  It will help us prepare.

15        The other thing is I don't have any theory of the case

16   instruction from the defendant.  Obviously you're entitled

17   to that in the charge.  Are you planning on submitting

18   something after the close of the evidence?

19             MR. CARR:  Yes, Your Honor.

20             THE COURT:  Okay.  The Government is--you--you've

21   got the--the Indictment in essence in the charge.  If you're

22   going to submit anything else on theory of the case, you

23   need to let me know.

24        I would not typically in this case since one of the

25   counts has been dismissed, submit the Indictment per se to

1   the jury, although you have a right to have it.  As the

2   Government did submit in its proposed instructions the

3   entire Indictment is in there as it stands right now so if

4   the defendant wants the whole thing to go back, I can send

5   that back.  I will certainly do it, but we're going to have

6   to explain to them about Count Five at that point.  So do

7   you all want to think about that and let me know.  I will be

8   reading every single count in its entirety to the jury in

9   the charge.

10          MR. DOUGLAS:  If we could think about that.

11          THE COURT:  Sure and we'll--I'll try to estimate

12   how long that charge is going to take.  It's close to fifty

13   so I know we're well at an hour.  We could be beyond that.

14   It could be a little bit more than that and given that,

15   when--just for preparing for your argument, what I would

16   suggest we do is after I charge the jury, which is before

17   you argue, we give them a break.  Then we come back in and

18   you argue the case in its entirety and the next time they go

19   out is to begin deliberations.  Is that acceptable to the

20   Government?

21          MR. DOUGLAS:  Yes, Your Honor.

22          THE COURT:  What about the defendant?

23          MR. CARR:  Yes, Your Honor.

24          THE COURT:  Okay.  Possible thoughts about the

25   timing or the length of closing argument?

 1          MR. DOUGLAS:  No longer than thirty minutes.

 2          THE COURT:  Okay.

 3          MR. CARR:  I apologize, Your Honor.  I was a little

 4    bit surprised by the brevity of the Government's response.

 5    I had expected, given the documents and the testimony, as

 6    well as quite frankly the somewhat complexity of the counts,

 7    I would request at least an hour.

 8          THE COURT:  I was prepared to give up to an hour.

 9    Think about is some more but certainly given a case like

10    this I would have allowed and will allow an hour per side,

11    whether you use it or not.

12          MR. DOUGLAS:  And we're going to reserve some time

13    for rebuttal as well.

14          THE COURT:  Well that was included in my question

15    initially so--you would just moving right on through with

16    rebuttal.  So you were thinking thirty minutes for your

17    opening?

18          MR. DOUGLAS:  Yes.

19          THE COURT:  Now I don't allow the same amount of

20    time for the Government's rebuttal.  I think Mr. Bernard can

21    fill you in on that but so you know a fair effort.  If you

22    have a thirty minute initial closing statement then probably

23    no more than fifteen for a rebuttal.

24          MR. DOUGLAS:  Yes, Your Honor.

25          THE COURT:  Okay.  But each side will have an hour

371

1  and as long as you allocate that fairly on the Government's

2  side, whether you use it or not is up to you.

3          MR. DOUGLAS:  Yes, Your Honor.

4          THE COURT:  Okay.

5          MR. CARR:  Yes, Your Honor, and I would note at

6  least at this point the defendant--the defense does not

7  believe that there has been any evidence whatsoever of

8  consciousness of guilt.  I had a discussion with the

9  Government when the jury instructions were first submitted.

10 I understood that they had thought about introducing a

11 certain piece of testimony.  That has not come in.  I do not

12 think that there's any consciousness of guilt and I will

13 discuss the matter with the Government but if--I also do not

14 think that that--not to raise issues that haven't been

15 raised yet, Your Honor, but I also don't think that

16 eliciting that testimony would be appropriate so--but we'll

17 discuss it.

18         THE COURT:  Well I don't know if there's going to

19 be any rebuttal case.  I guess that depends on what you hear

20 in the defendant's case in chief.  I'm just telling you

21 right now I don't see it.  It's going to be in the charge

22 but that doesn't mean I have decided to include it.  It's

23 for purposes of discussion.

24    All right.  That's what I needed to say.  Is there

25 anything else from the Government tonight?

372

1          MR. DOUGLAS:  No, Your Honor.

2          THE COURT:  Anything else from the defendant?

3          MR. CARR:  No, Your Honor.

4          THE COURT:  Thank you.  Court stands adjourned

5    until nine a.m. tomorrow morning.

6               (Trial adjourned at 4:35 p.m.)

7    ***************************************************************

8

9                        CERTIFICATE

10       I, Linda L. Bachman, Official Reporter of the United

11   States District Court for the Northern District of West

12   Virginia, do hereby certify that the foregoing is a true and

13   correct transcript of the proceedings had in the above

14   styled action on January 30, 2018, as reported by me by

15   stenomask.

16       I certify that the transcript fees and format comply

17   with those prescribed by the Court and the Judicial

18   Conference of the United States.

19       Given under my hand this 15th day of February, 2018.

20

21                        _____/s/ Linda L. Bachman_____
                         Linda L.  Bachman, CCR, CVR-M
22                       Official Reporter, United States
                         District Court for the Northern
23                       District of West Virginia

24

25