1                IN THE UNITED STATES DISTRICT COURT
             FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2

UNITED STATES OF AMERICA,
3
                  Plaintiff,
4
    vs.             CRIMINAL ACTION NUMBER:  1:17CR51
5
JAMES L. LAURITA, JR.
6
                 Defendant.
7
                **TRIAL – DAY 3**
8
    Proceedings had in the <u>Trial</u> of the above styled action
9
on January 31, 2018 before The Honorable Irene M. Keeley,
10
Senior Judge, at Clarksburg, West Virginia.
11
APPEARANCES:
12
FOR THE PLAINTIFF:     JAROD J. DOUGLAS, ESQUIRE
13                      RANDOLPH J. BERNARD, ESQUIRE
                      Assistant United States Attorney
14                      P.O. Box 591
                      Wheeling, West Virginia  26003
15                      304-234-0100
16
FOR THE DEFENDANT:     JOHN A. CARR, ESQUIRE
                      179 Summers Street, Suite 209
17                      Charleston, West Virginia  25301
                      304-344-4822
18
                      MICHAEL B. HISSAM, ESQUIRE
19                      Bailey & Glasser
                      209 Capitol Street
20                      Charleston, West Virginia  25301
                      304-345-6555
21
The defendant was present in person.
22
Proceedings recorded by stenomask, transcript produced by
23 official court reporter.
24
25

      **LINDA L. BACHMAN, CCR, CVR-M, OFFICIAL COURT REPORTER**
      **P.O. BOX 969, CLARKSBURG, WEST VIRGINIA  26302-0969**
                  **304-282-0395**

374

1                       **I N D E X**

2   **WITNESS**                **DIRECT**   **CROSS**   **REDIRECT**   **RECROSS**

3   (For the Defendant)

4   James L. Laurita, Jr.     384      410       454

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        P R O C E E D I N G S

 2          (01-31-2018, 9:00 o'clock a.m., defendant present)

 3               THE COURT:  Good morning.  I'm advised that all the

 4     jurors have arrived.  I think before we bring them in it's

 5     appropriate to hear any motions that the parties may wish to

 6     bring.

 7               MR. CARR:  Yes, Your Honor.  Upon the close of the

 8     Government's case, the defendant does make a general motion

 9     under Rule 29 for a directed verdict.  I do not believe that

10     a rational jury can find the defendant guilty beyond a

11     reasonable doubt.  The Government has not presented

12     sufficient evidence of all elements and especially the

13     element of willfulness.

14               THE COURT:  All right.  Government?

15               MR. DOUGLAS:  Your Honor, the Government argues

16     that the evidence is sufficient to sustain a conviction

17     under Rule 29 when taken in the light most favorable to the

18     Government.

19          Your Honor, first of all, starting with the conduit

20     contribution charges which is sort of the heart of the case,

21     Counts Two and Three, I conceptualize these in conduct

22     evidence and intent evidence.

23          Starting with the conduct evidence, there is sufficient

24     evidence that the defendant caused conduit contributions.

25     The executives identified the defendant as the originator
```

1    and leader of the contribution program.  The executives

2    testified that they made all these contributions because the

3    defendant asked them to do so and they would not have

4    contributed without the defendant's request.  The executives

5    identified Mepco and/or the defendant as the source of the

6    funding for the contributions through advancements and the

7    reimbursements.  The executives testified that they would

8    not have contributed without this funding.  The executives

9    denied that this second bonus was compensation to them and

10   in fact one of the executives testified that when he stopped

11   receiving the second bonus he did not complain because quote

12   "it wasn't my money" and of course regarding the conduct

13   there's also the bank records, e-mails and the Hughes and

14   Crane spread sheets showing the mechanics of the program.

15        Now, Your Honor, with regard to intent.  First of all

16   there is sufficient evidence for the jury to conclude that

17   the defendant knew about the individual contribution limits.

18   In 2010 there's evidence that Bill Raney told the defendant

19   in an e-mail what the limits were and, Your Honor, I have

20   exhibit numbers ready if the Court requests any.

21        In 2010 the defendant himself told someone at Allegheny

22   Energy what the individual limits were.

23        Between 2010 and 2013 we've seen that the defendant

24   received and approved numerous fundraiser invitations which

25   specified the individual limits.

1          In addition, we've seen evidence that the defendant

2     completed contribution forms for his own contributions which

3     specified the limits.

4          We have heard evidence and seen evidence that the

5     defendant asked the executives to contribute in amounts

6     which equaled the limits and the jury could conclude that

7     simply the use of his employees to contribute shows

8     knowledge of the limits and how he was limited.

9          Moving on to evidence of the defendant's knowledge of

10    the prohibition against conduit contributions.  First of

11    all, Your Honor, there is in evidence a contribution form

12    completed by the defendant for the Tom Smith campaign and it

13    includes a box checked and a signature and it says in part,

14    please check here to confirm that no one has advanced you

15    funds for the purpose of making this contribution and that

16    no one will reimburse you for it.

17         In addition there are numerous Critz--Mark Critz

18    fundraiser invitations back and forth in e-mail

19    correspondence between the defendant and others over nearly

20    the entirety of the program 2010, 2011 and 2012 at least and

21    these weren't just junk mail.  He was hosting these

22    invi--these fundraisers.  He was approving the drafting of

23    these fundraisers and those invitations to Mark Critz

24    fundraisers included language that quote "contributions must

25    be made from your own funds and funds cannot be provided to

378

1    you by another person or entity for the purpose of making

2    this contribution".

3       And then finally with regard to the prohibition against

4    conduit contributions and his knowledge of that prohibition,

5    the jury could conclude in the light most favorable to the

6    Government that the defendant sought to contain information

7    about the program.  It's undisputed that the payments that

8    funded these contributions were listed in payroll records as

9    a bonus when the jury could conclude that it was not a bonus

10    based on all eight executives indicating that it was not

11    compensation.  There's evidence that the defendant did not

12    ensure that any Mepco business record accurately recorded

13    the true purpose of the payments as funding political

14    donations, especially during a time when there was heavy

15    oversight concerning Mepco's finances.

16       In addition we heard testimony from Karen Hughes about

17    two rules, she called them, that she was given from the

18    defendant.  One was to not talk with anyone outside the

19    program about the program.  Another was to ask, not tell.

20    The jury could conclude, based on the fact that the

21    defendant was all the eight executives' boss.  He hired

22    them.  He promoted them.  That these weren't truly asks when

23    they were coming from him.

24       Finally, on this issue, there is evidence that the

25    defendant did not seek legal counsel of Louis Southworth on

1    the legality of the program, even though he had sought his

2    counsel on other campaign finance issues.  The jury could

3    conclude, in the light most favorable to the Government,

4    that means he already knew it was illegal.

5        Moving on to Count Four, the excessive contributions

6    charge.  Based upon the conduit contribution evidence just

7    outlined, the jury could conclude that the twenty-eight

8    thousand six hundred dollars in contributions made in the

9    names of the executives to the McKinley campaign in 2013

10   were attributable to the defendant as indirect contributions

11   from him and thus were in excess of his individual

12   limitation.

13       Finally, Your Honor, the false statement charges, Counts

14   One, Six, Seven and Eight.  Based upon the conduit

15   contribution evidence, the jury could find that the

16   defendant caused the FEC reports to be false as to a

17   material fact, specifically the true force of the

18   contributions made in the names of the executives.

19       There is evidence that the defendant was aware that

20   donation information was reported regularly to the FEC,

21   including the name of the contributor and the amount of the

22   contribution.

23       In 2010 Bill Raney told the defendant about reporting.

24   He indicated it is reported in the appropriate cycle for the

25   individual elections.  In 2010, at the beginning and

1    inception of this program, campaigns mentioned these reports

2    to the defendant in e-mails including quote "the way the

3    last FEC report ended after your fundraiser, we needed to

4    record the event at Mepco in this report.  Please let me

5    know the amount and the name of the person.

6        There is evidence from which the jury could conclude

7    that the defendant was aware that the reports contained

8    false statements because the defendant knew about the

9    mechanics of the program, including its funding from Mepco

10   and he knew that the campaigns believed he was lawfully

11   raising the contributions which was false.

12       And one last matter with regard to venue, there has been

13   evidence--first of all we're dealing with 18 U.S.C. Section

14   2 and the causing theory, that the defendant, as the

15   originator and controller of this program, was causing all

16   these things to happen, causing all these offenses and those

17   actions originated in Monongalia County where Mepco has its

18   main offices, where Karen Hughes has her main office from

19   which she was sending the e-mails and many other acts that

20   the Court has heard occurred in Mon County within the

21   Northern District of West Virginia.

22              THE COURT:  All right.  Thank you.  Mr. Carr, did

23   you wish to reply to any of that?

24              MR. CARR:  No, Your Honor.

25              THE COURT:  All right.  Thank you.  The Court has

1   heard argument on the Rule 29 motion and concludes that when

2   the evidence is viewed in the light most favorable to the

3   Government for the reasons argued by Government counsel

4   the--all of the counts in the Indictment will go to the

5   jury.  There is sufficient evidence to carry the case to the

6   jury.  The Court denies the motion.

7       Are we finished and ready to go?

8           MR. DOUGLAS:  Yes, Your Honor.

9           THE COURT:  Mr. Carr, because when the jury comes

10  back the defendant will have the opportunity to put on a

11  case in chief, can you advise me at this time whether the

12  defendant intends to do so and if so who will the first

13  witness be?

14          MR. CARR:  Your Honor, yes we do intend to do so

15  and the first witness will be Mr. Laurita.

16          THE COURT:  All right.  Mr. Laurita, as a

17  defendant, if you intend to testify I need to advise you as

18  follows.  Because you are the defendant in this case you are

19  presumed to be innocent of all the charges and the burden

20  remains on the Government at all times to prove each and

21  every element of each charge against you beyond a reasonable

22  doubt.  Do you understand that?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  All right.  Further more, while you

25  have--certainly have the right to testify, you're under no

382

1    right to testify because, as I instructed the jury

2    preliminarily, you have--you do not bear the burden of

3    proof.  You have no obligation to prove anything.  It's the

4    burden of the Government to prove it.  Do you understand

5    that?

6            THE DEFENDANT:  Yes, Your Honor.

7            THE COURT:  All right.  Now have you had the

8    opportunity to meet with your attorneys and to discuss these

9    rights?

10           THE DEFENDANT:  Yes I have.

11           THE COURT:  All right.  And have you, of your own

12   free will and with knowledge of your rights and of the

13   potential consequences, made a decision to take the stand

14   and to waive your right to remain silent and to testify?

15           THE DEFENDANT:  Yes I have, Your Honor.

16           THE COURT:  All right.  Do you have any concerns at

17   all that you're being harassed or pushed or in any way

18   having your will overborne in making this decision?

19           THE DEFENDANT:  No, ma'am, not so ever.

20           THE COURT:  All right.  Thank you.  You feel fully

21   informed?

22           THE DEFENDANT:  Yes, ma'am.

23           THE COURT:  Thank you.  You may be seated.

24   Counsel, is there anything else we need to take up before I

25   bring the jury in?

1          MR. DOUGLAS:  No, Your Honor.

2          MR. CARR:  No, Your Honor.

3          THE COURT:  All right.  Thank you.  We can bring

4     the jury in.

5          (Jury in 9:13 a.m.)

6          THE COURT:  Good morning, Ladies and Gentlemen,

7     welcome back.  I certainly hope your travels this morning

8     were not as challenging as yesterday morning and we

9     appreciate your--your timeliness.

10         As you may recall yesterday the Government rested its

11    case in chief and I advised you that when you returned this

12    morning the defendant, although under no obligation

13    whatsoever to put on any evidence, would have an opportunity

14    to do so should he choose so I will turn to one of the

15    defendant's attorneys, Mr. Carr, and ask if the defendant

16    intends to put on a case in chief?

17         MR. CARR:  We do, Your Honor.

18         THE COURT:  All right.  You may do so at this time.

19         MR. CARR:  Your Honor, at this time the defense

20    calls James L. Laurita, Jr.

21         THE COURT:  All right.  Mr. Laurita, would you

22    please approach the Clerk who will administer the oath to

23    you before you take the witness stand.

24         THE CLERK:  Thank you.  Please have a seat in the

25    witness stand.  The witness is James L. Laurita, Jr.

384

Laurita - Direct

1    L-a-u-r-i-t-a.

2           THE COURT:  Mr. Laurita, you've heard me tell the

3    other witnesses to speak in a loud, clear voice and that you

4    move the microphone, adjust it to your needs.  Mr. Carr, you

5    may proceed.

6           MR. CARR:  Thank you, Your Honor.

7                        DIRECT EXAMINATION

8    BY MR. CARR:

9    Q.  Jim, did you consider the money that was given to the

10   campaigns by your executive team to be your individual money

11   or Mepco money?

12   A.  It was their individual money.

13   Q.  Why did you think that?

14   A.  They had all agreed.  We discussed the concept.  They

15   had all agreed that they wanted to do this and thought it

16   was the right thing to do, so based on those principles they

17   were agreeable to the program so based on those principles

18   it was their money at that point.

19   Q.  To your knowledge did any of the execs have any other

20   source of income--significant source of income other than

21   the funds they received from Mepco?

22   A.  Not to my knowledge, no.

23   Q.  Jim, during the time that the program, as it has come to

24   be referred to in court--during the time period in which the

25   program was in existence, did you ever have any concerns

Laurita - Direct

1   whatsoever with the legality of the program?
2   A.  No.  None.  Not whatsoever.
3   Q.  Jim, how long have you been involved in the coal
4   industry?
5   A.  My whole life.
6   Q.  Were your parents in the coal business?
7   A.  Yes they were.
8   Q.  Did you work in the mines as a kid?
9   A.  Yes.  I pretty much grew up around the mines.  My dad
10  started taking me to the mines when I was very young
11  man--not a young man.  Shoot.  It was probably--I grew up
12  there essentially when I was a kid and so I spent a lot of
13  time on weekends going out with my dad to the mines and
14  particularly in the summers.  I spent the summers working at
15  the mines as a child and as a young adult.
16  Q.  Where were the mines?
17  A.  The mines were in the Maidsville, West Virginia area
18  which is about six miles north of Morgantown.
19  Q.  What type of work did you do in the mine?
20  A.  Well my dad had me starting out, with my brother as
21  well.  We did odd jobs around the mines, cleaning up, that
22  sort of thing and one of the things that he had taught us to
23  do was pick slate off the belt.  Coal would come out of the
24  mine on a conveyor belt and it would have rock within the
25  coal and so we were given a slate picker's job where we

Laurita - Direct

1    would pick rock out of the coal as it came out of the mine

2    and so that's one of the things we did during the

3    summertimes especially when we were much younger.

4    Q.  Did you go to college?

5    A.  Yes, I did.

6    Q.  Where at?

7    A.  I went to West Virginia University, Mining Engineering

8    Program there.

9    Q.  Did you get a degree?

10   A.  Yes.  I got a Mining Engineering Degree.

11   Q.  After you graduated, did you return to the family

12   business?

13   A.  Yes I did.  I--basically--I worked underground for four

14   years while I was going to college.  I had, you know, worked

15   up--increasing basically skills at the mines my dad would

16   teach us and then I worked underground for four years and

17   that gave me a really good leg up on trying to understand

18   mining application, that sort of thing and so once I got out

19   of college my dad wanted me to be the company mining

20   engineer so I became the company mining engineer as soon as

21   I graduated.

22   Q.  Did you continue to work your way up, so to speak,

23   through the company?

24   A.  Yes I did.  Probably over, you know, a fifteen year

25   period, gained increasing responsibilities in production,

Laurita - Direct

1    sales, that sort of thing, manage preparation plant, modify

2    preparation plant, just increasing--all aspects.  It was a

3    small company so you learn basically all aspects of the

4    business and my dad gave me increasing responsibilities

5    as--the older I got.

6    Q.  Jim, during the trial we have obviously heard of the

7    company Mepco.  Could you please tell the jury how that came

8    to be formed?

9    A.  In--around 1987 time frame--I am not sure of the exact

10   year, my father had purchased a mine.  It was called the

11   Sierra Mine.  It was an underground mine and he was going to

12   hire a contractor to contract mine that mine and I asked my

13   father if--if I could be the contractor and he considered it

14   and he said yes.  He said, however, I want you to have your

15   sister and brother go in with you and I said that's fine,

16   yeah.  So we formed Mepco at that time and we were a

17   contract miner for my father.

18   Q.  What position did you hold there?

19   A.  I was the Mine Superintendent and I continued to stay on

20   kind of part time working for my father as well as the

21   company engineer.

22   Q.  Did there come a time when Mepco was approached by the

23   investors for a company called GenPower?

24   A.  Yes.  In about 2001 a company named GenPower, which is a

25   power plant developer, approached us.  They were going to

Laurita - Direct

1    build a coal fired power plant in the Maidsville area and

2    wanted to have Mepco to be considered as the coal suppler

3    for that coal fired power plant.

4    Q.  How close was that power plant going to be to Mepco?

5    A.  Essentially adjacent to it.

6    Q.  Was there something that GenPower wanted in order to

7    guarantee--the investors for GenPower wanted in order to

8    guarantee that investment?

9    A.  Yes.  After we had, you know, spent some time with them

10   and they had--they had started permitting the project,

11   putting all the pieces together for the project, and once

12   they had all those pieces together and they were going out

13   for financing, one of the investors that was going to invest

14   money in the power plant said that--that essentially they

15   weren't going to invest the money in the power plant unless

16   they had a guaranteed fuel supply and so--and by that what

17   they meant is they wanted to own Mepco.  They wanted

18   assurance before they put the money down in a power plant

19   that they owned Mepco and so they approached us and said in

20   order for this to go through they have to buy Mepco and the

21   family chose at that time to--to sell the company.

22   Q.  What year was that?

23   A.  That was in 2007.

24   Q.  How much was it going to cost, to your knowledge, to

25   build Longview?

389

Laurita – Direct

1    A.  Longview was going to be about a two billion dollar

2    power plant project.

3    Q.  Were you involved in the West Virginia Coal Association

4    at this time?

5    A.  Yes, I was.

6    Q.  And exactly what is that organization?

7    A.  The West Virginia Coal Association is an association

8    that represents mining companies and suppliers for mining

9    companies throughout the state.

10   Q.  How would you describe the level of your political

11   activity before 2008?

12   A.  Almost nonexistent.  Very little.

13   Q.  Did you make campaign contributions?

14   A.  Probably some, but it would've been very little.

15   Q.  Did you host fundraisers?

16   A.  No.

17   Q.  Any particular reason why?

18   A.  Didn't see the need to.  Wasn't interested.

19   Q.  Did that--rephrase that.  Do you recall the election of

20   2008?

21   A.  Yes, I do.

22   Q.  Did you contribute to either Barack Obama or John

23   McCain?

24   A.  No I did not.

25   Q.  Did you campaign for them?

Laurita - Direct

1    A.   No I did not.

2    Q.   Did you--did you perceive the coal industry having any

3    concerns with the candidates?

4    A.   There was some concern because Barack Obama had said on

5    a few occasions that if he became president he was going to

6    bankrupt the coal industry.  There was some concern over

7    that but most of us, including me, didn't--didn't think much

8    of it, didn't think, you know, how a president on his own

9    would be able to destroy an industry so we really weren't

10   that concerned about it.

11   Q.   Did that change after the election?

12   A.   Very much so.

13   Q.   Why?

14   A.   Within days or a week or two, I don't remember; it was a

15   very short time after he took office, he formed essentially

16   new management in the EPA and they revoked the largest and

17   newest, most modern surface mine permit in the state history

18   of West Virginia.  It was called the Spruce Fork Permit and

19   it was unprecedented.  No one had ever seen a federal

20   government rescind a mining permit.

21   Q.   Did other concerns develop?

22   A.   Yeah.  Right on the heels of that a bill was introduced

23   into Congress.  It was called the--I believe it was the

24   Markey Waxman bill.  Essentially it was going to put new

25   emissions limits on all coal fired generation that in

Laurita – Direct

1    essence would just kill the industry.  The power plants

2    weren't going to be able to comply and even Longview Power

3    Plant, a brand new, modern power plant, which would be like

4    a Nissan compared to the 57 Chevys that were out there, it

5    was efficient, modern, almost no emissions.  By the time it

6    was constructed, within a few years afterwards, it wouldn't

7    have been able to comply with these new requirements so

8    Longview would've--it would not have been able to comply

9    right after it was constructed.

10   Q.  What would that mean for Mepco?

11   A.  It would have been the end of Mepco.  If Longview didn't

12   run, Mepco wasn't going to be able to run.

13   Q.  We have heard about a meeting with the execs that

14   you--the executive team that you had in March of 2010.  Did

15   that meeting happen?

16   A.  Yes, sir, it did.

17   Q.  What prompted that meeting?

18   A.  Several things.  Just the--what we were seeing as the

19   onslaught on the industry and the--we needed basically--the

20   elected officials or people that are campaigning, needing

21   support that they basically will come back, some of the

22   things that we were seeing in Washington and needed their

23   support.  The Coal Association was promoting it, that

24   executive teams get more active and the CEO of GenPower and

25   the CEO of Longview and was the Chairman of Mepco's board,

Laurita – Direct

1   which he was essentially my boss, had met at very early

2   March, first part of March and basically asked all the

3   executive teams of Longview, of GenPower and Mepco to get

4   more politically active.  So based upon all those, thought

5   about it.  I approached my management team; had a meeting

6   and I said this is what we're facing.  We're facing an

7   onslaught like we've never seen before in this industry and

8   is this the right thing to do?  Should we get involved

9   politically?  Is this the right thing to do and do you guys

10  agree with that?  And the consensus coming away from that

11  meeting is, yes, that's the right thing to do.  We need to

12  do it and so we started.

13  Q.  You mentioned the executives of GenPower and Longview,

14  did they tell you how to become more politically active?

15  A.  No they did not.

16  Q.  What was the relationship between the executive team

17  amongst each other and you as the president?  How did the

18  team operate?

19  A.  We operated a true team.  I spent probably nine months

20  with each one of them before I hired them.  We spent a lot

21  of time putting together a very good team.  I mean it was

22  the best executive team I had ever seen.  Cared about each

23  other.  Supported each other and we--I did not rule with an

24  iron fist.  They were not bobble heads.  We came together as

25  a team.  Did we have differences?  Yeah, we had differences

Laurita - Direct

1    but at the end of the day we agreed as a team and we managed

2    as a team.  We were--we were essentially friends as well,

3    became very close friends.

4    Q.  As you were putting this together did you decide to do

5    something regarding their compensation?

6    A.  Yes I did.

7    Q.  And what was that?

8    A.  Well I managed the team--we were--2010, 2009 were

9    difficult years.

10   Q.  Was Longview behind schedule?

11   A.  Yes.  Yes.  Longview was behind schedule.  It was a year

12   behind schedule.  Their anticipated--they had

13   a--a--essentially a fixed component to their salary and then

14   they had a variable component based upon sales and

15   production.  Longview was way behind and so that slowed down

16   Mepco's ramp up and growth so their compensation was behind.

17   They were way under their peer group of those with similar

18   jobs and similar responsibilities in the industry and so for

19   them to become more politically active, I needed to raise

20   their compensation package so they could do that.

21   Q.  How did you decide to do that?

22   A.  I chose the issue, what's called a discretionary bonus.

23   Q.  Why did you do that as opposed to increase their

24   salaries--their base salaries?

25   A.  GenPower had--the investors in GenPower, Longview and

Laurita – Direct

1   Mepco had the companies for sale.  They were actively

2   discussing sale of the companies to two different companies

3   at the time and it's a big no-no to start adjusting

4   executive teams base salaries during a time when you're

5   trying to sell a company.  That's very much frowned upon.

6   That's a big no-no.  You don't do that sort of thing and so

7   I chose to give a discretionary bonus instead of raising

8   their base compensation.

9   Q.  How soon was it expected that Mepco would be sold?

10  A.  We were expecting to be sold within a year.

11  Q.  Would and increase in the base salary be viewed as

12  temporary or permanent?

13  A.  A base salary would be viewed as a buyer as a permanent

14  because if a new buyer came in and the base salaries were

15  much higher and they wanted a completely different

16  compensation program with metrics, and that's typical.  In

17  executive they have metrics.  They have various levels of

18  compensation and so if you raise their base salary much

19  higher and then a new buyer comes in and says well I don't

20  like that base salary.  I'm going to lower that base salary,

21  that would've caused a lot of friction and a lot of upset,

22  hurt feelings within the management teams if you try to take

23  that away so we tried to avoid that.

24  Q.  Did you task, as we have heard, Karen Hughes with in

25  essence keeping track?

Laurita - Direct

1   A.  Yes, I did.

2   Q.  What instructions did you give her?

3   A.  Just basically told Karen that, you know, to issue the

4   bonus and we want to be assured that they didn't get hurt

5   and by that I meant that their bonus was well above anything

6   that they were going to be spending on campaign

7   contributions.  I didn't want them to get hurt.

8   Q.  Was it supposed to be a one-for-one?

9   A.  No.

10  Q.  And were the payments--the bonus payments--how did you

11  envision those being paid, after every contribution, in

12  bulk, what was the plan, if there was one?

13  A.  It definitely wasn't one-for-one.  Was going to issue a

14  bonus so they could afford to be able to give and it was

15  going to be a large bonus so it gives them the ability

16  financially they could afford to give and then it was also

17  grossed up for taxes and they also got 401(k) compensation

18  on that, so they got an extra five percent that went into

19  their 401(k).

20  Q.  To your knowledge was that placed into the payroll

21  system just like all other compensation of the execs?

22  A.  Yes.

23  Q.  And did you understand that it was called a bonus

24  because that was the only way to put it in the payroll

25  system?

396

Laurita - Direct

1    A.   To the best of my knowledge, yes.

2    Q.   Did you tell Karen Hughes anything about whether

3    communications regarding a particular candidate or an amount

4    was supposed to be mandatory or not?

5    A.   I gave her instructions that I did not want anybody to

6    feel like anything was mandatory or feel like they were

7    uncomfortable with it so--and in particular we had

8    discussions, debates from time to time on particular

9    candidates where some had, you know, would prefer one

10   candidate over another.  So I didn't want anybody to feel

11   uncomfortable with any request so I said make sure that

12   nothing is demanded because that's not the way this is going

13   to work and stuff so it has to be voluntary and everybody

14   had to be open and agreeable to that.

15   Q.   Where did you normally get the candidates that you

16   recommended donations to give to?  Where did you identify

17   them?  Who--

18   A.   We were a member--Mepco was a member of the West

19   Virginia Coal Association which we talked about a few

20   minutes ago, but also is a member of the Pennsylvania Coal

21   Association.  Pennsylvania Coal--because Mepco had mines in

22   Pennsylvania and West Virginia both and so we relied upon

23   them to give us guidance on who to give, who to support and

24   who not to support, who were the friends of the industry so

25   to speak so we relied heavily on the Pennsylvania and West

Laurita - Direct

1    Virginia Coal Association for that.

2    Q.  You mentioned that at times there were disagreements

3    between the executives as to a particular candidate.  Do you

4    remember an example?

5    A.  Yeah.  Yeah.  There was a lot of debate during the 2010

6    race for the general election.  Mike Oliverio was running

7    against David McKinley; David McKinley being a Republican

8    and Mike Oliverio being a Democrat.  Mike Oliverio was a

9    State Senator for many years, a staunch advocate of the coal

10   industry and the West Virginia Coal Association wanted to

11   back him.  They knew of David McKinley but not that well and

12   so the Coal Association made their endorsement,

13   recommendation to back Mike Oliverio and a couple of the

14   execs, particularly Eric Grimm and Brian Osborn, didn't

15   agree with that.  They thought that we ought to support

16   David McKinley instead and I said, you know, they're both

17   great candidates, do what you think is best.  Support who

18   you want to support.

19   Q.  Do you know who they eventually gave to?

20   A.  To the best of my knowledge they gave to--to McKinley.

21   They may have given some to Oliverio.  I don't know.  I just

22   left it up to them at that point.

23   Q.  Are you aware that Government Exhibit 52, the

24   spreadsheet that Karen was keeping indicates that during

25   that time period 2010 Gary Grimm did not give a donation to

Laurita - Direct

1    Mike Oliverio?

2    A.  I just don't remember.  What I told you is what I

3    remember so I don't know any specifics of what--I just don't

4    remember any specifics.

5    Q.  By the way did you know Karen was keeping a spreadsheet?

6    A.  No I did not.

7    Q.  You mentioned disagreements and discussions amongst the

8    executive team, Jim.  Did you ever consider or to your

9    knowledge give any perception to any member of the executive

10   team that there would be any retribution whatsoever if they

11   chose not to participate?

12   A.  Absolutely not.  I didn't manage that way.

13   Q.  At any time did any member of the management team give

14   you any indication at all that they considered there was

15   anything wrong with the program or that they did not want to

16   participate?

17   A.  Never.  Not once.

18           MR. CARR:  May I approach, Your Honor?

19           THE COURT:  You may.

20   BY MR. CARR:

21   Q.  Jim I'm showing you what has been marked and admitted as

22   Defendant's Exhibit A.  Can you read that?

23   A.  Do you want me to read it out loud?

24   Q.  You don't have to read it out loud, but can you see it?

25   A.  Yes, I can see it on the screen.

Laurita - Direct

1    Q.  And this was--Karen Hughes has told us about this

2    document.  It says the yellow highlights are those donations

3    I have not yet received from you.  If you intend to make

4    those donations, please fill in the amount and return to me.

5    And then asks, are you and Lory both making a fourteen

6    hundred dollar donation to McKinley.  Did you--and care may

7    not be the right word but you can insert your own, about

8    whether the executives followed all of the suggested

9    donations that were given to them?

10   A.  No.  I mean we operate as a team and they were relying

11   upon me to make suggestions.  If they wanted to do something

12   else, they're free to do so.

13   Q.  Did you instruct Karen to ensure that all of these

14   donations were made?

15   A.  I told her that we don't want to force anything on

16   anybody or make anybody feel uncomfortable so, no, I

17   never--I never pushed her or pushed anybody.

18   Q.  Do you recall her even telling you that donations had

19   not been made?

20   A.  No.

21          MR. CARR:  Retrieving Defendant's Exhibit A.

22   BY MR. CARR:

23   Q.  Jim, did you give Karen any instructions regarding

24   discussing the additional bonus outside the executive team?

25   A.  I'm sorry.  Could you ask that question again?

Laurita - Direct

1    Q.  I apologize.  I was walking in and out of the mic.  Did

2    you give Karen any instructions regarding talking about the

3    second bonus, as it's come to be called, outside of the

4    executive team?

5    A.  Just told her like all compensation, all bonuses, that

6    we don't want to be broadcasting any kind of bonuses, so we

7    keep all the bonuses with respect to the management team,

8    confidential.

9    Q.  Does that include their base salaries?

10   A.  Yes.

11   Q.  Does it surprise you that Suzanne Crane said that she

12   didn't even know, even though she was your personal

13   assistant--executive assistant, I should say, what the--what

14   your salary was or the executive team salary?

15   A.  No, she wouldn't no.

16   Q.  Was that information kept pretty tight?

17   A.  Yes.  Yes it was.

18   Q.  Did you ever make any effort to hide what the second

19   bonus was for?

20   A.  No.  No.  None whatsoever.

21   Q.  Did you ever instruct anyone to deny its existence?

22   A.  No I did not.

23   Q.  During this time period between 2010 and 2013, Jim, how

24   would you characterize the contact you had with campaigns?

25   A.  Well it was--it was increasing as time went on to some

Laurita - Direct

1    extent.  Beforehand--before we started getting involved and

2    giving contributions it was virtually no contact but after

3    we started giving contributions, you know, we started having

4    more and more contact and we wanted to--we wanted to contact

5    them.  We wanted to have a voice.  It was a war on coal.  It

6    was an onslaught like we had never seen before and it came

7    quickly and the candidates didn't even understand it.  We

8    were having a hard time grasping and understanding it and so

9    we wanted to spend a lot of time with them, educating them

10   on the issues and so I encouraged the management team,

11   encouraged a lot of people in permitting, engineering, to

12   try to spend as much time with the candidates as possible to

13   try to educate them as we were learning.  It was a dynamic

14   situation and so we spent as much time as we possibly can

15   and I encouraged them to do that to educate them as to the

16   obstacles and the challenges that we were facing at the

17   time.

18   Q.  Did you come to understand that the campaigns were

19   keeping track of both you and the executive teams donations?

20   A.  I come to learn that over time, yes.

21   Q.  Did that surprise you?

22   A.  I guess initially, yes, but it became common that they

23   would ping us if they wanted us to give the max, everybody

24   the max all the time and so, you know, we got--frequently

25   been asked, were asked consistently to try to give the max

Laurita - Direct

1    so we--so we knew if we didn't give the max, they would ping

2    us, say, hey can you give some more?  Can you give some

3    more?  What can you do to help us?

4    Q.  Did--and I believe there's--did they speak with you

5    about members of the executive team that had not given the

6    max or not given what they understood to be their quote

7    unquote "pledge"?

8    A.  Yeah, frequently.

9    Q.  Would you communicate that on to the executive team?

10   A.  No, not always.  No.  I mean we were inundated with

11   requests for contributions and you can't give to everybody

12   all the time and so I didn't pass on all that to the

13   executive team, occasionally.

14   Q.  Did you ever demand that anyone give to a certain

15   campaign?

16   A.  No.  Never.  Not once.

17   Q.  Were there times that candidates or elected office

18   members spoke to you directly about whether you had given to

19   them in what amounts or to an opponent?

20   A.  Yes.  Yes, I have been contacted twice from elected

21   officials about that.

22   Q.  What did they say?

23   A.  Well the first one was a veiled threat.  The second one

24   was a direct threat.  They--particularly the second one, he

25   stuck a finger in my face and said you are supporting my

Laurita – Direct

1    opponent and you better not do that anymore.  You better

2    stop.  You better support me.

3    Q.  During this time period did you also host fundraisers?

4    A.  Yes I did.

5    Q.  To your knowledge did most of the major coal

6    operators--coal operators host fundraisers?

7    A.  Yes they did.

8    Q.  And who were some of those?

9    A.  Virtually all of them in the state did.  The ones that

10   I'm most familiar with in our area up here is Consolidation

11   Coal Company, Alpha Natural Resources at the time and

12   Alliance.  Peabody Coal.  There was a number of them.

13   Q.  Do you understand one of the reasons why the campaigns

14   went to you regarding the executive team as well as

15   collecting at those fundraisers is because they could

16   collect in batches?

17   A.  Yes.  I was the representative for our company on the

18   Coal Association so they would come to the board members of

19   the Coal Association and approach them about trying to

20   campaign, you know, raise funds for them.

21   Q.  At these fundraisers did you ever see the other coal

22   company representatives present the campaigns with multiple

23   checks, bundles of checks?

24   A.  Yes.  Yes.  That was common.

25   Q.  Did you know how it was that those companies were

Laurita – Direct

1   running their campaign--their campaign support operations?

2   A.  No I did not.

3   Q.  At any time did you think there was anything wrong with

4   your executives' contributions to those campaigns?

5   A.  No I did not.

6   Q.  Anything unlawful?

7   A.  No; not whatsoever.

8   Q.  You mentioned that the second bonus was not to be

9   discussed like--just like all other compensation.  Sitting

10  through the trial here, Jim, you've seen two I believe

11  e-mails in which Karen Hughes told someone to delete

12  something.  Did you tell her to do that?

13  A.  No I did not.

14  Q.  Did you know she did that?

15  A.  No I did not.  Not until preparing for trial, is when I

16  first saw it.

17  Q.  Have you ever told someone to delete something?

18  A.  No.  Never.

19  Q.  And have you ever deleted anything to conceal the

20  program?

21  A.  No.  No.

22  Q.  You have also seen an e-mail that Karen sent where she

23  gives a specific dollar amount and says that's not your

24  money.  Did you tell her to say that?

25  A.  No I did not.

Laurita - Direct

1    Q.  Do you agree with that?

2    A.  No I don't.

3    Q.  What did you consider the executives' money once it hit

4    their accounts?

5    A.  It was their money.

6    Q.  You had Ernst & Young as well as other auditors in the

7    office, is that correct?

8    A.  Yes, frequently.  There was an auditor--independent

9    third party auditor that came in at least annually, if not

10   more often and they audited all the books and records of the

11   company.  More specifically the last eighteen months that I

12   was there at Mepco, there was a firm by the name of Alvarez

13   and Marsaw that came in.  Essentially the investors of

14   GenPower, Longview and Mepco--Longview was going to have to

15   go through what's called a restructuring.  It wasn't able to

16   pay its bills.  It was in financial trouble and so they

17   hired a professional team to come in and look at everything

18   under the company.  They looked at every dime the company

19   spent and had six full time people staffed at Mepco looking

20   at everything we did so it was--and that was continuous

21   every day, five days a week for a year and a half.

22   Q.  Were those second bonuses, to your knowledge, clearly in

23   the financial records?

24   A.  Yes, to my knowledge.

25   Q.  Did the second bonus program continue during this time

Laurita - Direct

1    period?

2    A.   Yes.

3    Q.   Why did it end, the program?

4    A.   It became apparent right around May or June of 2013

5    that--we thought for a while, you know, Longview was going

6    to go through a restructuring that--essentially that Mepco,

7    which was a guarantor--the company I ran was a guarantor of

8    the debt of Longview, was going to get a by.  It would not

9    have to go through a restructuring itself or be drug into

10   bankruptcy and when it became apparent that Mepco--Longview

11   was going to file bankruptcy and Mepco was going to have to

12   file bankruptcy, any kind of discretionary bonuses, it is a

13   big no-no, you do not give discretionary bonuses to any

14   executive when you're going to be in bankruptcy, so

15   that--that's prohibited and so we just stopped it, stopped

16   giving discretionary bonuses at that time.

17   Q.   At the time that you stopped giving discretionary

18   bonuses, did you have any concern with their legality?

19   A.   No; none whatsoever.

20   Q.   During the entire duration of the program had anyone

21   indicated anything that led you to believe that there was a

22   question as to whether it was lawful?

23   A.   No.  None.

24   Q.   During this time period between 2010 and 2013, what

25   did--what rules of campaign finance did you understand to

Laurita - Direct

1    be?

2    A.  I knew there were individual limits.  The campaigns

3    themselves educated us on that.  You could see it in big

4    bold letters on the flyers, on any of the invitations, but

5    the campaigns educated us on that because they wanted to try

6    to encourage people to give to the max so they always told

7    you what the maximum amount you're allowed to give.  I also

8    knew that--that a company can't write a check in itself to

9    campaigns and then I knew that--that if Joe blow gave me a

10   hundred dollars and says I'm going to give you a hundred

11   dollars and I want you to then give a hundred dollars to Joe

12   Manchin, I knew that was wrong.

13   Q.  You mentioned individual limits.  Did at times you even

14   get that wrong as far as whether you had given too much or

15   not split it between the primary and general?

16   A.  Yes.  There was--states--was federal law, state law;

17   they're all different and it was dynamic.  It changed all

18   the time so sometimes I got it wrong as to what--in West

19   Virginia there might be a thousand dollar limit.  In the

20   federal it might be twenty-four or twenty-five or

21   twenty-six.  Pennsylvania there are no limits so it was just

22   a mixed bag and at times it was confusing, so sometimes I

23   got it wrong too.

24           MR. CARR:  May I approach, Your Honor?

25           THE COURT:  Yes you may.

408

Laurita - Direct

1    BY MR. CARR:

2    Q.  Jim, I'm showing you what's been admitted as

3    Government's Exhibit 18-8.  The first page is on the screen.

4    Did you fill this form out?

5    A.  Yes I did.  That is my printing and that is my

6    signature.

7    Q.  How many, by the way, invitations would you typically

8    get during this time period from the campaigns, invitations

9    to fundraisers or to give?

10   A.  A lot.  I mean hundreds--hundreds.  If not coming into

11   the office, go home at night and routinely in the mail there

12   were many, many invitations to fundraisers.  It's just like

13   if you give to a charity or you give to some kind of cause

14   and they kind of hand your name out, next thing you know

15   you're on everybody's list.

16   Q.  What about contribution forms?

17   A.  Yes.  There were contribution forms typically attached

18   with most all the invitations.

19   Q.  There is a, kind of an affirmation here.  Was it your

20   experience that those varied widely across the contribution

21   forms?

22   A.  I don't think there was any standard or any--yes, they

23   varied widely and virtually every invitation looked

24   different.

25   Q.  This one says that please check here to confirm that you

Laurita - Direct

1    are at least eighteen years of age, that this contribution
2    is being made using your personal check or credit/debit
3    card, not the check or card of an incorporated entity or
4    another--other person; that no one has advanced you funds
5    for the purpose of making this contribution, and that no one
6    will reimburse you for it.  Did you--do you--did you believe
7    at the time between 2010 and 2013 that the second bonus
8    program violated that rule?
9    A.  No I did not believe it violated that rule.
10   Q.  Do you now?
11   A.  No I do not.
12   Q.  Why?
13   A.  It's a fundamental difference.  I took this as Joe Blow
14   coming up to me saying I'm going to give you a thousand
15   dollars; I'm going to give you a hundred dollars, whatever
16   amount you want to say and then I want you to take a
17   thousand dollars of your money and give to a candidate.
18   That's tit for tat, one-on-one.  That's the way I took that.
19   That's not what we did in the program at Mepco.
20   Q.  Jim, given that to your knowledge all the executive
21   compensation came from Mepco, did you think the situation
22   was any different if you raised their salaries?
23   A.  I'm sorry.  Could you ask that again?
24   Q.  To the extent that you understood that all of the
25   executives or nearly all of the executives' money came from

410

Laurita – Cross

1    their employment at Mepco, do you think this situation would

2    be any different had you increased their base salaries?

3    A.  No.

4           MR. CARR:  Your Honor, may I have a moment?

5           THE COURT:  Yes.

6        (Pause)

7           MR. CARR:  Your Honor, I will return Government's

8    Exhibit 18-8 and pass the witness.

9           THE COURT:  All right.  Thank you.  The Government

10   may cross examine.

11          MR. DOUGLAS:  Thank you, Your Honor.

12                      CROSS EXAMINATION

13   BY MR. DOUGLAS:

14   Q.  Mr. Laurita, you grew up in the coal industry, didn't

15   you?

16   A.  Yes I did.

17   Q.  Your family has run a coal company for generations,

18   hasn't it?

19   A.  Yes.  Yes they have.

20   Q.  Your father ran a coal company, right?

21   A.  Yes he did.

22   Q.  You've followed in your father's footsteps, haven't you?

23   A.  Yes.  Yes I have.

24   Q.  You started working for your father before you even

25   graduated high school, didn't you?

Laurita – Cross

1    A.  Yes, that's correct.

2    Q.  You worked for your father while you were attending WVU,

3    didn't you?

4    A.  Yes I did.

5    Q.  You're educated with a college degree in Mining

6    Engineer, right?

7    A.  Yes, I am.

8    Q.  And you're also a licensed and professional engineer,

9    right?

10   A.  Yes that's correct.

11   Q.  You had to meet certain requirements to obtain that

12   license, didn't you?

13   A.  Yes.

14   Q.  After obtaining your college degree you joined your

15   father's company full time, right?

16   A.  Yes.

17   Q.  As the company mining engineer I believe you testified?

18   A.  Yes.  At the time, yes.

19   Q.  In 1990 at thirty years old and after less than ten

20   years on the job, you became president of Mepco, didn't you?

21   A.  Yeah.  Yes.

22   A.  Okay.  In 2000 at forty years old you became CEO at

23   Mepco while remaining president as well, right?

24   A.  Yes.

25   Q.  Watching your father since childhood, you got to see

Laurita – Cross

1    what it was like to run a company, didn't you?

2    A.  Yes.  I mean it was a much smaller company.  Mepco had

3    grown much larger than the company my dad had run.  It was

4    very, very small, but yes, I mean--we learned some basic

5    skills.  That's what I learned from my dad.

6    Q.  You saw at least that your father had significant

7    responsibilities, didn't you?

8    A.  Yes.

9    Q.  And no matter the skill you noticed that one of his most

10   significant responsibilities was to negotiate and approve

11   contracts on behalf of the company, right?

12   A.  I don't know that I saw my dad negotiate contracts on

13   behalf of the company but I would suppose he did, yes.

14   Q.  You never saw that in high school?

15   A.  No, I never--no, I never saw my dad negotiate and sign

16   contracts, no.

17   Q.  You never saw that in college?

18   A.  No.

19   Q.  But you noticed that your father would review contracts

20   carefully before signing them, didn't you?

21   A.  No.  I have no knowledge of my dad--I never--I never,

22   you know participated with him signing contracts.

23   Q.  Not in high school?

24   A.  No.

25   Q.  Not in college?

Laurita - Cross

1   A.  No.

2   Q.  In your over twenty years of managing companies, you've

3   reviewed thousands of contracts and other legal documents,

4   haven't you?

5   A.  I would say it's a stretch to say thousands of documents

6   but, yeah, I have looked at various agreements over the

7   years, yes.

8   Q.  Okay.  You were careful to review those documents before

9   signing them, right?

10  A.  Depends on the transaction.  Depends on the amount of

11  paperwork.  You entrust your lawyers.  You entrust staff to

12  review documents and, no, there's many times I don't review

13  the documents.  I just trust the staff to do that on my

14  behalf and our lawyers to do that on my behalf and they tell

15  you--it's like if you go in to get a bank loan.  There may

16  be thirty pages and, you know, you trust your banker.  You

17  trust them that--that what you're signing is accurate.

18  Q.  Did you also do that when the contract was worth

19  millions of dollars?

20  A.  Yeah.

21  Q.  Okay.  So you made it a practice of just signing your

22  signature to things no matter what they said?

23  A.  That's not what I said.

24  Q.  I'm asking you, did you make it a practice of signing

25  things without reading them?

Laurita - Cross

1    A.  No I did not.

2    Q.  Okay.  While at Mepco you had many employees depending

3    on you, didn't you?

4    A.  Yes, sure did.

5    Q.  In fact at Mepco at one point you had eight hundred

6    employees, right?

7    A.  No.  It was about six hundred employees at Mepco.

8    Q.  Okay.  Under your management Mepco grew to become among

9    the largest independent coal operations in the northeastern

10   United States didn't it?

11   A.  It was fairly large.  It wasn't one of the largest, but

12   it was fairly large as far as an independent is concerned.

13   Most of the--most of the companies were publicly traded,

14   much larger than Mepco.

15   Q.  So if that's stated in those terms on the WVU web site

16   having your picture and your bio, that would be inaccurate

17   that it was one of the largest independent coal operations

18   in the northeastern United States?

19   A.  No, I disagreed to that.

20   Q.  Okay.

21   A.  It wasn't the largest, but it was one of the largest

22   independents.

23   Q.  You were heavily involved in the Longview Power Plant

24   Project, weren't you?

25   A.  Yes I was.

Laurita - Cross

1   Q.  And I believe you testified that was a two billion

2   dollar project?

3   A.  Yes it was.

4   Q.  And that's with a b, right?

5   A.  Yes, that's correct.

6   Q.  In fact at the time it was the largest single project

7   with respect to dollars spent in the history of the State of

8   West Virginia, wasn't it?

9   A.  Yes it was.

10  Q.  And Mepco, under your management, had invested over one

11  hundred million dollars in the project, correct?

12  A.  It was--Mepco had borrowed about a hundred million

13  dollars to expand so that it would have the coal readily

14  available when Longview went on line.

15  Q.  It was still over a hundred million dollars, right?

16  A.  Yes.  Yes it was.

17  Q.  You couldn't just do what you wanted to with the hundred

18  million dollars, correct?

19  A.  No.  No you could not.

20  Q.  Okay.

21  A.  It had to go to capital expenditures.

22  Q.  Those capital firms would get upset if you didn't pay

23  back the hundred million dollars?

24  A.  Very much so.

25  Q.  All right.  In 2010 the Longview Power Plant Project was

Laurita - Cross

1    still in the construction stage, wasn't it?

2    A.  Yes it was.

3    Q.  At the time you were concerned about the chance of

4    success for Longview, weren't you?

5    A.  Concerned about the chance of success.  I'm not

6    following your question.

7    Q.  You were concerned--first of all I think you testified

8    on direct that there was a permit pulled by the federal

9    government for the first time anyone could remember or

10   something to that effect.  Is that what you testified?

11   A.  Yes, that was with regard to the Spruce Fork Surface

12   Mine Permit in southern West Virginia.

13   Q.  Okay.  And I believe you testified on direct if Longview

14   didn't run, Mepco wouldn't be able to run.  Is that true?

15   A.  That's true.

16   Q.  And I think you even said it would be the end of Mepco,

17   didn't you?

18   A.  Yes.

19   Q.  That's your company?

20   A.  I was the president.  It wasn't my company but I was the

21   president of it.

22   Q.  You were an owner in the company as well, right?

23   A.  Very small fraction, yes.

24   Q.  Very small fraction of millions of dollars is a lot of

25   money, isn't it?

417

Laurita - Cross

1    A.  We borrowed millions of dollars.

2    Q.  Okay.  In fact in 2010, as you saw during this trial,

3    you sent Charles Huguenard an e-mail where you indicated

4    your concern because you had too much at stake financially,

5    isn't that true?

6    A.  Mepco and Longview had a huge amount at stake

7    financially.  Mepco and Longview both.

8    Q.  And you were running Mepco?

9    A.  Yes.

10   Q.  Okay.  If Mepco failed, then that would tarnish your

11   family name and legacy wouldn't it?

12   A.  No.  No.  We have a very good reputation.  I wasn't even

13   worried about that.

14   Q.  By 2010 you were the last of the Laurita involved in

15   Mepco, right?

16   A.  Yes.

17   Q.  Your siblings had sold their interests?

18   A.  Yes.

19   Q.  The success of Mepco was left to you, wasn't it, as the

20   president and CEO?

21   A.  No.  No.  Mepco is comprised of six hundred people and a

22   team and so it wasn't me.  It wasn't Jimmy Laurita.  It's

23   six hundred people.

24   Q.  But as the president and CEO you would agree at least

25   that there was a lot of pressure on you?

Laurita - Cross

1    A.  Certainly.  As president of the company, there's
2    certainly a lot of pressure on that individual.
3    Q.  And you would agree that pressure can cause someone to
4    do something they wouldn't normally do, right?
5    A.  I don't know how to answer that.
6    Q.  Do you agree with the statement that pressure can cause
7    someone to do things they wouldn't normally do, yes or no?
8    A.  That's--you know, that's kind of a--I don't know how to
9    answer that.  If you have pressure on you, of course you
10   could probably make mistakes.  You could do things you
11   normally wouldn't do I guess.  It's part of that job.  When
12   you become an officer of a company you've got pressure on
13   you all the time.
14   Q.  Do you agree that pressure can cause someone to do
15   something out of character?
16   A.  Depends on how strong your character is.
17   Q.  Now you testified on direct prior to 2008 I believe you
18   didn't find a need to make political contributions, right,
19   is that what you testified?
20   A.  Yes.
21   Q.  There was a need in 2010, wasn't there?
22   A.  Certainly.
23   Q.  And your solution to your concern about Longview was to
24   become more politically involved than ever before, right?
25   A.  I don't know if that was a solution but it's something

419

Laurita - Cross

1    that I felt we needed to do.

2    Q.  Okay.  In 2010 you called a meeting with your executives

3    to discuss political contributions, didn't you?

4    A.  Yes I did.

5    Q.  The executives were your employees, weren't they?

6    A.  Yes.

7    Q.  They were your subordinates, right?

8    A.  Yes they were.

9    Q.  In fact you had hired them, right?

10   A.  Yes.

11   Q.  You had also promoted them, correct?

12   A.  Yes I did.

13   Q.  You had known at least one of them, Karen Hughes, for

14   decades, hadn't you?

15   A.  Yes.  Yes I did.

16   Q.  You knew that they trusted you, didn't you?

17   A.  Yes, and I trusted them.

18   Q.  I believe you testified on direct that you were friends,

19   right?

20   A.  Yes.

21   Q.  You were a team, correct?

22   A.  Yes.

23   Q.  You worked closely together, right?

24   A.  Yes we did.

25   Q.  At that meeting you requested that your executives begin

Laurita - Cross

1    making political contributions, didn't you?

2    A.  Yes I did.

3    Q.  You requested that your executives have their spouses

4    make contributions, didn't you?

5    A.  I--I brought it up to them.  I said is this--again is

6    this the right thing to do, should we do this and they

7    agreed we should.

8    Q.  But it originated with you, correct?

9    A.  Yes it did.

10   Q.  All right.  And you knew that they would do what you

11   asked them because you were their boss, didn't you?

12   A.  No.  I did not manage that way.  I absolutely did not

13   manage that way.  Anybody that knows me, has been around me,

14   knows I don't manage that way.

15   Q.  You knew that they would do what you asked because you

16   had hired them and you had the power to fire them, didn't

17   you?

18   A.  No, that's incorrect.

19   Q.  You knew that they would do what you asked because you

20   had promoted them and had the power to demote them, didn't

21   you?

22   A.  That's not true.

23   Q.  You had the power--

24   A.  We had to operate as a team.  I didn't operate by force.

25   I didn't operate as a hammer.  I did not operate that way.

Laurita - Cross

1    Anybody that knows me, has been around me, knows that's not
2    the way I work.
3    Q.  But you did hire them, right?
4    A.  Yes I hired them.
5    Q.  You had the power to fire them, right?
6    A.  That is correct.
7    Q.  You had promoted them, correct?
8    A.  That is correct.
9    Q.  You had the power to demote them, true?
10   A.  Yes.
11   Q.  And I believe you testified on direct you had the power
12   to increase their pay, right?
13   A.  Yes.  I had the authority to do so.
14   Q.  You also knew that they would not participate if it
15   would cost them money, didn't you?
16   A.  I never asked that question.  I knew that they were
17   underwater to begin with.  I felt an obligation to raise
18   their compensation if I asked them to do this.  I never
19   asked them if they would do it absent that.
20   Q.  Sir, I didn't ask you if you asked them.  I asked, you
21   also knew that they would not participate if it would cost
22   them money, right?
23   A.  No.  I didn't ask--I didn't know because I never asked.
24   Q.  You assured them that they would not be out any money
25   because of this program, did you?

Laurita - Cross

1    A.  I assured them that they would not get hurt, that the

2    bonus would be an excess of--of any additional expenses they

3    would have associated with this.

4    Q.  What do you mean by hurt?

5    A.  That they wouldn't--they were already well underwater

6    compared to the other executives in their peer group and so

7    to ask them to now participate in this program when they are

8    already way behind compensation of everybody else, to me

9    that's getting hurt.

10   Q.  So you wanted them to have money to be able to

11   participate in the program then, right?

12   A.  I wanted to have additional compensation so it would be

13   much easier for them to do.

14   Q.  So the additional compensation was connected to the

15   program, correct?

16   A.  Yes.  I gave them a bonus.  I gave them additional

17   compensation.

18   Q.  And you did that with company money, correct?

19   A.  All the money, their pay.  It went into their normal pay

20   like all their other salary, bonuses; it's all the same.

21   Q.  This additional bonus was funded by Mepco money,

22   correct?

23   A.  Yes, sir.

24   Q.  You heard all eight executives testify that their

25   contributions were funded by Mepco, didn't you?

Laurita – Cross

1    A.  Yes.

2    Q.  And that that's what the second bonus was for?

3    A.  It was additional compensation so they could easily

4    afford to do this.

5    Q.  Eight different people didn't misunderstand you, did

6    they?

7    A.  No, I just agreed to that.  We--I raised their

8    compensation so they could afford to be able to do this,

9    much easier to be able to do this.

10   Q.  And you also saw during the trial bank records showing

11   multiple examples of a five figure deposit made into an

12   executive's account and then the very next day a check

13   written on the same account for contributions, didn't you?

14   A.  Yes.

15   Q.  You don't dispute the accuracy of those bank records, do

16   you?

17   A.  No, not at all.

18   Q.  So then you will admit that those five figure payments

19   from Mepco were earmarked for contributions and were not

20   compensation, right?

21   A.  They were not earmarked; no.  It was a compensation

22   method.  I issued a bonus like we discussed--

23   Q.  You're not suggesting it was a coincidence that someone

24   received a five figure deposit and the next day wrote a

25   check to a campaign, are you?

Laurita - Cross

1   A.  It wasn't a coincidence, no, but it wasn't earmarked

2   monies.  It's extra money.  It goes into their compensation

3   just like all their other compensation, the same bank

4   accounts all their other compensation goes to.

5   Q.  And you didn't seek any type of approval above you to

6   use nearly one half million dollars of company money to fund

7   these contributions, did you?

8   A.  I'm sorry, could you ask that again?

9   Q.  You didn't seek any approval above you to use nearly one

10  half million dollars of company money to fund these

11  contributions, did you?

12  A.  No, I didn't need to.

13  Q.  That's because you had the power to use nearly one half

14  million dollars of company money to make contributions,

15  didn't you?

16  A.  I wouldn't term it like that.  Our payroll was sixty

17  million dollars a year, okay, and so I had the ability to

18  adjust compensation if I needed to and one employee costs a

19  hundred thousand dollars a year so we had six hundred

20  people, you know, that's--in the scheme of things that's not

21  much money so I had the purview to be able to do that, to

22  adjust compensations if need be.

23  Q.  So with a sixty million dollar budget, it would be

24  difficult for an outsider to find just five hundred thousand

25  dollars and what happened with it, wouldn't it?

Laurita – Cross

1    A.  No.  I mean it's all--it was all open for everybody to

2    look at and it was not hidden.  Auditors could easily access

3    it.  Alvarez and Marsol could.  No, it was easy to track all

4    that.

5    Q.  At the meeting with your executives or shortly

6    thereafter, you told them, again your subordinates, that you

7    would be sending them suggestions regarding the

8    contributions, right?

9    A.  I told them that we would basically get the

10   recommendations from the West Virginia Coal Association and

11   Pennsylvania Coal Association and that we would use that as

12   our template, our guide to try to give us guidance on who we

13   should support and who we shouldn't support.

14   Q.  And you agree that those suggestions were coming from

15   you to your executives?

16   A.  Yeah.  I was the representative at the time--early on I

17   was a representative for both the Pennsylvania and West

18   Virginia Coal Association.  Subsequently after a period of

19   time Eric Grimm became the representative.  He represented

20   Mepco and Dana Mining on the Pennsylvania Coal Association

21   so some of the recommendations, Eric would tell me what

22   Pennsylvania Coal Association was recommending at that time.

23   Q.  You understand that suggestions from a boss are not

24   entirely suggestions, don't you?

25   A.  No.  No.  I did--you're mischaracterizing the way I

Laurita - Cross

1   managed and I did not manage that way.

2   Q.   I'm merely asking your understanding, sir?

3   A.   That's not my understanding.

4   Q.   These suggestions included which candidate, right?

5   A.   Yes.  Again we get our recommendations from the

6   Pennsylvania Coal Association, West Virginia Coal

7   Association and then we would debate them within the group

8   at times and group meetings we would debate and sometimes we

9   would choose not to support a candidate or sometimes we

10  would choose to support candidates different than what the

11  Coal Associations recommend.

12  Q.   But you did testify on direct that you did not care

13  about to which candidate the executives decided on their own

14  to contribute, right?

15  A.   Yes.

16  Q.   Wouldn't that be counterproductive if you have multiple

17  executives contributing to opponents?

18  A.   They had the choice to support whoever they wanted.

19  This executive team were all pro coal.  They were all a very

20  good executive team and you trust them.  You give them a lot

21  of responsibility.  You give them discretion.  You trust

22  them so if they were choosing to support a candidate, you

23  know, you had to believe that they know, you know, have a

24  good reason for that and what they're doing, so they had

25  their free will to support whoever they wanted to support.

Laurita - Cross

1    Q.  But you would agree the point of the program was to

2    contribute to coal friendly politicians?

3    A.  Yes.

4    Q.  And you testified that you receiving suggestions from

5    the West Virginia Coal Association, right?

6    A.  And the Pennsylvania Coal Association, yes.

7    Q.  You didn't receive any suggestions from the West

8    Virginia Coal Association that said you should probably give

9    equally to Mike Oliverio and David McKinley, did you?

10   A.  No.

11   Q.  Because they're opponents, right?

12   A.  Yes.

13   Q.  And one of them is going to be considered more coal

14   friendly than the other by a Coal Association, right?

15   A.  No, that wasn't the case.  As I testified earlier, Mike

16   Oliverio was a State Senator and he had supported the coal

17   industry for a lot of years here and David McKinley was not

18   as well known so the Coal Association--it was a tough

19   decision on the Coal Association's part but they ultimately

20   chose to endorse because they endorse--the Coal Associations

21   typically endorse candidates and so--in almost every race

22   and so they endorsed Mike Oliverio is what they chose to do.

23   Q.  In fact you changed your mind about Oliverio, didn't

24   you?

25   A.  No.  I never changed my mind about Oliverio.  No.  No.

Laurita – Cross

1    I eventually--as I came to know David McKinley and spent a
2    lot more time with him, he was--he was a great candidate and
3    subsequently since he's been a US Congressman, he does a
4    great job.  He represents the constituents of the state
5    very, very well and so in time I learned to appreciate him
6    quite a bit and I supported him.
7    Q.  These suggestions from you to your executives included
8    the amounts, correct?
9    A.  Yes.  They would depend upon me to make recommendations
10   on amounts.  Yes.
11   Q.  These recommendations included whether their spouses
12   would contribute, right?
13   A.  Yes.
14   Q.  These instructions included when the contributions were
15   needed, right?
16   A.  Yes.
17   Q.  These instructions included sometimes where the
18   contributions were to be made?  By this I mean you bundled
19   the contributions for delivery to the campaigns, didn't you?
20   A.  We would--the candidates would--typically instead of
21   going around chasing a bunch of different people for
22   contributions they--they depended on, as we talked about
23   before, the board members of the Coal Associations to try to
24   work on their behalf to try to fund raise for them, so they
25   would typically come to our office or, you know, if I was

Laurita - Cross

1    going to a fund raising event, I would take checks with me

2    or if I couldn't go then if one of the execs could go, that

3    they would take the checks with them.

4    Q.  But you admit that on occasion you had taken all the

5    executives' checks to the campaign?

6    A.  Yes.

7    Q.  So if you had taken all the checks to the campaign from

8    the executives, then you would know whether the executives

9    are making the suggested contributions, right?

10   A.  No, not always.  No.

11   Q.  Because you testified on direct that you did not know if

12   the executives were actually following your suggestions,

13   right?

14   A.  I don't remember tracking it to that detail.

15   Q.  My question is you testified on direct that you didn't

16   know that the executives were making all the contributions.

17   Is that a correct characteristic of the correct testimony?

18   A.  Yes.  Yes, I believe that is correct.

19   Q.  Okay.  So with all these suggestions and instructions,

20   you would agree that you were involved in every major aspect

21   of these contributions, weren't you?

22   A.  That's a pretty broad characterization.  I'm not sure

23   exactly what you're asking me.

24   Q.  You were involved in suggesting the candidate?

25   A.  Yes, I was involved in that.

430

Laurita - Cross

1    Q.  You were involved in suggesting the amount, correct?

2    A.  Yes I was.

3    Q.  You were involved in suggesting whether the spouses

4    would contribute, right?

5    A.  Yes I was involved with that.

6    Q.  You were involved in explaining when the contributions

7    were needed, right?

8    A.  Yes.  Generally, yes.

9    Q.  You were involved in delivering the contributions,

10   correct?

11   A.  Not always.

12   Q.  You were at points, weren't you?

13   A.  Yes.

14   Q.  Okay.  You were involved in every aspect of these

15   contributions because in truth they were your contributions,

16   aren't they?

17   A.  No.  That is absolute mistruth.

18   Q.  You would agree that it would be incorrect for the

19   campaigns to believe you were raising this money from the

20   executives, right?

21   A.  Can you ask that again?

22   Q.  You would agree that it would be incorrect for the

23   campaigns to believe that you were raising this money from

24   the executives, right?

25   A.  The campaigns depended upon me and may others, the coal

Case 1:17-cr-00051-IMK-JES  Document 62  Filed 03/14/18  Page 59 of 106  PageID #: 851

1    executives, to try to raise for them.

2    Q.  You did not raise this money, did you?

3    A.  I went out on their behalf and raised money.  I mean I

4    asked individuals to see if they would be willing to

5    contribute.

6    Q.  You didn't raise the money that the executives were

7    contributing, did you?

8            THE COURT:  All right.  That's the last time on

9    that one.  There's no objection but I think it's the third

10   time you've asked the same question.  I think he's answered

11   it.

12           MR. DOUGLAS:  Thank you, Your Honor.

13   BY MR. DOUGLAS:

14   Q.  All the money came from your company at your direction,

15   right?

16   A.  No.

17   Q.  All the money which funded the executives' contributions

18   came from your company, didn't it?

19   A.  The compensation came from Mepco.

20   Q.  It was either you or your company that was the true

21   source of the executives' contributions, right?

22   A.  All of their compensation came from Mepco.

23   Q.  But you would agree this wasn't just their salary from

24   which they were writing checks, right?

25   A.  This was their compensation, yes, that came--that wrote

Laurita – Cross

1    these checks.  It was their money.

2    Q.  You told Karen Hughes not to talk about the program

3    outside the executives, right?

4    A.  Yes.

5    Q.  You wanted to keep the information about the program

6    contained, didn't you?

7    A.  Wanted to keep the information with respect to their

8    compensation, like all their compensation, to be

9    confidential.

10   Q.  You knew that Karen Hughes was causing deposits into the

11   accounts of the executives for the program, right?

12   A.  Like all their compensation I assume would have been

13   deposits in their accounts.

14   Q.  Well, you've testified that the second bonus was related

15   to the program, didn't you?

16   A.  Yes, it was compensation--additional compensation so

17   that they could afford to be able to make campaign

18   contributions.

19   Q.  And you were the one telling Karen Hughes how much

20   to--what the amount of these deposits should be?

21   A.  I don't know if I did all the time.  There was only a

22   few a year and so--I mean they typically were very large

23   bonuses given as contributions.

24   Q.  You're not suggesting that Karen Hughes came up with

25   these five figure numbers on her own, are you?

Laurita - Cross

1    A.  No.  No.  But I did give her instruction that--that I
2    wanted to make sure their compensation was high enough so
3    they could be able to afford to do this.
4    Q.  You caused the company to also reimburse the executives
5    when the advancements ran out, didn't you?
6    A.  I think we issued more bonuses, more compensation.
7    Q.  Because you didn't want the executives be hurt, right?
8    A.  We issued additional additional compensation, just as I
9    explained earlier, to make sure that they didn't--that they
10   weren't in a situation where they were hurt financially.
11   Q.  You knew that these payments were being run through
12   payroll, right?
13   A.  I wasn't completely aware of the accounting system.  I
14   didn't--that wasn't really under my purview and I didn't get
15   involved with that so--so I assume it went into their normal
16   payroll.
17   Q.  You knew that these payments were being called bonuses
18   though, right?
19   A.  We called them bonuses.  I don't know how they did that
20   in the payroll system.
21   Q.  The executives received production bonuses but that's
22   not what these were, right?
23   A.  No.  This was a discretional bonus.  It was not a
24   production bonus.
25   Q.  The executives were not allowed to use this money as

Laurita – Cross

1    they wished, were they?

2    A.  Yes.  It was their compensation.

3    Q.  They couldn't have just booked a cruise and then not

4    made any of your suggested donations, isn't that true?

5    A.  It was part of their total compensation.  It all went

6    into one kitty and one compensation.

7    Q.  It was not your intent that the executives would make

8    money from these payments, right?

9    A.  I wanted to make sure that the compensation was well in

10   excess of any additional expenses they would have associated

11   with making campaign contributions.

12   Q.  So you merely intended to make them whole,right?

13   A.  No.  I wanted to be in excess of that and it was.  I

14   mean what I have reviewed in documents it was well above

15   that plus there was money put into their 401(k)s as well.

16   Q.  These payments were not called advancements for

17   political contributions in any Mepco records, were they?

18   A.  No.  Not to my knowledge.  I don't know.

19   Q.  These payments were not called, to your knowledge,

20   reimbursements for political contributions in any Mepco

21   records, were they?

22   A.  I really don't know.

23   Q.  You were aware that Mepco was being financially audited

24   on a regular basis, weren't you?

25   A.  Yes.

Laurita - Cross

1   Q.  But you didn't make sure, as president and CEO, that the

2   auditor knew the purpose for these payments, right?

3   A.  I didn't interact with auditors.  We had three

4   accountants on staff.  We had two financial analysts on

5   staff.  We had a huge Accounts Payable staff and that just

6   wasn't under my purview.  That's typically under Kent

7   Lindsay or Karen Hughes.

8   Q.  You knew that having to make these contributions was

9   annoying to most of the executives, didn't you?

10  A.  Hey, none of us liked giving money.  None of us liked

11  going to fundraisers but we needed to.

12  Q.  But you knew that they made the contributions, despite

13  their annoyance, because you were their boss, correct?

14  A.  No.  I think that it is a mischaracterization.

15  Q.  You asked Karen Hughes to communicate your requests for

16  contributions to the other executives, right?

17  A.  Yes.  And then subsequently it was Suzanne after I

18  brought Suzanne on board.

19  Q.  And you told her something to the effect of ask, don't

20  tell when communicating with them?

21  A.  As I talked about earlier, the--we just didn't want to

22  feel--anybody to feel that they were forced into it or

23  obligated to do that so I never wanted anybody to feel like

24  they had to do it.

25  Q.  When you, as president and CEO, cause your money to

436

Laurita - Cross

1    front almost fifteen thousand dollars to a subordinate and
2    then ask that employee to make a twenty-five hundred dollar
3    campaign donation, that's not really asking, is it?
4    A.  I went to them before we started it and asked them if
5    this was the right thing to do?  Did they want to do it?
6    Should we do it?  And they agreed.
7    Q.  I want to talk about your knowledge of the campaign
8    laws.  You testified on direct examination that you knew
9    there were individual limits or limits on an individual, how
10   much an individual can contribute, right?
11   A.  Yes.  Generally yes.
12   Q.  And I believe you indicated that you had learned that in
13   part from reading some of the invitations, right?
14   A.  Yes.
15   Q.  And you knew that this individual limit increased over
16   time, correct?
17   A.  I had come to learn that over time, yes.
18   Q.  I mean you did recall David McKinley himself sending you
19   an e-mail indicating that the limit had increased to
20   twenty-six hundred dollars, right?
21   A.  I don't remember that specific e-mail but I have learned
22   over time that they did increase, I think that on a federal
23   level but it's my understanding, like West Virginia's hadn't
24   but I believe the federal does.  I don't understand why or
25   how the mechanism but I had come to learn that they did

Laurita – Cross

1    increase over time.

2    Q.  And you do recall seeing the e-mails that were presented

3    during this trial between you and Suzanne Crane where you're

4    increasing your request from twenty-five hundred to

5    twenty-six hundred for some candidates?

6    A.  Yes, sir.

7    Q.  You knew that the individual limits prevented you from

8    personally contributing as much as you wanted to contribute

9    to certain candidates, did you?

10   A.  Can you ask that question again?

11   Q.  You knew that the individual limits prevented you from

12   personally contributing as much as you wanted to contribute

13   to some of the candidates?

14   A.  No.  I didn't want to contribute more, not personally

15   me.  I mean, you know, they always ping me to contribute to

16   the max and so, you know, I gave the max.

17   Q.  And you testified on direct that you knew that a company

18   couldn't write a check in its name to a candidate?

19   A.  That's right.

20   Q.  And did you learn that in part from that e-mail chain

21   between you, Bill Raney and Louis Southworth, where you were

22   asking about LLC's contributing?

23   A.  No, that pertained--I had seen something along the way

24   where it looked like an LLC was permissible and so I was

25   asking him--Mepco was an LLC so I was wondering, well can

Laurita - Cross

1    Mepco give and--because it's an LLC and so that was an
2    iteration of--of exchange back and forth trying to figure
3    out whether Mepco can give or not.
4    Q.  And you saw that information about LLC's by reading some
5    invitations, right?
6    A.  I don't remember exactly where I read it, but it
7    might've been some invitations.
8    Q.  You recall telling Thomas Jones at Camelot Coal I have
9    to do the max several times over, right?
10   A.  I remember that e-mail, yes.
11   Q.  When you made that statement to him you meant that you
12   were multiplying the individual maximum by maxing out each
13   of your executives, isn't that right?
14   A.  No it's not.  No.  We were asked several times by the
15   Manchin campaign--they had several fundraisers all in a row
16   and had asked me and my family to--to show up at each one of
17   them and so I believe I had my wife write a check to one of
18   the fundraisers and my dad to another and me another, so as
19   a family we had--we had maxed out.
20   Q.  You testified on direct that you understood that it was
21   prohibited for someone to give you a hundred dollars and say
22   here give this to, I think your example was, Senator Manchin
23   for me, right?
24   A.  Yes.
25   Q.  Isn't that what you were doing with the executives as

439

Laurita – Cross

1    well, right?

2    A.  No.  Big fundamental difference.  I wasn't doing a one

3    for one exchange of dollars and the executives, I came to

4    them beforehand and asked them, is this the right thing to

5    do?  Should we do this?  Do you want to do this?  And they

6    said yes.

7    Q.  I believe your testimony on direct was not all of it was

8    one-for-one, isn't that true?

9    A.  I'm sorry.  Can you ask the question again?

10   Q.  You testified on direct that not all of the money was

11   one-for-one with the contributions, right?

12   A.  None of it was one-for-one.

13   Q.  Okay.  You hosted Mark Critz fundraisers, right?

14   A.  Yes i did.

15   Q.  You approved invitations for those fundraisers, correct?

16   A.  I would generally take a look at the top half of the

17   fundraisers with respect to formatting or, you know, who all

18   was on those fundraisers.  Sometimes I was asked to

19   be--there was a large group of people on fundraisers;

20   sometimes it might've been just a few and so I would kind of

21   look at--look at those and see if the formatting looked good

22   and that sort of thing and then would depend upon the--the

23   campaigns to work with Suzanne, for example, when she was

24   working on those invitations to make sure everything was

25   acceptable to them.

Laurita - Cross

1   Q.  So you're saying you didn't read the bottom part which

2   said contribution rules and indicated contributions must be

3   made from your own funds and funds cannot be provided to you

4   by another person?

5   A.  I had seen that language over the years but I didn't

6   review--I didn't review all the boilerplate language, if you

7   want to call it that, at the bottom of these because they're

8   all different.  It would depend on the campaign.  I never

9   saw any kind of a standard.  The invitations varied

10  dramatically and typically the campaigns themselves would

11  approve of an invitation.

12  Q.  So you had seen language like that over the years?

13  A.  Yes I had.

14  Q.  Okay.  You agree that during the time of the program you

15  made a lot of contributions in your own name, right?

16  A.  Yes I did.

17  Q.  Between April of 2010 and October of 12 you made

18  contributions in your own name to over twenty different

19  federal candidates.  Does that sound about right?

20  A.  I don't remember, but it could be.

21  Q.  And about half of these candidates were candidates that

22  you did not ask your executives to contribute to, right?

23  A.  I really don't--I really don't remember.  There

24  were--there were a lot of candidates that were outside of

25  the region.  Typically the candidates that the executive

Laurita - Cross

1    team supported were candidates that--that represented areas
2    where our employees were at, southwestern Pennsylvania,
3    northern West Virginia, that's what typically the executive
4    team because they were representing the employees of the
5    company but there was a lot of--the Coal Association and a
6    lot of its members had asked me many times to support people
7    just across the country that they needed help and so I chose
8    personally to support people across the country that I
9    didn't even know but they needed help and the Coal
10   Association or various other board members asked for help so
11   I did.
12   Q.   You heard most of your executives testify that they had
13   never made contributions before 2010, right?
14   A.   Yes.
15   Q.   You admit that you were much more experienced with
16   political donations than your executives were, right?
17   A.   I would say it's a fair statement.
18   Q.   Likewise you admit that you were much more familiar with
19   contribution laws than your executives, right?
20   A.   I guess probably to some extent because I had given
21   before they had.
22   Q.   And you were shown on direct examination a contribution
23   form to Tom Smith that you indicated you completed and
24   signed, right?
25   A.   That's correct.

442

Laurita - Cross

1   Q.  And you indicated that you had read that before signing
2   it?
3   A.  Probably.  Yes.
4   Q.  You indicated that there were a lot of invitations
5   coming your way?
6   A.  Oh, yeah.  Yeah, quite a few.
7   Q.  And there were a lot of contribution forms?
8   A.  Yes.
9   Q.  But there weren't very many contribution forms that made
10  you sign the form, isn't that true?
11  A.  I remember filling out lots of forms.
12  Q.  You would agree it's rare on the contribution forms to
13  have you sign something?
14  A.  I'm sure I signed lots of them.
15  Q.  Before using hundreds of thousands of dollars of company
16  money to fund campaign donations you would agree that it
17  would be wise to confirm that doing so is lawful, right?
18  A.  Can you re-ask that question please?
19  Q.  Before causing these second bonuses, you would agree it
20  would be wise to determine whether it's lawful?
21  A.  The compensation of the officers, I didn't think that
22  anything was improper, not a bit.  It was just added
23  compensation so I didn't feel the need to go out and check
24  lawfulness because I didn't think there was anything wrong
25  with it.  I just added--I increased their compensation.

443

Laurita - Cross

1    Q.  But you did have access to legal advice as the president
2    and CEO of Mepco, right?
3    A.  Yes.  I had access to lawyers and all that sort of
4    thing.
5    Q.  You had a General Counsel?
6    A.  Yes I did.
7    Q.  You also had a personal attorney named Greg Rosen,
8    right?
9    A.  Yes.  He represented our family for many years.  Yes.
10   Q.  And you apparently had access to Louis Southworth as
11   well, correct?
12   A.  He was the attorney that represented the Coal
13   Association.
14   Q.  You knew that Mr. Southworth was one of the best
15   attorneys in the State, right?
16   A.  I don't know that I knew that but I knew he was a very
17   good attorney.  He was well thought of and highly respected
18   in the State.
19   Q.  As we've already covered, you sought Mr. Southworth's
20   advice on whether an LLC could make political donations in
21   its name, right?
22   A.  Yes.  That's correct.
23   Q.  So you also believed that he was knowledgeable on
24   campaign finance laws, right?
25   A.  Yes.

Laurita - Cross

1          THE COURT:  Mr. Douglas, it's a quarter till

2     eleven.  It's past time for the jury to have their

3     midmorning recess.  I do hate to interrupt your

4     cross-examination.  If you're almost finished I think we

5     could bear on but if it's going to take a while longer I

6     believe the jury's entitled to their midmorning recess.

7          MR. DOUGLAS:  We should take a recess.

8          THE COURT:  Okay.  Thank you.  Ladies and Gentlemen

9     of the Jury, it's time for your midmorning recess.  We'll

10    resume at eleven o'clock and I want to thank you for your

11    patience and attention.  Please leave your notebooks face

12    down on your chairs and do not discuss anything about this

13    case among yourselves during the recess.  Court Security

14    will lead you out.  Thank you.

15        (Jury out at 10:45 a.m.)

16         THE COURT:  All right.  Mr. Laurita, would you

17    please step down and be prepared to resume the stand at

18    eleven o'clock.  Court stands in recess until eleven

19    o'clock.  Thank you.

20         (Recess from 10:46 a.m., until 11:08 a.m.)

21         THE COURT:  Thank you.  Please be seated.  I

22    apologize for the brief delay.  I had other matters I had to

23    address.  We can bring the jury in.

24         MR. CARR:  Your Honor, while the jury--

25         THE COURT:  I was about to say, they're about to

Laurita - Cross

1   come in, Mr. Carr.  What is it?

2          MR. CARR:  Just very briefly, Your Honor.  I just

3   wanted to put on the record that I'm aware of the

4   prohibition of speaking to the defendant while he is

5   testifying and I did not do so.

6          THE COURT:  Thank you.

7       (Jury in 11:10 a.m.)

8          THE COURT:  Ladies and Gentlemen, welcome back and

9   my apologies for the brief delay.  I had another matter to

10  attend to.  Mr. Douglas, you may resume your

11  cross-examination.

12         MR. DOUGLAS:  Thank you, Your Honor.

13  BY MR. DOUGLAS:

14  Q.  Mr. Laurita, during the program you know it was unlawful

15  to provide a false statement to the federal government,

16  right?

17  A.  I would think so; yes.

18  Q.  During that time you also knew it was--it would be

19  unlawful to cause someone else to provide a false statement

20  to the federal government, correct?

21  A.  Yes.  I would think so.  Yes.

22  Q.  At that time you knew that the Federal Election

23  Commission was an agency of the federal government, didn't

24  you?

25  A.  I subsequently learned about that, yes, but at the time

446

Laurita - Cross

1   I don't--I wasn't familiar with the Federal Election

2   Commission.

3   Q.  You saw on e-mails where campaigns would mention the

4   FEC, didn't you?

5   A.  No I don't remember.

6   Q.  You knew that in some way the federal government was

7   providing some oversight to campaign contributions, didn't

8   you?

9   A.  I knew that there were--you know I learned through the

10  process that there was reporting requirements that the

11  campaigns had to report to the federal government, but I

12  didn't know to what extent.

13  Q.  And you knew that the purpose of this was to identify

14  individuals who gave money to campaigns, right?

15  A.  Yeah.  That was obvious from the forms that you filled

16  out that--that they wanted some information, your

17  occupation, where you lived, that sort of thing.

18  Q.  And you knew that the reporting would include name and

19  amount as well, right?

20  A.  Yes.

21  Q.  Okay.  You knew that the campaigns were receiving that

22  information and then providing it on to the government,

23  right?

24  A.  I assumed that.  I didn't know for a fact but I assumed

25  that.

447

Laurita - Cross

1  Q.  Would you agree that the Government's information on

2  this--on donations is only as good as what the campaigns

3  would give them?

4  A.  I would assume that's correct.

5  Q.  Would you agree that the campaigns' information is only

6  as accurate as what the donors would give them?

7  A.  Yes, that would be a fair assumption.

8  Q.  You understand the phrase garbage in, garbage out,

9  right?

10  A.  Yes I do.

11  Q.  That would apply here to, wouldn't it, to campaign

12  donations and information about them?

13  A.  Yes.

14  Q.  If a campaign had been given false information and

15  provided that to the federal government, then the federal

16  government would've received false information, right?

17  A.  Yes.

18  Q.  Then you understand that the whole system breaks down

19  when a campaign does not know the person giving them the

20  donation is not the true source of the money, right?

21  A.  Yes.  That's--that's correct.

22  Q.  You did not tell, for example, the McKinley campaign

23  that you were using company money to fund the donations of

24  your executives, did you?

25  A.  No I didn't because I didn't believe that was true.

448

Laurita - Cross

1  Q.  You didn't tell any of the campaigns that you were

2  providing bonuses to the executives that they were using for

3  donations, did you?

4  A.  No I did not.

5  Q.  And you knew of nothing indicating this fact to the

6  campaigns, right?

7  A.  Did I know of information provided to campaigns that

8  would state that?  I'm not following your question.

9  Q.  Okay.

10 A.  Could you re-ask that please?

11 Q.  If the campaigns had known that the executives'

12 donations were being funded by company money, you don't

13 believe they would accept the donations, do you?

14         MR. CARR:  Objection.

15         THE COURT:  Sustained.

16 BY MR. DOUGLAS:

17 Q.  In any event you knew that the campaign committees were

18 providing information to the government which identified

19 your executives and their spouses as donors, right?

20 A.  Yes.  I would say that's a fair assessment.  Yes.

21 Q.  You can agree that this program wasn't all about trying

22 to garner favor with coal friendly politicians, don't you?

23 A.  This program, as you call it, was about trying to

24 support candidates that were supportive of our industry and

25 support our employees.  I am not following your question.

449

Laurita – Cross

1    Q.  Okay.  Fine.  You liked being able to sit at the head

2    table with Senator Manchin at fundraisers, didn't you?

3    A.  That would be a privilege.

4    Q.  You could get face-to-face meetings with David McKinley,

5    Congressman McKinley, couldn't you?

6    A.  Yes, you could.  It maybe difficult at times because

7    he's, you know in Washington, DC but if he's in the area,

8    yes.  I mean I could get--I could get him to a face-to-face,

9    either drive up to see him or him come down to see me from

10   time to time.  Most of the time if we wanted to communicate

11   with the staff and wanted a face-to-face we would

12   typically--staff would be more readily available than what

13   he was.

14   Q.  At one point in 2013, so we're talking about three years

15   into the program, you told McKinley's staff I would like a

16   one on one meeting with David prior to setting up an event,

17   didn't you?

18   A.  Yes I remember that.

19   Q.  And you're talking about a fundraiser event being hosted

20   by you for Congressman McKinley?

21   A.  Yes I remember that very well.

22   Q.  And in that same chain of e-mail you told that same

23   staff person, I would prefer a meeting with David before we

24   commit because I need to have a discussion with him

25   beforehand?

Laurita - Cross

1    A.  Yes, sir, I remember that very well.  It was--some of

2    the executives were very concerned about some statements

3    that David McKinley had made as of late and they were of the

4    opinion that they may not want to support him anymore and so

5    I had requested a meeting with David McKinley to say, David,

6    you've got a lot of your constituents now that are very

7    concerned about you so you're going--you're going to need to

8    have a face-to-face with the executive team at some point.

9    I didn't want to do that in open forum, open public, so I

10   wanted to tell him that in private.

11   Q.  And you had actually had what you describe as lengthy

12   conversations with Congressman McKinley and it was reported

13   in the media that he was taking a position you didn't agree

14   with, isn't that true?

15   A.  Yes.

16   Q.  In fact you told a colleague, I spoke to David at length

17   yesterday morning about some news releases that were sent to

18   me which indicated David agreed that something needed to be

19   done to combat climate change.  He said he would put out a

20   press release clarifying his stance.  Is that accurate?

21   A.  Yes.  That was about the same time that the staff were

22   concerned--my staff were concerned about statements.  The

23   engineering staff were--I don't remember exactly what

24   the--what the--what it was about at this time but I remember

25   specifically that it was Brian Osborn, Eric Grimm because

Laurita – Cross

1    they--they managed a lot of the mining operations and Brian

2    was on the Engineering and Permitting.  They were very

3    concerned about some statements he had made and I don't

4    remember what those were and so I was trying to address that

5    with him that the staff were very concerned about it

6    and--and fairly, legitimately so.

7    Q.  So is it fair to say that after three years of giving to

8    Congressman McKinley that you could call a sitting

9    Congressman and have him put out a press release clarifying

10   a stance?

11   A.  No.

12   Q.  All right.  I want to end with a few questions here

13   again about the bonuses.  You termed them discretionary

14   bonuses, right?

15   A.  Yes.

16   Q.  And that means it's at your discretion as the president

17   and CEO of the company, correct?

18   A.  No.  What that means is discretionary is--where

19   is--there's a fixed component of their compensation and then

20   there is a variable component of their compensation.  Any

21   other bonuses beyond that are discretionary, like a

22   retention bonus, health and safety bonus, any kinds of

23   bonuses, they're all discretionary.

24   Q.  And it was your decision to start causing these bonuses

25   to be made to the executives?

452

Laurita – Cross

1   A.  Yes.

2   Q.  And that was in 2010, right?

3   A.  Yes.  I believe that's correct.

4   Q.  And so that was a time when you were concerned about the

5   Longview Power Plant, right?

6   A.  I was concerned about Mepco.  I was concerned about all

7   the employees, concerned about Longview, concerned about the

8   industry.

9   Q.  Okay.  You had a lot of concerns and they were partially

10  financial, right, financial concerns, would you agree?

11  A.  Some financial concerns, yes.  More so about the

12  livelihood of all the employees.

13  Q.  Okay.  If you had a lot of concern about finances and

14  you had a concern about the other employees then why did you

15  decide at that time that's a good time to start giving these

16  bonuses to your executives?

17  A.  The CEO of Longview and the CEO of GenPower and my boss

18  had called a meeting just a few days or a week before that

19  and asked that me and my executive team get more involved.

20  That's--that's--that's what started it.

21  Q.  Get more involved in politics?

22  A.  Absolutely, get more involved in politics and--

23  Q.  So then the bonus was for politics?

24       MR. CARR:  Objection, Your Honor.  Ask the witness

25  be allowed to finish his answer.

Laurita - Cross

1          THE COURT:  Sustained.  Let him finish his answer

2   before--

3          MR. DOUGLAS:  Yes, Your Honor.

4          THE COURT:  --you follow up.  Thank you.

5   BY MR. DOUGLAS:

6   A.  To be more involved with campaigns and getting involved

7   with, you know, the employees.  We started a program where

8   we started posting at the mines the recommendations of the

9   Coal Associations.  It was an across the company effort to

10  try to educate the employees with the Coal Associations,

11  their recommendations, so the Human Resource Department got

12  involved with that and so--even with our executive team,

13  they did as well.

14  Q.  So then the bonuses are directly related to getting

15  involved with campaign donations, right?

16  A.  The bonuses were given so that they would be able to

17  afford to start contributing to the campaigns.

18         MR. DOUGLAS:  Thank you.  Nothing further, Your

19  Honor.

20         THE COURT:  All right.  Is there any redirect?

21         MR. CARR:  Your Honor, may I have a moment please?

22         THE COURT:  Yes.

23     (Pause)

24         MR. CARR:  Your Honor, I apologize.  I just had a

25  pen explode.

454

Laurita – Redirect

1          THE COURT:  That can be a devastating experience.

2                     REDIRECT EXAMINATION

3    BY MR. CARR:

4    Q.  Jim, you were asked on cross-examination about attempts

5    to hide or mislabel the second bonus.  Is that true?

6    A.  No.  Never hid it, mislabeled, anything like that.

7    Q.  Did you ever or did you ever direct anyone else to deny

8    or mischaracterize the second bonus?

9    A.  No.  Never.  Not once.

10   Q.  I believe in this trial we have actually seen a

11   spreadsheet that was sent to you that had the different

12   columns for the executives and one of them said, in effect,

13   campaign contributions.  Do you recall that?

14   A.  Yes I do.

15   Q.  That was sent to you, was it not?

16   A.  Yes.

17   Q.  And who prepared it?

18   A.  Karen Hughes.

19   Q.  And that was clearly labeled?

20   A.  Yes.

21   Q.  Was there any attempt within the company, whether to

22   misrepresent to anyone, Ernst & Young, auditors, the

23   campaigns, anyone, what was happening with the second bonus?

24   A.  No.  It never was.  Never.  No one thought we were doing

25   anything wrong.

Laurita – Redirect

1   Q.  You mentioned the one for one?

2   A.  Yes, sir.

3   Q.  You think that would be wrong?

4   A.  Yes.

5   Q.  Did you ever collect checks from the miners for

6   campaigns?

7   A.  The individual coal miners?

8   Q.  Yes.

9   A.  No.  No.  I never asked them to do.

10   Q.  Did you consider that to be proper?

11   A.  The executive team are a privileged group.  They get

12   privilege pay and to go down to the coal miner level and try

13   to ask them for checks, I just--I would've--I would have

14   been very uncomfortable with that.  I would've thought that

15   improper.

16   Q.  Did you ever tell the miners who to vote for?

17   A.  No.  No.  We made--we posted at the mines the

18   recommendation of the Coal Associations.  One time Dana

19   Mining endorsed a candidate and the executive team and we

20   met in a meeting and we discussed it and we said, you know,

21   we probably shouldn't do that any more.  We--probably the

22   company should not endorse and so we just strictly stuck

23   with posting at the mines the recommendations of the

24   Pennsylvania Coal Association and West Virginia Coal

25   Association for the miners, you know, to--to use as a guide

456

Laurita - Redirect

1    to vote if they so choosed.

2    Q.  You were asked on cross-examination about the event

3    where you like to set at the head table with Governor

4    Manchin, do you recall that?

5    A.  Yes.

6    Q.  Do you recall that event?

7    A.  Yes I do.

8    Q.  Was there someone else there you wanted to see?

9    A.  Yes, more so than Governor Manchin or he might have been

10   Senator at that time, I'm not sure.  It was Paul Evanson.

11   He was the CEO of Allegheny Energy, was our largest customer

12   and had been our largest customer for many years.  It would

13   have been a privilege--I had only met him once in my life

14   even though my dad had sold coal to them before me, I had

15   only met him once so it would have been a privilege to sit

16   at the table with him.

17   Q.  In effect did Mepco get most of its money from Allegheny

18   Power?

19   A.  During the time when Longview was under construction

20   virtually all the money and for many years virtually all the

21   money came from First Energy and Allegheny Power.  It was

22   one in the same.  First Energy bought out Allegheny Power.

23   Q.  Did you enjoy being part of the campaigns, participating

24   in the campaigns?

25   A.  No.  Not at all.

457

Laurita – Redirect

1    Q.  Did you think it was necessary?

2    A.  Yes, I felt it was necessary.

3    Q.  At any time from 2010 to 2013 did you ever believe for a

4    second that there was anything wrong with what you did?

5    A.  No I did not.

6    Q.  If you did, would you admit it?

7    A.  Yes I would.

8         MR. CARR:  One more moment, Your Honor.

9    (Pause)

10        MR. CARR:  Nothing further, Your Honor.

11        THE COURT:  All right.  Is there any further

12   cross-examination?

13        MR. DOUGLAS:  No, Your Honor.

14        THE COURT:  Thank you.  Mr. Laurita, you may step

15   down and return to your seat.

16   (Witness excused from stand)

17        THE COURT:  All right.  Mr. Carr, you may call your

18   next witness.

19        MR. CARR:  Your Honor, at this time the defense

20   rests.

21        THE COURT:  Ladies and Gentlemen, it's necessary

22   for me to take up matters outside your hearing at this time

23   so if you would please follow Court Security back to your

24   jury room.  Please don't discuss the case among yourselves.

25   I don't think this recess will be very long, but please,

1    during that time don't discuss the case.  Please leave your

2    notebooks face down on your chairs.

3         (Jury out 11:30 a.m.)

4              THE COURT:  Does the Government intend to put on a

5    rebuttal case?

6              MR. DOUGLAS:  No, Your Honor.

7              THE COURT:  Is there a motion?

8              MR. CARR:  Yes, Your Honor.  We would renew our

9    Rule 29 motion.

10             THE COURT:  All right.  The defendant has renewed

11   it's Rule 29 motion at the close of all the evidence.  I

12   assume the Government's argument is the same?

13             MR. DOUGLAS:  Yes, Your Honor.

14             THE COURT:  And for the reasons stated, when viewed

15   in the light most favorable to the Government, as the Court

16   must view it, the Court denies the motion.  The case will

17   carry to the jury.

18        All right.  Now this is what I feared yesterday

19   afternoon that we'd have the jury in here for just a couple

20   of hours this morning and then have to let them go.  I don't

21   know whether you're ready to conduct a charge conference and

22   argue the case this afternoon.

23             MR. CARR:  Your Honor, I would--

24             THE COURT:  I'm not going to force you to do it

25   because I promised you could have until tomorrow but that

1    was--I was assuming we were going to be here into the

2    afternoon.

3            MR. CARR:  Your Honor, I would state as counsel and

4    I had discussed the matter, at least--I didn't press the

5    Government but as to the expected length of Mr. Laurita's

6    testimony I know that--I would say that my representation

7    was made in good faith yesterday.  There was a change in

8    decision about how the direct examination, the scope of it

9    would be conducted and I do apologize to the Court for that

10   but that was--that was not known to me yesterday.  That

11   decision had not been made so I do apologize to the Court.

12           THE COURT:  Okay.

13           MR. CARR:  I would very much appreciate, and I

14   don't know the Government's position--I also understand the

15   time of both the jury and the Court but do not believe that

16   the client would be well served by doing the arguments this

17   afternoon.

18           THE COURT:  All right.

19           MR. DOUGLAS:  The Government agrees, Your Honor.

20           THE COURT:  All right.  Thank you.  Then what I

21   intend to do is bring the jury back in and excuse them for

22   the day and bring them back in tomorrow morning when we will

23   begin the--with the charge and then as I said a break and

24   then move into the closing arguments and proceed through the

25   entirety of the close before we take another recess.  All

1    right?

2         MR. DOUGLAS:  Yes, Your Honor.

3         MR. CARR:  Yes, Your Honor.

4         THE COURT:  Okay.  Thank you.  Bring the jury in.

5    We'll do the charge conference after the noon recess so you

6    have time to look over the charge.

7         (Jury in 11:32 a.m.)

8         THE COURT:  Ladies and Gentlemen, the evidence in

9    the case has concluded and both counsel and I are surprised

10   at how quickly it moved this morning so I must tell you that

11   we're not prepared to charge you or to--for you to hear the

12   arguments until tomorrow morning so this means it's a very

13   short day today and I'm going to be adjourning the trial

14   until nine o'clock tomorrow morning at which time I will

15   give you a copy of the charge and read the charge to you

16   with all the instructions you need to decide the case,

17   following which you will hear the closing arguments of the

18   parties and you'll have the case to deliberate.  Until that

19   time, as you leave today, I must instruct you once again

20   that you are not to discuss the case among yourselves or

21   with anyone with whom you may have contact.  Should a third

22   party attempt to discuss the case with you, you have to walk

23   away from them and advise you've been instructed not to do

24   so and if they persist, please let me know through Court

25   Security--a Court Security Officer or Debbie at the earliest

1    opportunity.

2         Please do not review any media coverage of the case,

3    that would be television, radio, or in the newspaper.

4         Don't attempt any independent research, either by search

5    engines on your phone or on your tablet or at the library.

6         We thank you for your attention.  I apologize for the

7    brevity of today's session.  I know it's an imposition on

8    your personal time, on you work time.  It's--trials develop

9    and I think all of us gave you our best estimates on

10   everything so I apologize that our estimate yesterday was

11   off, but it was all based on the best knowledge we had at

12   the time.

13        So with that apology, please be careful driving home and

14   thank you for your patience and attention and your

15   dedication to the oath you've taken as jurors here and we'll

16   see you tomorrow morning ready to start at nine o'clock.

17   All right.  Leave your notebooks face down on your chairs.

18        (Jury out 11:35 a.m.)

19             THE COURT:  All right.  My suggestion would be that

20   we recess for lunch, give you a copy of the verdict form and

21   special interrogatories and would you be prepared--I have a

22   12:15 hearing.  I don't know how long it will last.  I think

23   it's probably going to be close to a half an hour in another

24   matter.  Therefore, I would say let's resume at one o'clock

25   if that's okay with all of you.

1          MR. DOUGLAS:  Yes, Your Honor.

2          MR. CARR:  It is, Your Honor, and I would state

3   that I've spoken to the Government.  Mr. Hissam actually

4   will be speaking regarding the charge for the defense but I

5   understand the Government does not wish for the

6   consciousness of guilt instruction to be given and I don't

7   believe that either side has any issues at the moment with

8   the charge and so we would otherwise expect that not to be

9   prolonged.

10          MR. DOUGLAS:  That is correct, Your Honor, and

11   Mr. Bernard will be speaking for the Government on the

12   charge.

13          THE COURT:  Okay.  Well we have to have a charge

14   conference even if it's very brief but that's fine with me.

15   I appreciate your letting me know.

16          MR. CARR:  Yes, Your Honor.

17          THE COURT:  Okay.  You might have to wait a couple

18   minutes to make sure.  Actually it's coming out to you with

19   the very careful eye of Mr. McDaniel.  I haven't looked at

20   it but I did look at it previously so I think this final

21   version is pretty close to what we had talked about.  Yeah.

22   And I think you'll recognize it.

23          MR. CARR:  Your Honor, I only mention that for the

24   Court's schedule as far as the anticipated disagreements.

25          THE COURT:  Pardon?

1          MR. CARR:  Your Honor, I only mention that for

2     the--

3          THE COURT:  Oh, I understand.  Well I only

4     scheduled one case today and it was at 12:15 so it's--oh,

5     two.  Sorry we have two.  Oh, 12:30.  Well I--I'll still be

6     ready by one o'clock.

7          MR. CARR:  Yes, Your Honor.

8          THE COURT:  Okay.  No problem.  Court stands in

9     recess until one o'clock.

10          (Recess from 11:40 a.m., until 1:05 p.m.)

11          THE COURT:  Thank you.  Please be seated.  All

12     right.  This is the charge conference in the case of United

13     States of America versus James L. Laurita, Jr. and I had

14     asked Mr. McDaniel to please provide you with draft number

15     two and also the verdict form.

16     I think the only change we made in draft number two

17     other than pagination was to take out the consciousness of

18     guilt instruction so I'm happy to hear from the Government

19     if you're ready.

20          MR. BERNARD:  Yes, Your Honor.

21          THE COURT:  Okay.  Mr. Bernard.

22          MR. BERNARD:  Thank you, Your Honor.  I don't know

23     if the Court want's to proceed page by page--

24          THE COURT:  Well sometimes it's the best way.

25     We've got the pages numbered, we've got the lines numbered

1    and we can move right through it.

2            MR. BERNARD:  Sure.  No objection to page one, Your

3    Honor.

4            THE COURT:  Okay.  If you want to just take me to

5    where you have your first objection.

6            MR. BERNARD:  The first page would be page ten.

7    It's not necessarily an objection.

8            THE COURT:  Okay.

9            MR. BERNARD:  It is the title, and hopefully the

10   copy I have is the correct draft, but I think it's draft

11   three, even though it says draft two, where it says other

12   crimes, wrongs or acts.  I think it would be more

13   appropriate just to put other acts of the defendant.

14           THE COURT:  Okay.

15           MR. BERNARD:  I don't think there is evidence of

16   crimes or necessarily wrongs.

17           THE COURT:  I'm sure there's no objection from the

18   defendant?

19           MR. HISSAM:  That's right, Your Honor.

20           THE COURT:  All right.  Thank you.  The Court will

21   make the--other acts so we'll redact crimes, wrongs or.

22   Thank you.

23           MR. BERNARD:  You're welcome, Your Honor.  Then the

24   next comment would be page twenty-eight so I don't know if

25   the defense has anything before that or not.

1          THE COURT:  Well I'll take theirs separately.

2          MR. BERNARD:  All right.  So--

3          THE COURT:  I think that makes for a cleaner

4    records sometimes.

5          MR. BERNARD:  That's fine, Your Honor.  The--and I

6    know the Government submitted the instructions on each of

7    these and so if there's any fault, it would be with the

8    Government but--

9          THE COURT:  No, we did--we did make some

10   modifications--if it's about willfully, we did make some

11   modifications.

12         MR. BERNARD:  Okay.  And i think the further

13   modification because willfully appears I believe four times

14   in the instructions.  Two times it's differently--it's

15   different and two other times it's--there's probably two

16   versions of willfully.

17         THE COURT:  Well we don't want that, that's for

18   sure.  Sorry about that.

19         MR. BERNARD:  I think it would be more

20   appropriate--it's a more appropriate statement of the law if

21   you look at page thirty-two, Your Honor, numbers eighteen

22   through twenty-two and it carries over to page thirty-three,

23   lines one through five.  I think they're basically saying

24   the same thing but that's probably a more appropriate

25   definition of willfully so I would--I would respectfully

1    request we strike on page twenty-eight lines three through

2    ten--or twelve and replace them will the--the willful

3    language.

4           THE COURT:  Okay.  What in particular is different

5    rather than strike the whole thing.  I have a suspicion a

6    lot of this is still the same.

7           MR. BERNARD:  Let's see.  You could probably--the

8    sentence on line six at page twenty-eight it says to

9    establish that the defendant acted willfully, the Government

10   does not have to prove that he was aware of the statutory

11   requirements and prohibitions of the Federal Election

12   Campaign Act or that he purposely violated the Act and if

13   you go over to page thirty-two, it is very similar but that

14   added language--

15          THE COURT:  It's more generic.

16          MR. BERNARD:  Yes.  I think more generic is the

17   more appropriate way and the more proper standard under the

18   law.  I think that additional language in there, they're

19   going to wonder, wait a minute, why are there different--why

20   is there an addition here versus at a later definition so

21   the more generic I think is--is more appropriate.

22          THE COURT:  This is as to Count One, right?

23          MR. BERNARD:  Yes.  Yes, Your Honor.

24          THE COURT:  Okay.  On page twenty-eight?

25          MR. BERNARD:  Yes.

1          THE COURT:  What if we were to add, to establish

2     that the defendant acted willfully as to Count One or put as

3     to Count One, to establish that the defendant acted

4     willfully and then made that specific as to each of the

5     counts because willfully is an element of every count,

6     correct?

7          MR. BERNARD:  It is.  I think it's the--all I'm

8     saying is that additional language that goes specific

9     there--

10          THE COURT:  Uh-huh (yes).

11          MR. BERNARD:  I think later on when they see

12     willfully in a more generic sense, it's like, well wait a

13     minute, you know, why is it--why is it generic here--I think

14     if it's generic as to Count One, it says the same thing.  If

15     we simply go with the sentence on page thirty-two, to

16     establish that the defendant, and this is at line

17     twenty-one, to establish that the defendant acted willfully

18     the Government does not have to prove that he was aware of

19     the specific provisions of the law that is charged with

20     violating and that's all you need.  We can take out that

21     other sentence and just replace it with--with that more

22     generic one and again that way the definition would be

23     consistent and there's one other place where it gets

24     specific and as I was looking at these I said that's going

25     to create--at least in my mind it creates a little bit of an

1    issue and a conflict.

2           THE COURT:  Okay.  Let me hear from the defendant

3    as to that one before we move on.

4           MR. BERNARD:  Sure.

5           THE COURT:  Thank you.

6           MR. HISSAM:  Sure, Your Honor.  We believe the

7    instruction on page twenty-eight, if was modified as the

8    Court suggested by saying as to Count One would be clear and

9    the meaning would be the same between page twenty-eight and

10   page thirty-two so we believe the Court's suggested

11   modification would address the Government's concern.

12          THE COURT:  All right.  Thank you.  I'm trying to

13   find it as to--I don't see it is to Count Two and I don't

14   see it as to Count Three or Count Four.  Is it Six, Seven

15   and Eight?  Is that where we come up next?

16          MR. BERNARD:  It would actually be to Count Three,

17   Your Honor.

18          THE COURT:  Oh, really.  Okay.  What page?

19          MR. BERNARD:  Page thirty-two.  Begins at

20   thirty-two, goes over to thirty-three.

21          THE COURT:  Oh, I thought you were okay with that.

22          MR. BERNARD:  I'm sorry, did you say too specific,

23   Your Honor?  I'm sorry.  I--

24          THE COURT:  I was looking for the other one that

25   you thought was too specific.

1              MR. BERNARD:  I will find that.  That is actually

2       on page--bear with me, Your Honor.

3              THE COURT:  Forty-one?  Forty-one, where it says to

4       establish that the defendant acted willfully, the Government

5       does not have to prove that he was aware--

6              MR. BERNARD:  Yes.

7              THE COURT:  It's the same language as to Count One,

8       right?

9              MR. BERNARD:  Right.  Those two are the same but

10      then the other two counts are a little bit different.  I

11      just--I think it's a correct statement of the law, the more

12      generic statement and I think one or the other has to be

13      consistent.  I think it's more consistent then to stay

14      generic rather than to go specific as to different counts

15      but it's the same standard.

16             THE COURT:  As to One, Six, Seven and Eight, we are

17      talking about the Federal Election Campaign Act, right?  And

18      in fact in the elements we do mention the Federal Election

19      Commission.

20             MR. BERNARD:  Technically I think we're talking

21      about 1001, Your Honor.

22             THE COURT:  Yeah.  Okay.  But what we're saying, if

23      you look at page forty, to establish the first element the

24      Government must prove beyond a reasonable doubt that a false

25      statement was made in a matter within the jurisdiction of

1    the Federal Election Commission and then we're saying that

2    the false statement was material to the Federal Election

3    Commission and then we're saying, as to willfully, to

4    establish that the defendant acted willfully the Government

5    does not have to prove that he was aware of the statutory

6    requirements and prohibition of the Federal Election

7    Campaign Act or that he purposely violated the Act.  Is

8    there any other way in which the Government would be

9    connecting or proving up the issue of willfulness that you

10   think would mislead the jury by mentioning--by mention of

11   the Act?

12           MR. BERNARD:  I don't--you know, Your Honor, when I

13   was looking at it, thinking as a juror who is looking at the

14   instructions and looks at the definition of willfully, the

15   only question I had is that going to raise a question in the

16   juror's mind, a question that doesn't need to be raised

17   because a more generic definition of willfully is

18   sufficient, sufficient under the law and there's no reason

19   to add that in those two--to add that to the term willfully

20   in those two counts and then later on with other actions

21   where at the same standards it's willfully, I think it

22   raises a question and it risks confusion.  That's all I'm

23   saying.  I don't know that it's inappropriate to put it

24   there but the problem is it's the same standard necessarily

25   for all four counts, maybe not the same specific elements so

1    I think it's--I think it's appropriate to be consistent

2    throughout the instructions with a definition.  That's all.

3         THE COURT:  All right.  Okay.  I understand what

4    you're saying and let me give it consideration.

5         MR. BERNARD:  Okay.

6         THE COURT:  I think that we're--I think we can do

7    that.  I have had a problem with this instruction from the

8    beginning and we did work with it, only for the reason that

9    I could see the jury coming back with questions and the more

10   generic the worse in a way.

11        MR. BERNARD:  Sometimes in a way, Your Honor, but I

12   think it's--definitely if it's inconsistent I think there's

13   a chance it will raise a question.

14        THE COURT:  I'm not sure it's inconsistent.  The

15   question I guess is as to Count Two and Three and Four, do

16   they specifically involve the Federal Election Commission or

17   does it involve the Federal Election Campaign Act?  And if

18   they do maybe I should just add it to all four, but I don't

19   think that's what you charged him under in Counts Two, Three

20   and Four.

21        MR. BERNARD:  Two, Three and Four are under the

22   Campaign Act.

23        THE COURT:  Oh, they are?

24        MR. BERNARD:  Yes.

25        THE COURT:  Okay.  Well what if we just added it to

472

1   everything?

2            MR. BERNARD:  We can do that, Your Honor.  As long

3   as it's consistent, I think that would be fine.

4            THE COURT:  Okay.

5            MR. HISSAM:  We believe that would be appropriate,

6   Your Honor.

7            THE COURT:  Okay.

8            MR. BERNARD:  Thank you.  Your Honor.

9            THE COURT:  All right.  What's your next one?

10           MR. BERNARD:  I'll have to shift around because I

11  think I had some of my flags with regard to that willful but

12  I think the next--

13           THE COURT:  Beyond willfully, because I know you

14  have four--that would be two objections or four objections,

15  depending on--

16           MR. BERNARD:  But I won't revisit those because I

17  think we've addressed that.  The next page would be page

18  thirty-seven and it is--this is maybe an addition to make so

19  I think it would be most appropriate to add something

20  between lines ten and eleven to explain that there's no

21  Count Five because we go from Four to Six, explain there's

22  no Count Five and that the jury does not have to concern

23  themselves with a Count Five.

24           THE COURT:  Okay.  So for purposes of continuity

25  there's no Count Five for the jury to consider.

 1              MR. BERNARD:  Correct, Your Honor.

 2              THE COURT:  Any objection?

 3              MR. HISSAM:  No, Your Honor.

 4              THE COURT:  Thank you.

 5              MR. BERNARD:  I believe--give me one moment, Your

 6      Honor, that might be--

 7              THE COURT:  Certainly.

 8              MR. BERNARD:  That's it, Your Honor.  Thank you.

 9              THE COURT:  Okay.  Before I hear from the

10      defendant, you know this so much better than I do, I know

11      Counts Six, Seven and Eight all reference quarterly reports

12      filed with the FEC, correct?

13              MR. HISSAM:  Yes, Your Honor.

14              MR. BERNARD:  Yes, Your Honor.

15              THE COURT:  Okay.  And I don't think that there's

16      any reference that--with that specificity in Counts Two,

17      Three or Four.  Am I correct?  Those really--with dates,

18      amounts and calendar years?

19              MR. DOUGLAS:  That's correct, Your Honor.

20              THE COURT:  Okay.  And Count--Count One covers the

21      gamut?

22              MR. BERNARD:  The scheme, Your Honor.

23              THE COURT:  All right.  I'm just thinking out loud.

24      I'll make a decision and let you all know.  What about the

25      defendant?

474

1          MR. HISSAM:  Your Honor, if I may remain here?

2          THE COURT:  Yes.

3          MR. HISSAM:  We only have one, Your Honor.  On page

4  one, line twenty-four we believe it would be confusing to

5  refer to a seven count indictment given that the verdict

6  form and the instructions refer to eight counts so we

7  believe that could just be changed to read--starting--

8          THE COURT:  To the indictment?

9          MR. HISSAM:  To each count of the indictment

10 perhaps.

11         THE COURT:  Uh-huh (yes).  No problem.  Does the

12 Government object?

13         MR. BERNARD:  No objection, Your Honor.

14         THE COURT:  Okay.

15         MR. HISSAM:  No remaining objections from the

16 defendant, Your Honor.

17         THE COURT:  All right.  Thank you.  All right.

18 What about the verdict form and special interrogatories?

19         MR. BERNARD:  Your Honor, the United States has no

20 objections or additions to that.  Thank you.

21         MR. HISSAM:  Your Honor, the defendant has no

22 objections or additions either.

23         THE COURT:  All right.  Thank you.  I will just

24 tell you adding unanimously and adding guilty beyond a

25 reasonable doubt, I'm just literally trying to account for

475

1    issues that under new Supreme Court law anybody ever says we

2    need to look behind the verdict, somebody didn't understand

3    so I know you don't typically see it this way but I'm

4    literally trying to just account for some of that.

5           MR. BERNARD:  No objection, Your Honor.

6           THE COURT:  All right.  Thank you.  If there's

7    nothing else then I think that concludes the

8    instructions--the charge.  I know the generic version works

9    and if the defendant doesn't have any problem with it, I'm

10   fine with it.  I think it was the idea that I didn't have

11   any theory of the case instructions from either side and I

12   just thought well maybe we could be a little more specific.

13          MR. HISSAM:  Yes, Your Honor.  I was just going to

14   add that we did not intend to submit one.

15          THE COURT:  Right.  I figured at this point you

16   didn't.  So if--that was the only reason.  I don't have a

17   problem with going back to the generic if the defendant

18   doesn't object, just using the generic throughout the whole

19   thing.  You're going to argue the Act throughout.  I feel

20   certain about that.

21      Okay.  Thank you.  If my Law Clerk changes my mind I'll

22   let you know.  So the Court stands adjourned until nine a.m.

23   tomorrow morning.  Obviously I'll be here before that if you

24   need to raise anything.  One hour per side still as you've

25   been thinking about it and a fair beginning and all of that.

1    We'll have Richard here tomorrow to offer technological help

2    if you're using PowerPoint or any instruction--well actually

3    your exhibits, you know how to do that but if there's

4    anything beyond that that you need assistance, Richard will

5    be here beforehand to help you set up.

6         MR. CARR:  Yes, Your Honor, and in speaking to the

7    Government, I believe I can speak for them, that we both

8    very much apologize for the change in the estimate that

9    occurred last night as far as testimony is concerned.

10        THE COURT:  No problem.  As I used to say to juries

11   about malpractice, it's an art, not a science; the same

12   thing with regard to trials.  Okay.

13        MR. CARR:  Thank you, Your Honor.

14        THE COURT:  Court stands adjourned.  Thank you.

15             (Trial was adjourned at 1:25 p.m.)

16

17

18

19

20

21

22

23

24

25

```
 1                           CERTIFICATE
 2       I, Linda L. Bachman, Official Reporter of the United
 3  States District Court for the Northern District of West
 4  Virginia, do hereby certify that the foregoing is a true and
 5  correct transcript of the proceedings had in the above
 6  styled action on January 31, 2018, as reported by me by
 7  stenomask.
 8       I certify that the transcript fees and format comply
 9  with those prescribed by the Court and the Judicial
10  Conference of the United States.
11       Given under my hand this 14th day of March, 2018.
12
13                           ____/s/ Linda L. Bachman
                             Linda L. Bachman, CCR, CVR-M
14                           Official Reporter, United States
                             District Court for the Northern
15                           District of West Virginia
16
17
18
19
20
21
22
23
24
25
```

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25