1

1          IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
2

UNITED STATES OF AMERICA,
3
                      Plaintiff,
4
     vs.                 CRIMINAL ACTION NUMBER:  1:17CR51
5
JAMES L. LAURITA, JR.
6
                      Defendant.
7
                  **TRIAL – DAY 4 & 5**
8
      Proceedings had in the <u>Trial</u> of the above styled action
9
on February 1 and 2, 2018 before The Honorable Irene M.
10
Keeley, Senior Judge, at Clarksburg, West Virginia.
11
APPEARANCES:
12
FOR THE PLAINTIFF:       JAROD J. DOUGLAS, ESQUIRE
13                       RANDOLPH J. BERNARD, ESQUIRE
                         Assistant United States Attorney
14                       P.O. Box 591
                         Wheeling, West Virginia   26003
15                       304-234-0100

16  FOR THE DEFENDANT:      JOHN A. CARR, ESQUIRE
                         179 Summers Street, Suite 209
17                       Charleston, West Virginia   25301
                         304-344-4822
18
                         MICHAEL B. HISSAM, ESQUIRE
19                       Bailey & Glasser
                         209 Capitol Street
20                       Charleston, West Virginia   25301
                         304-345-6555
21
The defendant was present in person.
22
Proceedings recorded by stenomask, transcript produced by
23  official court reporter.

24

25

        **LINDA L. BACHMAN, CCR, CVR–M, OFFICIAL COURT REPORTER**
        **P.O. BOX 969, CLARKSBURG, WEST VIRGINIA   26302–0969**
                         **304–282–0395**

1                                **I N D E X**

2      **WITNESS**                    **DIRECT   CROSS   REDIRECT   RECROSS**

3      (No Witnesses Called)

4      **February 1, 2018**

5      Government Closing Argument – Page 521

6      Defendant Closing Argument – Page 536

7      Government Rebuttal Closing Argument – Page 555

8

9      **February 2, 2018 – Page 588**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

478

```
 1                    P R O C E E D I N G
 2        (02-01-2018, 9:00 o'clock a.m., defendant present)
 3             THE COURT:  Good morning, Ladies and Gentlemen.  I
 4    am advised that Juror Number Nine has called in ill and that
 5    we'll therefore be replacing Juror Number Nine with
 6    Alternate Number One.  Any comment or objection from the
 7    Government?
 8             MR. DOUGLAS:  No, Your Honor.
 9             MR. CARR:  No.  Your Honor.
10             THE COURT:  All right.  Thank you.  All right.  we
11    can bring the jury in.
12        (Jury in 9:02 a.m.)
13             THE COURT:  You may be seated.  Good morning,
14    Ladies and Gentlemen.  Welcome back for the charge and
15    closing arguments in the case.  Before we get underway I
16    need to advise you that Juror Number Nine has called in this
17    morning and has advised that she is ill and will not be able
18    to sit this morning.  I therefore instruct Alternate Number
19    One, Ms. Bennett, to come and to replace Juror Number Nine.
20        Thank you very much.
21        All right, Ladies and Gentlemen, you have in front of
22    you a document, many pages that is styled the Charge, the
23    Jury Charge in the case.  I am about to read this to you.
24    That is my responsibility but you have it in front of you so
25    that you may follow along and because this belongs to you,
```

1    you may take notes on it, you may underline, you may circle,

2    you may do whatever you want to it.  This is your charge and

3    when you go back to the jury room to deliberate the case you

4    will have the charge with you.  All right.

5        You have the evidence, and I must now instruct you as to

6    the law applicable to this case.  The final arguments of

7    counsel will follow these instructions and, Ladies and

8    Gentlemen, we will have a brief recess between my reading of

9    the charge and your hearing the closing arguments.

10       As you know, the trial function of the judge is to

11   preside in such manner that proper and relevant evidence is

12   presented, and to instruct the jury on the law applicable to

13   the case.

14       Your function as the jury, on the other hand, is to

15   determine the fact from a fair consideration of the evidence

16   presented the case not from anything else.  The evidence

17   should be considered and viewed by you in the light of your

18   own observations and experience in the ordinary affairs of

19   life.

20       You have been chosen and sworn as jurors in this case to

21   try the issues of fact presented by the allegations of the

22   indictment as to the defendant, James L. Laurita, Jr., and

23   the denial made by his not guilty plea to each count of the

24   indictment.  You are to perform this duty without bias or

25   prejudice to any party.  The law does not permit you to be

1    governed by conjecture, suspicion, surmise, sympathy,

2    speculation, prejudice or, public opinion, nor may your

3    verdict be based on any of these things.  The defendant and

4    the public expect that you will carefully and impartially

5    consider all the evidence in the case, and follow the law as

6    stated by the Court.

7         As I earlier indicated to you, an indictment is but a

8    formal method of accusing a defendant of a crime.  As you

9    know, an indictment is not evidence of any kind against the

10   defendant.  It does not create any presumption or permit any

11   inference of guilt.  It is merely the formal means by which

12   the Government accuses an individual of a crime in order to

13   bring him to trial.  The defendant has answered the charges

14   in this case by pleading not guilty and you must not be

15   prejudiced against him.

16        There are two types of evidence from which you may find

17   the truth as to the facts of a case - - direct evidence and

18   circumstantial evidence.

19        Direct evidence is the testimony of one who asserts

20   actual knowledge of a fact, such as an eyewitness.

21        Circumstantial evidence is proof of a chain of facts and

22   circumstances indicating some further fact which, in a

23   criminal case, may bear on the guilt or innocence of a

24   defendant.

25        The law makes no distinction between the weight to be

481

1    given to either direct or circumstantial evidence.  Nor is a

2    greater degree of certainty required of circumstantial

3    evidence than of direct evidence.

4        Any evidence as to which an objection was sustained by

5    the Court, and any evidence ordered stricken by the Court,

6    must be entirely disregarded.

7        Unless you are otherwise instructed, anything you may

8    have read, heard, or seen outside the courtroom is not

9    evidence, and must be entirely disregarded.

10       You are to consider only the evidence in the case.  But

11   in your consideration of the evidence, you are not limited

12   to the bald statements of the witnesses.  In other words,

13   you are not limited solely to what you saw and heard as the

14   witnesses testified.  You are permitted to draw, from facts

15   which you find have been proven, such reasonable inferences

16   as you believe are justified in the light of experience.

17       As I have also indicated to you, the unsworn statements

18   and arguments of counsel during opening statement and

19   closing argument are not evidence in the case.  They are

20   intended only to assist the jury in understanding the

21   evidence and the contentions made.

22       Further, no statement, ruling, question, remark or

23   comment which I have made during the course of the trial was

24   intended to indicate my opinion as to how you should decide

25   the case or to influence you in any way in your

1    determination of the facts, nor should you draw any

2    inferences from anything I may have said.  You alone are to

3    judge for yourselves the questions of fact in this case.

4         In resolving these issues, you must bear in mind that,

5    under the law of our land, the defendant, James L. Laurita,

6    Jr., is presumed to be innocent -- and this presumption of

7    innocence remains with him at every stage of the trial.

8    Thus, the defendant, although accused, begins the trial with

9    a clean slate -- with no evidence against him.  The

10   presumption of innocence alone is sufficient to acquit a

11   defendant, unless you are satisfied beyond a reasonable

12   doubt of his guilt after careful and impartial consideration

13   of all the evidence in the case.

14        In this case, as in every criminal case, the burden of

15   proof is upon the United States to establish, first, the

16   fact that the crime charged was committed and second, that

17   the defendant on trial is guilty of the commission of the

18   particular crime as charged, beyond a reasonable doubt.

19        This burden never shifts to the defendant, but remains

20   upon the United States throughout the trial.

21        You should weigh all the evidence in the case.  After

22   weighing all the evidence, if you are not convinced of the

23   guilt of the defendant beyond a reasonable doubt, you must

24   find him not guilty.

25        A reasonable doubt means in law just what the words

1    imply, namely, a doubt based upon reason and common sense.

2    Its meaning is self-evident and I will not attempt to define

3    the term further.

4         It is not necessary for the Government to prove the

5    exact location of the commission of an alleged offense.  It

6    is sufficient if the evidence in the case establishes beyond

7    a reasonable doubt that the offense was committed within the

8    Northern District of West Virginia.

9         You will note also that the indictment charges that the

10   offense was committed on or about a certain date.  The proof

11   need not establish with certainty the exact date of the

12   alleged offense.  It is sufficient if the evidence in the

13   case establishes beyond a reasonable doubt that the offense

14   was committed on a date reasonably near the date alleged.

15        Although the indictment charges that some of the

16   statutes in question were violated by various acts that are

17   joined in the indictment by the word and, it is sufficient

18   for a finding of guilt if the evidence establishes beyond a

19   reasonable doubt any one of the violations charged.

20   In other words, counts charged using the word and should be

21   read as if they were charged using the word or.  For

22   example, if a count were to allege that a defendant violated

23   a statute by hitting someone and kicking them, it would be

24   sufficient for a finding of guilt if you found that the

25   defendant either hit or kicked him.  However, you must

1    unanimously agree that the defendant committed at least one

2    of the acts, and which act was committed.

3        In order to sustain its burden of proof on any of the

4    counts in the indictment, it is not necessary for the

5    Government to prove that the defendant personally did every

6    act constituting the offense charged.

7        As a general rule, if a defendant willfully causes an

8    act to be done by a third party that, if directly performed

9    by him, would be a crime, he is treated as if he had

10   committed the crime directly himself.  In other words, if

11   the defendant caused someone else – for example an innocent

12   intermediary – to perform some act by aiding, counseling,

13   commanding, inducing, or procuring the other person's

14   conduct, the law holds him responsible for that conduct just

15   as if it had been personally done by him.  It is not

16   necessary that the third party – that is, the person or

17   persons who actually performed the act – acted unlawfully

18   for you to find the defendant guilty.

19       The term material will be used frequently throughout

20   these instructions and the meaning is important in

21   understanding the law.  A material fact or matter is one

22   that has a natural tendency to influence or be capable of

23   influencing the decision maker to whom it was addressed.  A

24   material fact is a fact that would be of importance to a

25   reasonable person in making a decision about a particular

485

1    matter or transaction.

2        As you recall from my preliminary instructions to you,

3    you as jurors are the sole judges of the credibility of the

4    witnesses and the weight their testimony deserves.

5        You are not required to accept testimony, even though

6    the testimony is uncontradicted and the witness is not

7    impeached.

8        You should carefully consider each witness'

9    intelligence, motive, state of mind, and demeanor and manner

10   while on the stand.  Consider also any relation each witness

11   may bear to either side of the case, the manner in which

12   each witness might be affected by the verdict; and the

13   extent to which, if at all, each witness is either supported

14   or contradicted by other evidence in the case.

15       Inconsistencies or discrepancies in the testimony of a

16   witness, or between the testimony of different witnesses,

17   may or may not cause the jury to discredit such testimony.

18   Two or more persons witnessing an incident or a transaction

19   may see or hear differently; an innocent misrecollection,

20   like failure of recollection, is not an uncommon experience.

21   In weighing the effect of a discrepancy, always consider

22   whether it pertains to a matter of importance or an

23   unimportant detail, and whether the discrepancy results from

24   innocent error or intentional falsehood.

25       In addition, the testimony of a witness may be

1    discredited or impeached by showing that he or she

2    previously made statements that are inconsistent with his or

3    her present testimony.  As a general rule, earlier

4    contradictory statements are admissible only to impeach the

5    credibility of the witness, and not to establish the truth

6    of those statements.

7        If a witness is shown to have knowingly testified

8    falsely concerning any material matter, or conducted himself

9    or herself in a manner that indicates a propensity to lie,

10   or involves some element of deceit or untruthfulness, you

11   have the right to distrust the testimony of that witness in

12   other particulars, and you may reject all the testimony of

13   that witness or give it such credibility as you may think it

14   deserves.

15       In this connection, the weight of the evidence is not

16   necessarily determined by the number of witnesses

17   testifying.  Rather, you should consider all the facts and

18   circumstances in evidence to determine which of the

19   witnesses are worthy of greater credence or believability.

20       the testimony of a Government agent is entitled to no

21   special or exclusive sanctity.  A Government agent who takes

22   the witness stand subjects his or her testimony to the same

23   examination and the same tests that any other witness does.

24   You should recall their demeanor on the stand, their manner

25   of testifying, the substance of their testimony, and weigh

1    and balance it just as carefully as you would the testimony

2    of any other witness.  People employed by the Government,

3    including law enforcement agents, do not stand in any higher

4    station in the community than other persons, and their

5    testimony is not entitled to any greater weight than that of

6    other witnesses.

7        You have heard evidence that the defendant committed

8    certain acts which may be similar to acts charged in the

9    indictment.  You may not consider this evidence in deciding

10   if the defendant committed the acts charged in the

11   indictment.  However, you may consider this evidence for

12   other, very limited purposes, such as: to prove the

13   defendant had a motive or the opportunity to commit the

14   crimes charged in the indictment; to prove the defendant had

15   the state of mind or intent necessary to commit the crimes

16   charged in the indictment; to prove the defendant acted

17   according to a plan or in preparation to commit the crimes

18   charged in the indictment; to prove the defendant knew what

19   he was doing when he committed the crimes charged in the

20   indictment; to prove the defendant's identity; and to prove

21   that the defendant did not commit the crimes charged in the

22   indictment by accident or mistake.

23       Do not conclude from this evidence that the defendant

24   has bad character in general or that because the defendant

25   may have committed other similar acts that it is more likely

1    that he committed the crimes with which he is currently

2    charged.

3        As I stated in my preliminary instructions to you, the

4    law does not compel a defendant in a criminal case to take

5    the witness stand and testify.  Once a defendant, such as

6    James L. Laurita, Jr., waives his right to remain silent and

7    testifies, however, as is the case here, you should judge

8    his testimony in the same manner as you judge the testimony

9    of any other witness.

10       You are to return your verdict based upon the

11   evidence--upon the basis of the evidence with which--which

12   was presented to you at the trial and in accordance with

13   these instructions that I am in the process of giving to

14   you.  If the evidence in the case convinces you beyond a

15   reasonable doubt that a defendant is guilty of the offenses

16   charged in the indictment, then it will be your duty to find

17   the defendant guilty of those counts.

18       On the other hand, if a reasonable doubt exists in your

19   mind concerning the guilt of a defendant as to the offenses

20   charged in the indictment, then it will be your duty to find

21   that defendant not guilty of those counts.

22       I caution you, members of the jury, that you are here to

23   determine whether the Government has proved or failed to

24   prove the guilt of the defendant, James L. Laurita, Jr., as

25   to the charges set forth in the indictment.  The defendant

1    is not on trial for any act or conduct or offense not

2    alleged in the indictment.  Neither are you called upon to

3    return a verdict as to the guilt or innocence of any other

4    person or persons not on trial as a defendant in this case.

5        The punishment provided by law for the offenses charged

6    in the indictment is a matter which should never be

7    considered by the jury in any way in arriving at an

8    impartial verdict as to the guilt or innocence of the

9    defendant.

10       You, as jurors, are the judges of the facts.  But in

11   determining what actually happened in this case -- that is,

12   in reaching your decision as to the facts -- it is your

13   sworn duty to follow the law I am now in the process of

14   defining for you.

15       You must follow all of my instructions as a whole.  You

16   have no right to disregard or give special attention to any

17   one instruction, or to question the wisdom or correctness of

18   any rule that I may state to you.  That is, you must not

19   substitute your own notion or opinion as to what the law is

20   or ought to be.  It is your duty to apply the law as I give

21   it to you, regardless of the consequences.

22       By the same token it is also your duty to base your

23   verdict solely upon the testimony and evidence in the case,

24   without prejudice or sympathy.  That was the promise you

25   made and the oath you took before being accepted by the

1   parties as jurors in this case, and they have the right to

2   expect nothing less.

3       Ladies and Gentlemen, I will now provide you

4   instructions relating to the specific charges in the

5   indictment.

6       Count One charges that:  The defendant, James L.

7   Laurita, Jr., was the president, chief executive officer,

8   and minority owner of Mepco, LLC, a Delaware limited

9   liability company with its principal office address located

10  in Morgantown, West Virginia.

11      Mepco, LLC was a wholly owned subsidiary of a

12  partnership consisting of the defendant and Longview

13  Intermediate Holdings C, LLC.

14      Federal Candidate I was a candidate for election and

15  re-election to the United States House of Representatives.

16      Committee A was the authorized federal campaign

17  committee formed to receive campaign contributions for the

18  election and re-election of Federal Candidate I.

19      Federal Candidate 2 was a candidate for election and

20  re-election to the United States Senate.

21      Committee B was the authorized federal campaign

22  committee formed to receive campaign contributions for the

23  election and re-election of Federal Candidate 2.

24       Federal Candidate 3 was a candidate for election and

25  re-election to the United States House of Representatives or

1    the United States Senate.

2        Committee C1 and Committee C2 were the authorized

3    federal campaign committees formed to receive contributions

4    for the election and re-election of Federal Candidate 3.

5        Federal Candidate 4 was a candidate for election to the

6    United States House of Representatives.

7        Committee D was the authorized federal campaign

8    committee formed to receive contributions for the election

9    of Federal Candidate 4.

10       The Federal Election Campaign Act of 1971, as amended,

11   Title 42, United States Code, Sections 30101 through 30146,

12   the Election Act, placed limits and reporting requirements

13   upon financial activity intended to influence the election

14   of candidates for federal office for the purpose of

15   combating both corruption and the appearance of corruption.

16       To limit the influence that any one person could have on

17   the outcome of a federal election, the Election Act

18   established limits on the amounts individuals may contribute

19   to any candidates authorized campaign committee.

20       For the 2010 federal election cycle running from

21   November 2008 to November 2010, the Election Act limited

22   both primary and general election campaign contributions to

23   twenty-four hundred dollars each, for a total of forty-eight

24   hundred dollars from any individual to any one candidate in

25   the election cycle.

1     For the 2012 federal election cycle running from

2   November 2010 to November 2012, the Election Act limited

3   both primary and general election campaign contributions to

4   twenty-five hundred dollars each for a total of five

5   thousand dollars from any individual to any one candidate in

6   the election cycle.

7     For the 2014 federal election cycle running from

8   November 2012 to November 2014, the Election Act limited

9   both primary and general election campaign contributions to

10  two thousand six hundred dollars each, for a total of five

11  thousand two hundred dollars from any individual to any one

12  candidate in the election cycle.

13    To prevent individuals from evading the limit on amounts

14  that an individual could contribute to an authorized

15  campaign committee, the Election Act prohibited a person

16  from making a political contribution in the name of another

17  person, including giving or reimbursing funds to a conduit

18  contributor, also known as a straw contributor, for the

19  purpose of having the conduit contributor pass the funds on

20  to a federal candidate in the name of a conduit contributer.

21    The Federal Election Commission was an agency and

22  department of the United States with jurisdiction to enforce

23  the limits and prohibitions of the Election Act, and to

24  receive and publish truthful and accurate information from

25  authorized campaign committees specifying the source and

1    amounts of contributions to those committees for publication

2    on the Internet to provide citizens with a transparent

3    record of contributions to candidates for federal office,

4    which anyone may examine as a basis for further inquiry, and

5    thereby instill public confidence that the electoral process

6    has not been corrupted.

7        From on or about March 5, 2010, on or about July 15,

8    2013, in the Northern District of West Virginia and

9    elsewhere, in a matter within the jurisdiction of the FEC, a

10   department or agency of the United States Government, the

11   defendant, James L. Laurita Jr. did knowingly and willfully

12   cause the falsification, concealment, and cover up by trick,

13   scheme, and device of a material fact.

14       In or about March 2010, the defendant, aware of the

15   legal limits on individual campaign contributions, knowingly

16   devised a scheme and plan whereby he would unlawfully use

17   employees of Mepco, LLC and their respective spouses as

18   conduits through which to funnel the money of Mepco, LLC to

19   Committee A, Committee B, Committee C1, Committee C2,

20   Committee D, and other federal campaign committees, in the

21   names of the conduits.

22       It was part of the scheme and plan to knowingly conceal

23   from the FEC, the committees, the federal candidates, and

24   the public the true source and amount of the campaign

25   contributions.

1      It was part of the scheme and plan to use conduits to

2    knowingly deceive the federal candidates and the committees

3    into believing that the candidate (sic) lawfully raised

4    significant contributions of money for the committees from

5    the conduits when in truth and fact, he had not.

6      It was part of the scheme and plan to cause the various

7    committees to file reports with the FEC falsely stating that

8    the conduits had made the contributions, when in truth and

9    in fact, as the defendant will knew, each contribution was

10   made by himself with funds of Mepco, LLC.

11     In Execution of the scheme, the defendant, James L.

12   Laurita, Jr. committed, and caused others to commit, the

13   following acts and others, in the Northern District of West

14   Virginia, and elsewhere.

15     On or about March 5, 2010, the defendant met with a

16   number of employees of Mepco, LLC and advised them that he

17   would begin to direct them and their spouses to make

18   contributions to campaign committees selected by him in

19   amounts specified by him, and that the money of Mepco, LLC

20   would be used to fund these contributions.

21     On or about March 9th, 2010, the defendant caused Mepco,

22   LLC to advance funds to the conduit employees of Mepco, LLC

23   via direct deposit wire transfers from the bank account of

24   Mepco, LLC.

25     In or about March 2010, the defendant directly and

1    indirectly solicited employees of Mepco, LLC to have their

2    spouses make contributions to Committee A, in amounts

3    specified by the defendant and using the funds of Mepco,

4    LLC, which the defendant had caused to be advanced to the

5    employees.

6         On or about March 9, 2010, the defendant caused the

7    spouse of a Mepco, LLC employee to make a contribution to

8    Committee A in the amount of approximately five hundred

9    dollars, which the defendant had caused to be funded from

10   Mepco, LLC money.

11        In or about June 2010, the defendant directly and

12   indirectly solicited employees of Mepco, LLC, and their

13   spouses, to make contributions to Committee A in amounts

14   specified by the defendant and using the funds of Mepco,

15   LLC, which the defendant had caused to be advanced to the

16   employees.

17        On or about June 25, 2010, the defendant caused Mepco,

18   LLC employee--a Mepco, LLC employee and his spouse to each

19   make a contribution to Committee A in the amount of

20   approximately one thousand dollars, which the defendant had

21   caused to be funded from Mepco, LLC money.

22        In or about August 2010, the defendant directly and

23   indirectly solicited employees of Mepco, LLC to make

24   contributions to Committee B, in amounts specified by the

25   defendant and using the funds of Mepco, LLC, which the

1    defendant had caused to be advanced to the employees.

2       On or about August 16, 2010, the defendant caused

3    Mepco--or caused a Mepco, LLC employee to make a

4    contribution to Committee B in the amount of approximately

5    one thousand dollars, which the defendant had caused to be

6    funded from Mepco, LLC money.

7       Or about August 19, 2010, and in furtherance of his

8    scheme and plan, the defendant caused Committee A to file a

9    quarterly report with the FEC falsely stating that the

10   conduits had made the March 2010 contributions, when in

11   truth and in fact, and as the defendant well knew, the

12   defendant had caused each contribution to be funded from

13   Mepco, LLC.

14      In or about September 2010, the defendant directly and

15   indirectly solicited employees of Mepco, LLC to make

16   contributions to Committee C1, in amounts specified by the

17   defendant and using the funds of Mepco, LLC, which the

18   defendant had caused to be advanced to the employee.

19      On or about September 9, 2010, the defendant caused a

20   Mepco, LLC employee to make a contribution to Committee C1

21   in the amount of approximately five hundred dollars, which

22   the defendant had caused to be funded from Mepco, LLC money.

23      On or about October 15, 2010, and in furtherance of his

24   scheme and plan the defendant caused Committee B to file a

25   quarterly report with the FEC falsely stating that the

1    conduits had made the August 2010 contributions, when in

2    truth and in fact, and as the defendant well knew, the

3    defendant had caused each contribution to be funded from

4    Mepco, LLC.

5        Or about October 15, 2010, and in furtherance of his

6    scheme and plan, the defendant caused Committee C1 to file a

7    quarterly report with the FEC falsely stating that the

8    conduits had made the September 2010 contributions, when in

9    truth and in fact, and as the defendant well knew, the

10   defendant had caused each contribution to be funded from

11   Mepco, LLC.

12       On or about November 8, 2010, and in furtherance of his

13   scheme and plan, the defendant caused Committee A to file a

14   quarterly report with the FEC falsely stating that the

15   conduits had made the June 2010 contributions, when in truth

16   and in fact, and as the defendant well knew, the defendant

17   had caused each contribution to be funded from Mepco, LLC.

18       In or about March 11--I'm sorry, March 2011, the

19   defendant directly and indirectly solicited employees of

20   Mepco, LLC, and their spouses, to make contributions to

21   Committee A, in amounts specified by the defendant and using

22   the funds of Mepco, LLC, which the defendant had caused to

23   be advanced to the employees.

24       On or about March 1, 2011, the defendant caused Mepco,

25   LLC to advance funds to the conduit employees of Mepco, LLC

1    via direct deposit wire transfers from the bank account of

2    Mepco, LLC.

3        On or about March 17, 2011, the defendant caused a

4    Mepco, LLC employee and his spouse to each make a

5    contribution to Committee A in the maximum allowable amount

6    of approximately two thousand five hundred dollars, which

7    the defendant had caused to be funded from Mepco, LLC money.

8        On or about April 15, 2011, and in furtherance of his

9    scheme and plan, the defendant caused Committee A to file a

10   quarterly report with the FEC falsely stating that the

11   conduits had made the March 2011 contributions, when in

12   truth and in fact, and as the defendant well knew, the

13   defendant had caused each contribution to be funded from

14   Mepco, LLC.

15       On or about August 12, 2011, the defendant caused Mepco,

16   LLC to advance funds to the account--or to the conduit

17   employees of Mepco, LLC via direct deposit wire transfers

18   from the bank account of Mepco, LLC.

19       In or about April 12--or April 2012, excuse me, the

20   defendant directly and indirectly solicited employees of

21   Mepco, LLC to make contributions to Committee B, in amounts

22   specified by the defendant and using the funds of Mepco,

23   LLC, which the defendant had caused to be advanced to the

24   employees.

25       On or about April 5, 2012, the defendant caused a Mepco,

1    LLC employee to make a contribution to Committee B in the

2    maximum allowable amount for the primary and general

3    elections of approximately five thousand dollars, which the

4    defendant had caused to be funded from Mepco, LLC money.

5        On or about April 23, 2012, and in furtherance of his

6    scheme and plan, the defendant caused Committee B to file a

7    quarterly report with the FEC falsely stating that the

8    conduits had made the April 2012 contributions, when in

9    truth and in fact, and that the defendant well knew, the

10   defendant had caused each contribution to be funded from

11   Mepco, LLC.

12       In or about September 2012, the defendant directly and

13   indirectly solicited employees of Mepco, LLC to make

14   contributions to Committee D, in amounts specified by the

15   defendant and using the funds of Mepco, LLC, which the

16   defendant had caused to be advertised--or to be advanced to

17   the employees.

18       On or about September 21st, 2012, the defendant caused a

19   Mepco, LLC employee to make a contribution to Committee D in

20   the amount of approximately one thousand dollars, which the

21   defendant had caused to be funded from Mepco, LLC money.

22       On or about October 15, 2012, and in furtherance of his

23   scheme and plan, the defendant caused Committee D to file a

24   quarterly report with the FEC falsely stating that the

25   conduits had made the September 2012 contributions, when in

1   truth and in fact, and as the defendant well knew, the

2   defendant had caused each contribution to be funded from

3   Mepco, LLC.

4       In or about March 2013, the defendant directly and

5   indirectly solicited employees of Mepco, LLC and their

6   spouses to make contributions to Committee A in amounts

7   specified by the defendant and using the funds of Mepco,

8   LLC, which the defendant had caused to be advanced to the

9   employees.

10      In or about March 2013, the defendant directly and

11  indirectly solicited employees of Mepco, LLC and their

12  spouses, to make contributions to Committee C2, in amounts

13  specified by the defendant and using the funds of Mepco,

14  LLC, which the defendant had caused to be advanced to the

15  employees.

16      On or about March 14, 2013, the defendant caused Mepco,

17  LLC to advance funds to the conduit employees of Mepco, LLC

18  via direct deposit wire transfers from the bank account of

19  Mepco, LLC.

20      On or about March 23rd of 2013, the defendant caused a

21  Mepco, LLC employee and his spouse to each make a

22  contribution to Committee C2 in the maximum allowable amount

23  of approximately two thousand six hundred dollars, which the

24  defendant had caused to be funded from Mepco, LLC money.

25      On or about April 1, 2013, the defendant caused a Mepco,

LLC employee and his spouse to each make a contribution to
Committee A in the maximum allowable amount of approximately
two thousand six hundred dollars, which the defendant had
caused to be funded from Mepco, LLC money.

On or about April 15, 2013, and in furtherance of his
scheme and plan, the defendant caused Committee A to file a
quarterly report with the FEC falsely stating that the
conduits had made the March 2013 contributions, when in
truth and in fact, and as the defendant well knew, the
defendant had caused each contribution to be funded by--from
Mepco, LLC.

On or about July 15, 2013, and in furtherance of his
scheme and plan, the defendant caused Committee C2 to file a
quarterly report with the FEC falsely stating that the
conduits had made the March and April 2013 contributions,
when in truth and in fact, and as the defendant well knew,
the defendant had caused each contribution to be funded from
Mepco, LLC.

The defendant has pled not guilty to this Count.

The statutes defining the offense charged in Count One.

Section 1001(a)(1) Title 18 of the United States Code
provides, in part, that:

Whoever, in any matter within the jurisdiction of the
executive, legislative, or judicial branch of the Government
of the United States knowingly and willfully falsifies,

502

1    conceals or covers up by any trick, scheme, or device a

2    material fact shall be guilty of an offense against United

3    States.

4         Section 2(b) of Title 18 o the United States Code

5    provides in whole, that:

6         Whoever willfully causes an act to be done which if

7    directly performed by him or another would be an offense

8    against the United States, is punishable as a principal.

9         Now the scheme to cause false statements to Federal

10   Election Commission in Count One, the elements of the

11   offense.

12        For you to find the defendant guilty of Count One of the

13   indictment, you must find that the Government has proven,

14   beyond a reasonable doubt, that:

15        First:  The defendant falsified, concealed, or covered

16   up a fact by trick, scheme, or device, or caused another

17   person to do so, in a matter within the jurisdiction of the

18   Federal Election Commission;

19        Second:  The fact was material to the activities or

20   decisions of the Federal Election Commission; and

21        Third:  The defendant acted knowingly and willfully.

22        To establish the first element, the Government must

23   prove beyond a reasonable doubt that a fact was falsified,

24   concealed, or covered up by trick, scheme, or device, in a

25   matter within the jurisdiction of the Federal Election

1    Commission.

2         To establish the second element, the Government must

3    prove beyond a reasonable doubt that the fact falsified,

4    concealed, or covered up was material to the Federal

5    Election Commission -- in other words that the fact had a

6    natural tendency to influence, or was capable of

7    influencing, the agency's decisions or activities.  The fact

8    falsified, concealed, or covered up need not have actually

9    influenced the agency, and the agency need not rely on the

10   information in fact for it to be material.

11        To establish the third element, the Government must

12   prove beyond a reasonable doubt that the defendant acted

13   knowingly and willfully.  An act is done knowingly if the

14   defendant is aware of the act and does not act through

15   ignorance, mistake, or accident.  You may consider evidence

16   of the defendant's words, acts, or omissions, along with all

17   the other evidence, in deciding whether the defendant acted

18   knowingly.

19        An act is done willfully if the defendant acted with

20   knowledge that some part of his course of conduct was

21   unlawful and with the intent to do something the law

22   forbids, and again not by mistake or accident.  To establish

23   that the defendant acted willfully, the Government does not

24   have to prove that he was aware of the specific provision of

25   the law that he is charged with violating.  In other words,

504

1    a person acts willfully when he acts knowing that his

2    conduct is unlawful or with a bad purpose to disobey or

3    disregard the law, regardless of whether he precisely knows

4    which law or regulations make his conduct unlawful.

5        Count Two charges that during the calendar year 2012, in

6    the Northern District of West Virginia and elsewhere, the

7    defendant James L. Laurita, Jr. did knowingly and willfully

8    make, and cause to be made, contributions of money,

9    aggravating twenty-five thousand dollars and more during the

10   2012 calendar year, in the names of others, to a candidate

11   seeking nomination for election to federal office.

12       Count three charges that:  During the calendar year

13   2013, in the Northern District of West Virginia and

14   elsewhere, the defendant, James L. Laurita, Jr. did

15   knowingly and willfully make, and cause to be made,

16   contributions of money, aggregating twenty-five thousand

17   dollars and more during the 2013 calendar year in the names

18   of others to a candidate seeking nomination for election to

19   federal office.

20       The defendant has pled not guilty to these counts.

21       The statutes defining the offense charged in Counts Two

22   and Three.

23       Section 30122 of Title 52 of the United States Code

24   provides, in part, that:

25       No person shall make a contribution in the name of

1    another person or knowingly permit his name to be used to

2    effect such a contribution.

3        Section 30109(d)(1)(A) of Title 52 of the United States

4    Code provides, in part, that:

5        Any person who knowingly and willfully commits a

6    violation of Section 30116 of Title 52 of the United States

7    Code, which involves the making, receiving, or reporting of

8    any contribution, donation, or expenditure aggregating two

9    thousand dollars or more during a calendar year shall be

10   guilty of an offense against the United States.

11       Section 2(b) of Title 18 of the United States Code

12   provides in whole, that:

13       Whoever willfully causes an act to be done which if

14   directly performed by him or another would be an offense

15   against the United States, is punishable as a principal.

16       Making contributions in the name of another.  Count Two

17   and Count Three:  Elements of the offense.

18       To find the defendant guilty of Count Two and Count

19   Three, the Government must prove each of the following

20   elements beyond a reasonable doubt:

21       The defendant made or caused to be made contributions of

22   at least two thousand dollars during the calendar year 2012,

23   for Count Two, and at least two thousand dollars during

24   calendar year 2013, for Count Three;

25       Second: The person named as the contributor was not the

1    true source of the money used for the contribution, and the

2    defendant was aware of this;

3        Third:  The contributions were made to a candidate for

4    federal office, through the candidate's designated campaign

5    committee; and

6        Four or Fourth:  The defendant acted knowingly and

7    willfully.

8        As to the first element of Count Two and Count Three,

9    the Government must prove beyond a reasonable doubt that the

10   defendant made or caused to be made contributions that

11   totaled two thousand dollars or more during the calendar

12   year 2012, for Count Two, and during the calendar year 2013,

13   for Count Three.  The government need not prove that the

14   defendant made or caused to be made contributions that

15   totaled twenty-five thousand dollars or more, but only that

16   it was two thousand dollars or more.  If you find the

17   defendant guilty because the Government has proved this and

18   all the other elements beyond a reasonable doubt, then you

19   must make a further finding as to the first element.

20   Specifically, you must find whether the total contributions

21   made or caused to be made by the defendant fell within three

22   monetary ranges that I will provide to you on a special

23   verdict form, namely (a) two thousand to ten thousand

24   dollars, (b) ten thousand one dollar to twenty-four thousand

25   nine hundred ninety-nine dollars, or (c) twenty-five

1     thousand dollars or more.  Please--or do not concern

2     yourselves with the reason for specifying this range.

3          A contribution is any gift, subscription, loan, advance,

4     or deposit of money or anything of value made by any person

5     for the purpose of influencing any election for federal

6     office.

7          As to the second element of both Count Two and Count

8     Three, the Government must prove beyond a reasonable doubt

9     that the individual identified as the contributor was not,

10    in fact, the true source of the money used for the

11    contribution, and that the defendant knew the person

12    contributor--the named contributor was not the true source.

13    Specifically, the law prohibits conduit contributions, which

14    occur when a person provides anything of value, including a

15    gift, subscription, loan, advance, deposit of money, or

16    promise of reimbursement, to another person for the purpose

17    of causing that other person to make a contribution in that

18    other person's name.

19         As to the third element of both Count Two and Count

20    Three, the Government must prove beyond a reasonable doubt

21    that the recipient of the contributions was a candidate for

22    federal office, and that the contributions were made to the

23    candidate through the candidates designated committees.

24         Fourth, and finally, for both Count Two and Count Three,

25    the Government must prove beyond a reasonable doubt that the

1    defendant acted knowingly and willfully.

2         An act is done knowingly if the defendant is aware of

3    the act and does not act through ignorance, mistake, or

4    accident.  You may consider the evidence of the defendant's

5    words, acts or omissions, along with all the other evidence,

6    in deciding whether the defendant acted knowingly.

7         An act is done willfully if the defendant acted with

8    knowledge that some part of his course of conduct was

9    unlawful and with the intent to do something the law

10   forbids, and again not by mistake or accident.  To establish

11   that the defendant acted willfully, the Government does not

12   have to prove that he was aware of the specific provision of

13   the law that he is charged with violating.  In other words,

14   a person acts willfully when he acts knowing that his

15   conduct is unlawful or with a bad purpose to disobey or

16   disregard the law, regardless of whether he precisely knows

17   which law or regulation makes his conduct unlawful.

18        Count Four charges that:  In or about March 2013, in the

19   Northern District of West Virginia and elsewhere, the

20   defendant, James L. Laurita, Jr. did knowingly and willfully

21   make, and cause to be made, contributions to Committee A,

22   the official federal campaign committee of Federal Candidate

23   I, which contributions exceeded the limitation contained in

24   the Election Act, and which violation aggregated twenty-five

25   thousand dollars and more during the 2013 calendar year.

1       Defendant has pled not guilty to this charge--or to this

2   count.

3       The statutes defining the offense charged in Count Four.

4   Section 30116 of Title 52 of the United States Code

5   provides, in part, that:

6       No person shall make contributions to any candidate and

7   his authorized political committees with respect to any

8   election for federal office which, in the aggregate, exceed

9   the applicable limit.

10      Section 30109(d)(1)(A) of Title 52 of the United States

11  Code provides in part, that:

12      Any person who knowingly and willfully commits a

13  violation of Section 30116 of Title 52 of the United States

14  Code, which involves the making, receiving, or reporting of

15  any contribution, donation, expenditure aggregating two

16  thousand dollars or more during a calendar year shall be

17  guilty of an offense against the United States.

18      Section 2(b) of Title 18 of the United States Code

19  provides in whole, that:

20      Whoever willfully causes an act to be done which if

21  directly performed by him or another would be an offense

22  against the United States, is punishable as a principal.

23      making excessive campaign contributions, Count Four, the

24  elements of the offense.

25      To find the defendant guilty of Count Four, the

1    Government must prove the following elements beyond a

2    reasonable doubt:

3        First:  The defendant made or caused to be made

4    individual campaign contributions in excess of the limit

5    imposed on such contribution;

6        Second:  The excess contributions totaled two thousand

7    dollars or more during the calendar year 2013;

8        Third:  The excess contributions were made to

9    Congressman David McKinley, a candidate for federal office,

10    through his designated campaign committee, McKinley for

11    Congress; and

12        Four:  The defendant acted knowingly and willfully.

13        As to the first element, I instruct you that, in 2013,

14    the limit on individual contributions to candidates for

15    federal elected office and their designated committees was

16    two thousand six hundred dollars for the primary election

17    and two thousand six hundred dollars for the general

18    election, for a total of five thousand two hundred dollars.

19        To establish the first and second elements, the

20    Government must prove beyond a reasonable doubt that the

21    defendant made or willfully caused another to make

22    contributions on his behalf that totaled two thousand

23    dollars or more in excess of the five thousand two hundred

24    dollar limit during the calendar year 2013.  The Government

25    need not prove that the amount in excess of the limit was

1    twenty-five thousand dollars or more, but only that it was

2    two thousand dollars or more.  If you find the defendant

3    guilty because the Government has proved this and all the

4    other elements beyond a reasonable doubt, then you must make

5    a further finding as to the first element.  Specifically,

6    you must then find how much the contribution amount exceeded

7    the limit within two--within two monetary ranges that I will

8    provide to you on a special verdict form, namely, either (a)

9    two thousand dollars to twenty-four thousand nine hundred

10   ninety-nine dollars or (b) twenty-five dollars or more.  Do

11   not concern yourself with the reason for specifying this

12   range.

13       A contribution is any gift, subscription, loan, advance,

14   or deposit of money or anything of value made by any person

15   for the purposes of influencing any election--or any

16   election for federal office.

17       In addition, the law requires any contributions made by

18   the defendant, either directly or indirectly, on behalf of a

19   particular candidate, including contributions which are in

20   any way earmarked for or--or otherwise directed through an

21   intermediary or conduit to such candidate, as contributions

22   from the defendant to such candidate.

23       As to the third element of Count Four, the Government

24   must prove beyond a reasonable doubt that Congressman David

25   McKinley was a candidate for federal office, specifically

512

1    the United States House of Representatives, and that the

2    excess contributions were made to him through his designated

3    candidate committee, McKinley for Congress.

4        Fourth and finally, the Government must prove beyond a

5    reasonable doubt that the defendant acted knowingly and

6    willfully.

7        Any act is done knowingly if the defendant is aware of

8    the act and does not act through ignorance, mistake, or

9    accident.  You may consider evidence of the defendant's

10   words, acts, or omissions, along with all the other

11   evidence, in deciding whether the defendant acted knowingly.

12       An act is done willfully if the defendant acted with

13   knowledge that some part of his course of conduct was

14   unlawful and with the intent to do something the law

15   forbids, and again not by mistake or accident.  To establish

16   that the defendant acted willfully, the Government does not

17   have to prove that he was aware of the specific provision of

18   the law that he is charged with violating.  In other words,

19   a person acts willfully when he acts knowing that his

20   conduct is unlawful or with a bad purpose to disobey or

21   disregard the law, regardless of whether he precisely knows

22   which law or regulation makes his conduct unlawful.

23       Count Five.  There is no Count Five for you to consider.

24   You need not concern yourselves with the reason that there

25   is no Count Five.

1        Turning next to Counts Six, Seven and Eight.

2        Count Six charges that:  On or about October 15, 2012,

3  in the Northern District of West Virginia and elsewhere, in

4  a matter within the jurisdiction of the Federal Election

5  Commission, a department or agency of the United States

6  Government, the defendant, James L. Laurita, Jr. did

7  knowingly and willfully cause to be made a materially false,

8  fictitious, and fraudulent statement and representation, to

9  wit:  An October 2012 quarterly report filed with the FEC,

10  which falsely, fictitiously, and fraudulently stated that

11  contributions to Committee D came from the funds of

12  individual employees of Mepco, LLC and certain of their

13  spouses, when, in truth and in fact, as the defendant well

14  knew, the contributions came from himself through the funds

15  of Mepco, LLC.

16        Count Seven charges that on or about April 15, 2013, in

17  the Northern District of West Virginia and elsewhere, in a

18  matter within the jurisdiction of the Federal Election

19  Commission, a department or agency of the United States

20  Government, the defendant, James L. Laurita, Jr. did

21  knowingly and willfully cause to be made a materially false,

22  fictitious, and fraudulent statement or representation, to

23  wit:  An April 2013 quarterly report filed with the FEC,

24  which falsely, fictitiously, and fraudulently stated that

25  contributions to Committee A came from the funds of

1    individual employees of Mepco, LLC, and certain of their

2    spouses, when, in truth and in fact, as the defendant well

3    knew, the contributions came from himself through the funds

4    of Mepco, LLC.

5       Count Eight charges that on or about July 15, 2013, in

6    the Northern District of West Virginia and elsewhere, in a

7    matter within the jurisdiction of the Federal Election

8    Commission, a department or agency of the United States

9    Government, the defendant, James L. Laurita, Jr. did

10   knowingly and willfully cause to made a materially false,

11   fictitious, and fraudulent statement or representation, to

12   wit:  A July 2013 quarterly report filed with the FEC, which

13   falsely, fictitiously, and fraudulently stated that

14   contributions to Committee C2 came from the funds of

15   individual employees of Mepco, LLC, and certain of their

16   spouses, when in truth and in fact, as the defendant well

17   knew, the contributions came from himself through the funds

18   of Mepco, LLC.

19      Defendant has pled not guilty to these three counts.

20      The statutes defining the offense charged in Counts Six,

21   Seven and Eight.

22      Section 1001(a)(2) of Title 18 of the United States Code

23   provides, in part, that:

24      Whoever, in any matter within the jurisdiction of the

25   executive, legislative, or judicial branch of the Government

1    of the United States knowingly and willfully makes any

2    false, fictitious, or fraudulent statement or

3    representation, shall be guilty of an offense against the

4    United States.

5        Section 2(d) of Title 18 of the United States Code

6    provides in pertinent--in whole, that:

7        Whoever willfully causes an act to be done which if

8    directly performed by him or another would be an offense

9    against the United States, is punishable as a principal.

10       Causing false statement to Federal Election Commission,

11   Count Six, Count Seven, and Count Eight, elements of the

12   offense.

13       For you to find the defendant guilty of any or all of

14   Counts Six, Seven, and Eight of the indictment, the

15   Government must prove the following elements beyond a

16   reasonable doubt:

17       First:  The defendant made or caused another person to

18   make a false statement in a matter within the jurisdiction

19   of the Federal Election Commission;

20       Second:  The statement was material to the activities or

21   decisions of the Federal Election Commission; and

22       Third:  The defendant acted knowingly and willfully.

23       To establish the first element, the Government must

24   prove beyond a reasonable doubt that a false statement was

25   made in a matter within the jurisdiction of the Federal

1    Election Commission.

2        To establish the second element, the Government must

3    prove beyond a reasonable doubt that the false statement was

4    material to the Federal Election Commission - in other

5    words, that the statement had a natural tendency to

6    influence, or was capable of influencing, the agency's

7    decision--decisions or activities.  The false statement need

8    not have actually influenced the agency, and the agency need

9    not rely on the information in fact for it to be material.

10        To establish the third element, the Government must

11   prove beyond a reasonable doubt that the defendant acted

12   knowingly and willfully.  An act is done knowingly if the

13   defendant is aware of the act and does not act through

14   ignorance, mistake, or accident.  You may consider the

15   evidence of the defendant's words, acts or omissions, along

16   with all the other evidence, in deciding whether the

17   defendant acted knowingly.

18        An act is done willfully if the defendant acted with

19   knowledge that some part of his course of conduct was

20   unlawful and with the intent to do something the law

21   forbids, and again, not by mistake or accident.  To

22   establish that the defendant acted willfully, the Government

23   does not have to prove that he was aware of the specific

24   provision of the law that he is charged with violating.  In

25   other words, a person acts willfully when he acts knowing

1     that his conduct is unlawful or with a bad purpose to

2     disobey or disregard the law, regardless of whether he

3     precisely knows which law or regulation makes his conduct

4     unlawful.

5          Ladies and Gentlemen, that concludes my instructions for

6     you on the law.  The verdict as to the defendant must

7     represent the considered judgment of each juror.  In order

8     to return a verdict, it is necessary that each juror agree

9     to it.  Your verdict as to the defendant must be unanimous.

10         It is your duty, as jurors, to consult with one another,

11    and to deliberate with a view to reaching an agreement if

12    you can do so without sacrifice of conscientious conviction.

13    Each of you must decide the case for himself or herself, but

14    do so only after an impartial consideration of the evidence

15    in the case with your fellow jurors.  In the course of your

16    deliberations, do not hesitate to re-examine your own views,

17    and to change your opinion if you become convinced that it

18    is erroneous.  But do not surrender your honest conviction

19    as to the weight or effect of the evidence solely because of

20    the opinion of your fellow jurors, or for the mere purpose

21    of returning a verdict.

22         Some of you have taken notes during the course of this

23    trial.  Notes are only an aid to memory and should not be

24    given precedence over your independent recollection of the

25    facts.  A juror who did not take notes should rely on his or

1    her independent recollection of the proceedings and should

2    not be influenced by the notes of other jurors.

3        Remember at all times, you are not partisans.  You are

4    judges -- judges of the facts.  Your sole interest is to

5    seek the truth from the evidence in the case.

6        If it becomes necessary during your deliberations to

7    communicate with me, you may send a note through the Court

8    Security Officer, signed by either your foreperson or one or

9    more members of the jury.  No member of the jury should

10   attempt to communicate with the Court by any means other

11   than a signed writing, and the Court will not communicate

12   with any member of the jury on any subject touching the

13   merits of the case other than in writing, or orally here in

14   open Court.  Also, I will not give you transcripts of the

15   evidence or testimony adduced at trial.  You must make your

16   findings from the evidence as you remember it and let me

17   just move off the page for a moment, Ladies and Gentlemen,

18   we have no transcripts.  It's not that I would deprive you

19   of them if they were available, but we don't have any.

20       Bear in mind also that you are never to reveal to any

21   person -- not even to the Court -- how the jury stands,

22   numerically or otherwise, on the question of the guilt of

23   the defendant, until after you have reached a unanimous

24   verdict.

25       In addition, the local rules of this Court provide that

1    after the conclusion of a trial, no party, his agent or his

2    attorney shall communicate or attempt to communicate

3    concerning the jury's deliberations or verdict with any

4    member of the jury before which the case was tried, without

5    first obtaining an order of the Court granting permission to

6    do so.  This rule does not prevent you, the jury, from

7    communicating with anyone concerning your deliberations or

8    verdict, but merely governs the contact of you by other

9    persons involved in the trial.

10       Now, Ladies and Gentlemen, we'll stop there.  We're

11   going to take a fifteen minute recess to allow you to

12   regroup and to come back in and to hear the closing

13   arguments of the parties.  Upon the completion of those

14   closing arguments I will finish this last page of

15   instructions which tells you basically how to go about your

16   deliberations in the jury room.

17        Please understand that until you receive the case at

18   the conclusion of my final instructions after the closing

19   arguments, you cannot discuss the case among yourselves and

20   you cannot deliberate to a verdict.  This interval right

21   here is to allow you to have a rest and to be able to use

22   the facilities and to allow the parties to set up for the

23   closing argument.  All right.

24       So, again, do not discuss the case among yourselves and

25   please leave your charge and your notebooks face down on

1     your chairs.  When you come back we'll hear the closing

2     arguments and the next time you leave, you'll take the

3     charge and your notebooks with you.

4         Thank you for your attention and patience.

5         (Jury out 10:18 a.m.)

6             THE COURT:  Is there any objection to the charge as

7     I've communicated it to the jury to this point?

8             MR. DOUGLAS:  No, Your Honor.

9             MR. CARR:  No, Your Honor.

10            THE COURT:  All right.  Thank you.  The Court

11    stands in recess until twenty-five till eleven.

12        Oh, by the way, the jurors will be ordering menus to

13    have lunch delivered and we will be receiving their choices

14    from them, Debbie will.  That's the only communication with

15    the jury.  Thank you.

16            (Recess from 10:20 a.m., until 10:35 a.m.)

17            THE COURT:  Thank you.  Please be seated.  Are

18    there any matters to come before the Court?

19            MR. DOUGLAS:  No, Your Honor.

20            MR. CARR:  No, Your Honor.

21            THE COURT:  Thank you.  We can bring the jury in.

22        (Jury in 10:36 a.m.)

23            THE COURT:  Welcome back, Ladies and Gentlemen of

24    the Jury.  We'll now begin the closing arguments and as you

25    may recall from my preliminary instructions, because the

1   Government bears the burden in the case it has the right to

2   open and close the argument.  Mr. Douglas.

3           MR. DOUGLAS:  Thank you, Your Honor.

4           THE COURT:  You're welcome.

5                   GOVERNMENT CLOSING ARGUMENT

6           MR. DOUGLAS:  The Court has instructed you that it

7   is your sole interest to seek the truth of the evidence.

8   The truth of the evidence is that the defendant abused his

9   trust, the trust of his employees and the authority that he

10  had over them.

11      The Government has to prove beyond a reasonable doubt

12  every element of every offense in the indictment.  We're

13  going to take a look at those offenses.

14      The heart of the indictment is the charges of causes

15  contributions in the name of another, conduit contributions,

16  you've heard them called.

17      Count Two is for twelve--2012.  Count Three for 2013 and

18  then there's excessive contributions and the false reporting

19  charges.

20      We're going to start with the conduit contributions.  As

21  you've heard, there are four requirements of proof.  The

22  burden is on the Government.  The first is the defendant

23  caused contributions of at least two thousand dollars.  Well

24  we know in this case we're talking about hundreds of

25  thousands of dollars in contributions.

1          Second is that the person named as the contributor was

2     not the true source of the money.  We've heard what the

3     true source of the money was.  We've heard it from all eight

4     of the executives.  It was from Mepco and we know the

5     defendant is aware of this because he was causing the money

6     to be advanced to them or reimbursed to them.

7          We heard from the case agent on number three that the

8     contributions were made to a candidate for federal office

9     through a designated campaign committee.

10         And finally must prove certain states of mind.

11    Knowingly and willfully these actions were committed.

12         Now as you can see already here on the bottom what's not

13    required?  Evidence of coercion.  Evidence of

14    involuntariness is not required.  So when you're shown an

15    e-mail that says--from Karen Hughes, if you would like to

16    contribute, it does not relate to the law.

17         But I also want you to think about it in this way as

18    well.  Put yourself in the shoes of Rick Usery.  He was the

19    one who missed that initial meeting.  He was on vacation.

20    He's coming back from vacation, getting back to work, finds

21    out we're going to have to start making campaign

22    contributions.  He didn't feel comfortable, he told you.  He

23    does not feel comfortable so he shared his reservations with

24    the defendant and the defendant told him, well that's just

25    the way it works.  We need access to politicians for our

1    company.  So imagine Rick Usery receiving an e-mail saying

2    if you would like to contribute.  Do you think he thought,

3    did the boss change his mind already?  Did the boss change

4    his mind?  Now I don't have to make these contributions.

5        And then you've heard this one for one accounting that

6    we have to take out a cup of coffee at McDonald's.  We know

7    the money was put there for this purpose.  We don't have to

8    try to follow every dollar in through the bank account.

9    There's no requirement of that.

10       Let's get into what the evidence did reveal.  First of

11   all, what was common completely through all eight of

12   executives.  They testified that they made the contributions

13   with Mepco money through advancements and reimbursements.

14   They testified that they would not have even made the

15   contributions if not for the funding from the company and

16   you heard them reject, all of them, the suggestion that the

17   second bonus was additional compensation.  They testified

18   they never used the second bonus to pay personal expenses.

19       Now let's talk about the specific perspectives of each

20   of the executives and what they testified.  Karen Hughes,

21   the first witness, the secretary and treasurer.  Known the

22   defendant for forty years, said there was a direct

23   correlation between the second bonus and the contributions.

24   She was the one keeping the spreadsheets.  Now do you think

25   that Karen Hughes, who's known the defendant for forty

1    years, is going to go rogue and start keeping spreadsheets

2    if she's not doing what her boss is asking her to do?  Do

3    you think Karen Hughes, who's known the defendant for forty

4    years, would misunderstand what the defendant was asking her

5    to do?  She told us she received all of her instructions

6    from him.  She's the one that would go to him to ask what

7    the amount was.  She would receive those instructions.

8    You even saw her understanding from again communications

9    with the defendant when she wrote an e-mail to Kevin O'Dell

10   telling him that the money is not yours.  It's not yours.

11   Save for future contributions and on two occasions she asked

12   him to delete e-mails.  Again is this Karen Hughes just

13   going rogue on her own, acting on her own accord?

14        And then you'll see an e-mail where the same person,

15   Rick Usery, is asking her about a fundraiser.  Is this one

16   of those we're expected to attend and with a check?  She

17   said she's relatively certain about the check but she'll

18   find out about the attendance and she told us she was

19   relatively certain about the check because of communications

20   with the defendant and that she would find out about the

21   attendance through the defendant.

22        Kevin O'Dell, he told us the defendant called a meeting

23   and told the executives that they would be receiving a bonus

24   that they would then use to make the contributions.  He told

25   us the defendant did not tell him that the bonus was meant

1    to bring his pay up to speed.  You did hear that claim that

2    this bonus program was just to bring their pay up to speed.

3    This bonus program was about raising their earnings.  We saw

4    in the e-mail of 1-62 that he received a push from the

5    defendant.  He also told us the defendant asked, I did what

6    he said

7        Osborn.  Again, someone else, not my money.  The context

8    of that was he was asked, what did you think when the second

9    bonus stopped?  Did you complain?  He said no, it's not my

10   money and he told us what was his money, the salary

11   payments.  He also told us he made the contributions because

12   he was not concerned about losing the money.  That's because

13   they all knew that they wouldn't be out money.  They all

14   knew they would be made whole.  He also told us he never

15   decided which candidate.  He was always told.

16       Rick Usery told us what I've already discussed with you

17   and what's interesting there is the defendant testified that

18   no one told him they did not want to participate.  Isn't

19   that what Rick Usery testified that he was doing?

20       And then we have next, Kent Lindsay and Eric Grimm.

21   Kent Lindsay told the--said the defendant told the

22   executives that they would contribute and be reimbursed and

23   again which candidate and Mepco would pay for it.

24       You got to ask yourselves in this case, we've got all

25   eight executives testifying.  What motive did they have to

1    tell you a mistruth?  What motive does the defendant have?

2        Eric Grimm, when asked why he forwarded one of these

3    fundraising invitations on to the defendant said because it

4    was up to the defendant to decide whether to contribute.  He

5    also told us he would not have contributed to Critz without

6    running it by the defendant and then lastly on that Critz

7    donation, the defendant himself in this e-mail says that

8    Hughes would adjust Eric Grimm's account, adjust the

9    account.  If this was for compensation why are we talking

10   about adjusting the account?  We're adjusting it based on

11   the donations.  The account, the second bonus was for the

12   donations.

13       Polce, the last executive to testify, told us the

14   program was the defendant's program.  He said he went with

15   what the defendant or what he, the defendant, wanted him to

16   do and remember it was Polce who did not even want to

17   support Senator Manchin and when it was asked, well why did

18   you?  He said I did what the man, meaning the defendant,

19   asked him to do.

20       Let's talk about the other evidence.  This Court told

21   you you can consider circumstantial evidence.  Circumstances

22   are important.  At the start of this program Mepco had taken

23   out a loan for over one hundred million dollars for a two

24   billion project.  The project was behind.  You heard from

25   the defendant, if Longview didn't run, Mepco wouldn't run,

1    and that that would be the end of Mepco.

2         You heard that the defendant started Mepco with his

3    siblings.  They sold out their interests leaving him as the

4    only Laurita involved.  You heard that he was the president,

5    CEO, part owner.

6         Then you heard from his testimony that GenPower, the

7    company above him, suggested that he become more politically

8    involved so if you look here you have financial stress,

9    family stress, responsibility and stress from above your

10   head.  That is what was happening at the start of this

11   program.

12        Then you have to look at the group he approached with

13   this idea.  He had hired them.  He had promoted them, only

14   one of them had ever given campaign contributions.  None of

15   them were familiar with the laws and they all trusted him.

16        You heard that he didn't inform GenPower, that was his

17   parent company, First Reserve which had given him the

18   hundred million dollars or the auditor that was conducting

19   annual audits and with regard to GenPower and First Reserve

20        You heard Karen Hughes talk about these weekly

21   statements.  They didn't indicate that the bonus was for

22   campaign donations and you heard the defendant say they have

23   a sixty million dollar annual budget.  How is anyone

24   providing oversight over finances going to find five hundred

25   thousand dollars of campaign contributions in a sixty

1    million dollar budget?

2        Now we get to the knowledge that the defendant had about

3    campaign laws.  First we'll start with what he told us.  He

4    told us that he knew about the individual limitation, an

5    individual can only contribute so much.  He told us that he

6    knew that Mepco could not contribute and he also told us

7    that he knew about the conduit contribution prohibition.

8    The way he described it was he knew you couldn't just give

9    someone let's say a hundred dollars and say go give that to

10   Senator Manchin's campaign.  He said he knew that was

11   unlawful but that causing a bonus to be deposited into

12   someone's account and having them go give it to Senator

13   Manchin's campaign, he didn't know that was unlawful.  This

14   is not credible.

15       You didn't leave your common sense outside the courtroom

16   and you're actually instructed to use common sense.  The

17   Court instructed you that the evidence should be considered

18   and viewed by you in the light of your own observations and

19   experience in the ordinary affairs of life.

20       That he, a college educated professional, successful

21   businessman, running businesses, really thought well as long

22   as I don't just hand somebody a hundred dollars that should

23   be okay but you have to consider other discrepancies as the

24   Court instructed you, discrepancies in testimony.

25       You recall that from the beginning of the defendant's

1    testimony to the end things changed.  First he said he

2    started the program so that he could the executives more

3    money.  By the end he said he started the program because

4    GenPower asked him to be more political.

5        At the beginning he said I'm just trying to pay them

6    more money.  That was the purpose.  At the end he said well

7    the bonus was connected to the contributions.

8        So how can you believe the defendant if even in the

9    midst of an hour he changes on these two things.  They're

10   kind of important.

11       Let's also look at the mechanics of this briefly.  The

12   first bonus payment March 9, 2010.  What led up to it?

13   March 5, 2010 is when the meeting happened.  March 6, 2010

14   defendant himself is sending out an e-mail already talking

15   about suggested campaign donations.  March 9, 2010, the same

16   day as the deposit, Polce, his wife is writing the check

17   suggested to be written.  March 10th, more checks.  March

18   11, another check.

19       There's a direct correlation between receiving the money

20   and the checks immediately going out and if this was

21   compensation it seems quite coincidental that the very day

22   he wants to pay them more money is the very day they started

23   making campaign contributions, especially when you heard

24   that other than one of them none of them had ever made a

25   campaign contribution.

1          2011.  Bonus payment, March 17.  You see first Polce

2     jumped the gun there one day ahead of the bonus.  Does that

3     mean that the bonus didn't fund the March 16th check because

4     it came in the day after?  His five figure, meaning ten

5     thousand dollars or more, bonus payment didn't fund these

6     two twenty-five hundred dollar checks?  They were advanced.

7     They were reimbursed.  They all said the money came from

8     Mepco.

9          We jump to 2013 because in 2011 the advancement was so

10    large that it lasted through 2011 and 2012.  You can see

11    that in Karen Hughes' spreadsheet which is Exhibit 52.

12         The last bonus in the program March 14, 2013, you also

13    start to see here the correlation between the contributions

14    and the fundraisers hosted by the defendant.  Again one of

15    the executives made the checks out the day before.  That

16    does not mean that they weren't funded by the bonus payment.

17         Regarding those special interrogatories, special

18    questions regarding the amounts, in regard to Count Two

19    which is for 2012, there's more than twenty-five thousand

20    dollars in conduit contributions.  Manchin alone was forty

21    thousand dollars in April.  Snuffer eight thousand in

22    September and you can look for yourself in the exhibits and

23    see the campaigns reporting of what they received from the

24    executives and again you've heard from the executives that

25    all of the contributions they made were part of the program.

1           Count three, also more than twenty-five thousand

2    dollars.  Again just one candidate was more than twenty-five

3    thousand dollars, let alone when you add them together.

4           Count Four is also mentioned here because it is charged

5    that the McKinley contributions were excessive.  That means

6    once you determine that these were conduit contributions,

7    they were his contributions so they are attributable to him

8    and his individual limitation and you have to determine the

9    excess.  The reason why it is twenty-six thousand dollars,

10   and this will be the only math that you will have to do, is

11   that he did make a twenty-six hundred dollar contribution

12   himself to the McKinley campaign and he could have made an

13   additional twenty-six hundred dollars so you must subtract

14   that off and that is what the excess is because twenty-six

15   hundred dollars was the individual limitation for the

16   primary election in May here.

17          Let's talk about those FEC reports.  Here three

18   requirements of proof.  The defendant caused another person

19   to make a false statement in a matter within the

20   jurisdiction of the FEC.  The defendant is the originator

21   and the controller of the program and he is causing them to

22   make contributions.  You heard that he knew that the FEC

23   was--or that the campaigns were receiving the information

24   from the candidates and from the contributors and it

25   included the name and the amount.  You heard from the agent,

1    Special Agent Lafferty, about the FEC and what they're meant

2    to do, which is to try to bring transparency to the election

3    process, specifically the money that is influencing the

4    election process.

5        Number two:  The statement was material to the

6    activities or decisions of the FEC.  Also based on the

7    testimony of the agent, and this has been proven and we will

8    get again to the state of mind.  He again has to act

9    knowingly and willfully, which we have proved and we'll talk

10   about that.

11       We'll start with the defendant's own testimony.  He

12   testified that he knew that it was unlawful for someone to

13   cause another person to make a false state to the

14   Government.  He knew the committees or the candidates filed

15   reports with the Government.  He knew that the campaign

16   committees were reporting the names of the executives and

17   spouses.  In fact there's evidence that he provided names

18   directly to some of the campaigns and he of course knew that

19   Mepco was paying the executives the second bonus so that

20   they could afford, as he put it, to donate.

21       And let's just take a look here at some examples from

22   Exhibit 38 which was Capito for West Virginia FEC report.

23   If you look at the top right you see Eric Grimm and its

24   mentioned his employer is Dana Mining.  If you are not

25   intimately aware of the organizational structure of Mepco

1    you have no idea that Eric Grimm is even connected to Mepco,

2    let alone that Mepco was funding this contribution.

3         And it's even more stark when you look at these spouses

4    that were involved.  When you look at Lory Osborn and you

5    see WVU.  Oh, that's just another WVU employee making a

6    contribution.  There is no indication whatsoever to the

7    committees, to the candidates, to the Government and to the

8    public who is trying to influence the candidate through this

9    contribution.

10        Now you heard and you will see in the instructions the

11   indictment mentions Federal Candidate I, Committee A and so

12   forth.  The evidence has shown that this is what correlates

13   to those references.  The reason why it was referenced in

14   that way is because you've heard no evidence that the

15   candidates or the committees knew that Mepco was funding all

16   these contributions, knew the defendant was causing Mepco to

17   fund all these contributions.

18        You heard that the defendant did not tell them.  You saw

19   how much he communicated with them.  You how some of them

20   believed that he was raising the money, sending him

21   spreadsheets saying here is who you raised from in the past.

22   That's not true.  He was not raising the money.  That's if

23   you ask somebody make a contribution and they make it with

24   their own money, not when you're giving them a pool of money

25   and asking them to donate, especially your subordinates.

1     Also in Count One you'll see that it's just generically

2   mentioned when it was read to you.  Mepco employee, spouse

3   of Mepco employee.  That was done in that matter because of

4   the privacy of those individuals and of course as rightfully

5   so, they came in and testified.  These are those individuals

6   referenced and you can find it in their bank records and in

7   the FEC reports.

8     This case really comes down--it's been narrowed.  It's

9   been narrowed.  It's very simple issues.  We make it sound

10  very confusing, but it's really very simple.  You have eight

11  people saying the thing happened this way.  I understood it

12  this way from a meeting with the defendant.  I've known the

13  defendant for forty years.  That's how it happened.  This

14  was the purpose of the program.  This is how it was funded

15  and this is what we were supposed to do.  It was not

16  compensation and then on the other end you have the

17  defendant telling a completely different and opposite story.

18  This was compensation.  We bring in these one for one dollar

19  accounting.  You don't have to go back there, okay, and put

20  on your accounting hat and start looking at the bank

21  statements and crossing out Lowe's, McDonald's.  They told

22  you that they made contributions with Mepco money and they

23  would not have done it without the Mepco money.  That is

24  what a conduit contribution is and you cannot believe his

25  literal interpretation that as long as I am not giving

1  someone a hundred dollar bill and saying go give this to

2  Senator Manchin, it's okay.  So it was okay that I gave

3  hundreds of thousands of dollars to my employees and told

4  them to give it to Senator Manchin and other candidates.

5  That's just not appropriate.

6      Because you have to ask yourself, what motive do these

7  executives have coming in and telling you something that's

8  not true?  None.  None.  You saw how uncomfortable they

9  actually were, didn't you?  Karen Hughes, she's knowing him

10  for forty years.  They actually were talking about how they

11  had trusted him, how he had never steered them wrong.

12      He had never been in that situation before, a hundred

13  million dollars, two billion dollars.  Think of those

14  circumstances.  Pressure makes people do things they

15  wouldn't normally do.  He never steered me wrong before.  He

16  had never been in this situation before.

17      And then you have to compare that to the motive that the

18  defendant has to tell you something that's not true.  He's

19  the one sitting at the defense table.  He's the one charged

20  with crimes.  But, again, don't leave your common sense to

21  the side.  You have to look at the evidence through your

22  experience.

23      He got what he wanted too, didn't he?  He got the

24  access.  Oh, Congress McKinley said something about climate

25  change.  I better give him a call.  Oh, I'll put out a press

1    release.  Well he'd given him eighty-eight thousand dollars

2    in three years.  You can check the FEC reports.

3        At the end of the day the Longview Power Plant did not

4    fail because of the war on coal, but because of construction

5    defect.  You heard Charlie Huguenard tell us that.

6        You heard--you were instructed by the Court that you

7    were the judges of the facts and that it is your duty to

8    apply the facts and the law.  You would not be keeping that

9    duty if you said, well he was just trying to fight the war

10   on coal so we'll just go ahead and let him off.  That is not

11   your duty.  That would be against your duty and your oath.

12   It doesn't matter why he did it.  What matters is what he

13   caused his subordinates to do.  What matters is he knew that

14   it was wrong.  What matters is he did it anyway.

15       We're asking you to consider the evidence, consider it

16   through your experience and common sense, weighing the

17   credibility of the witnesses.  We ask you to find him guilty

18   as charged.

19             END OF GOVERNMENT'S CLOSING ARGUMENT

20             THE COURT:  Mr. Carr.

21             MR. CARR:  Thank you, Your Honor.  May I approach?

22             THE COURT:  You may.

23                 DEFENDANT'S CLOSING ARGUMENT

24             MR. CARR:  Ladies and Gentlemen of the Jury, as I

25   did start off in opening statement, the first thing I want

1    to do is thank each one of you for being here this week.

2    The case came in a little bit quicker than we expected,

3    certainly shortened the scheduled that we expected and the

4    parties apologize for the release yesterday after you having

5    traveled all this way.

6        But again, you all being here this week is just critical

7    to the foundation of our justice system in America and the

8    defendant's right to a jury of citizens like you to

9    determine whether these very serious allegations brought by

10   the Government have actually been proven beyond a reasonable

11   doubt and as the Court instructed you, the indictment and

12   these allegations are merely allegations. They have to be

13   proven.

14       The case obviously has involved campaign finance law.

15   We said it from the beginning and it's probably obvious from

16   the discussion, we do not--these are things--individual

17   campaign maximums, general and primary elections, PACs,

18   whether corporations can give whether that's LLC or a

19   corporation, it's not something that's easy. It's not

20   something that is intuitive and I suggest to you that the

21   simplistic view that the Government has put before you as a

22   theory is not reasonable and it's not accurate given the

23   facts of this case.

24       I want to say one other thing too just to start out

25   before we get into the facts of the case. It seems that

1    throughout this trial our elected officials have been

2    referred to as quote "politicians", trying to get access,

3    money being funneled to them.  There is nothing seedy with

4    giving campaign contributions within the law to individuals

5    who are running for elected office.  Within the law it is

6    actually a right guaranteed in the Bill of Rights to the

7    Constitution of the United States.  The individuals that

8    we're referring to as quote "politicians" are two sitting US

9    Senators from this State and Congressman.  There is nothing

10   seedy with giving them donations, or for that matter,

11   wanting to be able to get access to explain to them things

12   that are important to you, your family, the industry, and to

13   your company.  There is nothing wrong with that.  People may

14   disagree with how the American political system is but that

15   is how it is.

16       A few instructions that I would like to just briefly

17   reference.  The first one is on page ten, other acts of the

18   defendant.  I would suggest to you that this has been

19   included solely because of contributions to state

20   candidates.  It's not that it's some other alleged crime

21   that someone has committed but the state candidates are not

22   in the indictment.

23       Another instruction is from the Court, opening

24   statements and closing arguments by counsel are not

25   evidence.  I ask each one of you to rely upon your memory

539

1    and your notes as to what the witnesses on the witness stand

2    actually said.  There are no transcripts.  Counsel don't

3    have transcripts.  I would suggest to you that some of the

4    statements that have been made summarizing what witnesses

5    have said are not accurate.

6        Mr. Usery, he said that he did not feel comfortable

7    giving to politicians period.  He didn't like it but that

8    the quote "program" was explained to him and he agreed

9    because he thought it was necessary and the right thing to

10   do.

11       Mr. O'Dell, there was a quote on that screen, quote

12   "pushed" to try to get that donation in, a push.  He didn't

13   use that word.  Counsel asked him a leading question, so

14   this was a push and he said yes.  He didn't use the word

15   push.  We'll look at that e-mail here in a second.

16       I can never pronounce his name right, Polce, P-o-l-c-e.

17   He said he didn't generally like to give to campaigns, but

18   again he agreed to make a donation because he felt it was

19   necessary.

20       There also--there wasn't a number of a sixty million

21   dollar budget for Mepco.  Jim testified, it's a sixty

22   million dollar payroll.  The budget's a lot more than that.

23       And Jim Laurita from four years ago until the time he

24   walked off that witness stand has never changed his

25   testimony about anything.  He said the program from the

1    beginning was to increase political donations, political

2    presence but to do so he was going to increase compensation

3    for his executives.  There was nothing that changed from the

4    beginning of his testimony to the end.

5        Another thing I just want to briefly call your attention

6    to is the definition of reasonable doubt and again most

7    people know this.  The defense has no burden whatsoever,

8    none.  We don't have to present any evidence, no testimony,

9    nothing.  The burden is on the Government beyond a

10   reasonable doubt.  It's the highest burden known to the

11   justice system, to our legal system and it's that high for a

12   reason because the evidence needed to convict someone of a

13   crime, and it has been determined over time, is to be that

14   high.  A doubt based upon reason and common sense and if

15   they have not eliminated all doubt based upon reason and

16   common sense then you must return a verdict of not guilty.

17   As the instruction states, there can be no other attempt by

18   the Court to define that term.

19       This is page twenty-eight of the instructions.  I

20   believe that the definition of willful is word for word the

21   same throughout the indictment--or excuse me, throughout the

22   jury instructions.  I just used page twenty-eight because we

23   all need to look at one page.  Every one of these offenses

24   has to be done willfully.  There's a whole lot of other

25   elements.  They are also very important but for the moment I

1    want to focus on willfully.  When you go back for

2    consideration you have to, in order to find Mr. Laurita,

3    Jim, guilty beyond a reasonable doubt as to each element.

4    An act is done willfully if the defendant acted with

5    knowledge that some part of his course of conduct was

6    unlawful and with the intent to do something the law

7    forbids, and again not by mistake or accident.

8        Jim Laurita had to know that what he was doing was

9    unlawful.  That's a very clear distinction.  That does not

10   read or should have that something was unlawful.  He has to

11   know it was unlawful.  There is no direct evidence of that

12   whatsoever.  I suggest to you that what the Government has

13   tried to do is to expand, stretch a number of topics well

14   beyond any reasonable doubt to support a conclusion that Jim

15   thought he was doing anything unlawful.

16       Oh, but there's an attempt to hide this program.  There

17   was an attempt to hide it, the Government says.  What do

18   they point to?  Two e-mails from Karen Hughes in which he

19   says, please delete.  Of the thousands of pages of e-mails,

20   there's two of them in which Karen Hughes says delete?  And

21   what did she testify?  Jim didn't tell me to do that.  I did

22   that.  I don't know why I did it specifically as to those

23   e-mails and they weren't deleted.  We saw them.

24       This program was openly discussed among the executive

25   team.  Openly.  There were discussions about it nearly every

542

1    week.

2         No documents in Mepco, they say, indicated that that

3    bonus was for fundraising.  Government Exhibit 1-66,

4    fundraising compensation.  2011 fundraising compensation

5    through August 31st.  It wasn't being hid.

6         This quote "second bonus" was in the payroll system, was

7    in the computer system just like all other compensation.

8    Oh, but it was called bonus.  It was labeled bonus, the

9    Government says.  Tried to hide it.  That's not what Karen

10   Hughes told you.  It was put in, keyed as a bonus because

11   that was the only way to put it in the computer system.  It

12   wasn't an effort to hide it.  That money was put in.  Taxes

13   were taken out, Social Security, contributions to 401(k)

14   program, just like all other compensation that was paid to

15   the executives.

16        You know what there isn't in this case?  Cash envelopes.

17   Here guys.  Here's forty thousand dollars we're going to use

18   this year for political donations.  Everybody meet in the

19   parking lot after work.  We're going to talk about this.

20        You might have thought when you first heard that we were

21   dealing with campaign contribution violations there must

22   have been a whistle blower.  Somebody must have called law

23   enforcement, the FBI and said, listen, I know this is going

24   on in this company.  I told them you can't do this.  They

25   won't listen to me.  Maybe one of the execs told Jim, hey,

1    me and my wife, we have some concerns about this.  We think

2    maybe this isn't legal.  Nothing of the sort.  For three

3    years this went on.  The execs all said the same thing.  We

4    had no idea that there could be any accusation that any of

5    this was unlawful.  Jim told you the exact same thing.  No

6    idea.

7       The program ended, as we're calling it, completely

8    voluntarily.  It appeared the company was going into

9    bankruptcy and it stopped.  Nobody discovered it and called

10   the police.  That isn't what happened.

11      Oh, but this was not discussed.  We didn't want this

12   discussed outside the executive group.  The program was only

13   to be discussed with the executive team.  You heard from

14   Karen Hughes and others, all executive compensation was held

15   confidential.  All of it.  The second bonus wasn't treated

16   any differently.

17      Even Suzanne Crane, Jim's Executive Assistant, access to

18   his e-mails, a lot of personal information, had no idea how

19   much the executives were being paid; had no idea how much

20   Jim was being paid.  Not uncommon.  Not uncommon in

21   companies across this entire country.  Executive

22   compensation is not discussed.  Right, wrong or indifferent,

23   also certainly around hourly workers, to include miners.

24      Oh, the Government said, these contributions were being

25   bundled.  They're all being put in an envelope.  Someone

1   from the campaign is either coming to get them or they're

2   being taken to the fundraisers.  They are not being left

3   out--outside near the trash bin for somebody to come pick

4   up.  You heard Bill Raney say that's how the campaigns want

5   them.  They want you to hand them an envelope with the

6   checks in it.  They don't want to have to go around

7   convincing people.  Same thing Consol and Alpha were doing.

8   Consol did fundraisers.  Same thing that happened across the

9   country, nearly every fundraiser.  Jim Laurita thought he

10  was doing merely the exact same thing.

11       Again, all eight execs said exactly the same thing.  We

12  had no idea that there could be anything wrong with this.

13  Nothing.  Jim Laurita also had no idea there could be

14  anything with it.

15       They mentioned that people weren't told about it.  The

16  board wasn't told about it.  Ernst & Young and the other

17  auditors and consultants weren't told about it.  It was open

18  in the system. It was in the financial system.  Jim told

19  you, he can raise salaries, base salaries and give

20  discretionary bonuses.  He doesn't need board approval.

21  There wasn't any effort to hide it from the board.  Jim's on

22  the board.

23       Ernst & Young, the auditors, they went through the

24  entire financial system.  It's just the case no one said I

25  see that there's a second bonus here, what's it for?  Jim

1   told you, I never told anybody.  I didn't deny it.  If they

2   asked, I would have certainly told them.  I didn't think

3   there was anything wrong with it.

4        The execs also, nobody ever told us to deny anything.

5   Nobody told us to delete information, destroy records,

6   nothing.

7        If, when the program ended, and it did involuntarily,

8   the evidence came in the case and Jim thought there was

9   something that could possibly be wrong with it, wouldn't he

10  erase it from the company?  No.  Nobody thought there was

11  anything wrong with it.  Jim had not a single clue that

12  anyone could make an accusation there was anything wrong.

13       It's interesting.  The Government's presentation is that

14  the case isn't about voluntary--whether things are

15  involuntary and I would suggest to you they spent a good bit

16  of the first part of their closing argument talking about

17  whether it was voluntary or not.  Were these donations

18  mandatory or were they suggestions which the executives

19  could or could not agree to do and I submit to you that just

20  because the execs didn't do something before or after or

21  didn't necessarily look forward to going to fundraisers

22  doesn't mean that it's not voluntarily and I would ask each

23  of you to think of times or things in your personal lives

24  where you did something for a period of time, not before or

25  after, even though you didn't necessarily look forward to

1    it.  It doesn't make it involuntarily.  Because also

2    important, Jim didn't enjoy giving donations or going to

3    fundraisers either.  He preferred to be running a coal

4    company.

5         The Government seems to make--I won't use that word.

6    The Government seems to kind of just assume that it be very

7    dismissive about this question of it being Mepco money.  It

8    was a critical part of the indictment that this was Mepco

9    money.  I suggest to you that that is not as simple as

10   perhaps the Government has suggested.

11        Almost all of the compensation, all the money, income

12   that the executives got, that were in their bank accounts

13   came from Mepco.  Almost all of it.  Mepco got its money

14   from Allegheny Power.  All of it.  At what stage does

15   Allegheny Power's money become Mepco's money and at what

16   point does Mepco's money become O'Dell's money?  It's not as

17   clear, again I suggest, as the Government would have you

18   think.

19        Let's take for instance, everything that happened with

20   the donations.  Eliminate the second bonus.  The second

21   bonus never happened.  Jim has a meeting, says, hey, you

22   guys all--you guys think this is the right thing to do?  Is

23   this what everybody wants to do?  Everybody says yes.  Kevin

24   O'Dell says here's a check for fifty dollars to give to Joe

25   Manchin.  All his money comes from Mepco.  Is that his money

547

1   he gave or Mepco money, because Mepco gave it to him?

2       If a lawyer has a secretary who he knows wants to go to

3   a private school--put the daughter in a private school and

4   the lawyer says I'm going to give you a bonus.  You work

5   very hard.  It's important for my office.  I'm going to give

6   you a bonus that at least covers the tuition for your

7   daughter's private school.  I'm not going to keep track

8   dollar for dollar.  You're worth it.  Daughter's never been

9   in private school before.  Leaves the office next year.

10  Daughter no longer goes to private school.  Did the lawyer

11  pay for the school?  Is it that clear cut?

12      Kevin O'Dell may have said it best when we brought his

13  credit card statement back up and I pointed out that

14  McDonald's purchase and I said did Mepco buy your

15  McDonald's?  You may remember he hesitated and said, I see

16  your point.

17      What's very important in the case is not necessarily

18  what the executives thought as to whose money it was,

19  whether it was their money or Mepco money.  No one provided

20  an explanation as to when they thought something was theirs.

21  They just were answering the Government's question, who

22  ultimately paid for that, Mepco.  That would be true of

23  everything on the credit card statement.  Who paid for that?

24  Mepco did.  What's important is Jim thought, considered,

25  firmly believed, honestly believed it was their money.  It

1   was their compensation.

2       This is Government Exhibit 18-8.  Jim explained to you

3   from the stand--I want to say this right here again.  Jim

4   had absolute, constitutional Fifth Amendment right not to

5   take the stand.  He did and for the first time he was able

6   to tell people--never been interviewed, never even been

7   requested to be interviewed during this entire

8   investigation, what he did and why he did it and he

9   explained to you.  He read that.  He read that:  That no one

10  has advanced you funds for the purpose of making this

11  contribution and that no one will reimburse you for it and

12  he explained that is not what I thought was happening.  That

13  is not what I considered the second bonus to be.

14      We're dealing with a situation that is not as clear cut

15  as many other examples.  We're talking about an employer

16  with an executive team where all of the funds come from the

17  company.  We are not talking about someone giving to someone

18  walking along the street.  Jim never ever talked to the

19  miners about making donations.  Hey, guys, come over here

20  tomorrow morning.  You need a hundred dollar check to

21  Governor Manchin.  I'll have a hundred dollar bill for you.

22  Didn't happen.

23      We're not talking about somebody who brings all the

24  people in the neighborhood together and says, listen,

25  everybody show up tomorrow.  Don't worry about it.  Bring a

1    thousand dollar check for Senator Capito and I'll have the

2    money for you.

3        We're talking about an employer.  He said I didn't

4    consider that's what I was doing at all.  I know, if it was,

5    okay everybody, give me your check for McKinley, here's your

6    money, and I won't give it to you until I get the check.

7    That's just simply not what happened.  Jim did not think

8    that he was violating anything.

9        Every donation, request for a donation, that came from

10   Jim, Jim of course got his recommendations for the most part

11   from the West Virginia Coal Association.  They were

12   suggestions.  The number one rule Jim told Karen when this

13   started--the number one rule, this is not to be mandatory.

14   No one is required to do this.  I don't want that said.

15       All eight execs said, we were never told it was

16   mandatory.  It was requested and there were suggested

17   amounts.

18       Government Exhibit 1-92.  The Government referred to it

19   in their closings.  Conversation between Eric Grimm and Jim.

20   In essence I was only going to have Betty, his wife and I,

21   and I believe that's you and Cheryl give to Critz the

22   attached.  If you agree with that, Karen will take care of

23   adjusting your account.  If you think we need a different

24   strategy please advise.

25       If this program was run as the Government has tried to

1   represent to you, that e-mail would say, this is the amount.

2   I would like the check in my office tomorrow and don't

3   forget, Eric, I hired you; I promoted you; I can demote you;

4   and fire you.  I hope you brought your checkbook to work.

5   That's not what happened.  If you agree, please advise.

6        Government Exhibit 1-62.  Who's keeping track of

7   donations to campaigns?  The campaigns.  This is from the

8   McKinley campaign.  Kent Lindsay.  Mr. Courtland.  Kevin

9   O'Dell.  Kevin said the only thing he heard from Jim about

10  this is this e-mail.  Kevin, any help moving your donation

11  along would be appreciated.  Thanks for your help.  Did Jim

12  storm in his office and say what part of this don't you

13  understand?  You said you were going to do this.  Don't

14  leave work until it's done.  Don't forget I hired you.  I

15  promoted you.  I can demote you and fire you.  What part of

16  this don't you understand?  No.  Hey, any help moving your

17  donation along.  Kevin said that's all I heard.  This is the

18  example where the Government used the term, oh, so he gave

19  you a push.  Kevin said yeah.

20       Defendant's Exhibit A.  Karen Hughes to Brian Osborn.

21  The yellow highlights are those donations I have not yet

22  received from you.  If you intend to make these

23  donations--those donations, please fill in the amount and

24  return to me.  Karen Hughes is supposed to be administering

25  the program, kept a spreadsheet, which by the way, Karen

1    says you doesn't remember ever showing to Jim, Jim didn't

2    know that she was keeping it, but these are the

3    donations--if you intend to make those donations, please

4    fill in the amount and return to me.  Does that sound like

5    the program was being run as the Government has represented?

6        Brian, you're supposed to make these donations.  I'd

7    like to know why you haven't yet.  Jim wants to know why you

8    haven't yet.  You should understand what this is, not quite

9    sure what part of the memo you didn't.  Don't go to lunch

10   until I have a check on my desk because Jim's leaving for

11   the fundraiser tonight.  If you plan on making those

12   donations fill it out and let me know.

13       Defendant Exhibit B.  She said the same thing to Kent

14   Lindsay.  If you intend on making the donations let me know.

15       You can look at Government Exhibit 52.  Some people did

16   give to the candidate that was suggested, recommended.  Not

17   surprising, candidates who were suggested are pro coal and

18   in the amount.  Some did.  If you look at Eric Grimm's

19   mid-year section of his spreadsheet for Oliverio, this whole

20   issue of the e-mails about four checks and a thousand

21   dollars and whether he's giving to Oliverio or McKinley, you

22   all remember that discussion.  Those two were running

23   against each other.  The Coal Association had endorsed

24   Oliverio.  Eric Grimm didn't like Oliverio, didn't think he

25   was going to be strong enough for coal once he got to

1    Congress.  Eric Grimm didn't make those donations to

2    Oliverio.  A lot of people did.

3        Jim told you he had a meeting with them and Eric Grimm

4    said I don't like Oliverio.  Jim said do whatever you think

5    is right.  Didn't make the donations.

6        And for some of the execs there's some pretty deep

7    disparity as to who gave to who.  But it wasn't mandatory.

8    Jim didn't want it to be mandatory.  You  make your

9    decision.  All agreed that it was the right thing to do and

10   that they would support candidates.  Had any one of them

11   said I don't want to do this, it wouldn't happen.  Even one.

12   It wouldn't have been the other seven who would continue to

13   do it.  It would shut off.  It was done as a team.

14       The Government kept saying this hire, promote, demote,

15   fire, asked most of the execs those questions.  You know

16   what wasn't asked of the executives, the following question.

17   It wasn't asked.  Was that in any way, shape or form a

18   motivation for you to give a donation?  Not one exec was

19   asked that question, because it wasn't.  He hired you,

20   didn't he?  Yes.  He promoted you, didn't he?  Yes.  He

21   could demote you, couldn't he?  Yes.  And he could fire you?

22   Yes.  Okay.  He's like every other CEO in the entire

23   country.  That's why they're CEOs and president.  Not one of

24   them said that was a motivation for why they did it, that

25   there were afraid of retribution from him.  They did say Jim

1    thought it was important so they did it.  It wasn't some

2    threat about their job.

3         Oh, and, you know, Longview's two billion dollar power

4    plant.  There's family stress.  I heard nothing in this

5    case, perhaps you haven't either, about any family stress

6    with the family business.  The business was sold out of the

7    family a long time ago, but somehow implying that there is

8    just this tremendous amount of stress and so we had to start

9    this program.  No one testified about that at all.  In fact

10   everyone seems to be in complete agreement that the problem

11   was, is that it was perceived and actually they varied their

12   opinions on that, that there was a war on coal going on and

13   that people needed to voice their concerns to candidates and

14   their elected officials.  That's why the program started.

15   And why would the execs not say that was the motivation

16   because they know Jim.  They know Jim's character.  They

17   worked with him very closely and they did trust him.

18        The Government believes--something about abuse of power

19   and abuse of trust.  The Government believes Jim let the

20   execs down.  He violated their trust.  Jim didn't think that

21   was true at the time and he'll tell you he doesn't think

22   that now, because he didn't believe he was doing anything

23   unlawful and he still doesn't.

24        Oh, but Jim wanted to be a big political big shot, sit

25   at the lead table.  That's not what motivated Jim.

554

1      You get to judge and weigh the credibility, the

2   character of every person who was on that witness stand.

3   You also, in this case, got to do that with Jim Laurita.  He

4   took the oath and told you, again for the first time that he

5   was able to, what happened and why.

6      None of the eight execs had any inclination that they

7   there was anything wrong with this, anything unlawful in the

8   definition of every count under willfulness or willfully and

9   neither did Jim or it never would have happened.

10      Maybe Kevin O'Dell, that spoke on that issue best.  I

11   know Jim's a good man.  I know Jim is an honest man and I

12   trusted him.

13      Ladies and Gentlemen of the Jury, the Government has not

14   and cannot establish the elements of these counts of these

15   crimes beyond a reasonable doubt and that is especially true

16   on the issue of Mepco money and whether this was done

17   willfully.  Not a single person doing the existence of this

18   three year quote unquote "program" said anything about it.

19   No one raised a concern to Jim.  Jim never had any concerns.

20   It was discovered, the program, well after the fact.

21      Consequently when you return to your deliberation room

22   we're going to ask you, after your careful consideration of

23   the evidence and the testimony, to return a verdict of not

24   guilty beyond a reasonable doubt as to each count.  Thank

25   you.

1            END OF DEFENDANT'S CLOSING ARGUMENT

2            THE COURT:  Mr. Douglas, you have fifteen minutes.

3            MR. BERNARD:  Your Honor, I'll be doing the

4   rebuttal on behalf of the Government.  Thank you.

5            THE COURT:  Oh, I apologize for that.

6            GOVERNMENT REBUTTAL CLOSING ARGUMENT

7            MR. BERNARD:  Members of the Jury, fear not.  This

8   is rebuttal argument but I promise you it will be ten to

9   fifteen minutes, if that.

10      I could stand here and go over all the evidence as

11  previously summarized during our closing argument that

12  undercuts basically everything counsel just said but I'm not

13  going to do that as I said.  I'm going to hit the highlights

14  of--once again, maybe revisit a few points.

15      But let's--let's be clear.  What the defense essentially

16  is, is--I hate to use a cliche, but it's ignore the man

17  behind the curtain or in this case the man behind the money.

18      Every executive that took the stand said they wouldn't

19  have done this but for the fact that Mepco was paying for

20  those contributions, dollar for dollar reimbursement

21  essentially at the end and again, you heard the executives

22  say, yeah, no one ever told me that I had to go to

23  McDonald's that day to spend my money but what did they say

24  with respect to every contribution?  With respect to the

25  second bonus, every payment that was made by them from that,

1   they did receive direction and they did receive

2   reimbursement.  That's all that needs to be proved.  This

3   whole dollar for dollar, check in the bag, that's smoke and

4   mirrors.

5       You know, you've heard the evidence.  Your common sense

6   tells you what happened and that's what you can use.  You

7   didn't check your common sense at the door when you entered

8   the courtroom.

9       Now I have to address this whole voluntariness.  With

10  respect to the elements, if you look at those elements when

11  you consider the conduit contributions, there is no

12  requirement that they be compelled or involuntary.  It--the

13  executives could have certainly said, yeah, we'll go along

14  with these conduit contributions.  You give us some money.

15  We'll send money to the campaigns.  It's still a crime.  It

16  doesn't have to be compelled.  But, again, consider the

17  relationship when you do.  This goes to sort of the

18  willfulness or the defendant's intent, state of mind.  Think

19  about the position there and they're being approached by

20  their boss and yes, there is some compulsion there as there

21  is in every relationship.  They ultimately went along with

22  it.  You heard they didn't like to do it.  You know what

23  made them go along with it? Do you remember?  It was

24  because it wasn't their money.  They weren't going to be out

25  one red cent because the defendant, through Mepco, made

1   these contributions.  He paid for them through advancements,

2   reimbursements, every dollar.

3       If you look at willfulness, what it essentially requires

4   is that he knows the conduct that he's engaging in is

5   unlawful with the purpose to disregard the law and then

6   there's more to it but that's essentially what we're talking

7   about with willfulness.  Well, the defense said the

8   Government--Government is engaging or wants you to engage in

9   some intuitive argument or discussion or analysis.  You

10  don't need intuition.  You heard the defendant.  He knew

11  what the limits were.  He knew there were individual limits

12  and he knew the conduit contributions were prohibited.

13  There is no intuition.  He admitted it.  He also admitted at

14  the end of his testimony and the last statement he made is

15  that the second bonus was tied to political contributions.

16      Now one thing I do agree with counsel for the defendant

17  is he said there's nothing wrong, absolutely nothing wrong

18  in somebody making political contributions.  It's true.

19  Absolutely true.  But then you have a qualifier.  He said

20  absolutely nothing wrong with it as long as you're within

21  the law.  That's the problem.  What happened here was not

22  within the law and the defendant knew that.

23       Now I am going to revisit the compensation--this whole

24  compensation argument because it is just so flimsy.

25  Remember the defendant talking about--remember his e-mails

558

1    between Charlie Huguenard and himself talking about look

2    what we have financially at stake.  There's a war on coal.

3    I'm going--I'm going to lead the revolution.  That's Exhibit

4    1-8, look at it again.  Financially--there is so much

5    financial pressure that he wanted to be politically active

6    because he had never been politically active before.  He

7    didn't like it but he ran head first into the political pool

8    in this case and the question is, if it was so bad--if the

9    finances were so bad, why in 2010, when these guys worked

10   for him all these years, why at that time when there was

11   such a financial strain on the company, the industry, would

12   you seek to bring your executives' compensation up to

13   industry standards?  Makes no sense.  It really doesn't if

14   that was compensation.  However, it does make sense that the

15   day after or the day of the first deposit, what happens?

16   Political contributions start flowing from the executives

17   and their spouses.  That tells you.  The inference, your

18   common sense, your ordinary experience in life tells you

19   what that money was for.  It wasn't compensation.  It was

20   directly for political contributions by Mepco and the

21   defendant.

22       I think it's important--I believe counsel, during

23   closing argument, mentioned this.  I think it's important

24   because it was my witness that I was doing the direct of and

25   remember Mr. Osborn, I asked him, I said, well if this was a

1    bonus, if this was increasing your salary up to industry
2    standards, when this was stopped, fifty thousand dollars a
3    year, whatever it was, a ton of money, when those stopped,
4    did you question?  Did you complain?  Did you say, hey, I'm
5    just out fifty thousand dollars.  No, it wasn't my money.
6        Let's talk about motivation because again I think I
7    mentioned it but every executive said their motivation--they
8    didn't say he forced me but again think about the
9    motivation.  There motivation wasn't money and that they
10   weren't going to be out any money, that everything that they
11   gave to the campaign was going to be paid for by Mepco so,
12   again, keep that in mind.
13       And, again, I don't want to keep on about this
14   voluntariness but I do think it adds a flavor to the state
15   of mind of the defendant and what necessarily was going
16   through the executives' minds when he proposed or suggested
17   these things.  Were they really proposals or suggestions?
18       Counsel mentioned--I'm not going to spend a lot of time
19   on this but something about there was no whistle blower.
20   This wasn't a whistle blower case.  You know, as you heard
21   the testimony what happened was, yeah, this was hidden and
22   I'll say hidden.  Five hundred thousand dollars in a sixty
23   million dollar payroll, if you don't point that out, sure
24   the accountant's going to pay it but it appeared as a
25   payroll payment.  It did appear as a bonus.  If they don't

1    ask about, well, don't ask, don't tell basically was

2    the--the policy of the defendant and the Mepco employees,

3    especially those that were involved in the audit.

4        But what did happen in this case is when somebody in the

5    bankruptcy started to scratch below the surface, what

6    happened?  House of cards fell apart.

7        You know one thing I think is important when you're

8    assessing the credibility, his counsel said you saw the

9    defendant.  He said this.  He said that.  Believe him.

10   Well, you know what, you are the judges in this case of the

11   facts and the credibility.  It's an awesome responsibility

12   and when you do that you have to, as the Judge instructed

13   you, consider the witness' motive, their intelligence, their

14   state of mind at the time of the events we're talking about,

15   not when they're sitting on the stand necessarily, but what

16   was going through their mind when the events were happening.

17   Then you have to also consider the extent that their

18   testimony is contradicted or in direct conflict with other

19   witnesses.  Eight executives.  Yep, this was all reimbursed.

20   Mepco paid for these or I wouldn't have done it.  The

21   defendant, it's their money.

22       Again, another thing you have at your power is the power

23   of assessing this evidence for reasonable inferences.

24   Obviously, a lot of times you're not going to have a

25   confession or a map up on the stand.  You have to apply your

1    life experiences using reasonable inferences based on the

2    evidence and based upon these factors concerning witness'

3    credibility and you know one of the most important factors

4    that you have to consider is the--what is at stake for the

5    person on the stand?  How are they affected by the verdict

6    when assessing their credibility?  The executives were on

7    the stand.  They testified and again I think some of them

8    maybe not happy, Karen Hughes maybe not happy, but they

9    don't--they swore to tell the truth and that's what's at

10   stake.

11       The defendant on the other hand, what's at stake are the

12   crimes he's been charged with which the evidence establishes

13   he's guilty of.  That's what's at stake for him so remember

14   to assess his credibility under that standard.

15       Let's talk about willfulness a little bit because I

16   think it's important that you understand and counsel kind of

17   brushed over this but just remember, at this time back in

18   2010 Mepco had invested one hundred million dollars in

19   establishing and updating the Four West Mine which was going

20   to be providing all the coal for the Longview Power Plant.

21   There was a two point two billion dollar investment in

22   Longview.  Longview was a year behind its schedule and that

23   was going to have a substantial impact on the investors'

24   money and the defendant's financial interest as well.

25   There's a war on coal as you heard.  Okay.  There's a war on

562

1   coal.  All these things.  The defendant was pressured by the

2   parent company to get involved in the political process.

3   Recall the e-mails between Charlie Huguenard and the

4   defendant where the defendant said, My God, we have too much

5   at stake here.  The--you know, we need--I'm going to lead a

6   revolution.  Theses are all things that you must consider

7   that the defendant at this time, in desperate times,

8   sometimes people make desperate choices and unfortunately

9   sometimes those choices are to break the law.

10          In this case I think the evidence is overwhelming that

11   the defendant did, through Mepco, and cause the employees of

12   Mepco to make the conduit contributions.  They were fully

13   reimbursed by Mepco for those and that--plus the reports by

14   the campaigns included those individuals.  The defendant

15   knew that that was going to happen.  Once that information

16   got put in those FEC reports and they got filed with the

17   appropriate agency, the FEC, they were false statements.

18   The defendant knew that.  Hide those false statements.  They

19   were material.  It doesn't matter if the FEC really knew

20   about them or even acted on them.  It's the mere fact of

21   causing those material false statements that establishes the

22   defendant's guilt.

23          You know, passing judgment on another individual is not

24   an easy task.  It's not a pleasurable task.  It's tough.  I

25   understand that.  But in this case, passing judgment on the

1    facts, on the elements of the offenses based on the evidence

2    is not difficult.  The evidence establishes each and every

3    count, each and every element beyond a reasonable doubt and

4    that is that the defendant is guilty on all counts and I

5    would ask you to return a verdict of guilty on all counts.

6    Thank you.

7              END OF GOVERNMENT'S REBUTTAL ARGUMENT

8              THE COURT:  All right.  Ladies and Gentlemen, if

9    you'll refer back to the charge.  I'm on page forty-four but

10   just for your information I'm also going to be referencing

11   page thirty and page thirty-three--no, sorry, not

12   thirty-three, thirty-four.  So it's page thirty and

13   thirty-four as I discuss the verdict form with you.

14       All right.  Now on page forty-four.  Upon retiring to

15   the jury room you should select--first you should select one

16   of your number to act as a foreperson.  That person will

17   preside over your deliberations and will be your

18   spokesperson here in court.  Now just so you know, this is

19   not like TV where the foreperson has to get up and read the

20   whole verdict.  I do that.  The foreperson tells me that the

21   jury has reached a decision, whatever it is, those decisions

22   are unanimous and then you had the verdict form to the Court

23   Security Officer who hands it to me.  I just want you to

24   know that.

25       When you go to the jury room to consider the evidence

1    presented to you during the trial of this case, you will be

2    furnished with a jury verdict form which is

3    self-explanatory.  Now you don't have a copy of that.  There

4    will only be one in the jury room and it will be in the

5    possession of the foreperson.  You can only find the

6    defendant either guilty or not guilty as to each of the

7    charges in the indictment if all agree but I want to go over

8    this with you because you heard the phrase, or the term

9    special interrogatories used a couple of times, particularly

10   in the Government's close and I want to explain where they

11   are and how you should look at them.

12       As to Count One, that's the scheme count and you can

13   only find the defendant either guilty beyond a reasonable

14   doubt on not guilty of the charge of scheme to cause false

15   statements to Federal Election Commission as charged in

16   Count One of the indictment.  That's a separate count.  You

17   must all vote on it separately and you can return a verdict

18   only if your vote is unanimous, all twelve of you agree.

19   The foreperson will date it, and will sign it.

20       Now when you finish with that count, then you would move

21   on two Count Two.  That Count Two is the one you will find

22   on page thirty in the charge, which is the charge of making

23   or count of making contributions in the name of another.

24   It's also the same count or same allegation in Count Three

25   but it's for a different year.  Okay.

1       So in Count Two it's in 2012.  For Count Three it's

2   2013.  It is the same elements but you're going to decide

3   each of these counts separately okay.  And it tells you,

4   again, as to Count Two guilty beyond a reasonable doubt or

5   not guilty and then the foreperson will date and sign it.

6       Now the next thing that's on that page says Special

7   Interrogatories for Count Two.  That means there's more

8   than--interrogatory is a legal term meaning question.  Okay.

9   And there's more than one question but there are directions

10  for each of the questions.

11      The first direction is complete 2(a), which is this

12  first question, only if your finding for Count Two is guilty

13  and then there are three questions, 2(a), 2(b) and 2(c).  As

14  to 2(a) you have to determine whether you unanimously find

15  that the offense charged more than or equal to twenty-five

16  thousand dollars of total contributions made in the name of

17  another during the calendar year of 2012 to a candidate

18  seeking nomination for election to federal office.  Now

19  remember this is a charge of contribution in the name of

20  another so this is looking for an amount.

21      Now if you don't find that the offense involved more

22  than or equal to twenty-five thousand dollars total

23  contributions you would answer no.  If you found that it

24  did, then you would answer yes.

25      If you answered no, the instructions say complete 2(b)

1    only if your finding for Count Two is guilty and your

2    finding for 2(a) is no.  Okay.

3         So these are options and then 2(b), the amount involved

4    is more than ten thousand dollars of total contributions

5    made in the name of another during the calendar year 2012.

6    This is all still Count Two.  Now if you find as to Count

7    Two that the answer to more than ten thousand is no, then

8    you would go to Count Three.  Now remember, if you answered

9    yes to Count Two (2a) you don't go to 2(b).  If you answer

10   yes to 2(b) you don't go to 2(c).  You're only going to fill

11   out one of these three questions.  Okay.

12        Count--2(c) the amount is more than or equal to two

13   thousand dollars of total contributions.  So while you don't

14   have to do a lot of math, you do have to do some math to

15   find out what you unanimously agree is the amount involved

16   in Count Two if, and only if, you unanimously found the

17   defendant guilty as to that charge.  Whatever you find as to

18   the amount in the special interrogatory you must also agree

19   to unanimously.

20        The same instruction as to Count Three.  The only thing

21   that's changed there is the year and this is the calendar

22   year 2013.  If Mr. Laurita--if you find he is not guilty,

23   you don't answer any of the special interrogatories.  If you

24   find that he is guilty beyond a reasonable doubt unanimously

25   then you must answer one of the three interrogatories as to

567

1   the amount.  Okay.

2       Now as to the fourth count that is not one where you

3   have to make a--yes, you do.  You have to make--you have to

4   answer a special interrogatory for Count Four.  Count Four

5   charges making excessive campaign contributions so this is

6   the final interrogatory.  Count Four.  Again, if Mr. Laurita

7   is not guilty you don't answer any of the interrogatories.

8   If you found him unanimously--you found him guilty beyond a

9   reasonable doubt, then you must answer one of these three

10  interrogatories and the first, 4(a) again is the more than

11  or equal to twenty-five thousand dollars and the second

12  would be if--if you have to move on is more than two

13  thousand dollars and I apologize.  I said there were three

14  interrogatories.  As to Count Four there are only two.

15  You'll see it here.

16      There are no interrogatories as to Count Six, Seven and

17  Eight and you'll recall there's no Count Five.  Okay.

18      So this is in the hands of the foreperson who will sign

19  again as to each of the counts specifically.  There is a

20  signature line and a date for every count.  This will be

21  with you in the jury room.  All of you will be able to look

22  at it.  Although it will be in the possession of the

23  foreperson, certainly he or she may share it with all of

24  you.

25      Now please don't begin your deliberations until the

1    Clerk delivers to your jury room this verdict form and all

2    of the exhibits.  They will be in the jury room on the table

3    with you.

4         Now finally, and I must ask those in the front row of

5    the courtroom on the Government's side to leave that bench

6    and move back.  Thank you.  Observing that all the principal

7    jurors are able-bodied and mentally alert, it's now my duty

8    to ask the alternate jurors to stand aside and take a seat

9    in the courtroom and that would be Alternate Number Two

10   Mr. Dawson, Alternate Number Three Ms. Layman and Alternate

11   Number Four Ms. Thompson.  Ms. Layman and Ms. Thompson,

12   you're already there so, Mr. Dawson, if you'll just sit next

13   to them, I'm going to have further instructions for you

14   three after the main jurors leave the courtroom.

15        Ladies and Gentlemen, the case is now ready for your

16   deliberation and the Court Security Office will conduct you

17   to the jury from.  On behalf of the parties, counsel, I

18   thank you for your attention, your patience and I believe

19   that you will find your lunch in the jury room; if not, it

20   should be there shortly.  Thank you.  Take everything with

21   you please.

22        (Jury out 12:08 p.m.)

23             THE COURT:  Mr. Dawson, Ms. Layman and Ms.

24   Thompson, the Court Security Officer will escort you to your

25   room across the hall.  As you saw this morning, jurors can

1    become ill, something can happen.  Don't leave yet, I'm

2    still instructing you, Mr. Dawson.  That's okay.  It is not

3    ordinary but it is not uncommon that during deliberations a

4    juror may become incapacitated and unable to continue, at

5    which point we would go down numerically, Juror Two, Three,

6    Four to replace the main juror who was unable to continue to

7    serve and you saw what happened this morning with Juror

8    Number Nine so I therefore instruct you that you may not

9    discuss the case among yourselves when you are across the

10   hall.  Now please talk about the complete breakdown of West

11   Virginia University's basketball team last night if you'd

12   like to.  I'd be happy to talk to you about that after this

13   case was all over but I have--I think we have a couple of

14   magazines.  I hate to tell you how old they are and I've

15   looked at the newspaper.  I think I can send a newspaper

16   over.  I don't think there's anything on this case in our

17   local newspaper.  If there is, we'll cut it out.  I'm trying

18   to tell you we have some reading material for you but we

19   also have lunch and your lunch, as you ordered it, will be

20   across the hall so would you please now with our thanks and

21   out gratitude for your patience, proceed across the hall

22   with the Court Security Officer.  Whenever the jury is

23   brought back in, should that happen, for a question or

24   something, you will be brought in as well.  You're jurors.

25   Okay.  If you have to replace a juror, we will certainly let

570

1    you know.  When the verdict comes in, you will be brought in

2    here, okay, and then at the conclusion of the case you'll go

3    back to the jury room.  If you have personal belongings in

4    the jury room that you would like to have across the hall,

5    Debbie will take care of retrieving those for you so she'll

6    be over there to talk to you about anything that you need.

7    Okay.  Thank you.  Take those with you.  They belong to you.

8    They absolutely belong to you at this point.  Thank you.

9          (Alternate Jurors out)

10         THE COURT:  Counsel, any objections to place on the

11   record before we recess?

12         MR. DOUGLAS:  No, Your Honor.

13         MR. CARR:  No, Your Honor, and I'm returning

14   Defendant's A and B to the Courtroom Deputy.

15         THE COURT:  All right.  Thank you.  Now could I ask

16   counsel to please come up and look at those exhibits before

17   Debbie takes them in.  I'm not going to leave the Bench

18   until you've assured me that all the exhibits are there and

19   that you're satisfied.

20         (Pause)

21         THE COURT:  This is a housekeeping matter so anyone

22   who's in the courtroom and who wishes to go out for lunch or

23   whatever, you're free to leave.  This is just something that

24   the lawyers have to go through in order to make sure that

25   the correct exhibits go back to the jury room.

571

1      (Pause)

2           THE COURT:  Counsel, I will leave this courtroom

3    open for you.  You have your conference rooms.  You can stay

4    in here.  You can leave your files in here if you want to.

5    It's up to you but I--actually I need to ask Debbie.  Do I

6    have anything today?

7           THE CLERK:  No, Your Honor.

8           THE COURT:  Okay.  So there's no hearing.  So

9    you're free to leave anything you want in here, to move in

10   and out of the room.  I'll leave it open.

11          MR. DOUGLAS:  Thank you.

12          THE COURT:  You're welcome.

13          MR. CARR:  Your Honor, if I may ask, I know in the

14   Cason case so long as we were within a five to ten minute

15   radius--

16          THE COURT:  That's true.  Exactly.  Yeah.

17   Ritz's is always a good place to get lunch because it's

18   within five minutes if we get--if we get a question and I'm

19   sure you're very hungry so don't feel like you're obligated

20   to just stay here in the courthouse.

21          MR. CARR:  Thank you, Your Honor.

22          THE COURT:  You're welcome.  Is there any objection

23   to the instructions--I mean to the--to the evidence as

24   compiled?

25          MR. DOUGLAS:  No, we're still--

1          THE COURT:  You're still--oh, okay.  I thought you
2     were finished.  Thanks.
3        (Pause)
4          THE COURT:  Everybody left their cell number with
5     Debbie?  And depending on how this goes if you--during the
6     afternoon if you need coffee or anything, you're free to
7     come in Chambers.  We have a Keurig.
8          MR. CARR:  Thank you, Your Honor.
9          MR. DOUGLAS:  Thank you, Your Honor.
10       (Pause)
11         THE COURT:  Court stands in recess.  Thank you.
12          (Recess from 12:17 p.m., until 3:35 p.m.)
13         THE COURT:  Thank you.  Please be seated.  All
14    right.  You have a copy of the question that I have received
15    from the jury.  I'm going to suggest to you that perhaps a
16    simple response that says, they're calling step four but I
17    would--what I think we've called the fourth element--well
18    it's--it's willfulness and it applies to each and every
19    count of the indictment, right?  Isn't that what we're were
20    really talking about here?
21         MR. DOUGLAS:  Yes, Your Honor.
22         THE COURT:  I think.
23         MR. DOUGLAS:  It appears.
24         MR. CARR:  Your Honor, I very active much have to
25    admit that had not occurred to me as to what they were

1    referring to as--

2            THE COURT:  Well, it's step four of Counts Two and

3    Three are--

4            MR. CARR:  Your Honor, that makes a lot more sense

5    than what I was trying to figure out.

6            THE COURT:  Oh, okay.

7            MR. CARR:  And what I believed that it meant so--

8            THE COURT:  Well you may be thinking of the right

9    thing and I haven't thought of it.  I just assumed when I

10   looked at fourth, defendant acted knowingly and willfully.

11           MR. CARR:  Your Honor, we immediately thought of

12   the verdict form as you might imagine.

13           THE COURT:  The verdict form has three.

14           MR. CARR:  Your Honor, it didn't make any sense and

15   so I very much appreciate--we do agree and we also agree

16   that step four applies to each count or the four--

17           THE COURT:  Although there aren't four elements to

18   every count so I can take a stab at this, go back and bring

19   it out but I think what I should say to them is, Ladies and

20   Gentlemen of the Jury, if your question is directed to the

21   fourth element of knowingly and willfully and then I could

22   even do an open paren (see page 30 and page 35) as to Counts

23   Two and Three you must determine that element unanimously

24   beyond a reasonable doubt and then for each count, and I

25   think here they mean the entirety of the indictment, step

1    four, as they're calling it is actually in Count One, the

2    third element and in Court Four it's the fourth element and

3    in Counts Six, Seven and Eight it's the third element.

4        It's going to take me a little bit of time to construct

5    this but I think all I'm going to do is point them to the

6    page, tell them it's--the same element of knowingly and

7    willfully applies to each count but under a different number

8    depending on how many elements there are to that count.

9    Does that make sense?

10            MR. DOUGLAS:  Yes, Your Honor.

11            MR. CARR:  Yes, Your Honor.

12            THE COURT:  Okay.  I mean if you all want time to

13   talk about it among yourselves I'm happy to--to sit while

14   you think.

15            MR. CARR:  No objection, Your Honor.

16            THE COURT:  Okay.

17            MR. BERNARD:  I guess the first question is if

18   that's what they mean or are you just going to suggest, I

19   think this is what you mean?

20            THE COURT:  If you're referring to the fourth

21   element as found on page thirty for Count Three and

22   thirty--what did I say, four for Count Four, the element of

23   willfully and knowingly, you must find that unanimously

24   beyond a reasonable doubt as to each count and then as to

25   your second question for each count, that means every

575

1    count--each and every count of the indictment.  Willfully

2    and knowingly is an element of each count whether numbered

3    three as in Count One, Four, Six, Seven and Eight or four as

4    in Counts Two and Three.  Does that work?

5              MR. BERNARD:  No objection to that.

6              THE COURT:  I wish I had dictated that to somebody.

7              MR. BERNARD:  And if that's not their question I

8    guess they'll just return another note and say that's not

9    our question.

10             THE COURT:  Right.  Who's the person who told me if

11   we made that language uniform we wouldn't get a question?

12   All right.  I will be back in just a minute.

13             (Recess from 3:40 p.m., until 4:25 p.m.)

14             THE COURT:  Please be seated.  I'll give you a

15   minute to look over those proposed answers.  They didn't

16   number the notes and I tried to put them in order.  I did,

17   rather than four separate answers I did compress or did join

18   the answers to numbers, to notes two and three regarding

19   their deliberations.  Wait a minute.  Did we forget one?

20        (Pause)

21             THE COURT:  The one amount a unanimous verdict

22   didn't come out.  I apologize.  All right.  Are you ready to

23   discuss?  What's the Government's position?  Let's take

24   the--they're not numbered but the one that discusses the

25   first question in your first note.

576

1          MR. DOUGLAS:  No objection, Your Honor.

2          MR. CARR:  No objection, Your Honor.

3          THE COURT:  Okay.  Now as to the note--the response

4    that says as to each count the Government must prove beyond

5    a reasonable doubt.

6          MR. DOUGLAS:  No objection, Your Honor.

7          MR. CARR:  No objection, Your Honor.

8          THE COURT:  All right.  The next note, while we're

9    waiting for the other one.  This response is really to the

10   question about the juror contacting her employer and making

11   and it also relates in part to the other note regarding

12   where they stand and while we're waiting for the other note,

13   do you have any objection to this response concerning their

14   right to set their schedule?

15         MR. DOUGLAS:  No, Your Honor.

16         MR. CARR:  No, Your Honor.

17         THE COURT:  Okay.  So I will give these three

18   responses to--with the original notes to the Clerk and I

19   didn't number those notes because they didn't so the

20   record's not going to be very good about how they came in

21   but some of them are timed, some of them aren't.  I don't

22   know anything we can do except leave it the way they came in

23   to us.

24         MR. DOUGLAS:  That's fine, Your Honor.

25         THE COURT:  Those are the responses, Debbie.  We're

577

1    waiting on one more.

2        (Pause)

3            MR. DOUGLAS:  No objection, Your Honor.

4            MR. CARR:  No objection.

5            THE COURT:  All right.  Then I'll direct the Clerk

6    to take this answer as well.  Now there are four, correct,

7    take those to the jury and I'll wait to see what we receive

8    next.  The jury is thinking this through, and that was the

9    fourth note.  I don't think she had that.

10       So I will--if they don't respond with their schedule by

11   five o'clock I may bring them in to ask.

12           MR. CARR:  Your Honor, if I may respectfully ask a

13   question.  Do you think it would help the record--I know we

14   referred to the notes and it may be possible from reading

15   the transcript to identify them but for us to at least put

16   the first few words of note one and the response that goes

17   with it, note two and the response that goes with it just so

18   that perhaps the record--

19           THE COURT:  Well, I did that with the first one

20   where there was--there were two questions.

21           MR. CARR:  I understand, Your Honor.

22           THE COURT:  The others seem pretty self-explanatory

23   but--

24           MR. CARR:  Your Honor, I apologize.  I'm sure the

25   record will be clear.

578

1           THE COURT:  Okay.  I want the record to be clear as

2    well and if it's okay with you all what I can do with these

3    notes, just for purposes of an appeal, if there is one,

4    would be to on the court order denominate the notes one

5    through four for purposes of the record.

6           MR. DOUGLAS:  No objection, Your Honor.

7           THE COURT:  The jury didn't refer to them that way.

8    I won't refer to them that way with the jury but for the

9    record so, Debbie, if you want to hand these to me, just

10   make sure.  My recollection is that first note was the one

11   that had two questions in it.

12          MR. DOUGLAS:  Yes, Your Honor.

13          THE COURT:  All right.  So that would be marked as

14   Court--Jury Deliberations Exhibit 1.  Is that acceptable?

15          MR. DOUGLAS:  Yes, Your Honor.

16          MR. CARR:  Yes, Your Honor.

17          THE COURT:  Or Jury Deliberations Note One, just

18   with the sticker.  Did you docket it as one?

19      (Pause)

20          THE COURT:  I know but we need to know what to

21   refer to this as if we get another question so this would

22   be--this one I'm handing to you would be Jury Deliberation

23   Note One.

24      I believe the second one was for knowingly and willfully

25   or was that--no.  The second was what happens if?

579

1          MR. DOUGLAS:  It appears that that's correct, Your

2     Honor.

3          THE COURT:  All right.  That would be denominated

4     Jury Deliberation Note Two.

5       And the third would be Jury needs to contact?

6          MR. DOUGLAS:  Yes, Your Honor.

7          MR. CARR:  Yes, Your Honor.

8          THE COURT:  That would be denominated Jury

9     Deliberation Note Three.

10      And then the final one that begins four, knowingly,

11     would be denominated Jury Deliberation Note Four.

12         MR. DOUGLAS:  Yes, Your Honor.

13         MR. CARR:  Yes, Your Honor.

14         THE COURT:  Okay.  Anything else?

15         MR. DOUGLAS:  No, Your Honor.

16         MR. CARR:  No, Your Honor.

17         THE COURT:  And the record will reflect that the

18     Clerk has delivered--Debbie, did the Court Security Officer

19     take them in?

20         THE CLERK:  Yes.

21         THE COURT:  Okay.  So through the Clerk and the

22     Court Security Officer the answers to the notes have been

23     delivered to the jury.  Thank you.

24          (Recess from 4:35 p.m., until 5:15 p.m.)

25         THE COURT:  Thank you.  Please be seated there are

1    a couple of issues.  One is one juror needs to contact her

2    employer.  I can't let her go down to get her phone so if

3    it's acceptable to all of you I'm planning to send a note

4    asking the jury if they've determined what their schedule

5    for the evening is.  If the answer is they're going to

6    continue to deliberate and want us to send in menus for

7    dinner then I would get the number from the juror and call

8    her employer.  Any objection to that?

9            MR. DOUGLAS:  No, Your Honor.

10           MR. CARR:  No, Your Honor.

11           THE COURT:  The other issue is we've got three

12   alternates across the hall who are probably beginning to

13   think they've been locked in there for the night.  Once I

14   know the answer to the question about the schedule then I'll

15   bring them--if they're going to continue to deliberate, I'll

16   bring those alternates over, explain to them that that's

17   going on and also let them know we're going to get them

18   dinner.

19           MR. DOUGLAS:  No objection.

20           MR. CARR:  Yes, Your Honor.

21        (Pause)

22           THE COURT:  Please be seated.  This is not in

23   response to my request for the schedule.  This is a

24   simultaneous note.  We handed them my note.  They handed

25   their note.

581

1        Juror Number Ten, if you're wondering.  I have a

2    suggestion.  My suggestion, since you saw my note to them,

3    would be to bring them in, excuse them for the night, see

4    how Juror Number Ten does during the evening and resume

5    their deliberations at nine o'clock tomorrow morning or

6    actually, the weather reports are horrific.  Alternate

7    Number Two has a ninety mile one way drive.  My suggestion

8    would be perhaps they begin at ten which would give a fair

9    opportunity for the interstates and some of the second roads

10   to be cleared.  I know that's a delay and you don't like it.

11   The only other thing is to dismiss her, call in Alternate

12   Number Two but they may choose to leave in an hour anyway.

13        MR. BERNARD:  Your Honor, I don't see any choice

14   even if you empanel the alternate, they'd have to--

15        THE COURT:  They'd have to begin over again and

16   they probably want to be excused tonight.

17        MR. BERNARD:  So we're better off to see if she

18   feels well enough and if not seat the alternate.

19        THE COURT:  I think so.

20        MR. CARR:  May I have a moment, Your Honor?

21        THE COURT:  Yes.

22     (Pause)

23        MR. CARR:  Your Honor, respectively, the

24   defendant's position, given that she appears to be quite

25   sick and with the weather approaching, would be to dismiss

582

1    her and replace her with the alternative--with the

2    alternate.

3            THE COURT:  Well, I can do that in the morning too.

4    I mean that's not something that I have to do tonight if

5    perhaps she recovers throughout the night and is able to

6    continue tomorrow morning.  Otherwise, if she does not show

7    up tomorrow morning then I would replace the

8    Alternate--replace her with the Alternate and they would

9    begin their deliberations anew.

10           MR. CARR:  Yes, Your Honor.

11           THE COURT:  So there--I doubt--I candidly doubt

12   it's fair to ask them to begin their deliberations anew

13   tonight but I can--I think it's--excuse me.

14       (Pause)

15           THE COURT:  They passed the other note.  Okay.

16   Let's--where is it?  Court Security has another note.

17       (Pause)

18           THE COURT:  Okay.  They want to continue tomorrow.

19   So I think that answers the question.

20           MR. CARR:  Yes, Your Honor.

21           THE COURT:  Okay.  I order this--they sent it back

22   on the paper that I sent in and it's three words, continue

23   tomorrow please so I'll order the Clerk to file the note and

24   ask Court Security to please bring the jury in.  And we need

25   to bring the alternates in from across the hall please.  If

583

1    I let Juror Number Ten go tonight then I would move Juror

2    Number--Alternate Number Two up tonight but then they would

3    begin tomorrow morning.

4            MR. CARR:  I understand, Your Honor.

5            THE COURT:  And I would bring them in tomorrow

6    morning to advise them that they have to begin their

7    deliberations anew.

8            MR. CARR:  No objection, Your Honor, for the

9    record.

10           THE COURT:  Is there any objection to dismissing

11   the old juror tonight since they want to begin tomorrow

12   morning anyway?

13           MR. DOUGLAS:  No, Your Honor.

14           THE COURT:  Okay.  Then she can go home without the

15   anxiety of knowing whether she has to return tomorrow.

16   Notably, the juror who couldn't come this morning because

17   they were ill, and the juror who's become ill were sitting

18   next to each other or close.

19       (Alternate jurors in)

20           THE COURT:  Ladies and Gentlemen, we're bringing

21   the jury in to adjourn for the evening.

22       (Jury in 5:27 p.m.)

23           THE COURT:  All right.  Ladies and Gentlemen, I've

24   received your note and first we all thank you for all the

25   efforts you put into the case today.  I have also learned

584

1    from one of your notes that Juror Number Ten, Ms. Woody, has

2    been ill and trying to work through this all day.  Ms.

3    Woody, after consulting with the attorneys, I'll excuse you

4    as a juror.  You may leave at this time.  All right.  Now as

5    you do that, please leave your charge and your notes with

6    Debbie, the Clerk, and do not discuss this case with anyone.

7    All right.  Thank you very much.  I appreciate so much your

8    effort and I'm so sorry you don't feel well.

9         (Jury Number Ten excused)

10         THE COURT:  At this time I order Alternate Number

11   Two, Mr. Dawson, to replace Juror Number Ten.  Thank you,

12   Mr. Dawson.

13        Ladies and Gentlemen, with the replacement of Juror

14   Number Ten in the middle of your deliberations that means

15   that tomorrow morning you are to begin your deliberations

16   anew since you have a new juror.

17        You've requested to adjourn for the evening.  I'll bring

18   you back in tomorrow morning and more fully explain what

19   your obligations are with the new juror but during this

20   evening's recess please understand that you are not to

21   discuss the case with anyone else and don't call each other

22   on the phone.  You can only discuss this case among

23   yourselves when you're all together.  All twelve of you have

24   to be present in order to discuss the case.

25        As it stands tonight, the best I know about the weather

585

1    is it hasn't started, but it will get very cold this evening

2    and some areas may get snow.  There's going to be rain so I

3    want to get you out of here as quickly as possible.

4        Don't review any media coverage of this case should

5    there be any, whether in the newspaper, on the radio, or on

6    the television.  Don't attempt any independent research

7    regarding the issues that have been raised in the case and

8    please, as I've said, only discuss this case when you're all

9    together in the jury room in your secret deliberations.

10        Leave your notebooks and your charge face down on your

11    chairs.  Just so you're assured, we pick them up without

12    looking at anything and store them in the safe.  I told you

13    that on day one and nobody reads anything and this is only

14    Debbie who touches them and she will return them to you

15    again face down in your jury chair tomorrow morning.  You

16    can't take them home with you is the reason.  I told you you

17    could keep them until the case was over but it didn't end

18    today so we have to store them for you.

19        When you return tomorrow morning, we were just talking

20    about this, because we don't know how bad the weather will

21    be and for those of you and where you live, my

22    suggestion--it's the foreperson's decision, my suggestion

23    would be ten o'clock to give the roads a chance to be plowed

24    if there is a need for that, whatever it may be.  If you

25    want to eight, that's fine.  If you want to come at nine,

586

1    that's fine.  I would ask that you not come any later than

2    ten from wherever you are, but does the foreperson know what

3    the sense of the jury would be on that?

4        (Pause)

5            THE COURT:  All right.  Let me ask then.  I'm just

6    a former school teacher.  Raise your hands if you'd like to

7    start at eight a.m?

8        (No Response)

9            THE COURT:  Well that's one decision we--what about

10   nine a.m?

11       (No Response)

12           THE COURT:  Ten a.m?  Okay.  All right.  I was

13   going to say you have to come back.  You have to raise your

14   hand for one of them.  Okay.  All right.  Thank you very

15   much so we'll start at ten a.m.  I'm sure we will have some

16   delightful kind of doughnut here for you in the morning to

17   enjoy with your coffee or tea.  We thank you very much for

18   your attention, your patience and your diligence in your

19   duties.

20       At this time then with the instructions, finally if any

21   third party attempts to approach you to discuss this case

22   you must tell them no you are not allowed to and report that

23   contact to me through Court Security or Debbie at your

24   earliest opportunity.  You're free to go.  Thank you.  I

25   would request that everyone in the courtroom remain in the

587

1   courtroom until the jury is escorted out.  Because it's

2   after hours they have to go out through the main hallway.

3       (Jury out 5:36 p.m.)

4           THE COURT:  Is there any objection to the evening

5   instructions that I've given to the jury?

6           MR. DOUGLAS:  No, Your Honor.

7           MR. CARR:  No, Your Honor.

8           THE COURT:  All right.  Thank you.  Please, I'll

9   make sure Court Security lets you know and gives you the

10  high sign as soon as you can leave.

11          MR. CARR:  Your Honor, if I may inquire and I

12  apologize.  I've not been in this--

13          THE COURT:  Certainly.

14          MR. CARR:  --situation with a jury going into

15  Friday and with a new juror on the panel.  Understanding

16  that you have another case that we understood was starting

17  on Monday, if they do not--

18          THE COURT:  That case has been--there's been a

19  decision in that case.

20          MR. CARR:  Your Honor, if they do not reach a

21  decision then on Monday, just for counsel's planning

22  purpose, would we expect that they would return Monday then?

23          THE COURT:  You mean if they don't reach a decision

24  tomorrow?

25          MR. CARR:  Yes, Your Honor, that's what I meant to

588

1    say.

2            THE COURT:  I think that's a bridge to be crossed

3    during the day tomorrow.  We'll just have to wait and see

4    how--what develops.

5            MR. CARR:  Yes, Your Honor.

6            THE COURT:  Okay.  Thank you.  So we'll let you

7    know as soon as you can go out in the hall.  I apologize.

8    The courtroom--the courthouse is just too small.  There is

9    no separate ingress and egress for the public without

10   running into the jury until they're let out.  Thank you.

11      Court stands adjourned until ten o'clock tomorrow

12   morning.

13            (Trial adjourned at 5:40 p.m.)

14   ************************************************************

15                    **FEBRUARY 2, 2018**

16                    P R O C E E D I N G S

17      (02-02-2018, 10:00 o'clock a.m., defendant present)

18            THE COURT:  Good morning.  It is my intention to

19   bring the jury in to refresh their recollection about their

20   instructions to begin their deliberations anew this morning.

21   Is there any objection?

22            MR. DOUGLAS:  No, Your Honor.

23            MR. CARR:  No, Your Honor.

24            THE COURT:  All right.  Thank you.  Could we please

25   bring the alternate jurors into the courtroom and bring the

589

1    jury in.  Thank you.

2         (Jury in 10:01 a.m.)

3         THE COURT:  Good morning, Ladies and Gentlemen.

4    Thank you for being here this morning.  I hope that with the

5    delayed start you were able to make your way without too

6    much challenge on the interstate or the secondary roads.

7         As I advised you last night before we adjourned, you

8    need to begin your deliberations anew this morning because

9    of the replacement of Ms. Woody with Mr. Dawson and as you

10   go back into the jury room, please recall that you are only

11   to deliberate the case when you are in the jury room and if

12   you come back here in the courtroom because of any further

13   questions that need to be addressed in here, we will take

14   them up in here.  I will not come back to you in there.  Do

15   you all understand that?  And to the extent that you

16   deliberate through the day and wish to have lunch brought in

17   again today I'm happy to do that and Debbie can bring in the

18   menus for you so that that can be done on a timely basis.

19        Thank you for your attention and consideration.  The

20   case is yours to deliberate and you may return to your jury

21   rooms.  Do you have your notebooks and your charge?  Thank

22   you.  The alternates can return to their chambers.  Thank

23   you.

24        (Jury out 10:03 a.m.)

25        THE COURT:  Any matters to take up?

590

1          MR. DOUGLAS:  No, Your Honor.

2          MR. CARR:  No, Your Honor.

3          THE COURT:  Court stands in recess.  Thank you.

4          (Recess from 10:05 a.m., until 12:45 p.m.)

5          THE COURT:  Thank you.  Please be seated.  All

6   right.  So you've read the note from the jury.

7          MR. DOUGLAS:  Yes, Your Honor.

8          MR. CARR:  Yes, Your Honor.

9          THE COURT:  From the foreperson.  You all can

10  remain seated for this.  I think we have to discuss how we

11  want to proceed at this point and I have--not because I

12  intend to give one or the other but I have provided you with

13  a couple of examples of the kind of further supplemental

14  charge I could give the jury.  However, I would prefer to

15  hear from both sides prior to determining whether it's

16  appropriate, based on time passed since deliberations have

17  been underway and the substance of the juror--the

18  foreperson's note, whether to give the charge or not.

19      So I'll hear from counsel for the Government.

20          MR. CARR:  Your Honor, if I may, and I apologize.

21  Obviously we have received the information and I know both

22  sides have tried as diligently as possible in the time that

23  we've allowed.  Could we have sixty seconds for counsel to

24  discuss the matter with each other?

25          THE COURT:  Sure.  Do you want me to leave the

591

1    Bench and you can go across the hall and I can come back

2    when you're finished?

3            MR. CARR:  Your Honor, we certainly aren't trying

4    to inconvenience the Court.

5            THE COURT:  Oh, that's no inconvenience.

6            MR. CARR:  It's just--

7            THE COURT:  The jury is eating lunch as I

8    understand it so I don't think that there's any particularly

9    unusual urgency.

10           MR. CARR:  It just occurred to me that it might be

11   productive--

12           THE COURT:  All right.

13           MR. CARR:  --now that we've read this for counsel

14   to consult.

15           THE COURT:  Why don't I leave the Bench, give you

16   all a five minute recess.  If you need more you can let me

17   know and if you finish sooner you can tell me.

18           MR. CARR:  Thank you, Your Honor.

19           THE COURT:  Court stands in recess for five

20   minutes.

21                      (Recess)

22           THE COURT:  Thank you.  Please be seated.  Let me

23   advise the jury had not yet received their lunch due to a

24   mix-up at the mag so they've just received it now but I will

25   hear from the parties.

592

1          MR. DOUGLAS:  Your Honor, based on first of all the

2    notes, the specificity of the notes yesterday indicating

3    apparently that they're on the--onto the state of mind

4    elements and have been deliberating on that and then the

5    intensity of this note, we don't think it would be really

6    useful to give a modified Allen Charge at this stage and to

7    graduate it up to a full.  It appears that it would be most

8    appropriate to go ahead and go with the full Allen Charge.

9       With regard to it, Your Honor, on page--

10          THE COURT:  So you want an Allen Charge?

11          MR. DOUGLAS:  Yes, Your Honor.

12          THE COURT:  All right.

13          MR. DOUGLAS:  May I finish?

14          THE COURT:  Yeah.  I'm just thinking on that.

15          MR. DOUGLAS:  Yes, Your Honor.

16          THE COURT:  Go ahead.

17          MR. DOUGLAS:  On page four the paragraph that

18    starts with above all--

19          THE COURT:  Well before you start picking apart the

20    Allen Charge, what I understand, with respect, what you want

21    is an Allen Charge so let's lay aside the rest of that

22    because I have to decide whether I'm going to give one.

23          MR. DOUGLAS:  Yes.  Yes, Your Honor.

24          THE COURT:  Okay.  All right.  What's the

25    defendant's position?

1          MR. CARR:  I apologize, Your Honor.  It's very

2     unnatural to be sitting and addressing a Court.  Your Honor,

3     it's the defense's position, given the--the fact that this

4     issue was raised yesterday, we realize that there has been a

5     juror who is--the alternate juror was in place.  It does

6     appear they have no more questions.  They were instructed

7     very clearly on two related questions yesterday and the--I

8     believe it's been referred to the intensity of this note and

9     what it is that is referenced in the note about some of us,

10    we do not believe that the Allen Charge would be sufficient

11    at this time and would request that the Court declare the

12    jury hung and declare a mistrial.

13          THE COURT:  All right.  The first question is, is

14    it appropriate to--to give an Allen Charge at this point in

15    the case?  And some of the factors that you're aware we need

16    to consider in making this decision, all of us, is how long

17    was the trial?  How long has the jury been out and what can

18    we glean from the notes that we've received from the jury?

19    Of course what we're trying to avoid here is if I gave a

20    charge, giving one that had an impermissible coercive effect

21    on jury deliberations and here the trial began on Monday,

22    proceeded on Tuesday and wrapped up early Wednesday morning.

23    So the case, you know, it's basically, generously two and a

24    half days of evidence because most of Monday morning--all of

25    Monday morning was jury selection.  The jury began its

594

1    deliberations shortly after noon yesterday and adjourned

2    approximately five-thirty so we had, I would say

3    approximately five and a half hours of deliberation during

4    which the Court received four or five notes, Debbie?

5         (Pause)

6              THE COURT:  Six.  Technically six notes.  Okay.

7    But five substantive notes and then they've been

8    deliberating with a second alternate who took his seat

9    yesterday evening before we adjourned and who's been with

10   the jury as part of the jury since this morning at ten

11   o'clock and so I've received this note which is

12   unfortunately not dated--not timed and I was in another

13   hearing on the phone but I'm going to say what was it,

14   approximately a quarter till one?  Does anybody know what

15   time the jury handed out this note?  Twelve-thirty.  All

16   right.  So twelve-thirty.  I think it might have been a

17   little later than that given where I was in that other

18   hearing.  Well, okay, anyway, between twelve-thirty and

19   twenty till one and this note I think in very strong terms

20   indicates that the jury is unable to come to an agreement.

21        So it seems to me that the concern for the Court is what

22   is it that I should address to the jurors that is

23   appropriate but not coercive?

24        Now, we've been trying to do some research and we all

25   agree it's--there's a high degree of necessity required to

1    establish a mistrial due to the hopeless deadlock of jury

2    members.  That's the Supreme Court in Arizona versus

3    Washington.

4        The record should reflect that the jury is genuinely

5    deadlocked and we've had a reported inability to agree and

6    in determining whether to declare a mistrial because of jury

7    deadlock, a District Court should consider the--the jury's

8    collective opinion that it cannot agree, the length of the

9    trial, the complexity of the issues, the length of time the

10   jury has deliberated, whether the defendant has objected to

11   a mistrial, and the effects of exhaustion or coercion on the

12   jury.  Here it's the defendant moving for the mistrial.

13       The most critical factor, according to the majority of

14   courts, is the jury's own statement that it is unable to

15   reach a verdict.  Now--but something more is needed.  So I'm

16   receiving word from the jury that it can not reach a

17   verdict, as we have here.

18       I have a couple of options.  I can, in my discretion,

19   give an Allen Charge or I can question the jury and

20   ultimately I must question the jury to determine

21   independently whether further deliberations might overcome

22   the deadlock.

23       Now, I can bring the jury in and address the foreperson

24   as follows:  In your opinion is the jury unable to agree on

25   a verdict as to one or more counts?  I can address all the

596

1    jurors after that.  If any of you disagree with the

2    foreperson's answer, please tell me now.  If the foreperson

3    has answered yes, the jury is unable to agree, the next

4    question would be is there a reasonable probability that the

5    jury can reach a unanimous verdict if sent back to the jury

6    room for further deliberation and if the response to that is

7    no then I have the discretion to address all the jurors as

8    follows:  Without stating where any juror stands do any of

9    you believe that there is a reasonable probability that the

10   jury can reach a unanimous verdict if sent back to the jury

11   room for further deliberation?

12       Now that is something that I'm going to have to do

13   anyway and the question I think is really do I do that now

14   or do I give one or the other of the Allen Charges before

15   you.  One, the pure Allen Charge and the other a modified

16   Allen Charge.

17       The Fourth Circuit, this past year--actually a year ago

18   in February, but in an unpublished opinion styled United

19   States versus Maraz Fugon, M-a-r-a-z, F-u-g-o-n, 679 Fed

20   Appendix 270, 2017 found no error when a traditional pure

21   Allen Charge was given but did cite two United States versus

22   Cornell, a Fourth Circuit published opinion 2015, cert

23   denied, saying abuse of discretion is the standard and

24   stating in determining whether an Allen Charge has an

25   impermissible coercive effect on jury deliberations we

1    consider the content of the instruction as well as the

2    context.

3        So let's look at the context first.  The jury has been

4    at it for less than ten hours.  Why should I give an Allen

5    Charge?

6            MR. DOUGLAS:  Your Honor, it would be the position

7    of the Government again that it appears that very quickly it

8    became a particular narrow issue and--regarding the state of

9    mind--

10           THE COURT:  There weren't a lot of issues in the

11   case.  I mean I think that was pretty obvious from the

12   closing arguments, correct?

13           MR. DOUGLAS:  Yes.

14           THE COURT:  Yeah.  Factually this isn't a case

15   where the jury has hundreds of exhibits and has to go

16   through and make factual decisions about these exhibits.

17           MR. DOUGLAS:  Yes, Your Honor, and to the extent

18   that it's been a narrow issue case, they've been

19   deliberating on that issue, apparently from the notes, for

20   longer so I guess what I'm trying to say is it's longer than

21   it appears because they've been focusing on a single issue.

22           THE COURT:  I mean totality the jury hasn't been

23   deliberating ten hours.  You're saying of that period of

24   time that they have been deliberating, five and a half hours

25   yesterday and approximately two and a half hours today

598

1    before we heard from them, most of that has been focused on

2    the issues identified yesterday?

3              MR. DOUGLAS:  Yes, Your Honor.

4              THE COURT:  Okay.

5              MR. DOUGLAS:  And that that would support an Allen

6    Charge.

7              THE COURT:  Because the totality of the evidence in

8    the case took how many hours to get in?

9              MR. DOUGLAS:  Right.  The evidence only took, as

10   the Court said, generously two and a half days, really less

11   than that to put on and the closing arguments narrowed it

12   also really to credibility and who--who was to be believed.

13             THE COURT:  Uh-huh (yes).  All right.  Defense?

14             MR. CARR:  Your Honor, may I have a moment?

15             THE COURT:  Yes.

16      (Pause)

17             MR. CARR:  Your Honor, for the reasons previously

18   stated, we would stand by our request for the mistrial,

19   understanding that the Court would still need to question

20   the jurors.

21             THE COURT:  All right.  My decision is as follows.

22   One:  I deny the request for a mistrial at this time.

23   Two:  I will instruct the jury with what I think we--we in

24   the legal profession would call a neutral form of the Allen

25   Charge and that is the one page charge--recommended charge

599

1    that I've given to you rather than the pure Allen Charge of

2    four pages that I've also submitted to you.

3         I think that when--my reasons for this are that in

4    assessing the coerciveness of an Allen Charge  a Court

5    should look at the time the jury deliberated after receiving

6    the case and also the nature of the communication expressing

7    that they are unable to reach a verdict so the--and also the

8    fact that yesterday evening when the jury left we had an

9    indication of an issue.  A new juror joined.  The jury

10   returned this morning and we have now received a note

11   specifically telling us that they are unable to reach a

12   verdict.

13        So the Allen Charge that I deliver to them will be

14   delivered at an interval where they will not have a night to

15   think about it again.  They're going to have to go right

16   back in and deliberate and in order--I don't believe that a

17   neutral form of the Allen Charge will have a coercive effect

18   on the jury under those circumstances but I am very

19   concerned that a pure Allen Charge would--could be viewed as

20   impermissibly coercive on--through the retrospectoscope of

21   an appellate review.  This jury seems to have its mind made

22   up and I think the neutral Allen Charge simply informs them,

23   as we want to, that--to remind them I should say, of their

24   duty to reach a unanimous decision if it is at all possible

25   and for those reasons I intend to bring the jury in, read

600

1    the neutral Allen Charge, they will not need a copy of it

2    unless counsel wishes them to have a copy of it but it would

3    be--it would not be my intent to give them a copy of the

4    Allen Charge.  I don't think that--to carry back to the jury

5    room with them.  I think if they hear it, that's all they

6    need.  Does the Government have any objection?

7              MR. DOUGLAS:  No, Your Honor, no objection.

8              THE COURT:  Does the defendant?

9              MR. CARR:  Nothing further, Your Honor.

10             THE COURT:  All right.  We need to bring the jury

11   in and we need to bring in the alternates from across the

12   hall.

13        (Jury in 1:17 p.m.)

14             THE COURT:  Good afternoon, Ladies and Gentlemen.

15   I'm sorry if I've interrupted your lunch.  I've received the

16   foreperson's note and you have advised me that you have been

17   unable to agree upon a verdict in this case.

18        After some consideration I have decided to suggest a few

19   thoughts to you.

20        As jurors, you have a duty to discuss the case with one

21   another and to deliberate in an effort to reach the

22   unanimous verdict if each of you can do so without violating

23   your individual judgment and conscience.

24        Each of you must decide the case for yourself but only

25   after you consider the evidence impartially with your fellow

1    jurors.

2        During your deliberations you should not hesitate to

3    re-examine your own views and change your opinion if you

4    become persuaded that it is wrong.  However, you should not

5    change an honest belief as to the weight or effect of the

6    evidence solely because of the opinions of your fellow

7    jurors or for the mere purpose of returning a verdict.

8        All of you are equally honest and conscientious jurors

9    who have heard the same evidence.

10       All of you share an equal desire to arrive at a verdict.

11       Each of you should ask yourself whether you should

12   question the correctness of your present position.

13       I remind you that in your deliberations you are to

14   consider the instructions I have given you as a whole.  You

15   should not single out any part of any instruction, including

16   this one that I'm in the process of giving you and ignore

17   others.  All of the instructions are equally important.

18       I would now ask that you retire to continue your

19   deliberations and thank you for your attention to this

20   additional instruction.  Please follow Court Security back

21   to your jury room.  Would the alternates please follow the

22   Court Security Office back across the hall.  Thank you.

23       (Jury out 1:20 p.m.)

24           THE COURT:  All right.  I'll let you know if I

25   receive another note from the jury and if the import of that

602

1    note is as--that the jury's position has not changed I do

2    intend to inquire with the jury along the lines that I

3    outlined.  Does the Government have any objection to that

4    intent should it become necessary to do so?

5              MR. DOUGLAS:  No, Your Honor.

6              THE COURT:  Does the defendant?

7              MR. CARR:  No, Your Honor.

8              THE COURT:  All right.  Thank you.  And in

9    connection with doing that what I would likely do at that

10   point is poll the jurors individually when I go to the

11   entire jury if the questions require me to go to the jury.

12             MR. DOUGLAS:  No objection.

13             THE COURT:  All right.

14             MR. CARR:  No objection.

15             THE COURT:  Thank you.  Court stands in recess.

16   Thank you.

17              (Recess from 1:22 p.m., until 4:30 p.m.)

18             THE COURT:  Thank you.  Please be seated.  The jury

19   has returned a note or has sent a note and I have asked the

20   Clerk to distribute it to you so I think we're in a

21   situation where I need to raise the question of how do the

22   parties wish to proceed?  I'll begin with the Government.

23             MR. DOUGLAS:  Your Honor, the Government would

24   renew it's motion for a pure Allen Charge for the reasons

25   previously stated and in addition based upon the reference

1    in the new note to some jurors having had changed their

2    views.

3           THE COURT:  Uh-huh (yes).  What's the defendant's

4    position?

5           MR. CARR:  Your Honor, we would renew our motion

6    for the Court to declare the jury hung and also order a

7    mistrial.  Counsel also would note that it is possible, if

8    not perhaps probable, that the comment about changing

9    certain views is an indication from the jury that they took

10   the Court's previous instructions seriously but they are

11   hopelessly deadlocked.

12          THE COURT:  The Court denies the Government's

13   renewed motion for a pure Allen Charge and finds that it

14   would serve no purpose since the jurors note has

15   demonstrated that they did do exactly what the goal of the

16   Allen Charge, so called Allen Charge, is and that is

17   to--they went back and carefully continued their

18   deliberations and reconsidered their views.  To give what

19   the Government calls the pure Allen Charge at this point in

20   my opinion would be purely coercive and the Court will not

21   step into that erroneous ground, therefore declines--and

22   declines to do so.

23       Now pursuant to Rule 26.3, I just want to refresh your

24   recollection that before a Court can order a mistrial, the

25   Court must give each defendant and the Government an

1    opportunity to comment on the propriety of the order, to

2    state whether that party consents or objects and to suggest

3    alternatives.

4        I've rejected the Government's alternative at this point

5    of a "pure" quote unquote Allen Charge and would also advise

6    that I do suggest for your consideration that I bring the

7    jury in and inquire of the foreperson as to whether the jury

8    is hopelessly deadlocked and then poll--if the answer is

9    yes, poll the individual jurors about whether there's

10   reasonable probability that they could reach a unanimous

11   verdict if sent back to the jury room for further

12   deliberation and if the answer to that is no, then I think

13   it's--there's likely no other reasonable alternative to

14   suggest then the declaration of a mistrial.  What's the

15   Government's position on that?

16           MR. DOUGLAS:  Your Honor, with regard to the

17   polling, the Government has no objection other than to

18   request that the Court inquire as to whether it is on all

19   counts, although it appears it is.  If the--

20           THE COURT:  Well there--it's--the question would be

21   whether they're unable to agree on a verdict as to one or

22   more counts.  I don't think we're supposed to elicit from

23   them, in violation of the rules, any specificity.

24           MR. DOUGLAS:  Yes, Your Honor.  With regard to the

25   granting of a mistrial, it would be over the objection of

1   the Government.

2          THE COURT:  All right.  To the extent that the

3   foreperson responds that this is on some counts but not all

4   counts, I will certainly further inquire as to whether there

5   are any counts on which they've reached unanimity but I

6   believe from the current note and the two that preceded it

7   that's highly unlikely.  What's the defendant's position?

8          MR. CARR:  We do not object to the jury being

9   polled, Your Honor.

10         THE COURT:  All right.  Then I think at this time

11  it's appropriate to bring in the jury the alternates.

12      (Jury in 4:40 p.m.)

13         THE COURT:  Good afternoon, Ladies and Gentlemen of

14  the jury.  I have received the foreperson's note indicating

15  that no verdict will be unanimously given.  May I inquire of

16  Madam Foreperson, is that as to each and every count of the

17  indictment?

18         FOREPERSON:  Yes, Your Honor.

19         THE COURT:  All right.  Thank you.  Now, Madam

20  Foreperson, may I ask if it's your opinion that--whether the

21  jury is unable to agree on a verdict as to any count at all?

22         FOREPERSON:  We have not agreed unanimously on any

23  verdict.

24         THE COURT:  All right.  And it is your opinion that

25  based on where the jury stands that there is no reasonable

606

1    probability that that will occur?

2         FOREPERSON:  No, ma'am, I do not.

3         THE COURT:  All right.  Thank you.  Now I want to

4    address the next question to each of the jurors and just to

5    ask you by your juror number if you--if any of you disagree

6    with the foreperson's answer.

7      Juror Number One, do you disagree with the--with the

8    foreperson's answer?

9         JUROR NUMBER ONE:  I do not.

10        THE COURT:  All right.  Juror Number Two, do you

11   disagree?

12        JUROR NUMBER TWO:  I do not.

13        THE COURT:  All right.  Juror Number Three, do you

14   disagree?

15        JUROR NUMBER THREE:  I do not.

16        THE COURT:  Juror Number Four, do you disagree?

17        JUROR NUMBER FOUR:  I do not.

18        THE COURT:  Juror Number Five, do you disagree?

19        JUROR NUMBER FIVE:  I do not.

20        THE COURT:  Juror Number Six, do you disagree?

21        JUROR NUMBER SIX:  I do not.

22        THE COURT:  Juror Number Seven?

23        JUROR NUMBER SEVEN:  I do not.

24        THE COURT:  Juror Number Eight?

25        JUROR NUMBER EIGHT:  No.

607

1        THE COURT:  Juror Number Nine, do you disagree?

2        JUROR NUMBER NINE:  I do not.

3        THE COURT:  Juror Number Ten, do you disagree?

4        JUROR NUMBER TEN:  I do not.

5        THE COURT:  Juror Number Eleven, do you disagree?

6        JUROR NUMBER ELEVEN:  I do not.

7        THE COURT:  And, Juror Number Twelve, do you

8    disagree?

9        JUROR NUMBER TWELVE:  I do not.

10        THE COURT:  All right.  Thank you.  Having taken a

11    poll to--of the jurors as to whether there's agreement with

12    the--or any disagreement with the statement of the

13    foreperson, I have a follow up question for you.  I'm not

14    asking any juror to tell me where you stand on any of the

15    counts of the indictment.  My question is, without telling

16    me where you stand, Juror Number One, do you believe that

17    there is a reasonable probability that the jury could reach

18    a unanimous verdict if you went home for the weekend and

19    came back on Monday to continue your deliberations?

20        JUROR NUMBER ONE:  I'm not sure of the question.

21        THE COURT:  It would just be a yes or a no.  I'll

22    repeat it.  Do you believe there is a reasonable probability

23    that the jury could reach a unanimous verdict on one or more

24    of the counts if you had the weekend off and came back for

25    further deliberation on Monday?

608

1                    JUROR NUMBER ONE:  I do not.

2                    THE COURT:  All right.  Juror Number Two, your

3       answer to that?

4                    JUROR NUMBER TWO:  No.

5                    THE COURT:  Juror Number Three?

6                    JUROR NUMBER THREE:  No.

7                    THE COURT:  Juror Number Four?

8                    JUROR NUMBER FOUR:  No.

9                    THE COURT:  Juror Number Five?

10                   JUROR NUMBER FIVE:  No.

11                   THE COURT:  Juror Number Six?

12                   JUROR NUMBER SIX:  No.

13                   THE COURT:  Juror Number Seven?

14                   JUROR NUMBER SEVEN:  I do not.

15                   THE COURT:  Juror Number Eight?

16                   JUROR NUMBER EIGHT:  No.

17                   THE COURT:  Juror Number Nine?

18                   JUROR NUMBER NINE:  No.

19                   THE COURT:  Juror Number Ten?

20                   JUROR NUMBER TEN:  No.

21                   THE COURT:  Juror Number Eleven?

22                   JUROR NUMBER ELEVEN: No.

23                   THE COURT:  Juror Number Twelve?

24                   JUROR NUMBER TWELVE:  No.

25                   THE COURT:  All right.  The Court finds, based on

609

1    the jurors' answers to my questions that there is no

2    alternative to the declaration of--or to a determination by

3    the Court that the jury is deadlocked and will be unable,

4    based on further--any further deliberations to deliberate to

5    a verdict that would be unanimous and therefore I declare a

6    mistrial in the case.

7         The jury's duties are completed.  On behalf of the

8    parties and the Court, let me thank you for your very hard

9    work and I excuse you as jurors.  Please return to your jury

10   room.  I would like to come back personally and thank you

11   for your service and I'll be in just in a moment.  Please

12   accompany the main jurors.  That was directed to the

13   alternates.  Thank you.

14        (Jury out 4:44)

15             THE COURT:  Does the Government wish to place

16   anything on the record at this time?

17             MR. DOUGLAS:  No, Your Honor.

18             THE COURT:  Does the defendant?

19             MR. CARR:  No, Your Honor.

20             THE COURT:  All right.  In light of my declaration

21   of a mistrial, Mr. Laurita, you should understand that the

22   Government is free to prosecute the case again, bring the

23   case for trial.  That's a decision the Government will make,

24   not anything I will do.

25        Counsel, I'm going to go back and just thank the jury

610

1   for their service.  In light of the circumstances I do not

2   intend to inquire of them any further, just to give them my

3   thanks.  Thank you very much.

4                   (Trial concluded at 4:45 p.m.)

5   ****************************************************************

6

7                           CERTIFICATE

8       I, Linda L. Bachman, Official Reporter of the United

9   States District Court for the Northern District of West

10  Virginia, do hereby certify that the foregoing is a true and

11  correct transcript of the proceedings had in the above

12  styled action on February 1 and 2, 2018, as reported by me

13  by stenomask.

14      I certify that the transcript fees and format comply

15  with those prescribed by the Court and the Judicial

16  Conference of the United States.

17      Given under my hand this 14th day of March, 2018.

18

19                          ___/s/ Linda L. Bachman___
                            Linda L. Bachman, CCR, CVR-M
20                          Official Reporter, United States
                            District Court for the Northern
21                          District of West Virginia

22

23

24

25

611

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25